# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re:

| | |
|---|---|
| NATIONAL MEDICAL IMAGING, LLC and NATIONAL MEDICAL IMAGING HOLDING COMPANY, LLC, | Case No.: 08-17351-elf<br>Case No.: 08-17348-elf<br>(Jointly Administered) |
| Alleged Debtors. | |
| NATIONAL MEDICAL IMAGING, LLC and NATIONAL MEDICAL IMAGING HOLDING COMPANY, LLC, | Adv. Case No.: 14-00250-elf<br>Adv. Case No.: 14-00251-elf<br>(Consolidated for Pre-Trial and Trial) |
| Plaintiffs, | |
| vs. | |
| U.S. BANK N.A., *et al.*, | |
| Defendants. | |

## U.S. BANK DEFENDANTS' MOTION TO APPLY COLLATERAL ESTOPPEL AND/OR LAW OF THE CASE TO CERTAIN FINDINGS IN CASE NO. 16-05044-CMR

U.S. Bank National Association (including Lyon Financial Services, Inc. by merger), DVI Receivables XIV, LLC, DVI Receivables XVI, LLC, DVI Receivables XVII, LLC, DVI Receivables XVIII, LLC, DVI Receivables XIX, LLC, DVI Funding, LLC and Jane Fox (collectively, the "U.S. Bank Defendants"), by their undersigned counsel, respectfully move for the Court to apply collateral estoppel to certain findings made by the United States District Court for the Eastern District of Pennsylvania (the "District Court") in Case No. 16-cv-05044 (the "§303(i)(2) Case") and state the following:

1. As the Court is aware, Plaintiffs National Medical Imaging, LLC and National Medical Imaging Holding Company, LLC (collectively, "NMI") prosecuted a separate action in

the District Court against the defendants herein. In that case—the §303(i)(2) Case—NMI sought to recover damages allegedly caused by the filing of the involuntary bankruptcy petitions.

2. The defendants prevailed in the §303(i)(2) Case on summary judgment. The District Court determined that NMI had not suffered any actual damages as a result of the filing of the involuntary cases and did not have evidence that could support an award of punitive damages. NMI pursued an appeal, and the Third Circuit affirmed the District Court's decision. *See Nat'l Med. Imaging, LLC v. U.S. Bank, N.A.*, No. 16-5044, 2019 WL 4076768 (E.D. Pa. Aug. 28, 2019), *aff'd*, 818 F. App'x 129 (3d Cir. 2020).

3. In rendering the summary judgment decision, the District Court made specific factual findings that, depending on the scope of the upcoming fee trial, may be relevant. The District Court made the following findings, set forth at pages 2-8 of the District Court's opinion (*id*. at *2-8), that are relevant to the "totality of the circumstances" and the reasonableness of certain fees sought.

1. Prior to the filing of the November 2008 involuntary bankruptcy petitions against it, NMI was experiencing financial difficulties that it claimed were due in part to the Deficit Reduction Act ("DRA"), which impacted the billing of medical imaging services.

2. In light of these difficulties, NMI began discussions with U.S. Bank in 2008, in an effort to restructure its outstanding debt.

3. In October 2008, Rosenberg decided to close NMI's Maryland and Illinois locations, and notified Jane Fox, who was then the Director of Operations for a subsidiary of U.S. Bank [Lyon Financial], that NMI would surrender the equipment leased from U.S. Bank located in the Pennsylvania imaging centers.

4. By November of 2009, NMI closed all of its locations and effectively became defunct.

5. NMI's financial difficulties were caused by factors independent of the involuntary bankruptcy petitions.

6. Any purported injuries caused by the involuntary petitions are purely speculative, especially in light of NMI's "dire financial straits," and as NMI was closing its centers before the involuntary petitions were even filed.

7. NMI had been suffering losses prior to the involuntary bankruptcy petitions due to the DRA, and evidence in the record sheds light on the severity of its losses.

8. In a letter NMI sent to U.S. Bank, NMI asserted that the DRA resulted in a "significant reduction" in reimbursements, reductions in the number of patients that could be seen in outpatient centers, a decline of about 16% in total scan volume from 2005 to 2007, an overall company volume decline of about 19% when comparing January 2007 to January 2008, and a "severe reduction in cash collections." These changes "brought about disastrous results" for NMI.

9. Maury Rosenberg closed all of NMI's Maryland and Illinois centers in October of 2008, "as a cost-cutting measure."

10. In the face of the obstacles posed by the DRA and before the involuntary bankruptcy petitions were filed, Rosenberg had decided to close all of the NMI centers.

11. In an April 7, 2008 letter, NMI's counsel wrote that, "[g]iven the state of the industry and the liquidity markets, NMI does not expect additional sources of funding will be available in 2008."

12. In an April 9, 2008 email, Maury Rosenberg reiterated this comment, and also noted that NMI "does not have the cash flow, or access to additional debt, needed to continue and in most likelihood [will] shortly default on its debt," and that its efforts to cut its expenses "are not sufficient for [NMI] to survive" in the face of the "draconian changes brought about by the DRA."

13. As early as April 9, 2008, Rosenberg wrote in an email that "[m]ost outpatient centers are in the process of closing their doors and it is my opinion that in the very near term will stop to exist," and NMI's efforts to cut costs "are not sufficient for [NMI] to survive" in the face of the "draconian changes brought about by the DRA." In this email, Rosenberg blamed "the nonprofit and government authorities" for this financial hardship.

