## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

**In re:**     :   **Chapter 11**

     :

**NATIONAL MEDICAL IMAGING, LLC**    :   **Bky. No. 08-17351 (ELF)**

     :

     :

**NATIONAL MEDICAL IMAGING**     :   **Bky. No. 08- 17348 (ELF)**

**HOLDING COMPANY, LLC,**     :

_____

**NATIONAL MEDICAL IMAGING, LLC**    :

     :

**NATIONAL MEDICAL IMAGING**     :

**HOLDING COMPANY, LLC,**     :

          **Plaintiffs,**    :   **Adv. No. 14-250**

     :   **Adv. No. 14-251**

    **v.**     :

     :

**U.S. BANK, NATIONAL ASSOCIATION, et al.**   :

         **Defendants.**    :

# O R D E R

**AND NOW,** upon consideration of:

(1) the U.S. Bank Defendants' Motion to Apply Collateral Estoppel or Law of the Case ("the Collateral Estoppel Motion") (Doc. # 191);[1]

(2) the U.S. Bank Related Defendants' Motion To Limit Scope Of Fee Trial and Exclude Certain Testimony And Evidence ("the Motion to Limit") (Doc. # 192);

(3) NMI's Motion in Limine to Exclude Expert Testimony of Hon. Robert E. Gerber ("the Gerber Motion") (Doc. # 197);[2]

(4) the responses to the Collateral Estoppel Motion filed by NMI and the responses to the Motion to Limit filed by NMI and Defendant Ashland Funding, LLC ("Ashland");

**AND**, after a hearing held on **November 24, 2022**;

It is hereby **ORDERED** that:

1. The **Gerber Motion** is **DENIED** as moot.[3]

2. The **Collateral Estoppel Motion** is **DENIED**, except that a decision regarding proposed fact no. 15 stated in the Motion is reserved for trial.[4]

3. Notwithstanding Paragraph 2 above, certain facts have been determined through a prior fact stipulation of the parties.  For purposes of trial, the facts stated in the Joint Statement of Undisputed Facts to Putative Debtor's Motion to Dismiss Involuntary Cases  --  (attached as Ex. A to the Joint Pre-Trial Statement of Putative Debtors and Petitioning Creditors, filed 6/26/2009) (Bky. No. 08-17351, Doc. No. 83) and filed again as an Exhibit to the Motion for Sanctions filed 1/4/2010. (Bky. No. 08-17351, Doc. No. 188-2))  --  shall be treated as indisputable facts.  At trial, the parties may not introduce any evidence that is duplicative or cumulative of those established facts.[5]

4. A ruling on the **Motion to Limit** is **DEFERRED** pending a further resolution of the timeliness of NMI's claims under Fed. R. Bankr. P. 9011 claim, which will be determined at trial as follows:

   a. Trial of this adversary proceeding will be bifurcated.

   b. Trial evidence will begin with a determination whether NMI's Rule 9011 claims are barred by the <u>Pensiero</u> supervisory rule.

   c. The initial phase of the trial will be guided by the court's prior decision reported at <u>In re Nat'l Med. Imaging, LLC</u>, 570 B.R. 147, 167–68 & n.5 (Bankr. E.D. Pa. 2017).[6]

   d.  At the conclusion of this first phase, the court will rule on the timeliness of the Rule 9011 claims which, in turn, may affect the scope and relevancy of the additional evidence that NMI has proffered in its pretrial disclosures.

5.  After the conclusion of phase 1 of the trial and prior to the commencement of phase 2 of the trial, the court will reconsider the legal issue whether Defendant Fox may be held liable under 11 U.S.C. §303(i)(1) under the "participation theory" discussed in the court's prior opinion at 570 B.R. at 158–59.[7]

6.  Following reconsideration of the issue stated in Paragraph 5 above, phase 2 of the trial will be held to consider NMI's §303(i)(1) claims and the Rule 9011 claims (if they survive phase 1).

**Date:  November 28, 2022**

**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**

# E N D   N O T E S

1. The term "U.S. Bank Defendants" refers to: Defendants DVI Funding, LLC, DVI Receivables XIV, LLC, DVI Receivables XIX, LLC, DVI Receivables XVI, LLC, DVI Receivables XVII, LLC, DVI Receivables XVIII, LLC, Jane Fox, Lyon Financial Services, Inc. d/b/a U.S. Bank Portfolio Services, U.S. Bank, N.A.

2. The term "NMI" refers to: Plaintiffs National Medical Imaging Holding Company, LLC, National Medical Imaging, LLC.

3. At the November 28, 2022 hearing, the U.S. Bank Defendants advised the court that it will not call Mr. Gerber as a witness.

