**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: | **Chapter 11** |
| NATIONAL MEDICAL IMAGING, LLC and NATIONAL MEDICAL IMAGING HOLDING COMPANY, LLC, | **Case Nos. 08-17348 and 08-17351 (ELF)** |
| Debtors. | |
| NATIONAL MEDICAL IMAGING, LLC and NATIONAL MEDICAL IMAGING HOLDING COMPANY, LLC, | |
| Plaintiffs, | **Adv. Pro. No. 14-00250 (ELF)** |
| v. | **Adv. Pro. No. 14-00251 (ELF)** |
| U.S. BANK, N.A., *et al.*, | |
| Defendants. | |

## POST-TRIAL MEMORANDUM OF ASHLAND FUNDING, LLC

Ashland Funding, LLC (**"Ashland"**), by and through its counsel White and Williams LLP, submits this Post-Trial Memorandum to assist the Court in deciding the issues presented at trial (the **"Trial"**) in the above-captioned adversary proceeding.

## INTRODUCTION[1]

NMI seeks to hold Ashland jointly and severally liable with the U.S. Bank Defendants for attorneys' fees and costs in excess of $4 million under 11 U.S.C. § 303(i)(1), notwithstanding that the second and third amended petitions had only minimal impact on NMI's involuntary bankruptcy proceedings. This has always, at heart, been a two-party dispute between NMI and the U.S. Bank Defendants. Evidence at presented at Trial demonstrated that Ashland's limited involvement in the involuntary bankruptcy proceedings caused NMI to incur just $77,528.50 in

---

[1] Capitalized terms used in this Introduction are defined *infra*.

fees that it would not have otherwise incurred litigating with the U.S. Bank Defendants, only $36,937.50 of which relates to NMI's § 303(i)(1) claim so as to be potentially compensable under the framework delineated by this Court in its ruling on Defendants' summary judgment motions. Of the $36,937.50, $8,655.00 should be disallowed due to deficiencies such as vagueness, block billing, or as excessive or duplicative.

Ashland's small role aside, the attorneys' fees and costs sought by NMI are unreasonable – indeed "outrageously excessive" – in numerous respects. First, even those fees and costs incurred to defend the involuntary petitions are unreasonable in light of the fact that NMI had announced its imminent planned closure prior to the filing of the petitions. Second, the time records of NMI's counsel suffer from garden-variety deficiencies such as vagueness, block-billing, excessiveness (both as to time spent and hourly rates), and duplication among NMI's four law firms. While the vagueness and block-billing would be problematic in any fee-shifting scenario, it is doubly so here because NMI cannot meet its burden to show that the work relating to NMI's § 303(i)(2) was also "necessary and relevant to the § 303(i)(1) litigation" so as to be potentially compensable. Finally, NMI is not entitled to prejudgment interest for the reasons stated herein.

## BACKGROUND

### A.    The Filing and Dismissal of the Involuntary Petitions

On or about October 12, 2005, National Medical Imaging, LLC and National Medical Imaging Holding Company, LLC (collectively, **"Plaintiffs"** or **"NMI"**), Maury Rosenberg (**"Rosenberg"**), and certain affiliated entities entered into a Settlement Agreement (the **"Settlement Agreement"**) resolving a dispute relating to certain equipment leases (the **"Master Leases"**) whereunder the Original Petitioning Creditors (as defined below) were lessors and

Lyon Financial Services, Inc. d/b/a U.S. Bank Portfolio Services (**"Lyon"**) functioned as servicer.  In connection with the Settlement Agreement, Rosenberg and NMI were each required to execute new guarantees.  The Individual Limited Guaranty executed by Rosenberg (the **"Rosenberg Guaranty"**) stated that payment was due "to the Agent," which was defined as Lyon, while under the Unconditional Continuing Guaranty executed by NMI (the **"NMI Guaranty"** and, collectively with the Rosenberg Guaranty, the **"Guarantees"**), payment was due "in favor of the respective Lessor."

On November 7, 2008 (the **"Petition Date"**), six entities – DVI Receivables XIV, LLC; DVI Receivables XVI, LLC; DVI Receivables XVII, LLC; DVI Receivables XVIII, LLC; DVI Receivables XIX, LLC; and DVI Funding, LLC (collectively, the **"Original Petitioning Creditors"**) – filed involuntary bankruptcy petitions against each of the Plaintiffs in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the **"Bankruptcy Court"**). Trial Ex. A1, A2.

The involuntary petitions were thrice amended: on November 10, 2008, on April 10, 2009, and on August 26, 2009.  Trial Ex. A3 through A6.  In the second amended petitions filed on or about April 10, 2009, Ashland was, for the first time, listed as a new petitioning creditor and DVI Funding, LLC was removed.  Trial Ex. A5, A6.  Upon information and belief, this change was made because Ashland had acquired DVI Funding, LLC's right, title and interest in certain contracts, including without limitation some of the Master Leases that were the subject of the Settlement Agreement and Guarantees, pursuant to a Portfolio Sale Agreement dated March 2, 2007.

On December 4, 2008 – prior to the addition of Ashland as a petitioning creditor – NMI moved to dismiss the involuntary petitions.  Trial Ex. D-209.  On December 28, 2009, the

Bankruptcy Court dismissed the involuntary petitions, *see In re National Med. Imaging, LLC*, 439 B.R. 837, 843 (Bankr. E.D. Pa. 2009), giving collateral estoppel effect to certain portions of an August 21, 2009 opinion that dismissed an involuntary bankruptcy case pending against Rosenberg in the United States Bankruptcy Court for the Southern District of Florida (the **"Florida Bankruptcy Court"**).[2]  Trial Ex. D-213, D-214.  The Original Petitioning Creditors and Ashland appealed the dismissal of the involuntary petitions, but the dismissal was affirmed by the District Court on March 24, 2015 and by the Third Circuit on May 3, 2016.  *See DVI Receivables XIV, LLC v. Nat'l Med. Imaging, Holding Co., LLC*, 529 B.R. 607 (E.D. Pa. 2015), *aff'd* 648 F. App'x 251 (3d Cir. 2016).

**B.    NMI's Unsuccessful § 303(i)(2) Claims**

On May 27, 2014, NMI filed a complaint (the **"Complaint"**) against U.S. Bank, N.A. (**"U.S. Bank"**), Lyon, Jane Fox (**"Fox"**), the Original Petitioning Creditors, and Ashland (collectively, **"Defendants"**) in the District Court.   Trial Ex. D-236.   The first count of the Complaint sought to hold the Defendants jointly and severally liable for compensatory and punitive damages under 11 U.S.C. § 303(i)(2), while the second count sought to hold the Defendants jointly and severally liable for attorneys' fees and costs under 11 U.S.C. § 303(i)(1) and Rule 9011 of the Federal Rules of Bankruptcy Procedure (**"Fed. R. Bankr. P."**). Simultaneously with filing the Complaint, the Plaintiffs commenced the above-captioned adversary proceedings, Adv. Nos. 14-250 and 14-251 (the **"Adversary Proceedings"**) in the Bankruptcy Court, against the same Defendants, alleging the same facts as the Complaint and seeking the same exact relief as the second count of the Complaint (but not compensatory and punitive damages under 11 U.S.C. § 303(i)(2)).

---

[2] Rosenberg asserted § 303(i) claims against Ashland in the Florida Bankruptcy Court, but those claims were dismissed in their entirety.  *See* Trial Ex. A14 at 7.

On May 14, 2015, after obtaining leave from the Bankruptcy Court to do so, NMI filed an Amended Complaint and Jury Demand (the **"Amended Complaint"**) in each of the Adversary Proceedings.  The first count of each Amended Complaint seeks to hold the Defendants jointly and severally liable for compensatory and punitive damages under 11 U.S.C. § 303(i)(2), *see id.* ¶¶ 85-88, while the second count seeks to hold the Defendants jointly and severally liable for attorneys' fees and costs under 11 U.S.C. § 303(i)(1) and Fed. R. Bankr. P. 9011, *see id.* ¶¶ 89-93.  On August 9, 2017, the Bankruptcy Court stayed Adversary Proceedings pending the entry of a final judgment on NMI's 11 U.S.C. § 303(i)(2) claims.