14. Rosenberg also expressed his intention to close NMI in numerous pre-petition emails to U.S. Bank representatives.

15. Brier [U.S. Bank's consultant] informed Fox [a bank officer] in an October 28, 2008 email that "an involuntary bankruptcy ... now seems to be our best choice," given Maury Rosenberg's indication that the NMI centers will be closed "in a matter of months if not sooner," and that Maury Rosenberg "declined" to meet with a potential inquirer and "said it was too late, that he was closing all the centers now and that NMI had nothing to sell."

16. NMI's financial situation was dire and Maury Rosenberg repeatedly threatened to abruptly cease operations.

17. On November 3, 2008, Rosenberg, apparently referencing a prior conversation concerning the closing of all NMI centers, wrote to Bob Brier, U.S. Bank's business consultant at the time, that "as previously discussed, we are in the process of closing all of the centers [and] this process should be completed no later than 12/15/08."

18. That same day, Maury Rosenberg told a potential purchaser that NMI "expects to close all of the [Pennsylvania] centers prior to Mid-December and is in the process of negotiating real estate lease terminations and will tender the equipment back to the secured lenders."

19. A few days later, on November 6, 2008, Rosenberg urged Brier to begin picking up equipment at the Pennsylvania sites because various landlords were calling.

20. Prior to the bankruptcy filings, NMI was already in default of its line of credit loan from Sterling National Bank ("Sterling") based on NMI's failure to comply with the covenants in their Loan and Security Agreement; namely, violations of the required debt to tangible net worth ratio covenant, the tangible net worth covenant, and the EBITDA covenant. Sterling sent NMI a default letter explaining these violations on August 21, 2008.

21. In September 2008, Maury Rosenberg had a meeting with two representatives from Sterling to discuss NMI's large daily overdrafts, many of which ranged from $500,000 to $800,000, and "were the result of checks written to the [Douglas Rosenberg] Trust to cover deposits the Trust made on behalf of NMI the day before."

22. Additionally, Maury Rosenberg told Sterling that he did not have any additional collateral and that the Trust (which owned 99% of NMI) would not provide a guaranty.

23. Sterling informed Maury Rosenberg that NMI would have to "find another source of financing," Sterling was unwilling to consider his request for a higher line of credit, and Sterling "wanted the loan to come down in an orderly fashion."

24. Sterling's former Senior Vice President, Joseph Costanza, asserted that Sterling was "looking to exit its relationship with NMI," prior to October of 2008, and that Maury Rosenberg was informed of this intention at the September 2008 meeting.

25. Furthermore, the events that followed Sterling's discovery of the involuntary bankruptcy petition, including the creation and subsequent violation of the forbearance agreement, were not driven by the involuntary petitions.

26. The evidence shows that NMI breached the forbearance agreement [with Sterling] by diverting funds to a non-permitted account at another bank, and by repaying the subordinated Trust debt ahead of Sterling.

27. NMI did not lose preferred provider status, physician referrals, accounts receivable value or the ability to obtain credit as a result of the involuntary bankruptcy petitions.

28. NMI was closing due to forces and decisions independent of the involuntary bankruptcy petitions, and no evidence exists that the involuntary petitions proximately caused any damages to NMI.

4. These 28 findings will be relevant if the Court hears evidence during the fee trial concerning such matters as the merits of the involuntary petitions, the reasonableness of the

4

decision to file the petitions, and the motivation and objectives behind the filing of the petitions. These findings may also be relevant to issues concerning the reasonableness of certain fees sought by NMI.

5. The U.S. Bank Defendants should not have to relitigate these facts. They should not have to prove, once again, that NMI was in dire financial straits before the petitions were filed, that it did not have sufficient cash or sources of additional financing to continue in business, that NMI advised U.S. Bank that NMI was in the process of closing all of the centers and would complete that process by mid-December 2008, that NMI, in fact, was in the process of closing down rapidly, and that the involuntary petitions caused no damages to NMI because NMI's business was being shut down. These facts were found by the District Court on a full record.

6. NMI had every opportunity to litigate these matters and did so in the §303(i)(2) Case. A complete identity of parties exists as between this case and the §303(i)(1) Case. All of the requirements for collateral estoppel are satisfied here as explained in the accompanying memorandum of law.

7. Alternatively, the Court should apply the law of the case doctrine which applies to both issues of law and issues of fact. The §303(i)(2) action is a closely related action, even though it was not necessary for NMI to prosecute that action to develop a record for seeking §303(i)(1) fees for the dismissal work. The District Court's findings are set forth in a final order of the District Court which was affirmed on appeal. Those findings should apply here as well, and the underlying factual issues should not be relitigated here. The applicable case law concerning this doctrine is discussed in the accompanying memorandum of law.

**WHEREFORE**, it is respectfully requested that the Court grant this motion, apply collateral estoppel and/or the law of the case doctrine to the 28 findings of fact set forth above, if such facts are deemed relevant, and grant such other and further relief as may be just and proper.

Dated: November 9, 2022

/s/ *Peter H. Levitt*
Peter H. Levitt, *pro hac vice*
Jack C. McElroy, *pro hac vice*
John W. Bustard, *pro hac vice*
Shutts & Bowen LLP
200 South Biscayne Boulevard, Suite 4100
Miami, FL 33131
Telephone: (305) 415-9447
Email: plevitt@shutts.com
Email: jmcelroy@shutts.com

-and-

/s/ *Steven J. Adams*
Steven J. Adams
Stevens & Lee, P.C.
PA I.D. No. 56293
111 North Sixth St., P.O. Box 679
Reading, Pennsylvania 19603
Telephone: (610) 478-2133
Email: sja@stevenslee.com

**Attorneys for the U.S. Bank Defendants**

MIADOCS 25285421 1