4. There is a rebuttable presumption in favor of awarding costs and reasonable attorney's fees under 11 U.S.C. §303(i)(1) if the involuntary petition has been dismissed and the putative debtor has not waived its §303(i)(1) claim.  See, e.g., In re Nat'l Med. Imaging, LLC, 644 B.R. 94, 110 (Bankr. E.D. Pa. 2022).  The petitioning creditor has the burden to rebut the presumption. Express Car & Truck Rental, 440 B.R. 422, 432 (Bankr. E.D. Pa. 2010). The creditor can avoid liability for costs and attorney's fees by demonstrating that "the totality of the circumstances" warrants a denial of a putative debtor's requested relief under §303(i)(1).

In its pleadings, U.S. Bank appears to have raised the totality of the circumstances defense under §303(i)(1).  (See U.S. Bank Amended Answer to Amended Complaint, fourth affirmative defense) (based on "unclean hands") (Doc. # 136).  However, in the Motion to Limit, U.S. Bank stated that it will not introduce any evidence in support of the "totality of the

circumstances" defense.  U.S. Bank confirmed this at the November 28, 2022 hearing. At the

hearing, Defendant Ashland also stated that it would not be offering such evidence.

After reviewing the twenty-eight (28) statements of fact that U.S. Bank extracted from the

narrative in the district court's opinion,  National Medical Imaging, LLC v. U.S. Bank, N.A.,

2019 WL 4076768 (E.D. Pa. Aug. 28, 2019), I find that, with the possible exception of

proposed fact no. 15, all of the proposed preclusive facts are irrelevant to a determination of

NMI's entitlement to attorney's fees and costs under §303(i).  Proposed fact no. 15 differs in

that it may be relevant in connection with NMI's theory of liability against Defendant Fox.  See

n.5, infra.  I will reserve a decision on that question until an appropriate time during or at the

end of the trial, assuming that Defendant Fox remains as a defendant in this proceeding after

consideration of the issues described in Paragraphs 4.b and 5 of this order.

5.  For ease of reference, the Fact Stipulation referenced in the text is attached as an Appendix to

this Order.

As guidance to the parties, I make one other observation. Certain evidence regarding the

prepetition relationship of the parties will be relevant insofar as NMI's theory of liability

depends upon what has been described as the *de facto* petitioner theory and the participation

theory as discussed in the court's 2017 decision, authored by Judge Fehling, denying the

Defendants' Motion to Dismiss the Amended Complaint.  See In re Nat'l Med. Imaging, LLC,

570 B.R. 147, 158–59 (Bankr. E.D. Pa. 2017).

As a note of caution, however; at present, it appears to me that the relevant evidence mostly,

and perhaps entirely, will concern the relationship among the parties on the creditor side of the

case, not the events occurring between NMI and its creditor.  Perhaps one (1) exception to this

statement is that there may be some relevant evidence regarding Defendant Fox's interactions

with NMI, if NMI's claims against her under Rule 9011 or 11 U.S.C. §303(i)(1) survive phase

1 the trial (see Paragraph 4 of this Order) and the court's reconsideration of the Motion to

Dismiss NMI's §303(i)(1) claim against Defendant Fox (as described in Paragraph 5 of this

Order).

6.   In that 2017 decision denying the Defendants' Motion to Dismiss NMI's Rule 9011 claim, the

court held that the Pensiero supervisory rule is not inflexible and that the court needed a record

in order to determine whether the Rule 9011 claim was asserted in a manner "sufficiently

prompt as to warrant the relaxation of the supervisory rule."  Nat'l Med. Imaging, 570 B.R. at

167 (Bankr. E.D. Pa. 2017) (quoting In re Theokary, 2012 WL 3717967, at 2, n. 4 (Bankr. E.D.

Pa. Aug. 22, 2012)).  In n.5, the court further explained:

> Whether it was practicable for NMI to have filed their Rule 9011 sanctions request
> at an earlier time is difficult to say on the record now before me. Many factors could
> influence my decision, some of which follow: (1) Whether NMI was required to
> devote substantial time and funds towards their efforts to have the improperly filed
> involuntary petitions dismissed, and if so, how this detracted from their ability to
> devote time and funds to filing and prosecuting Rule 9011 motions; (2) whether the
> fact that NMI filed motions for sanctions on January 4, 2010 placed Defendants on
> sufficient notice that NMI would be seeking attorneys' fees and costs against them
> under Rule 9011; (3) why NMI did not include a request for Rule 9011 sanctions in
> the sanctions motions it filed on January 4, 2010; (4) why NMI did not seek relief
> from my stay Orders, which were in effect from January 14, 2010 until May 2,
> 2014, to prosecute Rule 9011 motions; and (5) whether, given the circumstances of
> the case (which must be developed on the record), the amount of time that passed
> between my vacating of my stay Orders on May 2, 2014, and NMI's filing of this
> adversary complaint on May 27, 2014, was sufficiently prompt to warrant a finding
> that the Pensiero rule was not violated.

Id. at 168 n.5.

I consider the court's 2017 ruling on this issue to be law of the case.

7. I recognize that the court's prior ruling regarding the participation theory (like the ruling on the Pensiero issue) is law of the case.  However, I find it appropriate to treat the two (2) issues differently.