Meanwhile in the District Court, at the conclusion of discovery, Defendants moved for summary judgment on Plaintiffs' § 303(i)(2) claims.  Trial Ex. D-293, D-294, D-297, D-298, D-299.  On August 28, 2019, the District Court granted Defendants' motions.  *See Nat'l Med. Imaging, LLC v. U.S. Bank, N.A. (In re Nat'l Med. Imaging, LLC)*, 2019 U.S. Dist. LEXIS 146907 (E.D. Pa. Aug. 28, 2019)(Rufe, J.).  Despite "some evidence that Defendants were negligent and hasty in their filing of the involuntary petition as to NMI," *id.* at \*20, and "limited indicia of bad faith … such as insufficient pre-filing investigation into the facts and law," *id.* at \*10, the District Court declined to grant summary judgment – either for or against Defendants – on the issue of bad faith.  Nonetheless, the District Court granted summary judgment in Defendants' favor on Plaintiffs' § 303(i)(2) claims.  *Id.*  As to compensatory damages under § 303(i)(2)(A), the District Court found, in part, that no genuine dispute of material fact exists on the issue of proximate cause because pre-existing factors entirely independent of the involuntary bankruptcy precipitated NMI's demise.  As to punitive damages under § 303(i)(2)(B), the District Court held that, even if proven at trial, the conduct alleged by NMI does not rise to the requisite level of intentional malice or particularly egregious conduct, "especially considering

NMI's severe financial distress." *Id.*

NMI unsuccessfully appealed the District Court's ruling on its 11 U.S.C. § 303(i)(2) claims to the Third Circuit Court of Appeals, which upheld the District Court's ruling in all material respects. *See Nat'l Med. Imaging, LLC v. U.S. Bank, N.A. (In re Nat'l Med. Imaging, LLC)*, 818 Fed. Appx. 129 (3d Cir. Aug. 25, 2020). NMI then unsuccessfully petitioned the United States Supreme Court for certiorari. *See Nat'l Med. Imaging, LLC v. U.S. Bank, N.A.*, 2021 U.S. LEXIS 1406 (Mar. 22, 2021). All avenues of appeal having been exhausted, the Adversary Proceedings were removed from suspense on March 26, 2021.

### C.    NMI's Voluntary Bankruptcy Petitions

On June 12, 2020, Plaintiffs filed voluntary bankruptcy petitions in this Court, which are being jointly administered at Case No. 20-12618 (the **"Voluntary Case"**). Trial Ex. D-354. U.S. Bank filed a motion to dismiss the Voluntary Case, which was subsequently denied.

### D.    The Court's Summary Judgment Ruling in the Adversary Proceedings

On December 6, 2021, the Defendants moved for summary judgment in these Adversary Proceedings. While the U.S. Bank Defendants sought partial summary judgment, Ashland sought complete summary judgment, arguing that *none* of the exorbitant attorneys' fees incurred by NMI are reasonable given the irreparable state of NMI's business, which had announced plans to close all of its centers by December 15, 2008. Alternatively, Ashland argued that even if this Court is inclined to allow attorneys' fees and costs directly relating to the defense of the involuntary petitions, any fees and costs *un*related to that defensive effort – including the astronomical tab for NMI's unsuccessful *offensive* effort to obtain an affirmative recovery pursuant to § 303(i)(2) – must be denied.

Relying largely on *Hensley v. Eckerhart*, 461 U.S. 424 (1983) and *McKenna v. City of Phila.*, 582 F.3d 447 (3d Cir. 2009), the Court denied Defendants' summary judgment motions, holding that "the unsuccessful § 303(i)(2) claim is related to some degree to the § 303(i)(1) claim and therefore, complete denial of attorneys' fees incurred in the § 303(i)(2) litigation is not appropriate." *See* Opinion dated Sept. 2, 2022 [Dkt. No. 158] (the **"9/2/2022 Opinion"**) at 30. The Court opined that:

> [T]he only "success" required by §303(i) before an award of fees can be granted for any part of the §303(i) litigation – including (i)(2) claims – is the dismissal of the involuntary petition. Having established eligibility for an award of attorney's fees under §303(i)(1)(B), a putative debtor then need only show that such fees are reasonable and convince a court to exercise its discretion to grant its request. An imposition of additional success-based criteria for putative debtors seeking fess for §303(i)(2) litigation is unwarranted by the text of the statute
>
> This is not to suggest that a plaintiff's success (or lack thereof) in its §303(i)(2) claim does not play a role in the court's discretion to award fees. It does – just not as a threshold eligibility determination.

*Id.* at 25-26. As to how NMI's lack of success on its §303(i)(2) claims would factor into the Court's discretion, the Court instructed that:

> Considering the lack of success of the § 303(i)(2) case, the time spent on the § 303(i)(2) claim ***may be compensable only to the extent that the counsel was obliged to develop a record that was also necessary and relevant to the § 303(i)(1) litigation***. This factor, along with the lack of success under § 303(i)(2), may well result in a severe reduction in the attorneys' fees awarded for services rendered in the § 303(i)(2) litigation.

*Id.* at 31 (emphasis added). This appears to be how the Court intends to reconcile its threshold eligibility holding with precedent instructing that the applicant has the burden to establish that the time spent pursuing the unsuccessful claims contributed in some way to the success of the remaining claims. *See McKenna*, 582 F.3d at 457-58 (*citing Hensley*, 461 U.S. at 435). Insofar as the dismissal of the petition predated the performance of the Category 4 work, the Category 4

work cannot possibly have contributed to the "success" (i.e., the dismissal of the petitions), but some of it could be "necessary and relevant to the § 303(i)(1) litigation."[3]

## E.    NMI's Attorneys' Fees and Costs

On November 11, 2008, NMI engaged counsel, Maschmeyer Karalis P.C. (**"MK"**),[4] "for the sole purpose of defending the involuntary petitions" filed in the Bankruptcy Court.  *See* Trial Ex. A12.   After MK "successfully defended the involuntary petitions filed against [NMI]," it entered into an amended and restated engagement letter dated October 23, 2013 for not only "the recovery of attorneys' fees and costs" but also "a finding of bad faith and damages caused by the involuntary filings including punitive damages."  *See* Trial Ex. A13.

Pursuant to a Fee Agreement dated October 23, 2013, NMI engaged Kauffman, Coren & Ress, P.C. (**"KCR"**) as special litigation co-counsel to:

> commence one or more proceedings to recover attorneys' fees, compensatory damages, special damages and/or punitive damages (under U.S.C. § 303(i) or otherwise) against all responsible parties – including but not limited to U.S. Bank, Lyon Financial Services, Inc. d/b/a U.S. Bank Portfolio Services, and the Original Petitioning Creditors – arising out of the wrongful commencement of the now-dismissed Bankruptcy Cases (collectively, the "Litigation Claims").

*See* Trial Ex. A15.   KCR's Fee Agreement does not mention Ashland by name.   The Fee Agreement contemplates that KCR would "be compensated for its services on a contingent fee basis."  *Id.*  Specifically, KCR would:

> be entitled to receive the <u>greater</u> of: (a) a contingent fee equal to Thirty Percent (30%) of the "Financial Benefit" (as defined … below) hereafter recovered or obtained by or on behalf [NMI] in connection with the Litigation Claims, whether recovered by settlement, judgment, award, verdict or otherwise; or (b) the reasonable attorneys' fees awarded by a court against any/all parties found liable

---

[3]  Ashland respectfully disagrees with the Court that any of the fees and costs associated with the failed § 303(i)(2) claims are recoverable.  That Ashland works within the framework of the 9/2/2022 Opinion for purposes of this Post-Trial Memorandum should not be interpreted as a waiver or admission in the event of a future appeal.
[4]   Effective December 31, 2017, Maschmeyer Karalis P.C. dissolved and NMI engaged Karalis P.C. as its bankruptcy counsel going forward.  *See* Trial Ex. A14.

> to [NMI] in connection with the Litigation Claims *which KC&R agree[s] to*
> *pursue vigorously*. … [T]he "Financial Benefit" recovered by or on behalf of
> the … Debtors shall include all monies received or recovered (including all sums
> received on account of compensatory damages, and punitive damages), and the
> fair value of all other property recovered or received ***exclusive of costs and***
> ***expenses and attorney fees.***

*Id.*[5] Insofar as no monies were received or recovered on account of NMI's claims for compensatory

damages, special damages and/or punitive damages, and "Financial Benefit" excludes "costs,

expenses, and attorney fees" (i.e., any recovery on the § 303(i)(1) claim), NMI derived no

"Financial Benefit" from the Litigation Claims.

On October 17, 2022, filed Plaintiffs' Allocation of Legal Fees and Costs, Pursuant to 11

U.S.C. § 303(i)(1) [Adv. Case No. 14-250, Dkt. No. 181] (the **"Fee Allocation"**), *see* Trial Ex.