The law of the case doctrine provides that courts will not re-decide issues that were previously decided in the litigation, thereby promoting finality and judicial economy. However, it is a prudential doctrine and not one that limits a court's power. Courts have an inherent power to reconsider prior orders. E.g., In re Energy Future Holdings Corp., 904 F.3d 298, 310–11 (3d Cir. 2018); Lesende v. Borrero, 752 F.3d 324, 338–39 (3d Cir. 2014).  Further, even when the doctrine applies, there are circumstances that may warrant a departure from the doctrine. See International Poultry Processors, Inc. v. Wampfler Foods, Inc., 1999 WL 213369, at *1–2 (E.D. Pa. April 8, 1999), aff'd, 215 F.3d 1314 (3d Cir. 2000).

Generally speaking, the participation theory provides that an individual who participates in the tortious activity of an artificial entity (a corporation, limited liability company, etc.) may be held liable for the tortious acts of the entity.  See e.g., Markert v. Becker Technical Staffing, Inc., 2010 WL 1856057, at *8 (E.D. Pa. May 7, 2010); In re Balko, 382 B.R. 717, 725 (Bankr. W.D. Pa. 2008); Wicks v. Milzoco Builders, Inc., 503 Pa. 614, 621, 470 A.2d 86 (Pa.1983).

While I recognize the logic of Judge Fehling's reasoning regarding application of the participation theory, I question its premises, i.e., (1) that Pennsylvania law applies and (2) even

7

more importantly, that a claim under 11 U.S.C. §303(i)(1) is a remedy for a "tort." that permits

the imposition of liability on the individual responsible for an entity's tor decisions that led to

the dismissal of the involuntary bankruptcy case.  For now, I focus on the second premise.

To the extent that liability under 11 U.S.C. §303(i) derives from tortious conduct, the structure

of the provision suggests that the tort concept is located solely in §303(i)(2), not §303(i)(1).

Section 303(i)(2) requires wrongful conduct before liability may be imposed. Section

§303(i)(1) has no requirement that the petitioning creditor act wrongfully; it requires only that

they lose the litigation over the merits of the involuntary petition.  Thus, §303(i)(1) is a fee-

shifting provision that comes into play by virtue of success when a putative debtor succeeds in

obtaining dismissal of the involuntary case (subject only to an affirmative defense that defeats

the right to attorney's fees and costs in the totality of circumstance which might typically

involve some type of putative debtor misconduct or some other serious, extenuating

circumstances which would lead the court to relieve the petitioning creditors of their

presumptive liability).  When viewed as straightforward fee shifting provision triggered merely

by a successful outcome in the involuntary (especially in comparison to §303(i)(2)), I do not

perceive §303(i)(1) liability as a tort that triggers the participation theory.

My present thinking is that the prior ruling by the court on the issue was clearly erroneous and

that it would be a manifest injustice to subject Defendant Fox to a trial on the issue, especially

if I were to apply law of the case all the way through trial and the entry of judgment.  See

Int'l Poultry Processors, 1999 WL 213369, at *2 (E.D. Pa. Apr. 8, 1999) (stating standards for

departing from the law of the case doctrine) (citing Public Interest Research Group of N.J., Inc.

v. Magnesium Elektron, Inc., 123 F.3d 111, 117 (3d Cir.1997)).  However, before taking

further action, I will give the parties the opportunity to present argument on the issue.

**EXHIBIT A
TO JOINT PRE-TRIAL STATEMENT OF
PUTATIVE DEBTORS AND PETITIONING CREDITORS[1]**

**JOINT STATEMENT OF UNDISPUTED FACTS TO
PUTATIVE DEBTORS' MOTIONS TO DISMISS INVOLUNTARY CASES**

A.    **Procedural Background**

1.    On November 7, 2008 ("Petition Date"), DVI Receivables, XIV, LLC ("DVI XIV"), DVI Receivables XVI, LLC ("DVI XVI"), DVI Receivables XVII, LLC ("DVI XVII"), DVI Receivables XVIII, LLC ("DVI XVIII"), DVI Receivables XIX, LLC ("DVI XIX"), and DVI Funding, LLC ("DVI Funding")[2] (collectively, the "Original Petitioning Creditors") filed involuntary Chapter 7 bankruptcy petitions (individually, the "Original Involuntary Petition" and collectively the "Original Involuntary Petitions") against National Medical Imaging, LLC ("NMI") and National Medical Imaging Holding Co., LLC ("NMI Holding") [Exs. 84-85] (at times, NMI and NMI Holding are also collectively referred to as the "Putative Debtors") in the United States Bankruptcy Court for the Eastern District of Pennsylvania, Cases No. 08-17351 (JKF) and 08-17348 (JKF) (the "Involuntary Cases").