A11, seeking a total of $4,215,030.83 in fees and costs, divided into the following categories:

| Category | Description |
|---|---|
| 1 | Fees/Costs Incurred to Dismiss Involuntary Petitions |
| 2 | Fees Incurred to Sustain Dismissal of Involuntary Petitions on Appeal |
| 3 | Fees Incurred for Section 303(i)(1) Recovery |
| 4 | Fees Incurred to Pursue 303(i)(2) Claims |
| 5 | Fees Incurred for Florida State Court Matters |
| 7 | Fees Incurred to Effectuate Chapter 11 Filings |
| 8 | Fees Incurred to Oppose U.S. Bank's Motion to Dismiss and for Related Proceedings |
| 9 | Fees Incurred to Oppose U.S. Bank's Motions for Relief from Stay and for Related Proceedings |
| 10 | Fees Incurred for 2020 Adversary Proceeding for Declaratory Relief |
| 11 | Fees Incurred for U.S. Bank's Appeal in Declaratory Judgment Action |
| 12 | Fees Incurred for Administration of Chapter 11 Cases |
| 13 | Fees Incurred for Matters Relating to Chapter 11 Plan |

During the Trial, NMI made the following modifications to the fees and costs requested

in the Fee Allocation:

- A 25% discount on the Category 4 fees, which works out to a reduction of $331,638.75
  on the $1,326,555.00 Category 4 subtotal (reducing it to $994,916.25).

---

[5]  The italicized phrases have been penciled into the Fee Agreement and initialed by the parties thereto.

- A 10% discount on the Category 10 fees, which works out to a reduction of $15,382.84 on the $153,828.36 Category 10 subtotal (reducing it to $138,445.52).

- A reduction of Genovese Joblove & Batista's fees from $139,952.00 to $50,000.

- A net addition of $56,688.09 to the Category 12 fees ($62,986.77 with a 10% discount).

- An additional $250,000 "unallocated" discount.

Per the Fee Allocation as modified at Trial, NMI seeks a total of $1,370,753.38 on account of fees and costs incurred to Maschmeyer Karalis, P.C. and Karalis P.C. (collectively, **"MK"**) relating to categories 1, 2, 3, 8, 9, 10, and 11, as follows:

| Category | Description | Fees Sought | Costs Sought |
|---|---|---|---|
| 1 | Fees/Costs Incurred to Dismiss Involuntary Petitions[6] | $701,093.75 | $47,722.89 |
| 2 | Fees/Costs Incurred to Sustain Dismissal of Involuntary Petitions on Appeal | $11,948.00 | $82.20 |
| 3 | Fees/Costs Incurred for Section 303(i)(1) Recovery | $493,363.25 | $15,499.14 |
| 8 | Fees Incurred to Oppose U.S. Bank's Motion to Dismiss and for Related Proceedings | $43,786.50 | $2,392.20 |
| 9 | Fees Incurred to Oppose U.S. Bank's Motions for Relief from Stay and for Related Proceedings | $16,432.00 | |
| 10 | Fees Incurred for 2020 Adversary Proceeding for Declaratory Relief | $26,950.45[7] | |
| 11 | Fees Incurred for U.S. Bank's Appeal in Declaratory Judgment Action | $11,483.00 | |
| TOTAL | | $1,305,056.95 | $65,696.43 |

---

[6]  Category 1 is further broken down info fees/costs incurred through 11/30/2009 and from 12/1/2009 through 5/16/2014.

[7]  This figure reflects a 10% reduction from the $29,945.50 originally requested in the Fee Allocation.  *See* Trial Ex. A11.

Ashland was not a party to the litigation encompassed by categories 8, 9, 10 and 11, which represent $98,652.45 of MK's fees and costs. NMI has paid $438,567.07 of MK's fees and costs. *See* 12/1/2022 Trial Transcript (**"Tr."**) at 21:19 to 22:2.

The Fee Allocation, as modified at Trial, breaks down the fees and costs alleged to have been incurred[8] to Kaufman, Coren & Ress, P.C. (**"KCR"**) into categories 2, 3, 4, 5, 7, 8, 9, 10, and 11, which are subsequently described as follows:

| Category | Description | Fees Sought | Costs Sought |
|---|---|---|---|
| 2 | Fees Incurred to Sustain Dismissal of Involuntary Petitions on Appeal | $76,514.50 | $8.22 |
| 3 | Fees Incurred for Section 303(i)(1) Recovery | $366,010.00 | $2,213.00 |
| 4 | Fees Incurred to Pursue 303(i)(2) Claims | $994,916.25[9] | $161,003.88 |
| 5 | Fees Incurred for Florida State Court Matters | $12,503.50 | $0.00 |
| 7 | Fees Incurred to Effectuate Chapter 11 Filings | $35,379.50 | $0.00 |
| 8 | Fees Incurred to Oppose U.S. Bank's Motion to Dismiss and for Related Proceedings | $53,982.00 | $0.00 |
| 9 | Fees Incurred to Oppose U.S. Bank's Motions for Relief from Stay and for Related Proceedings | $1,870.00 | $0.00 |
| 10 | Fees Incurred for 2020 Adversary Proceeding for Declaratory Relief | $95,620.50[10] | $0.00 |
| 11 | Fees Incurred for U.S. Bank's Appeal in Declaratory Judgment Action | $96,274.50 | $156.64 |
| Multiple | | $170,385.75 | $135,450.93[11] |
| TOTAL | | $1,903,456.50 | $298,832.67 |

---

[8] No fees or costs were actually incurred to KCR, insofar as NMI engaged KCR on a contingent fee basis. As discussed *supra*, Ashland objects to KCR's fees on the basis that the conditions of the contingent fee arrangement were not met (i.e., NMI derived no "Financial Benefit" from the "Litigation Claims" as those terms are defined in KCR's Fee Agreement).
[9] This figure reflects a 25% reduction from the $1,326,555.00 originally requested in the Fee Allocation.
[10] This figure reflects a 10% reduction from the $106,245.00 originally requested in the Fee Allocation.
[11] This figure includes $102,114.15 in costs ascribed to both Categories 3 and 4 and $33,336.78 in Westlaw charges that are not ascribed to any category.

PHLDMS1 30018454v.1

*See* Trial Ex. A11 at Ex. B, p. 24.  Although KCR's Fee Agreement does not contemplate that

KCR would assist with the dismissal efforts, *see* Trial Ex. A15, $76,522.70 is sought for Category 2

(Fees Incurred to Sustain Dismissal of Involuntary Petitions on Appeal).  Ashland was not a

party to the litigation encompassed by categories 5, 7, 8, 9, 10 and 11, which represent at least

$306,254.50 of KCR's fees and $156.64 of KCR's costs.  Of the $170,385.75 in fees that KCR

assigned to multiple categories, $55,830.00 relates exclusively to categories 5, 7, 8, 9, 10 and 11

and $141,786.00[12] relates partially to categories 5, 7, 8, 9, 10 and 11.  KCR's costs include

$33,336.78 in Westlaw costs that KCR has failed to definitively link to Categories 1 through 4.

NMI has not paid any of KCR's fees or costs to date, and will not be required to pay any of

KCR's fees and costs if this Court wholly or partially denies NMI's § 303(i) claims pursuant to

the terms of KCR's Fee Agreement with NMI.  *See* Trial Ex. A15.

Per the Fee Allocation as modified at Trial, NMI seeks a total of $215,972.50 on account

of fees and $4,654.99 on account of costs incurred to Dilworth Paxson LLP (**"Dilworth"**)

relating to categories 3, 5, 6, 7, 8, 9, 10, 11, 12 and 13, as follows:

| Category | Description | Fees Sought | Costs Sought |
|---|---|---|---|
| 3 | Fees Incurred for Section 303(i)(1) Recovery | $27,553.00 | $0.00 |
| 5 | Fees Incurred for Florida State Court Matters | $8,950.75 | $5.81 |
| 6 | Fees/Costs Incurred Regarding Propriety of Chapter 11 Filings | $3,162.50 | $0.00 |
| 7 | Fees Incurred to Effectuate Chapter 11 Filings | $44,467.75 | $3,445.38 |
| 8 | Fees Incurred to Oppose U.S. Bank's Motion to Dismiss and for Related Proceedings | $61,433.50 | $842.94 |
| 9 | Fees Incurred to Oppose U.S. Bank's Motions for Relief from Stay and for Related Proceedings | $39,357.50 | $0.00 |

---

[12]  KCR has agreed to reduce $98,430.00 of its fees by 50% "[t]o account for overlap with fees associated with
unsuccessful appeal." *See* Trial Ex. A11, Ex. B, Schedule 10 to Ex. 1, at p. 15.

| 10 | Fees Incurred for 2020 Adversary Proceeding for Declaratory Relief | $15,549.30[13] | $360.86 |
|---|---|---|---|
| 11 | Fees Incurred for U.S. Bank's Appeal in Declaratory Judgment Action | $13,770.50 | $0.00 |
| 12 | Fees Incurred for Administration of the Chapter 11 Cases | $62,986.77[14] | $0.00 |
| 13 | Fees Incurred for Matters Relating to Chapter 11 Plan | $0.00 | $0.00 |
| TOTAL | | $277,231.57 | $4,654.99 |

*See* Plaintiff's Trial Exhibit 162A.  Only $27,553.00 of Dilworth's fees relate to one of the categories in which Ashland participated (Category 3).  *See* Trial Ex. A11, Ex. C.