2.    On the Petition Date, the Original Petitioning Creditors also filed an involuntary Chapter 7 bankruptcy petition (the "Rosenberg Petition") against Maury Rosenberg ("Rosenberg" or at times, the "Alleged Debtor"), who is a co-guarantor with the Putative Debtors under that certain Settlement Agreement, dated August 12, 2005, between Rosenberg, NMI,

---

[1]    In addition to this Joint Statement, the Putative Debtors and the Petitioning Creditors each have submitted their own Statements of Facts which include facts in addition to those stated herein as to which the parties have not agreed.    The terms of the documents admitted into evidence shall control to the extent any statements contained herein do not accurately describe, restate, paraphrase or quote the documents that are the subject of the statements.

[2]    DVI Funding was one of the six Original Petitioning Creditors in these cases.    Ashland Funding, LLC ("Ashland Funding"), however, joined in the second amended involuntary petitions as a party petitioner and DVI Funding did not sign the second amended involuntary petitions.    See [Exs. 84 and 85].

NMI Holding, the NMI LPs (*defined below*) and Lyon Financial Services, Inc. d/b/a U.S. Bank

Portfolio Services ("Lyon")[3] as successor servicer and as agent for U.S. Bank, N.A. as trustee

("U.S. Bank" or the "Trustee") (hereinafter, the " Settlement Agreement") [Exs. 26 and 75].

3. On November 10, 2008, the Original Petitioning Creditors amended the Original

Involuntary Petitions ("First Amended Involuntary Petitions") and the Rosenberg Petition. [Exs.

7,9 and 11]. According to the Original Petitioning Creditors, the First Amended Involuntary

Petitions were required by the Clerk of the Court to include information indicating that each of

the Involuntary Cases and the Rosenberg Petition are related. [Rosenberg D. 77, ¶ 2].[4]

4. On December 3, 2008, Rosenberg filed his own motion to dismiss and or,

alternatively, to transfer venue pursuant to Bankruptcy Rule 1014(a)(2) and Federal Rule 12(b)(3)

("Motion to Transfer Venue"). [Rosenberg D. 2]. Subsequently, the Motion to Transfer Venue

was granted by agreement of the parties. By Order dated January 30, 2009, the Rosenberg

involuntary case was transferred to the Southern District of Florida (the "Florida Bankruptcy

Court"). [Ex. 64]. The issues raised in the Rosenberg motion to dismiss and the response filed

in opposition by the Original Petitioning Creditors were briefed with memoranda in support of

the respective positions. [Rosenberg D. 2, 22 and 28]. Accordingly, on March 2, 2009, the Florida

Bankruptcy Court entered its Order Setting Hearing, [Rosenberg D. 6 ], specially setting a

hearing on the Rosenberg motion to dismiss. The Florida Bankruptcy Court' s Order also

---

[3] The use of the term "Lyon" in this document, without any description of Lyon's role or capacity, shall be interpreted to mean that Lyon was acting as a servicer for theOriginal Petitioning Creditors and/or Ashland Funding ( as may be applicable) and as agent for U.S. Bank, N.A., as Trustee. The parties refer the Court to the documents themselves for a description of Lyon's status and capacity in respect of particular actions.

[4] The record will be referred to herein by the Court's docket number either as " **Rosenberg D.** ___ ". " **NMI D.** ___ " or "**NMI Holding D.** ___" **[page number(s) and/or ¶ number(s)].**" The Putative Debtors' Trial Exhibits will be referred to as **[Ex .- (exhibit number)]**. Deposition Transcripts will be denoted as **[(date of transcript) (first name initial, last name of witness), (page numbers)]**.

Pursuant to Rule 201(d) of the Federal Rules of Evidence, the Court takes judicial notice of all papers filed in this proceeding. Further, the Court takes judicial notice of any other matters of public record admitted into evidence.

provided that "[t]o the extent the [M]otion to [D]ismiss answers the [I]nvoluntary [P]etition, the Court will, at that time, conduct an evidentiary hearing on the answer to the petition." [Id.].

5.      On December 4, 2008, NMI and NMI Holding filed motions to dismiss the Original Involuntary Petitions pursuant to Rule 1011(b) of the Federal Rules of Bankruptcy Procedure and Rule 12 of the Federal Rules of Civil Procedure (the "Motions to Dismiss"). [NMI D. 10; NMI Holding D. 10].

6.      The parties filed memoranda of law in support of their respective positions concerning the issues raised in the Motions to Dismiss and the responses filed in opposition thereto by the Original Petitioning Creditors.     [NMI D. 10, 16, 17, 23 and 25; NMI Holding D. 10, 14-15, 21 and 25].

7.      The trial on the Rosenberg motion to dismiss was held on April 20, 2009, at which time the parties agreed to the authenticity and admissibility of all of the documents to be submitted into evidence.   The parties also agreed to forego live testimony and to use deposition transcripts already designated.  The Florida Bankruptcy Court has not yet issued its ruling on the Section 303(b) issues.

8.      On May 13, 2009, the Putative Debtors moved to strike the second amended involuntary petitions on the grounds that the Original Petitioning Creditors did not seek leave of Court to file the second amended involuntary petitions, and did not seek authority to substitute DVI Funding as a party petitioner as required by Rules 7015 and 7025 of the Federal Rules of Bankruptcy Procedure as made applicable to this proceedings by virtue of Rule 1018 of the Federal Rules of Bankruptcy Procedure (the "Motions to Strike").  [NMI D. 70; NMI Holding D. 69].