In the Fee Allocation as modified at Trial, NMI asserts a total of $50,000.00[15] on account of fees and $2,469.24 on account of costs incurred to Genovese Joblove & Battista, P.A. (**"GJB"**).  *See* Plaintiff's Trial Exhibit 162A.  The Fee Allocation indicates all of GJB's fees and costs relate to Category 5, in which Ashland did not participate.  *See* Trial Ex. A11, Ex. D.

## ARGUMENT

### A.    NMI's Fees Are Unreasonable

Under 11 U.S.C. § 303(i)(1), a court has discretion to award – at most – "a reasonable attorney's fee."  *Jaffe v. Wavelength, Inc. (In re Wavelength, Inc.)*, 61 B.R. 614, 621 (9th Cir. B.A.P. 1986)("The statute, rules, and case law interpreting § 303 have not delineated clear standards for finding whether a particular fee is justified," but "[a]t a minimum, … compensation should be reasonable."); *In re Ross*, 135 B.R. 230, 239 (Bankr. E.D. Pa. 1991)("Only reasonable fees should be awarded.").  "An award should be premised on the detailed accounts of services rendered."  *In re Fox Island Square Partnership*, 106 B.R. 962, 966 (Bankr. N.D. Ill. 1989) (reducing putative debtor's fee award by 50% where case was "overlawyered").  "[T]he

---

[13]  This reflects a 10% reduction from the $17,277.00 originally requested in the Fee Allocation.  *See* Trial Ex. A11.
[14]  This figure was $0.00 in the original Fee Allocation.  *See* Trial Ex. A11.
[15]  This figure was $139,952.00 in the original Fee Allocation.  *See* Trial Ex. A11.

evidentiary burden of showing the reasonableness of the requested fees and costs remains on the debtor" and, "[a]ccordingly, *after* the debtor demonstrates that the fees and costs are reasonable, the petitioning creditor has the burden to establish, under totality of the circumstances, that factors exist which overcome the presumption and support the disallowance of fees." *In re Quantum Cool, LLC*, Case No. 12-00260-8-SWH, 2013 WL 3733182, *12 (Bankr. E.D. July 15, 2013)(emphasis added).

### 1.      NMI's Fees Are Unreasonable in Light of Its Preplanned Closure

The District Court's findings reflect that, in the weeks prior to the Petition Date, Rosenberg stated repeatedly – each time with more specificity – that he was closing *all* the centers:

- Jane Fox testified that, in October 2008, Rosenberg verbally informed her that he intended to close the centers.

- On October 24, 2008, Rosenberg rebuffed Defendants' attempts to introduce a prospective buyer for the business, telling Brier that he intended to close all of the centers.

- On November 3, 2008, Rosenberg advised Brier and the prospective purchaser, "as previously discussed, we are in the process of closing all of the centers [and] this process should be completed no later than 12/15/08 – I don't believe that there is anything to talk about."

- Later the same day, Rosenberg reiterated to the prospective buyer, "NMI expects to close all of the PA centers prior to Mid-December and is in the process of

negotiating real estate lease terminations and will tender the equipment back to
the secured lenders."[16]

*See Nat'l Med. Imaging*, 2019 U.S. Dist. LEXIS 146907, at *12.   In its summary judgment

motion, Ashland argued that it was unreasonable for NMI to have incurred over a million dollars

of attorneys' fees and costs fighting the involuntary petitions when it had previously announced

the planned closure of all its centers.   Even the fees that ostensibly relate to the defense of the

petition – the Category 1 fees – are unreasonable given that they were incurred to "save" a

business that was slated to be closed within five weeks.   As the Court has previously

acknowledged, "courts expect attorneys to exercise billing judgment in fee shifting situations to

avoid running up unnecessary fees for the opposing party."  9/2/2022 Opinion at 48 (citing *In re*

*Forever Green Athletic Fields, Inc.*, 2017 Bankr. LEXIS 1240, 2017 WL 1753104 (Bankr. E.D.

Pa. May 3, 2017)).   *See also West Virginia Univ. Hosp., Inc. v. Casey*, 898 F.2d 357, 365 (3d Cir.

1990)("[M]embers of the bar are officers of the court and … should demonstrate the same level

of billing judgment and sensitivity in fee shifting situations as they do with their own private

clients).   At the time, however, the Court found the issue unripe for summary judgment.

9/2/2022 Opinion at 48.  Now that the record is complete, it is time for this issue to be revisited.

Insofar as NMI knew by April 2008 that it could not survive, *see Nat'l Med. Imaging*,

2019 U.S. Dist. LEXIS 146907, at *11, the fees it incurred to defend the petitions appear to have

been motivated not by a reasonable cost-benefit analysis but rather by a desire to run up fees in

the hope they would ultimately be borne by the Defendants.  "As recognized by the Supreme

Court" – and in *Forever Green* – "fee-shifting statutes should not be read to encourage this type

of behavior."  *Forever Green*, 2017 Bankr. LEXIS 1240, at *47.  NMI used even less billing

discretion in connection with Categories 3 and 4, hiring a high-priced, top-flight litigator – Mr.

---

[16]  All centers outside Pennsylvania had already closed.

PHLDMS1 30018454v.1

Coren of KCR – to pursue the § 303(i)(2) claims, when Mr. Karalis was already capably representing NMI at half of Mr. Coren's rate. Of course, NMI could afford to dispense with reasonable billing judgment, secure in the knowledge that it would never be required to pay KCR out of pocket under the terms of KCR's Fee Agreement. *See* Trial Ex. A15. NMI had no incentive to push back when Mr. Coren raised his rates. Mr. Coren argued/testified that Defendants' "particularly aggressive" actions necessitated the retention of an attorney of his caliber. However, as discussed *infra*, when challenged to describe Ashland's "particularly aggressive" behavior, Mr. Coren was left grasping at straws.

### 2.     NMI's Time Records Are Deficient

The time records supporting the Fee Allocation suffer from a number of deficiencies, such as excessive time spent, vagueness, block billing, and duplication of effort. *See* U.S. Bank Defendants' Trial Ex. D-426 through D-436.[17] While these deficiencies would be problematic in any fee shifting case, they are doubly so given the framework enunciated by this Court in the 9/2/2022 Opinion, *i.e.*, that fees and costs related to the pursuit of the § 303(i)(2) claim would be compensable only to the extent necessary and relevant to the

### a.     Deficient Timekeeping Practices

Faced with the obvious fact that its timekeeping practices would not pass muster in a bankruptcy fee application context, NMI argued at Trial that a more lenient standard should apply:

> Let me talk a little bit about what this Court is tasked with doing because my adversaries have made this presentation where they have looked at line items and challenged this description, or this fee, or that whatever. I don't even think that would be appropriate under, you know, in the bankruptcy world where you take a look at this stuff. But the reality is it has no business in a fee shifting case, none whatsoever. There are totally different rules.

---

[17] U.S. Bank Defendants' Trial Ex. D-426 through D-436 identify specific objections to the time records of NMI's counsel. Ashland joins in these objections, and incorporates Trial Ex. D-426 through D-436 herein by reference.

*See* 11/30/2022 Tr. at 25:11-18.  NMI attempted to make excuses for the inadequacy of KCR's time records, arguing that the Third Circuit has "adopted a very liberal approach toward the level of specificity required for billing hours in a fee shifting case as: the billing hours only need to remain specific enough to allow the District Court to determine if the hours claimed are unreasonable for the work performed."  11/30/2022 Tr. at 25:19-25.  The applicable standards are not as liberal as NMI suggests.