9.      On May 13, 2009, the Original Petitioning Creditors, excluding DVI Funding, and Ashland Funding moved the Court for authority to file the third amended involuntary petitions (the "Third Amended Involuntary Petitions"). [NMI D. 68; NMI Holding D. 69]. According to these Original Petitioning Creditors and Ashland Funding, the third amendment is required in order to correct an error in the calculation of the amounts allegedly due and owing by NMI and NMI Holding to the Original Petitioning Creditors (excluding DVI Funding) and Ashland Funding. [Id., ¶ 6; 04/28/09 R. Brier Dep., p. 94; 04/22/09 J. Fox Dep., pp. 65-66].

10.     The Putative Debtors objected to the Petitioning Creditor's Motion for Leave to file the Third Amended Involuntary Petitions.

11.     The Putative Debtors and the Petitioning Creditors have requested and the Court has agreed to address the issues on the Motions to Strike and the Motions for Leave to File the Third Amended Involuntary Petitions and the Objections thereto with the issues raised on the Motions to Dismiss and not to conduct separate hearings.

**B.      Factual Background**

    (i)     **The Master Leases, the Securitization Transactions and the DVI Financial Bankruptcy.**

12.     DVI Financial Services, Inc. ("DVI Financial") was a finance company that provided loans and lease financing to health care providers.

13.     Starting in November, 2000, certain limited partnerships ("NMI LPs") entered into various master leases and equipment schedules (the "Master Leases") with DVI Financial Services, Inc. ("DVI Financial") for the purpose of financing the acquisition of medical imaging and PET scan machines used at diagnostic imaging centers operated by the NMI LPs. [Ex. 26 and 75, ¶ B; Ex. 104, ¶ 5]. As security for the payment of the obligations of the NMI LPs under the Master Leases, Rosenberg was required to execute and deliver individual limited guaranties

to DVI Financial. [Exs. 26 and 75, schedule 5]. NMI and NMI Holding were also required to execute and deliver a guaranty to DVI Financial. [Id.] The Master Leases were part of complex securitization transactions. [ Exs. 69-75].

14. NMI is a service company that performs management, billing and collection services for diagnostic imaging centers.

15.    NMI is the limited partner of each of the NMI LPs.  NMI Holding is a general partner of each NMI LP.  Maury Rosenberg is the Managing Member of NMI.  Rosenberg owns 1% of NMI.  The remaining 99% is owned by the Rosenberg family trust.  [Ex. 51 at ¶¶ 2-5; 04/07/09 Rosenberg Dep., pp. 4-6 & 35; 10/02/08 Rosenberg Dep., pp. 5-6].

16.    At various times from 2000 to 2003 and pursuant to the terms of certain Contribution and Servicing Agreements, DVI Financial transferred and assigned the Master Leases and related assets to certain corporations known as DVI Receivables Corp. XIV, DVI Receivables Corp. XVI, DVI Receivables Corp. XVII, DVI Receivables Corp. XVIII, DVI Receivables Corp. XIX, and DVI Funding Corporation (collectively, the "Transferees").  In connection therewith, DVI Financial agreed to service the Master Leases for such parties. [Id.]

17.    Simultaneously therewith, and as part of the securitization transactions, each of the Transferees further transferred the Master Leases and related assets to the respective Original Petitioning Creditor with a similar name (*e.g., DVI Receivables Corp. XVI simultaneously transferred the Master Leases and related assets it received from DVI Financial to DVI Receivables XVI, LLC, which is one of the Original Petitioning Creditors*).  Such transfers were consummated pursuant, inter alia, the terms of certain Subsequent Contract Transfer Agreements and Contribution and Servicing Agreements.  [Exs. 69–74].

18.    With the exception of DVI Funding,[5] each of the Original Petitioning Creditors, simultaneously with the execution and deliver of the Subsequent Contract Transfer Agreements and Contribution and Servicing Agreements referred to above, completed the securitization transactions by entering into, inter alia, certain Indentures with the Trustee, pursuant to which the Original Petitioning Creditors (*other than DVI Funding*) issued notes to certain noteholders, represented by the Trustee. [Exs. 69-74].

19.    The documents governing Lyon's rights and duties as the successor servicer are the Contribution and Servicing Agreements that were entered into by DVI Financial at the time of the original securitizations, as amended by the settlement agreement approved by the DVI Bankruptcy Court (*as hereinafter defined*), and the February 3, 2004 Order of the DVI Bankruptcy Court. These Contribution and Servicing Agreements were amended and then assigned to Lyon pursuant to the February 3, 2004 Order of the DVI Bankruptcy Court. See [Ex. 69 (PC000683-PC000757; Ex. 70 (PC000958-PC001032); Ex. 71 (PC001240-PC001315); Ex. 72 (PC000376-PC000444); Ex. 73 (PC000003-PC000113); Ex. 74 (PC001543-PC001620)].