In the only recent case cited by NMI at Trial, the Third Circuit held that "denial of a fee award was entirely appropriate under the circumstances" because "[c]ounsel's success at trial notwithstanding, the fee petition was severely deficient in numerous ways."  *Clemens v. N.Y. Cent. Mut. Fire Ins. Co.*, 903 F.3d 396, 400 (3d Cir. 2018).[18]  Among other deficiencies, "many of the time entries submitted were so vague that there is no way to discern whether the hours billed were reasonable," including "a number of entries for 'Attorney review,' 'Analysis/Strategy,' or 'Review/analyze with no additional explanation regarding the subject or necessity of the review."  *Id.* at 401 (confidentiality obligations notwithstanding, such entries are "nowhere near specific enough").  Similarly, KCR's time records (and to a lesser those of extent NMI's other counsel) contain literally hundreds of extremely vague time entries for "File Review," "Document Review," and "Interoffice conference with staff" that fail to identify the subject or necessity of the review or meeting.[19]  Additionally, KCR's time records contain numerous entries for "Trial preparation" or "Trial prep" that are not only vague, *see Mozingo v. Oil States Energy Servs., L.L.C.*, 2018 LEXIS 158780, *28 (W.D. Pa. 2018)(declining to

---

[18]  At the Trial, NMI cited *Clemens* for the proposition that "It is not necessary to know the exact number of minutes spent, nor the precise activity to which each hour was devoted, nor the specific attainments of each attorney." However, this quote in fact appears to have come from an older case also cited by NMI at Trial, *Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973).
[19]  Subject matter is identified infrequently, as an exception rather than as a rule.

compensate for "trial prep" and other vague entries), but also bear no apparent chronological relation to any hearing or trial.

Block billing also runs rampant in KCR's time records. As just one example, 6.2 hours was spent on 8/15/2017 for "Doc Review/Correspondence/Discovery/Case Analysis" – basically, a hodge-podge of tasks that an attorney may hypothetically perform on any given day – without any breakdown or specificity as to the time expended per task or the subject or necessity of the discrete tasks performed. It is impossible to assess the reasonableness of the time expended, or to confirm that the Category 4 work supported NMI's § 303(i)(1) claim consistent with the framework required by the 9/2/2022 Opinion. Some courts have tolerated block-billing. For example, in *Mozingo*, reluctantly allowed block-billed time, while cautioning against it and noting the court's obligation to scrutinize the billed time. *Mozingo*, 2018 LEXIS 158780 at *31 (warning that "counsel barely meets the standard today and we can understand another reasonable judge finding block billing without specifics impermissible *per se* in a fee shifting case"). Others have disallowed it. *See Walker v. Gruver*, 2013 U.S. Dist. LEXIS 158219, *38-*39 (M.D. Pa. Nov. 5, 2013)(excluding all block-billed entries, and explaining that "where the court is unable to separate unrecoverable time from recoverable time in such billing entries, the court may reject the entire billing entry"). Certainly, NMI's highly experienced counsel knew they were taking a risk by block billing, especially given that the fees would be presented in bankruptcy court, where detailed timekeeping is the norm.

**b.    The Deficiencies Are Magnified by the 9/2/2022 Opinion**

In denying Defendants' summary judgment motions, the Court's instructed that § 303(i)(2) work would be compensable only to the extent it also supported NMI's § 303(i)(1) claims. *See* 9/2/2022 Opinion at 31. *See also Hensley*, 461 U.S. at 435 (applicant has the burden

to establish that the time spent pursuing the unsuccessful claims contributed in any way to the success of the remaining claims); *McKenna*, 582 F.3d at 457-58 (same).  However, for the most part, the descriptions of the Category 4 work performed by KCR are simply too vague meet NMI's burden to show that the work supported NMI's § 303(i)(1) claims.  Of the nearly thirty (30) fact witnesses deposed in the § 303(i)(2) case, NMI planned to call only four (4)[20] as witnesses at Trial on NMI's § 303(i)(1) claims.  The necessary inference is that the other witnesses possessed no information germane to NMI's § 303(i)(1) claims, such that the time associated with their depositions is not compensable under the framework enunciated by the Court in its 9/2/2022 Opinion.  Likewise, the majority of the written discovery conducted in the § 303(i)(2) case was irrelevant to NMI's § 303(i)(1) claims, and none of the pleadings prepared or reviewed in Category 4 is compensable.

### c.    Excessive Hourly Rates, Excessive Time Spent, and Duplication of Effort

The applicant also bears "the burden of showing that their requested hourly rates were reasonable in light of the prevailing rates 'in the community for similar services by lawyers or reasonably comparable skill, experience, and reputation.'"  *Clemens*, 903 F.3d at 402.  While much was made of Mr. Coren's forty-two years of experience, NMI offered no evidence to suggest that Mr. Coren's rate – which skyrocketed from $850 per hour in 2021 to $1,100 per hour in 2022, inconsistent with KCR's prior practice of $50 per hour increases every 1-2 years, *see* 11/30/2022 Tr. at 55:18-22[21] – represents a reasonable rate in the Philadelphia marketplace.[22] On the contrary, Mr. Coren testified that:

---

[20]   These witnesses were Jane Fox, Robert Pinel, Robert Brier, and Robert Walton (with Alan Winick listed as a potential witness should the need arise, but later eliminated).  Of the 3880.3 hours and $ 1,331,078 in fees associated with Category 4, only 175.2 hours and $65,445.50 in fees related to these four witnesses. *See* Trial Ex. D-434.

[21] This sharp increase is suspect, having coming on the heels of NMI exhausting all avenues of appeal on the § 303(i)(2) claims that KCR had been engaged to pursue on a contingency basis.

> For the most part the last several years it was an $850 rate, it was raised to $1,100 the beginning of 2022. And the reason for that is every time I appear in a bankruptcy court and I hear the rates of people with my experience and my years at the bar, now 42 years, my rates are lower than the associate rates at many of these firms; absolutely in the Delaware Courts where I spend a lot of time.

> Now perhaps the rates are a little bit different here, but I have one bill -- I don't have a Philadelphia billing rate, and a Delaware billing rate, and a New York billing rate. I think the rules say your billing rate is your billing rate.

11/30/2022 Tr. at 6:4-16. Accordingly, the $1,100 per hour rate appears to be based on hearsay evidence about rates in the Delaware market, which Mr. Coren admits "are a little bit different" than the Philadelphia market. It is also worth noting that the highly-regarded Mr. Karalis has 34 years' experience in comparison to Mr. Coren's 42, but charged $550 per hour in 2022, just half of Mr. Coren's rate. Mr. Karalis was also responsible for the only "success" that this Court has found germane for awarding fees: the dismissal of the involuntary petitions. *See* 9/2/2022 Opinion at 25. The § 303(i)(2) claims handled by KCR were unsuccessful.

Moreover, NMI provided no evidence that KCR is compensated $1,100 per hour – or even $850 per hour – for Mr. Coren's time outside a contingent fee or fee-shifting context. Certainly, NMI is not required to pay KCR a single penny out of its own pocket – much less $1,100 per hour – under the terms of its Fee Agreement with KCR. *See* Trial Ex. A15. Just because a client may be willing to pay an exorbitant hourly rate does not mean that rate is "reasonable" in a fee award context. For example, in *Giedgowd v. Cafaro Grp., LLC*, 2021 U.S. Dist. LEXIS 205889, *15 (E.D. Pa. Oct. 26, 2021), the court reduced the hourly rate of a senior attorney from $960 per hour to $650 per hour, explaining that while "[h]e is an experienced and highly regarded advocate and clients may choose to pay him as they deem in their interests[, …]

---

[22] Mr. McMichael's rate is nearly as high at $975-$1,000 per hour, also raising concerns as to reasonableness insofar as Mr. Karalis could have handled the Voluntary Case. However, unlike KCR, Dilworth did not have the potential upside of a windfall contingent fee recovery. Moreover, only $27,553.00 of Dilworth's fees relates to one of the categories in which Ashland participated (Category 3), and only $5,252.50 of that time is Mr. McMichael's.

- 20 -

this is a different scenario."  Even if NMI had provided such evidence, just because some clients may be willing to pay Mr. Coren $1,100 per hour does not mean that the rate is reasonable for purposes of a fee award.  It is also worth noting that the results delivered by Mr. Coren do not justify his exorbitant rate; on the contrary, even in the hands of an attorney of Mr. Coren's considerable skill and experience, NMI's § 303(i)(2) claims could not survive summary judgment.  Trial Ex. D-426 through D-436 identify numerous instances of excessive time spent, as well as duplication of effort among the four firms  The Third Circuit has held that "where a fee-shifting statute provides a court discretion to award attorney's fees, such discretion includes the ability to deny a fee request altogether when, under the circumstances, the amount requested is 'outrageously excessive.'"  *Clemens*, 903 F.3d at 400.   Here, NMI's fee request is "outrageously excessive."