20.    The equity interests in the Original Petitioning Creditors are property of the Liquidating Trust of DVI Financial, which was formed pursuant to a confirmed Chapter 11 plan in the DVI bankruptcy proceeding. Dennis Buckley serves as the Liquidating Trustee. [J. Fox Aff. (Rosenberg D. 65) at ¶¶ 6-11].

21.    Lyon opened a bank account in the name of each Original Petitioning Creditor into which it deposits the payments it collects under the Master Leases. [04/22/09 J. Fox Dep., pp. 32-37]. Jane Fox ("Ms. Fox") and certain other employees of Lyon are the only persons with signatory authority over each bank account. [04/22/09 J. Fox Dep., pp. 37-38]. All funds in

---

[5]    DVI Funding entered into a separate Loan and Security Agreement with the Trustee and did not securitize its Master Leases.

these accounts are held until the end of the month when Lyon, after deducting servicing fees, causes the funds to be transferred to the Trustee. [04/22/09 J. Fox Dep., pp. 38-39].

22.     On August 25, 2003, DVI Financial, together with certain affiliates filed voluntary Chapter 11 petitions under the Bankruptcy Code in the District of Delaware (the "DVI Bankruptcy Court"). See [In re DVI Financial Services, Inc., United States Bankruptcy Court for the District of Delaware, Bankruptcy No. 03-12657, at Docket Entry Nos. 1 and 2]. Pursuant to an Order, dated February 3, 2004, the DVI Bankruptcy Court approved, among other relief, the amendment and the assumption and assignment of the Contribution and Servicing Agreements relating to the Master Leases from DVI Financial to Lyon. See [Ex. 23, at ¶ 5; Ex. 22]. After the entry of the February 3, 2004 Order by the DVI Bankruptcy Court, Lyon took over the servicing obligations from DVI Financial as the successor servicer in respect of the Master Leases. [Id.]

23.     In connection with its servicing of the Master Leases, Lyon provides periodic servicing reports to the Trustee on the amounts collected in connection with the Master Leases. [10/01/08 J. Fox Dep., p. 46]. See also, [04/22/09 J. Fox Dep., pp. 39-41, 93 and 95].

24.     Lyon is indirectly affiliated with the Trustee through its parent company, U.S. Bank Corp. Equipment Finance, which is wholly owned by U.S. Bank, N.A. [04/02/08 J. Fox Dep., pp. 28-29].

(ii)   **Events Leading to Settlement Agreement and Single Guaranty from the Putative Debtors.**

25.     On November 5, 2003, DVI Financial filed a complaint against NMI, NMI Holding, and Rosenberg in the DVI Bankruptcy Court alleging, inter alia, that these parties had defaulted under the Master Leases. See [DVI Financial Services, Inc. v. National Medical Imaging, LLC et al., United States Bankruptcy Court for the District of Delaware, Adversary Proceeding No. 03-57568, at Docket Entry No. 1]. NMI responded by filing a Motion to

Dismiss the Complaint on or about December 3, 2003. [Id., at Docket Entry No. 4]. Thereafter, in an Opinion reported In re DVI, Inc., 305 B.R. 414 (Bankr. D. Del. 2004), the DVI Bankruptcy Court dismissed the complaint.

26.     Starting on December 19, 2003, U.S. Bank Portfolio Services, a division of Lyon Financial Services, Inc., as servicer for U.S. Bank, N.A., as Trustee, as plaintiff, filed thirteen (13) separate lawsuits against each of the NMI LPs, and NMI, NMI Holding and Rosenberg, as guarantors, in the Court of Common Pleas of Bucks County, Pennsylvania (the "Original Bucks County Actions") for recovery of amounts allegedly due under the Master Leases. [Ex. 75, Sch. 6; Ex. 24].

27. On March 3, 2005, three of the Original Petitioning Creditors, namely DVI XIX, DVI XVIII, and DVI XVII, filed an involuntary petition under Chapter 11 of the Bankruptcy Code against both NMI and NMI Holding in the United States Bankruptcy Court for the Eastern District of Pennsylvania, Case Nos. 05-12714-DWS and 05-12719-DWS. [Exs. 12 and 13 ]. Two other entities, General Electric Capital Corporation and Universal Shielding Corporation, also joined as petitioning creditors in the two involuntary cases. [Id.]

28.     On August 12, 2005 Rosenberg, NMI, NMI Holding and the NMI LPs entered into the Settlement Agreement with Lyon for the purpose of restructuring the obligations under the Master Leases. [Exs. 26 and 75].

29.     The parties to the Settlement Agreement are listed in the first paragraph thereof and on the signature page. [Ex. 26, pp. 1a, 22a-24a]. The parties are NMI, NMI Holding, National Medical Imaging of Broad Street, L.P. ("Broad Street"), the NMI LPs, Rosenberg, and Lyon, in its capacity as the successor servicer for the ●riginal Petitioning Creditors and as agent to the Trustee. [Id., p. 1a].