## B.      Apportionment of Liability Among Petitioners

In denying the summary judgment motions filed by Ashland and the U.S. Bank Defendants, this Court stated:

> Ashland clearly played a smaller role in the involuntary petition against the Debtors than U.S. Bank and does not appear to have participated in U.S. Bank's efforts to foreclose on the §303(i)(2) choses in action.  Assuming §303(i)(1) permits the court to allocate liability for costs and fees on a relative-fault basis, the degree of that relative fault is unclear.  The legal and factual determinations involved in apportioning liability must be made after trial.

*See* 9/2/2022 Opinion at 48.   As set forth below, this Court may and should exercise its discretion to apportion, at most, one-sixth of any recoverable Category 1 – 4 fees and costs to Ashland.

### 1.      Ashland Did Not Participate in Categories 5 through 13

This Court has previously acknowledged that "Ashland also did not take part in many of the legal skirmishes between U.S. Bank and the Debtors in other fora."  *See* 9/2/2022 Opinion at

- 21 -

4. Ashland presented argument and evidence at Trial – contested by neither NMI nor the U.S. Bank Defendants – that it did not participate in Categories 5 through 13, which encompass ancillary litigation between NMI and the U.S. Bank Defendants. Indeed, when the Court tested Ashland's assertion that it should not be liable for fees and costs incurred prior to April 10, 2009 or for fees and costs incurred in Categories 5-13, both NMI and the U.S. Bank Defendants appeared to accept that Ashland should not be liable for any fees and costs associated with these categories. Acknowledging that the apportionment of liability was within the Court's discretion, NMI's counsel posited that Ashland could be jointly and severally liable for the Category 1-4 fees but not the Category 5-13 fees. 11/29/2022 Tr. at 105:16-23.[23] Moreover, NMI's counsel did not advise or consult Ashland's counsel prior to reporting a partial settlement of GJB's fees on the record, tacitly acknowledging that the resolution had no impact on Ashland as it involved exclusively Category 5 fees. 11/30/2022 Tr. at 8:13-18 ("So we reduced that from $139 to $50,000. And U.S. Bank agreed to that allocation with their continued reservation that they can challenge the legitimacy of categories."). Likewise, the U.S. Bank Defendants' counsel argued that certain Ashland-specific fees are not recoverable from the U.S. Bank Defendants, and conversely "activities that Ashland was completely uninvolved in," 11/29/2022 Tr. at 106:8-19 (listing activities), thereby acknowledging the fees associated with Categories 5 through 13 are not recoverable from Ashland. The Ashland-specific fees are those fees associated with the Third Circuit appeal of the dismissal order (which Ashland continued after the U.S. Bank defendants abandoned it) amounting to $36,937.50 and another $40,591.00 of Ashland-specific fees (which, in any event, are unrelated to NMI's entitlement to fees), for a total of $77,528.50,

---

[23] When asked about NMI's position on this issue, NMI's counsel advised the Court:
> Well, I don't care vis-à-vis themselves, but their liability is joint and several. To the extent, you know, I mean it's really the Court's discretion. You could say given Ashland's role, we don't think it's joint and several for this amount … [b]ut not for the rest.

11/29/2022 Tr. at 105:16-23

*see* 12/1/2022 Tr. at 146:23-147:2; Trial Ex. D-434 at 1, 36, 71.  However, of the $36,937.50 in

time spent on the appeal, $8,655 suffers from deficiencies such as vagueness, block-billing and

excessiveness, as shown in Exhibit "A" hereto.[24]

### 2.    Ashland's Involvement in Categories 1 through 4 Was Limited

Before Ashland was added as a petitioning creditor on April 10, 2009, $219,360.12 of

$748,816.64 in Category 1 fees and costs had already accrued.  Even once it did became a

petitioner, "Ashland clearly played a smaller role in the involuntary petition against the Debtors

than U.S. Bank," as this Court previously recognized.  *See* 9/2/2022 Opinion at 48 (nonetheless

finding that Ashland's "degree of … relative fault is unclear" and "[t]he legal and factual

determinations involved in apportioning liability must be made after trial").

While it is difficult to prove a negative from an evidentiary standpoint, the record clearly

evidences Ashland's minimal role in the proceedings.  For example, Ashland served only one set

of 16 written discovery requests in the § 303(i)(2) case, noticed no depositions, and engaged a

single expert (who addressed the issue of damages, which does not overlap with § 303(i)(1)).

*See* Plaintiff's Trial Ex. 88, 201.  In contrast, the U.S. Bank Defendants served a total of 107

interrogatories, 212 requests for production, and 50 requests for admission.  Plaintiff's Trial Exh.

201.  Additionally, the U.S. Bank Defendants noticed 22 depositions and engaged 4 experts.

Plaintiff's Trial Ex. 86, 88.  NMI noticed 9 depositions and engaged 2 experts.  Plaintiff's Trial

Ex. 87, 89.  While the discovery relates to Category 4 (which is largely not compensable, for

reasons already discussed), it is emblematic of the bigger picture, in which Ashland played only

a minimal role.  The U.S. Bank Defendants argued at Trial that Ashland "made a decision to ride

our coattails and let us do most of the work," *see* 11/29/2022 Tr. at 107:13-14, which Ashland

---

[24]  Trial Ex. D-434 does not include a line-by-line analysis of the time associated with Ashland's Third Circuit
Appeal.

PHLDMS1 30018454v.1

freely acknowledges.  But the U.S. Bank Defendants would have had to do this work with or without Ashland's involvement.  There was no reason to unnecessarily run up its own or other parties' attorneys' fees by duplicating the U.S. Bank defendants' efforts.  Based on the U.S. Bank Defendants' own calculations as discussed above, Ashland's involvement increased NMI's attorneys' fees and costs by only $77,528.50 compared to what NMI would have incurred fighting against the U.S. Bank Defendants alone, just $36,937.50 of which ($28,282.50 excluding otherwise objectionable fees) relates to potentially compensable activities.

At one point during the Trial, Mr. Coren stated in relation to the document requests listed in Plaintiff's Trial Ex. 201:

> [Y]ou can take a look at the document request and you can see, you know, how volum[inous] they are, what level of commitment was required to respond to them, and no question that we had to respond to quite a bit from U.S. Bank.  ***And Ashland, they were particularly aggressive, and I'm not blaming them for being aggressive,*** but that's what we had to  -- we faced and that's what we had to deal with.

*See* 11/30/2022 Tr. at 166:8:15 (emphasis added).  When confronted on cross-examination about what Ashland behavior was "particularly aggressive," Mr. Coren cited three supposed examples:

- In light of 11 U.S.C. § 303(i)'s rebuttable presumption in favor of fees, "Ashland should have just paid in full ***its responsibility***.  It knew what all the fees were from Mr. Karalis in obtaining the dismissal and it didn't."  12/1/2022 Tr. at 5:9-17 (emphasis added).  Yet, NMI rebuffed each of Ashland's attempts to make an Ashland-only settlement offer, without once making a counteroffer or an Ashland-only settlement demand.  Mr. Coren's co-counsel Mr. Karalis admitted that, when he sent a statement of fees incurred to date to U.S. Bank's counsel in 2017, he did not send it to Ashland, and that, aside from serving

Ashland with the January 4, 2010 motion for sanctions,[25] MK made no quantified

demand on Ashland to pay its fees.  12/1/2022 Tr. at 59:15-20.  Nonetheless, Ashland

made an Ashland-only settlement offer of $50,000 on September 12, 2017, which NMI

rejected without countering.  *See* Trial Ex. A30.  Neither MK nor KCR provided copies

of their invoices to Ashland until August 2021, when they were produced during the

discovery process in this adversary proceeding.  As such, Ashland could not have "just

paid in full its responsibility" as suggested by Mr. Coren, because it did not know the

total amount of the fees, much less "its responsibility" compared to that of the U.S. Bank

Defendants' share.  Prior to Trial, Ashland did offer to pay $150,000 – more than one-

sixth of the Category 1 fees, which seemed more than fair given Ashland's late addition

as one of six petitioners – but the offer was rejected out of hand due to joint tortfeasor

concerns.  *See* Trial Ex. A31.  NMI's counsel advised:

> Given the paucity of the insurance coverage, even a tender of the policy
> limits [approximating $300,000] – plus an additional payment on account
> of prejudgment interest which an endorsement to the policy permits –
> would pose potentially insurmountable complications.

> We are unwilling to enter into a settlement with Ashland that could in any
> way impair, prejudice or reduce our claims and potential recovery against
> U.S. Bank Defendants.