30.    Lyon signed the Settlement Agreement as successor servicer for the Original Petitioning Creditors and as agent for the Trustee. [Id., p. 22a]. Ms. Fox signed the Settlement Agreement on behalf of Lyon as its "Director of Operations." [Id.]

31.    Lyon had the authority to determine the final terms of the Settlement Agreement, and did not need additional authorization from anyone else (including the Original Petitioning Creditors). [10/01/08 J. Fox Dep., p. 64-65, 68].

32.    The Settlement Agreement provides that the total amount due and owing by the NMI LPs to Lyon, as successor servicer for the special purpose entities, and as agent for U.S. Bank, N.A., as Trustee, in August 2005, was $23,881,557.88.  [Ex. 26].  This amount was divided into two parts: $15,124,920, which was defined as the "Amortized Obligations" and $8,756,637.88, which was defined as the "Unsecured Obligations." [Id., at pp. 1a and 3a, § 2(i)].

33.    The Settlement Agreement provides and requires that each of Rosenberg, NMI, NMI Holding and Broad Street execute and deliver a guaranty agreement. [Id., § 2(a)(iv)].

**(iv)    NMI and NMI Holding Guaranty**

34.    In connection with the Settlement Agreement, NMI and NMI Holding executed an unconditional continuing guaranty (the "Continuing Guaranty") in the amount of $15,124,920 (the "Guaranteed Amount") for the Master Leases, as modified by the Settlement Agreement, which amount was to be reduced as provided in the Continuing Guaranty and the Settlement Agreement. [Ex. 29].

35.    The Continuing Guaranty specifically provides that, in part, NMI and NMI Holding "unconditionally, absolutely and irrevocably guarantee[d] the full and prompt payment when due, whether by acceleration or otherwise, of the sums identified as the  'Guaranteed

Amount' for each Modified Lease on the attached Schedule "A" due by the respective Lessee..."
[Id. ¶ 2].

36.  In addition, the Continuing Guaranty specifically provides, in part, that "[i]f a monetary Event of Default shall occur under any one or more of the Modified Leases, or a non-monetary Event of Default of any other material provision of the Modified Leases, in the Agent's sole but reasonable discretion, or a breach by Guarantors of any of the terms hereof, the Guarantors shall, upon the demand by the Agent, pay the Obligations..." [Id.]. Further, the Continuing Guaranty defines Agent as "Lyon Financial Services, Inc. d/b/a U.S. Bank Portfolio Services as successor servicer for the Lessors and as agent for the Trustee." [Id., ¶ 1].

37.  Pursuant to the terms of the Settlement Agreement, Lyon executed a Release in favor of NMI and NMI Holding, among others, which released them of all claims except for obligations arising under the Settlement Agreement. See [Ex. 76].

38.  The Continuing Guaranty also requires both NMI and NMI Holding to execute one confession of judgment in favor of Lyon* (the "Confession of Judgment"), [Ex. 29, ¶ 16], which document NMI and NMI Holding executed. [Exs. 42 and 43].

## AMENDMENTS TO MASTER LEASES

39.  In connection with the Settlement Agreement, the NMI LPs executed twenty-five (25) amendments to their Master Leases and NMI executed five (5) amendments to their Master Leases for a total of thirty amendments to the Master Leases (the "Modified Leases"). [Ex. 122].

(v)  **Notice of Default**

40.  On March 21, 2008, Lyon notified NMI and Rosenberg that an event of default had occurred by reason of the NMI LPs' failure to make monthly payments as required under the terms of the Settlement Agreement. [Ex. 45]. In such letter, counsel to Lyon asserted, inter alia,

that "[Lyon] is entitled to all of the rights and remedies" provided in the Settlement Agreement, "including, without limitation, the right to accelerate the unpaid balance due under the Leases and enforce the Guaranties and Confessions of Judgment as provided therein." [Id.] Counsel to Lyon further stated in the March 21, 2008 letter that Lyon would review a proposal to restructure the payments under the Settlement Agreement. [Id.] However, counsel for Lyon nevertheless made it clear that "[n]o consideration of any proposal shall constitute a forbearance by [Lyon] from enforcing its rights and remedies under the Settlement Agreement." [Id.]

(vi)    **The Second Bucks County Action**

41.    On July 31, 2008, Lyon, as agent for the Trustee, filed a single complaint in confession of judgment against NMI, NMI Holding, Rosenberg and the other defendants in the Court of Common Pleas of Bucks County, Pennsylvania (the "Second Bucks County Action"). [Ex. 49]. The plaintiff in the Second Bucks County Action was Lyon as agent for the Trustee.

42.    In the Second Bucks County Action, a judgment was entered in favor of Lyon, as agent for the Trustee, and against NMI and NMI Holding, as guarantors, in the sum of $13,025,234.17 [Ex. 48, p. 9].

43.    On August 22, 2008, NMI, NMI Holding, Rosenberg and the other defendants in the Second Bucks County Action jointly filed a Petition to Strike or Open Confessed Judgments and Request for Stay of Execution (the "Bucks County Petition").