> While the PA joint tortfeasor act likely does not apply, we will not take
> the risk that a release of and settlement with Ashland may have a negative
> impact on the claims and recovery against the U.S. Bank Defendants.

*Id.*[26]  This record evidence, together with Mr. Coren's testimony at Trial that there were

"too many concerns about joint tortfeasor implications and whether or not accepting

something from Ashland could prejudice or impact our claims against U.S. Bank,"

---

[25] The motion sought fees in the amount of $600,099.00 and costs in the amount of $43,336.85.  *See* Plaintiff's Trial Ex. 116 at 2-3.

[26] As set forth *infra*, Ashland disputes that NMI is entitled to prejudgment interest.  Moreover, Ashland takes exception to NMI's counsel's comment concerning the "paucity" of the remaining coverage.  On the contrary, considerable billing judgment was exercised to conserve the policy for a potential settlement, which NMI hastily rejected.

12/1/2022 Tr. at 10:14-17, strongly suggest that NMI would not have entered into an Ashland-only settlement on *any* reasonable terms due to amorphous joint tortfeasor concerns even though "the PA joint tortfeasor act likely does not apply."

- "Ashland took an appeal of the dismissal order to the Third Circuit, as did U.S. Bank, but U.S. Bank dropped its appeal before the briefing schedule issued. Ashland took it to the end in the Third Circuit, wasn't satisfied with what had happened in the Eleventh Circuit and the decisions of Judge Fehling …." 12/1/2022 Trial Tr. at 5:18-23. As previously discussed, NMI incurred just $36,937.50 as a result of Ashland's pursuit of the Third Circuit appeal. Moreover, on cross-examination by U.S. Bank's counsel, Mr. Coren admitted that "a party that believes that the decision of a lower court is not appropriate, for whatever the reasoning is, has a right to appeal if they do it timely," 12/1/2022 Tr. at 38:3-5, and acknowledged that both sides have pursued appellate rights at various during this litigation, 12/1/2022 Trial Tr. at 38:9-29:21. Pursuing appeals does not make a party "intransigent" or "particularly aggressive."

- Finally, as evidence of Ashland's "particularly aggressive" behavior, Mr. Coren stated "I went through the exhibits, which are in evidence, and I counted this morning Ashland participated in 26 depositions in the (i)(2) litigation." 12/1/2022 Trial Tr. at 38:9-29:21. He could not say whether Ashland noticed any of said depositions; NMI's own trial exhibits reflect that Ashland did not. *See* Plaintiff's Trial Ex. 86-89.

Clearly, Ashland's behavior was ***not*** "particularly aggressive." Indeed, Ashland played a substantially lesser role than U.S. Bank in the involuntary proceedings from beginning to end. But rather than simply acknowledging that he had misspoken, Mr. Coren doubled down on his

accusation, citing absurd examples of Ashland's supposedly aggressive behavior and thereby

undermining the credibility of his testimony.

### 3.      Joint and Several Liability Should Not Be Imposed

In the 9/2/2022 Opinion, the Court questioned whether "§303(i)(1) permits the court to

allocate liability for costs and fees on a relative-fault basis" as a matter of law, *see* 9/2/2022

Opinion at 48, pondering that "the wording of the statute may indicate that apportioning liability

on a causal basis is appropriate only for awards under §303(i)(2)," *id.* at 47.[27]   The unequal roles

played by the petitioners in this case illustrate precisely why courts do and should have

discretion as to whether or not to hold some or all petitioners jointly and severally liable.

As the source of its concern, the Court references the wording of the statute and *In re*

*Advance Press & Litho, Inc.*, 46 B.R. 700, 705 (Bankr. D. Colo. 1984), which notes "a paucity of

authority with respect to when, under what circumstances and specifically against whom an

award under this subsection should be made" and thus "interpret[s] this provision as

contemplating a 'no-fault' standard, whereby an award, if at all, should be imposed against all

petitioners, jointly and severally."   However, since 1984, numerous courts have exercised their

discretion to allocate not only compensatory damages, but also attorneys' fees and costs, on a

relative fault basis.   A more recent case out of the same district that decided *Advance Press*

states:

> The Court should allocate costs and damages against those who are the most
> responsible for the litigation; the driving force(s) behind the Petition filing.   To do
> otherwise would be manifestly inequitable and an injustice

---

[27]   The Court contrasts §303(i)(1), which "states that judgment may be grated 'against the petitioners,'" with §303(i)(2), which "provides for judgment 'against any petitioner that filed in bad faith.'"   9/2/2022 Opinion at 47. Respectfully, Ashland submits that this is a stretch.   Both subsections of §303(i) give the Court broad discretion to award and apportion liability.   If anything, apportioning liability for attorneys' fees jointly and severally where, as here, one petitioner "clearly played a smaller role" and did not participate at all in several of the ancillary matters for which fees are sought would be inconsistent with §303(i)(1)'s requirement that only "reasonable" fees are recoverable.

*See In re Oakley Custom Homes*, 168 B.R. 232, 242 (Bankr. D. Colo. 1994)(apportioning attorneys' fees among petitioners).

Other courts have followed suit, holding that "a bankruptcy court has **discretion** to hold all or some petitioners jointly or severally liable **for costs and fees**, to apportion liability according to the petitioners' relative responsibility or culpability, or to deny an award against some or all petitioners, depending on the totality of the circumstances." *Sofris v. Maple-Whitworth, Inc.*, 556 F.3d 742, 746 (9th Cir. 2009)(emphasis added). Similarly, in this District, the *Forever Green* court stated:

> [T]here is no requirement that a § 303(1) award be assessed equally among the petitioning creditors. It is within a bankruptcy court's discretion to assess one creditor with the entirety of the §303(i) award and hold the others harmless.

*Forever Green*, 2017 Bankr. LEXIS 1240, at *24-*25. Accordingly, the *Forever Green* court held that a petitioner who "did not participate in the appellate proceedings … therefore should not bear any liability for those fees and costs." *Id.* at *48. *See also Ross*, 135 B.R. at 239 ("When a particular petitioner was the driving force behind the filing of the involuntary case, **the fees** may be assessed in whole or in large part against that petitioner.")(emphasis added).

It can readily be demonstrated that Ashland did not contribute to at least $1,100,758.72 of the $4,215,030.83 in fees and costs sought pursuant to 11 U.S.C. § 303(i)(1). Even the other parties to the Adversary Proceedings have conceded that Ashland should not share in these fees and costs. Moreover, the evidence presented at Trial strongly suggests that, despite Ashland's minimal role, NMI would **never** have entered a standalone settlement with Ashland due to its joint tortfeasor concerns. *See* Trial Ex. A31; 12/1/2022 Tr. at 10:14-17. These facts illustrate precisely why – contrary to the reservations expressed by the Court in the 9/2/2022 Opinion – courts may and should exercise their discretion to allocate liability for costs and fees on a

relative-fault basis.  Moreover, even as to Categories 1, 2, 3, and 4, the Court should – in addition to other challenges to the reasonableness and recoverability of the fees – be permitted to consider evidence and argument concerning relative fault of the petitioners as suggested by its statement that "Ashland clearly played a smaller role in the involuntary petition against the Debtors than U.S. Bank." *See* 9/2/2022 Opinion at 48.  Moreover, as Ashland argued at Trial, imposing joint and several liability could work a substantial injustice on Ashland given the pending Third Circuit appeal of the U.S. Bank Defendants' setoff rights.

**C.     NMI Is Not Entitled to Prejudgment Interest**

For the reasons set forth in U.S. Bank Defendants' Bench Memorandum Regarding Plaintiffs' Claim for Pre-Judgment Interest on Attorneys' Fees [Dkt. No. 201] (the **"Prejudgment Interest Memo"**),[28] prejudgment interest is unwarranted and, even if it were appropriate, NMI seeks prejudgment interest at an improperly high rate.  Prejudgment interest is intended to "compensate a beneficiary for the lost interest value of money *wrongly withheld* from him or her."  *Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 617-18 (6th Cir. 1998)(emphasis added).  *See also* Prejudgment Interest Memo at 4.  Even though this Court has found there to be a rebuttable presumption that reasonable attorneys' fees will be awarded under § 303(i)(1) upon dismissal of an involuntary petition other than on consent of all parties, such an award is discretionary rather than mandatory.  *In re Express Car & Truck Rental, Inc.*, 440 B.R. 422, 431 (Bankr. E.D. Pa. 2010).  *See Ross*, 135 B.R. at 237.  The Court retains discretion to evaluate the reasonableness of NMI's fee request and to grant or deny some or all of the fees requested.