44.    By order dated August 28, 2008 in the Second Bucks County Action, the execution on the confessed judgment against NMI, HMI Holding, Rosenberg and the other defendants was stayed pending disposition of the Bucks County Petition. [Ex. 50].

45.    On September 11, 2008, Lyon, as agent for the Trustee, filed a response in opposition to the Bucks County Petition denying the allegations set forth therein. [Ex. 52]. Lyon

admitted in such response that the amount of the confessed judgment obtained against NMI, NMI Holding and Rosenberg was overstated by $58,351.40. [Id., ¶¶ 59, 63, and 65-66].

### (vii)    The Involuntary Petitions Filed against NMI and NMI Holding.

46.    A review of the signature blocks on the Original Involuntary Petitions evidence that Ms. Fox signed the Original Involuntary Petitions on behalf of each Original Petitioning Creditors. [Id.; 04/22/09 J. Fox Dep., p. 32; Exs. 8 and 10; NMI D. 1; NMI Holding D. 1].

47.    Ms. Fox is not an officer, director or employee of any of the Original Petitioning Creditors. [04/02/09 J. Fox Dep., p. 33; 04/22/09 J. Fox Dep., p. 34]. Ms. Fox is the Director of Operations for Lyon. [Ex. 104, ¶ 1].

48.    As of the Petition Date, the corporate good standing of each Original Petitioning Creditor (*except for DVI XIX*) had lapsed and such Original Petitioning Creditors had been administratively dissolved. [Ex. 47]. They were subsequently reinstated in 2009 and are now in good standing.

49.    None of the Original Petitioning Creditors maintains an office or employees. [10/01/08 J. Fox Dep., pp. 36-37; 04/02/09 J. Fox Dep., pp. 35-36; 04/22/09 J. Fox Dep., pp 34-36].

50.    There was no meeting of the directors or officers of the Original Petitioning Creditors to authorize Ms. Fox to sign the Original Involuntary Petitions. [04/02/09 J. Fox Dep., pp. 33-34; 04/22/09 J. Fox Dep., pp. 34-35].

51.    Ms. Fox is not an officer, director or member of any of the Original Petitioning Creditors. [04/02/09 J. Fox Dep., p. 33; 04/22/09 J. Fox Dep., p. 34].

52.     According to Ms. Fox, only Lyon had authority to sign the Original Involuntary Petitions. [04/02/09 J. Fox Dep., pp. 31-33; 04/22/09 J. Fox Dep., pp 33-34, 67], and none of the Original Petitioning Creditors had the authority to do so on their own behalf. [Id.].

53.     The Original Involuntary Petitions were executed by attorney Robert A. Pinel of the law firm of Flamm Boroff & Bacine, PC located at 4905 W. Tilghman Street, Allentown, PA 18104 (the "Flamm Law Firm"), acting as counsel to the Original Petitioning Creditors. [Exs. 8 and 10; NMI D. 1; NMI Holding D. 1; 04/02/09 J. Fox Dep., pp. 5-6; 04/22/09 J. Fox Dep., pp. 8-9].

54.     In the Original Involuntary Petitions, each of the Original Petitioning Creditors based their respective claims on a "contract" and asserted a claim against NMI and NMI Holding in the following amounts, which total $13,277,407.78:

| TABLE 1 | | |
|---|---|---|
| PETITIONING CREDITOR | NMI AMOUNT | NMI HOLDING AMOUNT |
| DVI XIV | $    911,938.53 | $    911,938.53 |
| DVI XVI | $   1,722,554.29 | $   1,722,554.29 |
| DVI XVII | $   3,736,847.64 | $   3,736,847.64 |
| DVI XVIII | $   2,436,935.83 | $   2,436,935.83 |
| DVI XIX | $   4,064,909.73 | $   4,064,909.73 |
| DVI Funding | $    354,191.76 | $    354,191.76 |
| TOTAL AMOUNT | $ 13,277,407.78 | $ 13,277,407.78 |

[Ex. 6].

55.     In the proposed Third Amended Involuntary Petitions, the amounts alleged to be due from the Putative Debtors are asserted to be based on "contract" and are alleged to total $12,977,807.24, as follows:

| TABLE 2 | | |
|---|---|---|
| **PETITIONING CREDITOR** | **NMI AMOUNT** | **NMI HOLDING AMOUNT** |
| DVI XIV | $ 890,991.80 | $ 890,991.80 |
| DVI XVI | $ 1,731,974.64 | $ 1,731,974.64 |
| DVI XVII | $ 3,651,692.40 | $ 3,651,692.40 |
| DVI XVIII | $ 2,380,756.12 | $ 2,380,756.12 |
| DVI XIX | $ 3,970,989.79 | $ 3,970,989.79 |
| Ashland Funding | $ 351,402.49 | $ 351,402.49 |
| **TOTAL AMOUNT** | **$ 12,977,807.24** | **$ 12,977,807.24** |