---

[28] Ashland incorporates by reference the Prejudgment Interest Memo, which aptly summarizes the relevant law on prejudgment interest.

This Court considered the propriety of prejudgment interest in *David Cutler Indus. v. Bank of Am. (In re David Cutler Indus.)*, 502 B.R. 58 (Bankr. E.D. Pa. 2013). There, where an avoidance action defendant "ha[d] not articulated any grounds for the denial of prejudgment interest as inequitable or inappropriate," the Court "perceive[d] no reason to depart from the presumption in favor of prejudgment interest." *Id.* at 79. The Court relied on *Hechinger Inv. Co. of Del., Inc. v. Universal Forest Prods. (In re Hechinger Inv. Co. of Del., Inc.)*, 489 F.3d 568 (3d Cir. 2007), which – like *David Cutler* – arose in an avoidance context. In *Hechinger*, the Third Circuit recognized that while "[t]here is no reference to prejudgment interest in the Bankruptcy Code, … courts have relied on the word 'value' in § 550(a) as authorizing an interest award." *Id.* (citing *In re Art Shirt Ltd., Inc.*, 93 B.R. 333, 341 n.9 (E.D. Pa. 1998)). Significantly, while § 550(a) permits the recovery of "property transferred, or, if the court so orders, the *value* of such property," 11 U.S.C. § 550(a), § 303(i)(1) permits the recovery of only "(A) costs; or (B) a reasonable attorneys' fee," 11 U.S.C. § 330(i)(1). Accordingly, the same statutory analysis that supports prejudgment interest on a § 550(a) award compels the opposite result under the more narrowly-worded § 330(i)(1).

Moreover, unlike in *David Cutler*, the Defendants have articulated numerous reasons why awarding prejudgment interest to NMI would be inequitable and inappropriate. *See* Prejudgment Interest Memo at 8-11. Most notably, much of the passage of time in this case has resulted from various Court-imposed stays and other tactical case management decisions made by NMI itself. In particular, NMI made an intentional, strategic decision to bifurcate its § 303(i)(1) and (2) claims and to proceed with the § 303(i)(2) claim first in the hope of getting its § 303(i)(2) claim in front of a jury. NMI's strategy did not pay off, and Defendants should not be expected to pay prejudgment interest due to NMI's tactical decisions. *See David Cutler*, 502

B.R. at 79 (citing *In re Interstate Bakeries Corp.*, 499 B.R. 376 (Bankr. W.D. Mo. 2013)(denying prejudgment interest as inequitable because value of avoidable transfer was not clear prior to trial, making it impossible for the defendant to determine how much it might owe and because trustee's tactical decisions delayed the adjudication).

As to Ashland specifically, Ashland has explained *supra* why – contrary to NMI's assertion that "Ashland should have just paid in full its responsibility" because "[i]t knew what all the fees were from Mr. Karalis in obtaining the dismissal and it didn't," 12/1/2022 Tr. at 5:9-17 – it was impossible for Ashland to know how much it might owe. Ashland's attempts to engage NMI in Ashland-only settlement discussions were rebuffed, and NMI never made a counteroffer or Ashland-only settlement demand. When MK's accrued fees were communicated to the U.S. Bank Defendants in 2017, Ashland was not included. *See* 12/1/2022 Tr. at 59:15-20. Ashland did not wrongly withhold any funds from NMI as would be required for an award of prejudgment interest. Moreover, aside from $438,567.07 of MK's fees, *see* 12/1/2022 Tr. at 21:19 to 22:2, NMI has paid nothing out of pocket and therefore has not been deprived of the time value of its money. NMI's counsel could have commanded interest in its fee agreements, but did not.

NMI's request for prejudgment interest should be denied as inequitable and inappropriate, but to the extent it is granted in whole or in part, the appropriate interest rate is determined by 28 U.S.C. § 1961 insofar as NMI's claim for attorney's fees and costs is "a remedy provided by a federal bankruptcy cause of action." *See David Cutler*, 502 B.R. at 80 (where claim arose pursuant to a section of the Bankruptcy Code (§ 550), "the appropriate rate is determined by federal law," *i.e.*, 28 U.S.C. § 1961).

PHLDMS1 30018454v.1

## JOINDER

Ashland joins in the U.S. Bank Defendants' post-trial memorandum to the extent that it supports the disallowance of fees and costs against all Defendants, including on any additional basis not discussed herein.

## CONCLUSION

WHEREFORE, Ashland respectfully requests that the Court: (a) decline to hold Ashland liable for fees and costs incurred prior to April 10, 2009; (b) decline to hold Ashland liable for fees in Categories 5 through 13; (c) decline to hold Ashland jointly and severally liable with the U.S. Bank Defendants; (d) deny NMI's request for $76,522.70 in Category 2 fees and costs as outside the scope of KCR's engagement as stated in its Fee Agreement; (e) deny KCR's fees on the basis that the conditions of the contingent fee arrangement were not met (i.e., NMI derived no "Financial Benefit" from the "Litigation Claims" as those terms are defined in KCR's Fee Agreement); (f) deny or reduce NMI's Category 1 through 4 fees and costs as unreasonable in light of NMI's imminent closure at the time the involuntary petitions were filed; (g) deny or reduce NMI's Category 1 through 4 fees and costs as unreasonable in light of deficiencies, including without limitation vagueness, block-billing, duplication, and excessive time spent and hourly rates; (h) deny or reduce the Category 4 fees and costs to the extent they were neither necessary or relevant to § 303(i)(1) litigation; and (i) grant such other and further relief as is just and proper.

PHLDMS1 30018454v.1

Dated: December 23, 2022            **WHITE AND WILLIAMS LLP**

By:    */s/ Amy E. Vulpio*
           Amy E. Vulpio
           PA ID No. 84477
           1650 Market Street, Suite 1800
           Philadelphia, PA  19103
           Telephone: (215) 864-6250
           Facsimile:  (215) 789-7550
           Email: vulpioa@whiteandwilliams.com

           *Counsel for Defendant, Ashland Funding, LLC*

PHLDMS1 30018454v.1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: | : **Chapter 11** |
| | : |
| NATIONAL MEDICAL IMAGING, LLC and | : **Case Nos. 08-17348 and 08-17351** |
| NATIONAL MEDICAL IMAGING HOLDING | : **(ELF)** |
| COMPANY, LLC, | : |
| | : |
| Debtors. | : |
| | : |
| NATIONAL MEDICAL IMAGING, LLC and | : |
| NATIONAL MEDICAL IMAGING HOLDING | : |
| COMPANY, LLC, | : |
| | : **Adv. Pro. No. 14-00250 (ELF)** |
| Plaintiffs, | : |
| | : **Adv. Pro. No. 14-00251 (ELF)** |
| v. | : |
| | : |
| U.S. BANK, N.A., *et al.*, | : |
| | : |
| Defendants. | : |

**<u>CERTIFICATE OF SERVICE</u>**

I, Amy E. Vulpio, hereby certify that a true and correct copy of Post-Trial Memorandum

of Ashland Funding, LLC was delivered via email and the Court's electronic filing system to the

following parties on December 23, 2022.

| | |
|---|---|
| Steven M. Coren, Esquire | Aris J. Karalis |
| Janice Felix, Esquire | Maschmeyer Karalis P.C. |
| Kaufman, Coren & Ress, P.C. | 1900 Spruce Street |
| Two Commerce Square, Suite 3900 | Philadelphia, PA  19103 |
| 2001 Market Street, | (215) 546-4500 |
| Philadelphia, PA  19103-2713 | akaralis@cmklaw.com |
| (215) 735-8700 | |
| scoren@kcr-law.com | |
| jfelix@kcr-law.com | |

Steven J. Adams, Esquire
Stevens & Lee, P.C.
111 North Sixth Street
P.O. Box 679
Reading, PA  19603-0679
(610) 478-2133
sja@stevenslee.com

Peter H. Levitt, Esquire
John Bustard, Esquire
Shutts & Bowen LLP
1500 Miami Center
201 South Biscayne Blvd. #1500
Miami, FL  33131
(305) 415-9447
plevitt@shutts.com
jbustard@shutts.com

Dated: December 23, 2022

**WHITE AND WILLIAMS LLP**

By:     */s/ Amy E. Vulpio*
Amy E. Vulpio
PA ID No. 84477
1650 Market Street, Suite 1800
Philadelphia, PA  19103
Telephone: (215) 864-6250
Facsimile:  (215) 789-7550
Email: vulpioa@whiteandwilliams.com

*Counsel for Defendant, Ashland Funding, LLC*

PHLDMS1 30018454v.1