IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| NATIONAL MEDICAL IMAGING, LLC | : | Case No.: 08-17351-jkf |
| and NATIONAL MEDICAL IMAGING | : | Case No.: 08-17348-jkf |
| HOLDING COMPANY, LLC, | : | |
| | : | |
| Alleged Debtors | : | Involuntary Chapter 7 Cases |
| | : | |
| NATIONAL MEDICAL IMAGING, LLC | : | Adv. Case No.: 14-00250 |
| and NATIONAL MEDICAL IMAGING | : | Adv. Case No.: 14-00251 |
| HOLDING COMPANY, LLC, | : | (Consolidated for Pre-Trial and Trial) |
| | : | |
| Plaintiffs | : | |
| | : | |
| vs. | : | |
| | : | |
| U.S. BANK N.A., *et al,*. | : | |
| | : | |
| Defendants | : | |
| | : | |

## U.S. BANK DEFENDANTS' POST-TRIAL MEMORANDUM

Following the trial conducted by the Court on November 28 to December 1, 2022,

the Court permitted the parties to submit post-trial briefs on or before December 23, 2022.

The first part of this brief discusses the applicable law, the Court's prior rulings and

certain legal issues and arguments that arose during the course of the trial. The second

part contains U.S. Bank's assessment of the amounts that should be awarded, at most, in

accordance with the Court's prior rulings and otherwise applicable law.[1]

---

[1] For ease of reference, the U.S. Bank Defendants (all defendants other than Jane Fox who is no longer a defendant and defendant Ashland Funding, LLC) will refer to themselves as "U.S. Bank."[1] They will refer to the Debtors either as the Debtors or collectively as "NMI." They will refer to Case No. 15-05044-cv-CMR (E.D. Pa.) as the "damages case" or the "(i)(2) case" and to the instant case as the "fee case" or the "(i)(1)

## RESERVATION

U.S. Bank does not waive, and expressly preserves, its position that Section 303(i)(1) of the Bankruptcy Code only allows an award of reasonable fees and costs for the legal work performed in obtaining the dismissal of an involuntary petition.[2]

## APPLICABLE LEGAL PRINCIPLES

## I.    THE APPLICABLE STATUTE

Section 303(i) of the Bankruptcy Code provides:

**(i)** If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment—

**(1)** against the petitioners and in favor of the debtor for—

**(A)** costs; or
**(B)** a reasonable attorney's fee; or

**(2)** against any petitioner that filed the petition in bad faith, for—

**(A)** any damages proximately caused by such filing; or
**(B)** punitive damages.

---

case." Trial exhibits will be referred to as P-# for Plaintiffs' exhibits and D-# for the U.S. Bank Defendants' exhibits.

[2] This Court (Judge Fehling) ruled that Section 303(i) authorizes appeal fees, fees for fee recovery litigation, and fees incurred in pursuing a bad-faith claim pursuant to Section 303(i)(2). *See In re Nat'l Med. Imaging, LLC*, 644 B.R. 94 (Bankr. E.D. Pa. 2022). More recently, this Court ruled that NMI can recover fees incurred to preserve a Section 303(i) claim from offset or judgment execution and, possibly, fees for the unsuccessful prosecution of a bad-faith claim. *In re Nat'l Med. Imaging, LLC*, 570 B.R. 147, 151 (Bankr. E.D. Pa. 2017). As to the latter, the Court imposed certain evidentiary requirements concerning relatedness and cautioned that any fees awarded for the unsuccessful damages case might be significantly discounted based on the result.

Preliminarily, it is clear from a plain reading of Section 303(i) that it does not impose a form of strict liability[3] for attorney's fees or provide a proximate cause standard, as suggested (without citation to authority) at trial by one of NMI's counsel. The statute does impose a proximate cause standard for the recovery of *actual damages*. No court has applied a "proximate cause" tort concept in determining what fees to award under Section 303(i)(1).

## II.   THE "LODESTAR" APPROACH

As this Court has explained, the Supreme Court, in *Hensley*, "established the well-known lodestar formula for determining an amount of a 'reasonable fee' under federal fee-shifting statutes: 'the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.'" *In re Nat'l Med. Imaging, LLC*, 644 B.R. 94, 108 (Bankr. E.D. Pa. 2022) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) and *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 546 (2010)).

In Section 303(i) and other cases based on statutory fee-shifting[4] statutes, courts begin their analysis with the "lodestar." *In re Delaware Valley Lift Truck Inc.*, 640 B.R. 342, 373 (Bankr. E.D. Pa. 2022); *In re Diloreto*, 388 B.R. 637, 652 (Bankr. E.D. Pa.

---

[3] Strict liability would remove the discretionary term "may" from the language of § 303(i) and erroneously replace it with the mandatory directive "shall." *See In re Clean Fuel Techs. II, LLC*, 544 B.R. 591, 601 (Bankr. W.D. Tex. 2016) (rejecting automatic fee shifting and holding, in accord with the overwhelming majority of courts, that Section 303(i) fees are discretionary). Even if the statute did impose automatic fee-shifting, that would not remove the requirement that the fees be reasonable. In fact, the statute itself merely gives the court discretion to impose a "reasonable fee."

[4] Section 303(i) does not fit the mode of the usual "prevailing party" fee-shifting statute. It requires an entitlement determination as a threshold issue. Nevertheless, Section 303(i) has been construed within the framework the Supreme Court and other courts have applied when analyzing fee-shifting statutes.

2008), *aff'd*, 442 B.R. 373 (E.D. Pa. 2010).  The party moving for statutory fees bears the initial burden of presenting evidence to support the reasonableness of the fees.  *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990) (citing *Hensley*, 461 U.S. at 433); *Norman v. Housing Authority of the City of Montgomery*, 836 F.2d 1292, 1303 (11th Cir. 1988) (the "fee applicant bears the burden of establishing entitlement and documenting the appropriate hours and hourly rates."); *Metal Partners Rebar, LLC v. Carson Concrete Corp.*, 2015 WL 4378386, at *2 (E.D. Pa. July 16, 2015) (same).

The first step in calculating the lodestar is determining whether the number of hours expended by the attorneys was reasonable.  Any "hours that were not reasonably expended" must be excluded from the fee calculation.  *Hensley*, 461 U.S. at 434 (internal quotations omitted). "Hours are not reasonably expended if they are excessive, redundant, or otherwise unnecessary." *Rode*, 892 F.2d at 1183.  Here, as discussed below, a separate issue exists as to time that was *not* devoted to compensable tasks.

Once the petitioning party provides evidence of the reasonable hours expended, the burden shifts to the other party to demonstrate the unreasonableness of the hours expended.  *Metal Partners*, *supra*, at *3 (citing *Wachovia Securities, LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 759 (7th Cir. 2012)).

After the Court determines whether the hours expended were reasonable, it must then assess the hourly rates charged for that work. A "reasonable hourly rate is calculated according to the prevailing market rates in the community." *Washington v. Philadelphia Cnty. Ct. of Common Pleas*, 89 F.3d 1031, 1035 (3d Cir. 1996). "The starting point in determining a reasonable hourly rate is the attorneys' usual billing rate, but this is not dispositive." *Pub. Interest Research Group v. Windall*, 51 F.3d 1179, 1185 (3d Cir.1995).

4

Once the lodestar has been computed, the "court can adjust the lodestar downward if the lodestar is not reasonable in light of the results obtained." *Rode*, 892 F.2d at 1183.

On a broader level, the "*Johnson* factors" must be considered in evaluating the reasonableness of the fees sought under a federal statute providing for fees.[5]  For the most part, NMI did not address the *Johnson* factors at trial.  It merely presented its fee records, attested that the work reflected therein was actually performed and that the attorneys were charging their standard rates.  Aris Karalis provided some testimony as to the work his firm performed during the dismissal phase and as to the intensity of that effort.[6]

As to complexity, the dismissal work did not involve novel or particularly difficult issues.  The main issue was whether the DVI entities were to be viewed as separate creditors of NMI.  A finding, by a different court, that they were not separate creditors led to the dismissal of the petitions in this case.  The ultimate disposition of the

---

[5] *Hensley* and other federal fee-shifting cases direct courts to evaluate the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).  *Hensley*, 461 U.S. at 429-30.  The twelve factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Hensley*, 461 U.S. at 430 (citing *Johnson*, 488 F.2d at 717-19).

[6] The *Rosenberg* involuntary bankruptcy case also involved intensive effort by the alleged debtor, as evidenced by the dockets in the main case and the fee adversary proceeding.  D-362 & D-363.  The motion to dismiss the involuntary petition involved an evidentiary hearing addressing a wide-range of issues.  *In re Rosenberg*, 414 B.R. 826, 832 (Bankr. S.D. Fla. 2009), *aff'd*, 472 F. App'x 890 (11th Cir. 2012).  Rosenberg sought the total sum of $334,915.45 in fees and costs of $23,624.05 incurred by him in "fending off" the involuntary bankruptcy (not including appeals and fee litigation).  Case 10-03812-AJC (Bankr. S.D. Fla.), D.E. 16 (p. 17).  The MK fees for Category 1 are double this amount.

involuntary petitions in this case turned on the application of collateral estoppel. These were not run-of-the-mill issues, but they were not especially complex ones either.

The work performed in the fee case focused on a few key legal issues, including whether fees can be awarded for unsuccessful work and for collateral proceedings. The fee case has not been a "walk in the park" for either side, and it has been hotly contested, but only a few key legal issues have been (and continue to be) critical. The rest of the work mainly involves assessing the "lodestar."

Further, by commencing a separate and unsuccessful action seeking damages, NMI complicated both the underlying litigation and the task of determining reasonable fees and costs. Much of the fee litigation (including much of the trial time and much of this brief) has revolved around issues concerning the ability of NMI to recover fees for the wholly unsuccessful prosecution, mainly in the District Court, of the damages case. The entire issue of "relatedness" arises from NMI's decision to split its Section 303(i) causes of action and prosecute them through separate complaints in two different courts.

NMI made the voluntary decision to take that approach because its goal was to prosecute a potentially half-billion case (which had no basis in fact) before a Philadelphia jury in federal district court. U.S. Bank should not be taxed with the fallout from NMI's strategic (and unsuccessful) decision.[7]

---

[7] "[T]he only fees that should be shifted are those the losing party foisted on the winner. Expenses the winning party incurred unnecessarily or unreasonably may not be shifted, else we induce the winners to run up bills on the losers' tabs." *Matter of Pierce*, 165 B.R. 252, 255 (Bankr. N.D. Ind. 1994) (quoting *Matter of Central Ice Cream Co.*, 841 F.2d 732, 735 (7th Cir.1988)). Thus, "when a defendant seeks prevailing party attorney's fees[,] the plaintiff should not be penalized for the defendant's failure to mitigate the amount of his attorney's fees." *Id.* (quoting *Leffler v. Meer*, 936 F.2d 981, 987 (7th Cir. 1991)). Here, not only did NMI not mitigate its fees, it exponentially

Before analyzing the legal issues impacting the potentially compensable work, U.S. Bank will address work that is not compensable because it is not sufficiently related to any of the areas the Court has described as potentially compensable.

## III.   UNRELATED MATTERS

Only the legal work that relates to the claim for which statutory fees are available is compensable.  Bankruptcy courts have reduced Section 303(i) fees for time spent on matters that are not sufficiently related to the dismissal of an involuntary petition.  *See In re Forever Green Athletic Fields, Inc.*, 2017 WL 1753104, at *12 (Bankr. E.D. Pa. May 3, 2017) (deducting time for work on collection of a fee award);  *In re Better Care, Ltd.*, 97 B.R. 405, 413 (Bankr. N.D. Ill. 1989) (deducting fees for time spent on state court litigation and resisting an IRS levy).

As discussed further below, this Court ruled that some fees incurred by NMI in its unsuccessful bad-faith claim may be related to compensable work—*i.e.*, the recovery of Section 303(i)(1) fees—and, therefore, compensable.  *Nat'l Med. Imaging*, 644 B.R. at 119-20.  As discussed below, most of the work performed by KCR in the damages case was unrelated.

In the fee recovery area (Category 3), KCR had numerous hours for non-compensable work—*i.e.*, work that was not sufficiently related to the recovery of fees to be compensable.  This non-compensable KCR Category 3 work is detailed in D-434 (pdf 24-31).  It even includes 27.3 hours and $11,092.50 for vetting NMI's bad-faith claim,

---

increased its fees (and U.S. Bank's) by deciding to litigate the two causes of action separately in two different courts.  That procedural choice vastly (and unnecessarily) increased the fees for litigating fees.

evaluating whether to take it on contingency and preparing the contingency fee agreement.  D-434 (pdf 29).  This is work KCR did *even before being retained*.  KCR vetted the case and then lost it.  It wants U.S. Bank to pay for the vetting work.  KCR spent 27.3 Category 3 hours ($18,059.00) on Rosenberg's Florida case, U.S. Bank's action to enforce Rosenberg's guaranty, the assignment of NMI's claim to the Douglas Rosenberg Trust, and work that should have been placed in Category 4 because it relates to the failed damages claim.  These items are documented in D-434 as well.

A substantial portion of the hours logged by MK and KPC (the two firms headed by Aris Karalis) were unrelated to compensable tasks, either to dismissal of the petitions or to the recovery of fees for the dismissal of the petitions.

D-430 shows MK time in Category 1 (dismissal of petition) from November 2008 through May 2016 that is not related to NMI's efforts to obtain dismissal of the petition. 146.5 hours of attorney time totaling $61,788.75 was for tasks unrelated to dismissal or not sufficiently related to justify a fee award.  Brief summaries of the work are located on the bottom of each page in D-430.  This work included, among other things, matters relating to U.S. Bank's guaranty enforcement action in Bucks County (in which U.S. Bank prevailed), matters concerning NMI landlords, matters relating to other lenders including General Electric, First Keystone and Sterling Bank,[8] insurance matters, the *Rosenberg* Florida case and the pursuit of damages in that case[9] (including voluntary

---

[8] Many of the entries concern a long-running dialog with Sterling Bank, NMI's line of credit provider.  The District Court, in the damages case, determined that the involuntary petitions did not create NMI's problems with Sterling Bank.

[9] Many of the entries involve the *Rosenberg* litigation.  It appears from these records that Mr. Karalis was not merely receiving occasional updates.  He was actively

mediation[10] in *Rosenberg*), and matters concerning the Pennsylvania DOR. Defendants object to all of these hours and fees as unrelated to NMI's dismissal effort and therefore not compensable.

D-431 shows unrelated MK attorney time in Category 3 (fee recovery) and a small amount in a "combined" category. The date range is January 2010 through September 2016. Based on the descriptions of the entries in D-431, these charges were not for Section 303(i)(1) fee recovery work, but, rather, were for unrelated tasks or tasks not sufficiently related to justify compensation. The unrelated time, as shown in D-431, amounts to $275,489.75 for 762.05 hours of work.

The majority of the unrelated time was spent in the years 2010, 2011, 2012 and 2013. In those four years, with the exception of the month of January 2010, the proceedings in the Bankruptcy Court were stayed. Little record activity, other than administrative matters, and U.S. Bank's failed effort to vacate the stay in October 2010, took place in those four years, and none of it relevant to the recovery of fees except the motions filed on January 4, 2010 (seeking fees, costs and damages) and the motion filed

---

involved in substantive discussions with Rosenberg's Florida counsel. A number of entries actually state that the work concerns Rosenberg's damages claim.

[10] Some courts have declined to award prevailing party fees for an attorney's voluntary participation in a mediation or a settlement conference. *Vallies v. Sky Bank*, 2012 WL 2301706, at *7 (W.D. Pa. June 18, 2012) (finding that awarding such fees would disincentivize settlement efforts). Policy issues aside, NMI's counsel should not be paid by U.S. Bank for attending a voluntary mediation in a related case in another jurisdiction, one in which the client (Rosenberg) was represented by other counsel. Relatedly, a mandatory judicial settlement conference took place in the damages case before Magistrate Judge Wells of this District. But, NMI lost that case. It can hardly seek payment of its counsel costs for a settlement conference in a case it lost. Clearly, the settlement conference was not necessary to building a record to recover 303(i)(1) fees and was not useful for that purpose.

on December 18, 2013 (D.E. 243 in Case No. 08-17351-elf) seeking to vacate the stay. Basically, Judge Fehling shut the proceeding down for nearly four years.

How then did MK amass approximately $452,000 in fees, much of it during this quiet period in the NMI proceedings? *See* P-162A (Category 3). The time entries extracted and reprinted in D-431 show how. Much of MK's work concerned the goings on in the *Rosenberg* case. Other work concerned non-bankruptcy litigation between U.S. Bank and NMI or Rosenberg. Other work involved NMI business matters. Brief summaries of the work are located at the bottom of each page in D-431.

For 2014 and 2015, there are Category 3 time entries showing work in developing NMI's damages case, coordination and consultation with Steven Coren and his colleagues concerning NMI's damages claim and the review of developments concerning the NMI damages claim.

No doubt the work performed by the Karalis lawyers was valuable to their client. But, it is not related to fee recovery or at least not related closely enough to require U.S. Bank to pay the charges. Total non-compensable charges in the "fee recovery" category as reflected in D-431 are $275,489.75 for 762.05 hours of work. U.S. Bank should not be required to pay the $275,489.75 amount.

## IV.  KCR'S CATEGORY 4 WORK

### A.  This Court's Approach

NMI seeks to recover $1,336,555 for KCR's work in Category 4, which consists of fees incurred in unsuccessfully prosecuting the damages case in District Court.

The Supreme Court has stated:

> If ... a plaintiff has achieved only partial or limited success, the product of
> hours reasonably expended on the litigation as a whole times a reasonable
> hourly rate may be an excessive amount.

*Hensley*, 461 U.S. at 436.  The Court noted that, in fixing the reasonable attorney's fee,

"the most critical factor is the degree of success obtained."  *Id*.  Accordingly, it held that

when only limited success is obtained, the district court "may simply reduce the award to

account for the limited success."  *Id*. at 436-37.

As this Court explained, "[t]he degree of litigation success is 'particularly crucial'

where a plaintiff has succeeded 'on only some of his claims for relief.' . . .   In such cases,

the court must determine whether the plaintiff's unsuccessful claims are related to the

successful claims."  *Nat'l Med. Imaging*, 644 B.R. at 108-09 (quoting *Hensley* at 434).[11]

Here, NMI pursued a separate claim for damages (the (i)(2) claim) in the District

Court.  NMI relied heavily on separate contingency counsel, KCR, to pursue that claim.

NMI suffered a complete loss, not a partial loss.  In cases in which unsuccessful claims

---

[11] This Court, citing *Hensley* at 434-35, addressed the role of "relatedness" as the issue has been addressed in single cases involving a combination of successful and unsuccessful claims.  This Court stated: "Related claims will generally 'involve a common core of facts or will be based on related legal theories.  A counsel's work on related claims 'will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis.'  Conversely, unrelated claims 'are based on different facts and legal theories.'  Where work on a particular claim did not contribute to the successful outcome of a different claim, those claims are unrelated. The relatedness of successful to unsuccessful claims dictates whether a court can award any fees for work expended on unsuccessful claims. If unrelated to a successful claim, a counsel's efforts on an unsuccessful claim 'cannot be deemed to have been expended in pursuit of the ultimate result achieved.'  No fees may therefore be awarded for work on such unrelated and unsuccessful claims.  The court should treat such unrelated claims 'as if they had been raised in separate lawsuits.'  Successful lawsuits involving related—but unsuccessful—claims require a different approach. Such a lawsuit cannot be viewed as a series of discreet claims.  In such cases, a court 'should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.' "  *Nat'l Med. Imaging*, 644 B.R. at 109 (internal citations omitted).

are distinct from successful claims, fees for the unsuccessful claims must be disallowed in their entirety. *Smith v. Borough of Dunmore*, 633 F.3d 176, 184 (3d Cir. 2011).

U.S. Bank maintains that the work in the damages case was distinct and that none of it should be the subject of a fee award. But, in denying U.S. Bank's motion for partial summary judgment, this Court held that NMI may be entitled to some of the fees incurred in the damages case if NMI can show relatedness. This Court reasoned that, at least at the summary judgment stage, "the unsuccessful § 303(i)(2) claim is related to some degree to the § 303(i)(1) claim and therefore, complete denial of attorney's fees incurred in the § 303(i)(2) litigation is not appropriate." *Nat'l Med.*, 644 B.R. at 119-20. This Court noted that, with a trial record, it would "focus on those aspects of the claims that are related as well as 'the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.'" *Id*. (citing *Hensley*, 461 U.S. at 435).

This Court further explained: "Considering the lack of success in the § 303(i)(2) case, the time spent on the § 303(i)(2) claim may be compensable only to the extent that the counsel was obliged to develop a record that was also necessary and relevant in the § 303(i)(1) litigation. This factor, along with the lack of success under § 302(i)(2), may well result in a severe reduction in the attorney's fees awarded for services rendered in the § 303(i)(2) litigation." *Id*.

The Court  made clear, referring to the work on the Section 303(i)(2) claim, that "the relief available to the Debtors is circumscribed." *Id*. The Court considered and rejected the Debtors' argument that *In re TPG Troy, LLC*, 2013 WL 3789344 (Bankr. S.D.N.Y. July 18, 2013), *aff'd*, 793 F.3d 228 (2d Cir. 2015), provides precedent for

12

awarding fees for a wholly unsuccessful § 303(i)(2) claim.[12]  *Id*. at 120.  The Court also rejected the Debtors' argument that the Court should focus on the reasonableness of the Debtors' (or the Debtors' counsels') initial decision to pursue the (i)(2) claim or on the circumstances that existed at the time this decision was made.  *Id*.

Based on the Court's summary judgment decision, U.S. Bank understood that the focus at trial, in respect of NMI's request for fees based on work relating to the prosecution of the (i)(2) claim, would be the relatedness of that work to NMI's effort, in this Court, to recover fees for the dismissal of the involuntary petitions.  U.S. Bank understood that the critical question would be, as this Court put it:  was "the time spent on the § 303(i)(2) claim" spent because NMI's "counsel was obliged to develop a record that was also necessary and relevant in the § 303(i)(1) litigation."  644 B.R. at 119.

At trial, the Court rejected the notion that it should attempt to guess what was in the minds of the litigators or accept their *post hoc* representations concerning their mental states or intentions.  Instead, the Court explained that it would examine the actual work product in the (i)(2) case.  In other words, the Court adopted a "proof is in the pudding" approach.  The "pudding" shows that the majority of the work in the damages case was related to damages, not liability.  Only four witnesses had facts relevant to the "bad faith" issue which was the liability issue.

---

[12] *Troy* is unique in that the court decided that the amount of attorney's fees, which were in the area of $500,000, was sufficiently high to be a deterrent, and, therefore, it did not need to consider awarding damages.

## B.      NMI's Evidentiary Failure

Examining the work product in the (i)(2) case, only the depositions of Jane Fox, Robert Brier, Robert Pinel and Robert Walton and NMI's written discovery requests to U.S. Bank are even arguably relevant to developing a record for the fee case.  Even still, the work was unnecessary as explained below.  But, before examining the work product in the 303(i)(2) case, it is important to note that NMI failed to meet its evidentiary burden at trial on the relatedness issue.

This Court set a high bar for the recovery of fees for the (i)(2) case, and it was incumbent upon NMI, as the movant seeking fees, to provide specific relatedness evidence during the four-day trial.  NMI failed to meet that burden.  NMI did nothing more than offer general statements or general testimony concerning relatedness.

A plaintiff seeking statutory attorneys' fees has the burden to segregate recoverable fees from unrecoverable fees.  *Cohen v. Cmty. Coll. of Phila.*, 522 F. Supp. 879, 881 (E.D. Pa. 1981) ("the burden of persuasion clearly rests on the petitioner to demonstrate which hours were fairly devoted to the successful claims"; criticizing plaintiff's counsel for arguing that all of the work was necessary to achieving overall success).[13]  The difficulty in performing the allocation task "does not relieve a party from its burden."  *D&D Assocs., Inc. v. Bd. of Educ. of N. Plainfield*, 2016 WL 10571900, at *1 (D.N.J. Apr. 29, 2016).  The difficulty of segregating time "in terms of issues or claims presented in a case" . . .

---

[13] *See also Omnipol, A.S. v. Worrell*, 2021 WL 1842213, at *4 (M.D. Fla. Mar. 23, 2021), *report and recommendation adopted*, 2021 WL 1840512, at *4 (M.D. Fla. May 7, 2021) (quoting *Durden v. Citicorp Trust Bank, FSB*, 763 F. Supp. 2d 1299, 1306-07 (M.D. Fla. 2011)); *Gray v. Novell, Inc.*, 2012 WL 3871872, at *4 (M.D. Fla. 2017); *Crown Custom Homes, Inc. v. Sabatino*, 18 So. 3d 738, 740 (Fla. 2d DCA 2009); *Chodorow v. Moore*, 947 So. 2d 577, 579 (Fla. 4th DCA 2007).

"does not excuse [the] Plaintiff from presenting credible evidence that the hours expended by his attorneys were reasonably supportive of his successful claims." *Skehan v. Bd. of Trustees of Bloomsburg State Coll.*, 501 F. Supp. 1360, 1384 (M.D. Pa. 1980).

Further, ("[c]onclusory testimony [as to relatedness] does not carry the Plaintiff's burden." *Id*. The movant must prove relatedness by competent proof, not merely attempt to do so through vague statements that all of the time was inter-related. *Id*. *See also Washington*, 89 F.3d at 1044 (court was "unconvinced" by general argument of counsel that all of the evidence obtained in pursuing the unsuccessful claim also was necessary for the successful claim); *Lubkey v. Compuvac Systems, Inc.*, 857 So. 2d 966, 968 (Fla. 2d DCA  2003) (opinion testimony by the movant's expert concerning the relatedness of claims, lacking any factual foundation, was not competent evidence).

Courts will disallow or reduce time charges if the movant fails to segregate the compensable time relating to a successful statutory fee-shifting claim from time devoted to an unsuccessful claim or one not subject to a fee-shifting statute. *Washington*, 89 F.3d at 1044 (50% reduction where plaintiff failed to prevail on one of his two central claims); *Gray,* 2012 WL 3871872, at *9 (30% reduction overall because the party seeking fees "did not make a sufficient effort to separate time devoted to different claims unrelated to the defense of the civil RICO action").

NMI did not show—by identifying particular deposition testimony or other discovery obtained in the (i)(2) case—that its work met the relatedness standard crafted by this Court.  The time to make that showing was at trial before NMI rested its case. NMI cannot use a post-trial brief to cure its evidentiary failure at trial.  Thus, if NMI's post-trial brief attempts to present facts, not adduced at trial, linking work product in the

15

(i)(2) case to the recovery of fees in the (i)(1) case, the Court should reject that evidence as untimely.

All of the time charges for the (i)(2) case are for time of KCR attorneys. KCR made no effort to segregate the work it claimed was needed to build a record for dismissal fees from other work. Prior to the start of the trial, KCR submitted a billing narrative that included 100% of its Category 4 attorney time prior to August 29, 2019, the date of the adverse summary judgment against NMI entered by the District Court. *See* P-162 (D.E 181-2) (pdf 612-650).

Consequently, NMI failed to carry its burden at trial, and the Court should disallow 100% of the fees in Category 4 (the § 303(i)(2) fees). The Court should also reduce significantly the fees sought by NMI for trial preparation in this case—the fee case—and the four-day trial itself. By not undertaking the necessary allocation process, NMI complicated the trial and placed undue burden and expense on U.S. Bank. But, if the Court decides to forgive this failure, U.S. Bank has analyzed the fees in Category 4 that are potentially compensable, as discussed below.

### C.    The Four "Totality" Factors

The relatedness test for the Category 4 time must be evaluated through the lens of the four factors that bankruptcy courts examine when deciding to award Section 303(i)(1) fees based on the "totality of the circumstances" test. The four general factors are as follows: "(1) the merits of an involuntary petition, (2) the role of any improper conduct on the part of the alleged debtor, (3) the reasonableness of the actions taken by petitioning creditors, [and] (4) the motivation and objectives behind filing the petition." *Nat'l Med. Imaging*, 570 B.R. at 168-69 (citing *Higgins v. Vortex Fishing Systems, Inc.*, 379 F.3d

701, 707 (9th Cir. 2004)).  Scores of bankruptcy cases have recited these four main

factors. [14]

Examining the records for the KCR Category 4 time in light of the four factors, it

is clear that the vast majority of this time was not even arguably related to the pursuit of

the recovery of (i)(1) dismissal fees.  Before examining the KCR work product in

Category 4, it is necessary to dispel two alternative theories for awarding KCR's Category

4 fees.

### 1.    Proof of Damages

No reported case has focused on the absence of proof of damages as a factor in

evaluating the "totality of circumstances."  No court has listed, for instance, "whether or

not the debtor suffered damages or was harmed" as one of the "totality" factors, as if there

might be a "no harm, no foul" rule.

The Court raised a quick question about this at trial, and NMI's counsel then

embraced this theory although never mentioning it before, but this theory lacks any case

law support.  In *DSC*, the bankruptcy court recited the four totality factors and stated that

---

[14] *See, e.g.*, *In re TPG Troy, LLC*, 793 F.3d 228, 235 (2d Cir. 2015); *In re Wyo. Cnty. Builders, LLC*, 514 B.R. 719 (B.A.P. 10th Cir. 2014); *In re Cadena*, 634 B.R. 1038, 1049 (Bankr. C.D. Cal. 2022); *In re Navient Sols., LLC*, 627 B.R. 581, 588 (Bankr. S.D.N.Y. 2021), *aff'd*, 2022 WL 863409 (S.D.N.Y. Mar. 23, 2022); *In re HL Builders, LLC*, 630 B.R. 32, 39-42 (Bankr. S..D. Tex. 2020); *In re Anmuth Holdings LLC*, 600 B.R. 168, 188 (Bankr. E.D.N.Y. 2019); *In re Forever Green Athletic Fields, Inc.*, 2017 WL 1753104, at *9 (Bankr. E.D. Pa. May 3, 2017); *In re Clean Fuel Techs. II, LLC*, 544 B.R. 591, 602 (Bankr. W.D. Tex. 2016); *In re Taub*, 438 B.R. 761, 775 (Bankr. E.D.N.Y. 2010); *In re Express Car & Truck Rental, Inc.*, 440 B.R. 422, 432 (Bankr. E.D. Pa. 2010); *In re Skyworks Ventures, Inc.*, 431 B.R. 573, 576 (Bankr. D.N.J. 2010); *In re DSC, Ltd.*, 387 B.R. 174, 178 (Bankr. E.D. Mich. 2008); *In re Hentges*, 351 B.R. 758, 770 (Bankr. N.D. Okla. 2006); *In re Scrap Metal Buyers of Tampa, Inc.*, 233 B.R. 162, 166-67 (Bankr. M.D. Fla. 1999), *aff'd*, 253 B.R. 103 (M.D. Fla. 2000).

the four factors, while not necessarily exclusive, are "definitive in most cases." *In re DSC, Ltd.*, 387 B.R. 174, 178 (Bankr. E.D. Mich. 2008). Applying the four factors, the court determined that the dismissal was a "close call" involving a determination that two of the petitioners were owed debts that were in bona fide dispute. Although it conducted a thorough analysis explaining why it would not award fees, the court did not even address the issue of whether the debtor had suffered any actual damages. *Id*. at 174-78.

In many Section 303(i) cases, courts award no damages, but do award fees and costs for the work involved in dismissing the petition. They do so without even questioning the appropriateness of awarding fees in the absence of damages. *See*, *e.g.*, *In re Diloreto*, 388 B.R. 637, 649, 651-655 (Bankr. E.D. Pa. 2008), *aff'd*, 442 B.R. 373 (E.D. Pa. 2010); *In re St. Marie Dev. Corp. of Montana, Inc.*, 334 B.R. 663, 673 (Bankr. D. Mont. 2005); *In re Mundo Custom Homes, Inc.*, 179 B.R. 566, 570, 570-71 (Bankr. N.D. Ill. 1995); *In re Whiteside*, 240 B.R. 762, 767 (Bankr. W.D. Mo. 1999). *See also In re MicroStructure Techs. Inc.*, 2009 WL 2208590, at *6 (Bankr. W.D. Wash. July 17, 2009); *In re Synergistic Techs., Inc.*, 2007 WL 2264700, at *7 (Bankr. N.D. Tex. Aug. 6, 2007).

U.S. Bank is unaware of any published decision in which the creditors argued "no harm, no foul." That approach would make little sense. It would force debtors to prove actual damages in order to recover the fees incurred in opposing an involuntary petition that, while not filed in bad faith or not causing actual damages, nevertheless did not satisfy statutory requirements and caused the alleged debtor to incur substantial legal expense.

KCR was not striving to prove damages as a means of proving that Aris Karalis and his colleagues were entitled to fees for the dismissal work. KCR was attempting to

18

recover the amount it pled as actual damages -- $50 million[15] – plus unspecified punitive

damages.[16] The legal work in the (i)(2) case is not related to the (i)(1) case on the basis

that NMI sought to prove damages as a means of bolstering its (i)(1) claim. The four

factors courts examine in deciding whether to award (i)(1) fees do not consider whether

the filing caused damages.

## 2. Defenses Based on Debtor Misconduct

Another issue that surfaced at trial was whether NMI, in the damages case, was

spending time on discovery in an effort to overcome two defenses that U.S. Bank raised

alleging misconduct by NMI. NMI never made this argument until after the Court briefly

raised this issue at trial and then, of course, NMI's counsel immediately embraced this

argument.

"Misconduct by the debtor" is one of the four "totality" factors for a fee award.

But, the focus is not on general or historical debtor misconduct or general bad acts. The

focus is on whether the debtor's misconduct in dealing with the petitioners induced them

to file the petition. *See In re Starlite Houseboats, Inc.*, 470 B.R. 191, 195 (Bankr. D. Kan.

2012). In addition, a few courts have tied this factor to possible debtor misconduct during

the involuntary case itself. *In re Clean Fuel Techs. II, LLC*, 544 B.R. 591, 604 (Bankr.

W.D. Tex. 2016) (explaining that this factor "focuses primarily on the actions of the

---

[15] NMI's expert witness, John Mitchell, later opined that NMI's actual damages were only $31 million. P-160 (pdf 6). The District Court found to the contrary. It concluded that NMI had not even established a genuine issue of material fact as to whether the petitions had proximately caused NMI actual damages. *Nat'l Med. Imaging, LLC v. U.S. Bank, N.A.*, 2019 WL 4076768, at *8 (E.D. Pa. Aug. 28, 2019), *aff'd sub nom. In re Nat'l Med. Imaging, LLC*, 818 F. App'x 129 (3d Cir. 2020).

[16] Although KCR was not seeking damages to bolster the Section 303(i)(1) claim, if that had been the goal, it certainly was not achieved.

alleged debtor preceding and during adjudication of the involuntary petition."). *See also*

*In re Peterson*, 2011 WL 1750732, at *3 (Bankr. D. Wyo. May 3, 2011) (finding that the

debtor's refusal to comply with statutory requirements during the involuntary bankruptcy

proceeding "contributed to the costs of litigating this matter and the delay in the ability

of the court to resolve it").

In its Answer and Affirmative Defenses to NMI's Amended Complaint, U.S. Bank

raised, as its twelfth defense, "misconduct" by NMI.  U.S. Bank alleged that NMI engaged

in misconduct by:  (a) committing a "strategic" payment default, (b) raising frivolous

defenses in the state court confession of judgment action, (c) failing to provide adequate

financial disclosure to Lyon, (d) misleading Lyon concerning NMI's financial condition

and business plans, (e) operating NMI in such a manner that NMI preferred insider

creditors, (f) engaging in deceptive accounting practices designed to conceal additional

compensation paid to Maury Rosenberg, (g) engaging in bad faith negotiations

concerning repayment of the debt, (h) threatening to abandon the leased equipment if its

debt reduction demands were not met, (i) failing to disclose material facts to Lyon

including the fact that NMI's major lender, Sterling Bank, had declared NMI in default,

(j) preferring a related party creditor, the Douglas Rosenberg 2004 Trust, (k) failing to

disclose significant related party business transactions that worsened NMI's insolvency,

(l) failing to advise Lyon that NMI did not own any of its business assets, and (m)

allowing NMI's financial condition to deteriorate without taking reasonable and adequate

steps to protect NMI's creditors including Lyon. U.S. Bank, as a fourth defense, asserted "unclean hands" and referenced various misconduct by NMI.[17]

None of these factors involves misconduct by NMI *during* the bankruptcy case. One or two (perhaps (g) and (h)) might involve conduct NMI committed pre-petition (and known to Lyon pre-petition) that arguably contributed to the decision to file the involuntary petitions. But, NMI needed to show at trial that the litigation activity or discovery in the (i)(2) case concerned the various strands of this "debtor misconduct" defense. NMI failed to make that showing, and it is too late now.

At trial, NMI's counsel merely suggested that U.S. Bank might have intended to explore these areas in depositions. But, NMI did not show that, in the actual discovery that was taken, U.S. Bank in fact sought to develop evidence concerning debtor misconduct. Had NMI attempted to make that showing, it would have failed. But, it is too late now to make that attempt. A post-trial brief is not the occasion to present new evidence. Further, the question is really whether NMI sought to develop contrary

---

[17] U.S. Bank cited NMI's conduct in "(a) misrepresenting the financial condition of NMI to Defendants, (b) misrepresenting the financial condition of Rosenberg to Defendants, (c) committing a strategic payment default to attempt to pressure Defendants into renegotiating a court-approved settlement, (d) making fraudulent and preferential transfers to the Douglas Rosenberg 2004 Trust and to Maury Rosenberg individually; (e) preferring insiders to unrelated creditors; (f) engaging in fraudulent and deceptive accounting practices in order to disguise secret compensation being paid to Maury Rosenberg; (g) diverting corporate opportunities to NMI's 99% shareholder, the Douglas Rosenberg 2004 Trust; (h) breaching a court-approved settlement under which NMI's debt was substantially reduced; and (i) engaging in frivolous litigation tactics in order to avoid paying NMI's lawful obligations to creditors."

evidence proving lack of misconduct so that NMI could respond effectively to such arguments to the extent raised by U.S Bank in the fee case.

At trial, U.S. Bank's counsel testified that the Bank already had the evidence it needed to support these allegations of debtor misconduct, most of which have nothing to do with inducement and none of which concern activity in the involuntary cases themselves.  Further, U.S. Bank's counsel testified that the Bank had cooperative witnesses who could provide testimonial support for these debtor misconduct assertions. In any event, it was NMI's burden at trial to prove that it did work in these areas, and to tie that work to the development of evidence for the (i)(1) claim, and NMI failed to do that.

### D.    Analysis of Legal Work in the Damages Case

Although NMI did not carry its trial burden, U.S. Bank will review the work product in the damages case.  The relevant materials are in the trial record.

### 1.    Depositions

In the damages case, NMI took limited discovery (most probably because NMI's counsel realized that the discovery had been done previously during the dismissal phase and in the related *Rosenberg* litigation) .  NMI noticed only the depositions of Jane Fox, Robert Brier, Robert Pinel and Robert Walton, and it cross-noticed Alan Winick.  The first four individuals, all of whom had been deposed previously,[18] had knowledge of the

---

[18]   NMI's counsel attached to each deposition transcript the prior depositions of these witnesses, many of which were taken on issues relating to the filing of the involuntary bankruptcy case.  Jane Fox and Robert Brier, the two main fact witnesses, were previously deposed extensively by Aris Karalis and Rosenberg's counsel.  Fox was deposed five prior times in related matters.  *See* P-174, pp. 3-4 (deposition of Fox by S.

factors that led to the filing of the involuntary petitions and the reasons and motivations of the petitioners. Winick, a New York attorney, only had knowledge that NMI defaulted under a court-approved settlement agreement and that NMI had approached him in early 2008 to seek debt relief. Winick was one of the outside counsel who represented Lyon in the 2005 series of involuntary bankruptcy cases. Winick's involvement with the NMI matter ended in April 2008, many months before the November 7, 2008 involuntary bankruptcy petitions were filed.[19]

Even though, before Mr. Coren took their depositions, all four of the witnesses with knowledge of facts relevant to the "totality factors"—Fox, Brier, Pinel and Walton—had been deposed on those subjects (and the first three also testified at the *Rosenberg* jury trial), these depositions are at least arguably compensable under the "building a record" concept articulated by this Court. As discussed below, these depositions were not actually necessary because, on January 4, 2010, NMI already had an extensive record to seek dismissal-related fees. But, giving NMI the benefit of the doubt, these four depositions are at least potentially compensable under the "building a record" concept.

The focus of the depositions of Fox, Brier, Pinel and Walton was on the *alleged misconduct of the creditors*, not the misconduct of the Debtors. The Court will see that by reviewing the depositions. But, these witnesses at least had knowledge of the

---

Coren on 5-8-18 in the damages case, attaching five prior depositions and two days of testimony at the *Rosenberg* jury trial).

[19]  Counsel for NMI established nothing at the Winick deposition that could be helpful in addressing the "totality" factors. To the contrary, in response to NMI's counsel's questions, Winick testified that he had no knowledge of Jane Fox's view of NMI or her motivations. P-199 at 106-09. Winick also testified that he lacked knowledge of anything that happened after he sent an April 8, 2008 email to Rosenberg's counsel Susan Verbonitz. *Id*. at 88. The involuntary petitions were filed seven months later.

circumstances surrounding the filings, the events leading to the filings and the purposes of the filings.

The rest of the deposition discovery in the damages case had nothing to do with NMI disproving the "misconduct" defenses (or with any of the totality factors). U.S. Bank took numerous depositions to prove that NMI was a defunct company, grossly insolvent and lacking in any value as a going concern or any asset value. U.S. Bank also sought to disprove the specific assertions made by NMI as to damages which included, among other things: (1) that the involuntary petition caused NMI to lose patient referrals, (2) that it caused NMI to lose access to credit, (3) that it caused Sterling Bank to call NMI's loan, (4) that it caused a loss of "preferred provider" status, (5) that it caused a loss in the value of accounts receivable, (6) that it caused NMI to lose working capital, and (7) that it damaged NMI's reputation in the medical and commercial communities.

The individuals who U.S. Bank deposed, including NMI personnel, were questioned mainly about damages-related issues, not about NMI's misconduct during the involuntary cases or misconduct inducing the filing. Plaintiffs have listed the depositions noticed by U.S. Bank (P-86) and those noticed by Plaintiffs (P-87). The descriptions Plaintiffs have provided concerning the identities of the witnesses seem generally accurate. U.S. Bank has provided a list of depositions, showing the minimal involvement of Plaintiffs in most of the depositions taken by U.S. Bank. Plaintiffs asked almost no questions during most of the depositions. D-425. That is because Plaintiffs did not need these witnesses to build their record—either for the damages case or the fee case.

Plaintiffs' description (P-87) of the depositions they took in the damages case substantiates U.S. Bank's position that the only "related" depositions were those of Fox,

Brier, Pinel and Walton.  Here are Plaintiffs' descriptions of the witnesses they noticed

for deposition as set forth in P-87:

> Alan Winick (cross-notice served by Plaintiffs) (deposed  4/24/2018):

> "Outside counsel for DVI/Lyon/US Bank during the 2005 Involuntary Bankruptcy
> Petitions, involved in negotiating the Settlement Agreement of that filing. Involved
> in 2007 Improper Default Notice sent to NMI and then discussions regarding
> restructuring NMI debt in early 2008."  [Note: nothing in this description shows
> that Winick had any knowledge of the "totality" factors or misconduct by NMI
> inducing the involuntary petitions.]

> Jane Fox, deposed 5/8/2018 and 5/9/2018:

> "Director of Operations at Lyon who signed/authorized both the 2005 Involuntary
> Bankruptcy Petitions and the 2008 Involuntary Bankruptcy Petitions; Deposed
> Personally and as 30(b)(6) Deponent for US Bank Defendants."

> Robert Brier, deposed 5/30/2018:

> "Consultant/Debt Collection Agent hired by Lyon in May 2008. Principal at BG
> Capital Advisors/BG Management, Ashland Funding. Heavily involved in the
> decision to file the 2008 Involuntary Bankruptcy Petitions."

> Robert Walton, deposed 5/31/2018:

> Attorney at the Flamm Boroff & Bacine, law firm engaged by Brier to represent
> Lyon in debt collection efforts in May 2008. Also Principal at Ashland Funding.
> Heavily involved in the decision to file the 2008 Involuntary Bankruptcy Petitions.

> Robert Pinel, deposed 6/20/2018:

> "Bankruptcy Attorney at the Flamm Boroff & Bacine who prepared the 2008
> Involuntary Bankruptcy Petitions and subsequent amendments."

In addition, P-87 reveals that NMI deposed the following damages or causation of

damages expert witnesses:  Harris Devor 10/26/2018, John O'Donnell 10/29/2018, David

C. Levin 10/30/2018, and Charles Lunden 11/8/2018.   These are all damages experts.

NMI did not depose Judge Gerber (and U.S. Bank did not depose Lawrence McMichael).

As P-86 reveals, U.S. Bank deposed Maury Rosenberg over several days in several capacities. At the same time as the damages case was pending also pending in the same Court before the same judge was a tortious interference case filed by Sara Rosenberg as Trustee of the Douglas Rosenberg Trust and numerous real estate partnerships. *See Sara Rosenberg, et al. v. DVI Receivables, XIV, LLC*, 400 F. Supp. 3d 236, 240 (E.D. Pa. 2019) (granting summary judgment for U.S. Bank). Many of the questions posed to Maury Rosenberg concerned the Sara Rosenberg tortious interference case. Many other questions concerned the allegations of damages in the NMMI damages case (the 303(i)(1)) case. If there were any questions touching on matters related to the fee case, they were few. The depositions are in the trial record. D-381 to D-384. Plaintiffs at trial did not meet their burden of showing that any of the depositions taken by U.S. Bank, including Rosenberg's, are connected to the fee case.

It should be noted here that U.S. Bank put all of the deposition transcripts from the damages case into the trial record here as trial exhibits to enable this Court to evaluate the work product, not to show that these depositions are related to proving entitlement to fees. U.S. Bank included them as trial exhibits for purposes of the lodestar and relatedness (lack thereof), not to use them for litigating the entitlement issues. They are D-375 to D-400.

### 2.    Written Discovery Requests

NMI's written discovery requests to U.S. Bank in the damages case do not concern debtor misconduct. NMI has marked all of U.S. Bank's written discovery requests (four document requests, two sets of interrogatories and a request for admissions) as trial exhibits. They are P-70, P-71, P-72, P-76, P-202, P-203, P-204, P-205 and P-206. U.S.

Bank's written discovery requests concerned damages, not debtor misconduct or any of the other totality factors. The Court can review these requests to ascertain their purpose. Hence, NMI's document review, retrieval (including ESI vendor costs) and production work was related to damages, not to U.S. Bank's efforts to take discovery on the "bad faith" issue or matters relating to entitlement to fee recovery.

NMI served a request for production (D-419) and a short set of interrogatories (referred to in P-201, p. 5) on U.S. Bank. That discovery does touch on issues that relate to liability. Therefore, NMI should get credit for preparing those discovery requests, but the time for doing so is excessive. *See* Exhibit D.

NMI's counsel has reported over 50 hours devoted to reviewing documents produced by U.S. Bank. But, U.S. Bank produced its own documents as well as copies of documents obtained by subpoena from multiple third parties. The time records do not indicate what documents were reviewed by source. Also, it is not possible to tell whether the documents reviewed, or what quantum of them, were (1) not previously produced in earlier litigation (either the dismissal litigation or *Rosenberg*) and (2) necessary to the development of a record to recover dismissal-related fees.

Even if NMI can show that its 50 plus hours of review turned up a couple of new documents, potentially helpful to both the (i)(1) and (i)(2) claims, that would not justify compensation for 50 plus hours of work. Further, again, NMI was required to make that showing at trial—*i.e.*, show that it was compelled to seek additional documents to prove-up its (i)(1) claim. NMI did not carry its trial burden of proving relatedness, and it is too late to do so now. Therefore, none of the time spent in reviewing U.S. Bank's documents can be allowed.

### 3.    Expert Witnesses

The expert witness work did not concern debtor misconduct or any of the four totality factors.  All of the expert witnesses were damages experts except Lawrence McMichael, whose proposed testimony was largely excluded, and U.S. Bank's opposing bankruptcy expert, retired judge Robert Gerber.

U.S. Bank successfully moved to exclude McMichael's testimony as a bankruptcy expert as to most issues including the legal requirements for filing an involuntary petition and the key issue of whether the petitions were filed for an improper purpose.  D-307. Judge Rufe did allow, however, that Mr. McMichael could testify concerning standards in the insolvency industry (*e.g.*, "whether Defendants' conduct fell below the applicable professional standards in the insolvency industry").  *Id*.  But, as evidenced by Plaintiffs' description of his testimony in D-89, Mr. McMichael did not have any opinions on industry standards in the insolvency industry relating to the filing of involuntary bankruptcy cases.

Neither Mr. McMichael nor U.S. Bank's bankruptcy expert, retired judge Robert Gerber, were deposed.  The other experts were damages experts—accountants or business valuators—John Mitchell (for NMI), Harris Devor (for U.S. Bank), John O'Donnell (for U.S. Bank), Dr. David Levin (for U.S. Bank), and Charles Lunden (for Ashland).  *See* P-88 (Plaintiffs' list of experts) and the transcripts (P-170, P-181, P-182, P-185 and P-187).

Incredibly, NMI seeks an order of this Court requiring U.S. Bank to pay the attorney's fees NMI's counsel, KCR, incurred in connection with these experts, including the depositions of the damages experts.  NMI apparently has decided not to require U.S. Bank to pay the actual fees charged by its experts in the failed damages case.

28

### 4.    Motions and Other Procedural Matters

None of the motion practice in the (i)(2) case was relevant to the (i)(1) case or, more specifically, building a record for the (i)(1) case.  The motion practice concerned withdrawal of reference/waiver of jury trial (the withdrawal of reference did not advance the fee case, and NMI lost on the jury waiver issue, D-256), production of privileged documents by the Bank (NMI's motion to compel was unsuccessful, D-285[20]), whether the Bank's counterclaim should be stricken or NMI granted leave to file an omitted answer in order to avoid defaulting (NMI lost, D-286), exclusion or limits on expert testimony (U.S. Bank's motion to exclude Lawrence McMichael was largely granted, D-287 & D-307, although its motion to exclude the *rebuttal* report of NMI's damages expert John Mitchell was denied, D-306), whether the Bank's liability should be determined based on collateral estoppel (NMI's motion was denied, D-280), and, ultimately, whether U.S. Bank and Ashland should be granted summary judgment (those motions were granted, D-310 & D-311).  KCR incurred at least 898.5 hours working on pleadings and motion practice in the (i)(2) case, leading to fees of $307,282.  D-434 (Category 4).  Of that time, 615.7 hours ($202,011.50) was spent on the losing end of motion practice.  D-434 (pdf 57-63).

Regardless of the results, the motion practice in the (i)(2) case did not help NMI enhance the record for recovering of (i)(1) fees, and NMI, at the trial in this action, did

---

[20] NMI sought to compel the Bank to produce privileged documents generated subsequent to the date of the filing of the involuntary petitions.  The Bank was willing to produce privileged documents pre-dating the petition because the Bank was relying, in part, on advice of counsel.  Judge Rufe agreed with the Bank's position.  D-285.

not even attempt to introduce testimony or other evidence establishing the relatedness of this motion practice.

### 5.  Conclusion as to Lack of Overlap

In sum, it was NMI's burden to undertake this kind of analysis as a means of attempting to show on overlap between the two cases. Because it failed to do so, the entire $1.3 million plus in fees in Category 4 should be excluded. But, if the Court wishes to excuse NMI's failure of proof, U.S. Bank's analysis shows that very little of the legal work in the damages case is even *potentially* compensable as related to the pursuit of dismissal phase fees (and even those fees should be reduced as discussed below).

Additionally, in opposing U.S. Bank's motion for summary judgment in the District Court, NMI relied extensively on the depositions of Fox, Brier, Pinel and Walton to address the "bad faith" issues. D-302; D-309. As to damages issues, NMI cited its damages expert, John Mitchell, Maury Rosenberg, and Anne-Marie Iannarelli, an office manager for NMI who was deposed in the *Rosenberg* case but not in the NMI damages case. NMI also made passing reference to snippets from the depositions of Joe Costanza (Sterling Bank) and Peter Brown (IBM), Constanza to point out that Sterling Bank had not joined the petitions and Brown to point out that IBM had entered into loan restructuring talks with NMI. U.S. Bank, in seeking summary judgment on the liability issue, relied primarily on the deposition testimony of Fox, Brier and Pinel and a declaration by Fox. D-297 to D-299, D-305 & D-437.

When NMI filed its Pretrial Disclosures in this case, NMI disclosed that it would use the depositions of Fox, Brier, Pinel, Walton and possibly Winick and attorney Susan Verbonitz. D-438. Winick and Verbonitz were on the "possible" list indicating it was

not likely NMI would use their testimony to prove the "totality" factors. Verbonitz, an attorney for Rosenberg, was not even deposed in the damages case. Thus, when NMI thought it needed to address the "totality of the circumstances" standard with evidence at the trial in this case, it designated only Fox, Brier, Pinel and Walton (and possibly Winick), not the many other witnesses U.S. Bank deposed in the damages case.

Here, the Court, after carefully considering U.S. Bank's motion for partial summary judgment, determined that NMI's ability to recover fees for the failed damages case was "circumscribed," 644 B.R. at 120, and limited to work "counsel was obliged to develop a record that was also necessary and relevant in the § 303(i)(1)." *Id*. at 119. The Court also ruled that, even within this circumscribed ambit, the fees could be reduced severely based on the result obtained. *Id*. But, NMI disregarded the Court's guidance, sought all of the fees in the damages case, save those incurred after Judge Rufe granted summary judgment for U.S. Bank, and failed to provide relevant allocation evidence during the trial, instead offering only generalized arguments. For this reason, the Court should not award any Category 4 fees, but, if it decides to award such fees, the fees should be limited to the four depositions and NMI's minimal written discovery to U.S. Bank as reduced for excessive time.

### E. The Record Was Previously Built

On January 4, 2010, shortly after the dismissal of the petitions, NMI filed a motion for sanctions, seeking both fees and damages. D-215. NMI supported that motion with exhibits, depositions and a 70-plus page memorandum of law (D-216). D-216 to D-221. NMI cited two depositions of Jane Fox on matters relating to the "totality" factors and two deposition of Bob Brier on those matters. D-226 to D-229. Those two individuals

31

were the people with the most knowledge (other the attorneys) of the reasons for the filings, the objectives, the status of the DVI companies and other relevant matters.

Together with the motion for sanctions, NMI filed a separate motion for clarification of certain issues. D-230. In that motion, NMI asked for a brief continuance of a January 25, 2009 hearing so that NMI could depose U.S. Bank's attorneys, Pinel and Walton, but only if U.S. Bank planned to call them as witnesses. *Id.*, ¶¶ 41-45. NMI did not express the need for any extensive additional discovery.

The depositions Aris Karalis took of Jane Fox and Bob Brier (before the dismissal) were extremely detailed and methodical. D-227; D-229. Mr. Karalis was developing evidence, not merely to prove a totality case, but to prove a bad faith case. That is clear from a review of the deposition transcripts. In addition, NMI relied on extensive depositions of Fox and Brier taken by Rosenberg's counsel. Those depositions covered many of the same issues. D-226; D-228. NMI cited all four of the pre-dismissal deposition transcripts in support of its motion for sanctions. *See* D-217.

Several years after NMI filed its motion for sanctions, in 2013, Rosenberg won a large jury verdict. Following the procedure in *Rosenberg*, NMI replaced the motion for sanctions with an adversary complaint, and that later developed into two adversary complaints and then transformed back into one, with the damages claims removed to the District Court. As soon as NMI filed its adversary complaint, it signaled that it would rely heavily on the factual record in *Rosenberg*. NMI even asserted that it was entitled to a ruling on liability in its favor based on the verdict in *Rosenberg*. D-236 (¶¶74-79). NMI's later motion for this relief failed. Without doubt, NMI had a full factual record before even commencing the District Court litigation on its (i)(2) claim.

The Karalis firm proved that it was more than capable of mustering evidence and filing a well-documented motion for fees under Section 303(i)(1), and it did so.[21] Later, at the end of 2013, after the jury verdict in *Rosenberg*, NMI made a decision to bring in jury trial counsel, Steven Coren, to pursue a $50 million (and possibly, with punitive damages, half a billion dollar) case before a Philadelphia jury. KCR would not have been retained if NMI had decided to pursue only a claim for dismissal-related attorney's fees even though it is true that KCR also took the lead for NMI in the appeals from the dismissal order.

Karalis and his associates have substantial expertise in the area or recovering attorney's fees having filed numerous fee applications. Further, acting on their own, without Steven Coren or another nationally recognized "big case" trial attorney, the Karalis law firm recovered substantial Section 303(i)(1) fees in *Forever Green*, another heavily litigated Section 303(i) case. *See In re Forever Green Athletic Fields, Inc.*, 2017 WL 1753104 (Bankr. E.D. Pa. May 3, 2017) (Aris Karalis and partner Robert Seitzer were sole counsel for the putative debtor and successfully obtained substantial 303(i)(1) fees in fiercely contested litigation). Thus, the notion that the Karalis firm *needed* KCR to help Karalis build a record to recover his dismissal phase fees is nonsense.

The retention of an additional law firm, KCR, to recover dismissal phase fees was unnecessary, but it did have significant consequences. Most of the fees now disputed in this matter arose because NMI made the decision to seek huge damages (knowing it really

---

[21] U.S. Bank makes no comment here about the merits of the sanctions motion, only that Mr. Karalis had an extensive record at his disposal and had the capability to present NMI's position as well as any other counsel might have done or better.

had none), hire additional counsel, pursue a separate action in District Court and litigate

the damages claim to the hilt, including appeals all the way to the Supreme Court. Many

of the fee issues now in dispute, including issues regarding relatedness, duplication and

excessive fees, arose because NMI retained separate counsel to pursue a damages case

that lacked merit.

Any argument that the damages case was pursued for four years to try to build a

record to help Mr. Karalis recover $700,000 in dismissal phase fees strains credulity. That

record was developed by Karalis during the dismissal proceeding and further developed

in the extensive and related *Rosenberg* litigation.

### F.    NMI's "Intransigence" Argument

NMI's counsel suggested at trial that it was necessary for NMI to bring in

additional counsel, not just for the damages case, but for the fee case as well because U.S.

Bank was "intransigent." NMI's counsel argued that U.S. Bank should simply have cut

a check to pay the Karalis firm's fees in full as soon as those fees were made known. As

noted, on January 4, 2010, Mr. Karalis filed a motion for sanctions in which his firm,

Maschmeyer & Karalis, P.C. ("MK"), sought approximately $700,000 in fees for the

dismissal work.[22]

---

[22] MK's entitlement to fees was not determined until November 28, 2022 when
U.S. Bank stipulated to fee entitlement. NMI is seeking prejudgment interest for the
period prior to a determination of entitlement or amount. U.S. Bank has addressed the
issue of prejudgment interest in a separate bench memorandum. D.E. 201. The Third
Circuit has ruled that even when entitlement has been determined, prejudgment interest
does not run until the amount is quantified. *See Eaves v. Cnty. of Cape May*, 239 F.3d
527 (3d Cir. 2001). Here, entitlement only recently was determined. U.S. Bank could
not find a single 303(i) case in which a court awarded prejudgment interest on fees. Judge
Fehling mistakenly concluded that he had "equitable discretion" to award prejudgment
interest. *Nat'l Med. Imaging*, 570 B.R. at 161. But, he deferred on that issue, stating that

U.S. Bank did not immediately cut a check to MK.  It was not required to do so, and not doing so does not demonstrate "intransigence."  The relevant procedural history is as follows (all docket cites are to *In re Nat'l Medical Imaging, LLC*, Alleged Debtor, Case No. 08-17351-elf):

1.  On December 28, 2009, Judge Fehling dismissed the involuntary petitions based on collateral estoppel.  D.E. 183.

2.  On January 4, 2010, the Debtors filed their Motion for Sanctions.  D.E. 185. The motion was accompanied by a declaration that attached billing records.  D.E. 186.

3.  On January 11, 2010, the Creditors (*i.e.*, the petitioning creditors) filed their Motion for Reconsideration of the dismissal order.  D.E. 192.

4.  On January 14, 2010, Judge Fehling *sua sponte* stayed all proceedings.  D.E. 197.

5.  On December 18, 2013, the Debtors moved to vacate the stay.  D.E. 243.

---

he would consider it at trial.  *Id*.  NMI failed to present any trial evidence to support the exercise of equitable discretion to award prejudgment interest, even if such discretion exists in a Section 303(i) case (and it does not).  Judge Fehling cited *In re John Richards Homes Bldg. Co.*, 523 B.R. 83, 88 (Bankr. E.D. Mich. 2014), a poorly reasoned case in which the court *denied* prejudgment interest on fees based on the untimeliness of the request and for other reasons.  The only other case cited by Judge Fehling as a basis for "equitable discretion" is wholly inapposite.  *In re Groggel*, 333 B.R. 261 (Bankr. W.D. Pa. 2005), cited by Judge Fehling, involved a state law breach of contract claim.  The court applied Pennsylvania state law governing prejudgment interest which apparently vests courts with some discretion in this area.  The instant case involves a federal statutory claim, not a state law claim.  Further, NMI is wrongly seeking a rate of interest substantially higher than the federal judgment interest rate set forth in 28 U.S.C. § 1961. Information about rates can be found at: http://www.federalreserve.gov/releases/H15. Finally, to the extent NMI is urging that prejudgment interest should be awarded because U.S. Bank was "intransigent," the record does not support that assessment.

6.      On January 23, 2014, Judge Fehling approved a stipulation for further briefing on the long-pending motion for reconsideration.  D.E. 256.

7.      On April 23, 2014, Judge Fehling heard argument on the motion for reconsideration.  D.E. 269.

8.      On May 2, 2014, Judge Fehling announced his ruling denying reconsideration and entered an order so providing.  D.E. 273-74.

9.      On May 6, 2014, Judge Fehling entered an order vacating the stay.  D.E. 280.

10.     On May 12, 2014, the Creditors filed a notice of appeal as to the order of dismissal.  D.E. 282.

11.     On May 13, 2014, Judge Fehling filed a statement in support of denial of reconsideration.  D.E. 284.

12.     On May 27, 2014, the Debtors filed an Adversary Complaint seeking relief under 11 U.S.C. § 303(i)(1) and (2).  D.E. 297.

At this juncture (end of May 2014), the dismissal order was on appeal to the District Court, and the Debtors had replaced their original January 4, 2010 Motion for Sanctions with an Adversary Complaint.  NMI certainly cannot contend that U.S. Bank was "intransigent" during the period from January 2010 through May 2014.  It was not intransigent to seek reconsideration of the collateral estoppel decision.  Judge Fehling thought it appropriate to consider fairly extensive additional briefing on the reconsideration arguments, as evidenced by the docket entries.  Case No. 08-18351-elf, D.E. 256, 258, 259, 263, 265, 266, 269-71 & 273-74.  Judge Fehling thought it appropriate

to enter a detailed 24-page written statement explaining why he was denying reconsideration.  D.E. 284.

Thereafter, briefing ensued in the District Court appeal, and the District Court rendered a decision affirming Judge Fehling's dismissal order based on collateral estoppel.  *See DVI Receivables XIV, LLC v. Nat'l Med. Imaging, LLC*, 529 B.R. 607 (E.D. Pa. 2015), *aff'd sub nom. Nat'l Med. Imaging, LLC v. Ashland Funding LLC*, 648 F. App'x 251 (3d Cir. 2016).

The District Court, while affirming, acknowledged that the NMI guaranty, unlike the Rosenberg guaranty (construed by the Florida Bankruptcy Court), provided that the "Guaranteed Amount" for each "Modified Lease" was "due by the respective Lessee in favor of the respective Lessor."  The "Lessors" were defined as the DVI securitization entities.  However, despite this difference in language, which the District Court acknowledged created an ambiguity as to whether the NMI debts were owed to Lyon or to the DVI entities, the District Court concluded that the NMI guaranty "read as a whole" was sufficiently similar to the Rosenberg guaranty to support the application of collateral estoppel on the issue of who was the creditor (Lyon or the DVI entities).  529 B.R. at 623.  The District Court did not state that this distinction, urged by U.S. Bank, lacked merit.

Further, the District Court did not disagree with U.S. Bank's assertion that contractual rights create standing, even if the parties who hold those rights lack an economic interest in the contractual recoveries.  The District Court did not reject this argument even though it was contrary to the "real party in interest" ruling in *Rosenberg* that Judge Fehling had relied upon.  The District Court determined that it did not need to

decide this issue in view of its affirmance of the Bankruptcy Court's determination, based on collateral estoppel, that Lyon was the sole beneficiary of the NMI guaranty. *Id*. at 624.

Finally, the District Court determined that one of U.S. Bank's appellate arguments had not been preserved for appeal. That argument was that Judge Cristol's ruling on novation could not be given collateral estoppel effect because, on appeal in Florida, that ruling was not affirmed by the Florida District Court. Judge Rufe concluded that this argument had not been asserted below. *Id*. at 625.

Subsequently, U.S. Bank filed a notice of appeal to the Third Circuit. Ashland Funding, represented by separate counsel, filed a separate notice of appeal. Before briefing, U.S. Bank dismissed its appeal. *See* No. 15-1996 (3d Cir.) (Motion to Dismiss Appeal, filed 9-9-15). Ashland continued with its separate appeal, and the Third Circuit affirmed the collateral estoppel rulings, adopting the District Court's analysis. *See Nat'l Med. Imaging, LLC v. Ashland Funding LLC*, 648 F. App'x 251 (3d Cir. 2016).

In sum, from January 2010 to May 2016, when the Third Circuit affirmed the dismissal order, the dismissal and collateral estoppel issues were either the subject of a motion for reconsideration or appeals. Nothing happened in those years, in the underlying litigation, or on appeal, that provides evidence of *intransigence*.

At trial, U.S. Bank pointed out that NMI and its founder and Managing Member, Maury Rosenberg, pursued reconsideration and appeal when they disagreed with decisions by various courts in this long-running litigation. Indeed, not only did NMI pursue an appeal to the Third Circuit of Judge Rufe's summary judgment ruling, but NMI filed petitions for rehearing and a petition for certiorari to the Supreme Court.

NMI also sought reconsideration when it deemed it appropriate to do so. For instance, NMI, unhappy with Judge Rufe's decision that NMI had waived its right to a jury trial as against U.S. Bank, Lyon and Fox, filed a motion for reconsideration which was denied. D-254; D-256. Rosenberg, for his part, appealed the Florida District Court's Rule 50(b) decision overturning the jury verdict. He prevailed on appeal, although the Eleventh Circuit never reached the merits, concluding that the Bank's Rule 50(b) motion was untimely. *Rosenberg v. DVI Receivables XIV, LLC*, 818 F.3d 1283 (11th Cir. 2016).

NMI and Rosenberg were not intransigent or dilatory because they refused to accept unfavorable court decisions. Likewise, U.S. Bank was not intransigent because it pursued its own appellate rights.

At trial, NMI also argued that the Bank refused to engage in settlement discussions, seemingly pointing to this as evidence of intransigence. But, the Bank's counsel testified that the Bank, on more than one occasion, had attempted to settle the overall litigation and had made substantial cash offers. As to the fees, NMI's counsel, in January 2017, provided to U.S. Bank's counsel fee information showing that MK's fees through January 31, 2017 were $1,227,368. P-125. But, as indicated in P-125, that tally included approximately $437,000 in fees and costs for work in fee recovery efforts. Given the fact that the fee litigation was stayed from January 2010 through May 2014, and very little had occurred in the fee litigation from May 2014 through January 2017, that figure was (and still is) difficult to fathom.

In any event, the fact that the Bank did not cut a check in January 2010 or in January 2017 does not suggest "intransigence." The Bank had the right to challenge entitlement to fees, as well as amount. As the Court is aware, Section 303(i) does not

39

provide for automatic fee-shifting. The standard is discretionary. The Bank had every right to contest entitlement. It also had every right to challenge the reasonableness of the fees on MK's spreadsheet (as U.S. Bank is doing now).

While the trial evidence did not establish that the Bank made an offer to settle MK's fees at a discount, the evidence also failed to show that MK ever made a demand for less than 100% of the amount shown in its billing records. Further, the fee claim was (and still is) owned, not by MK, but by NMI, which was managed by Mr. Rosenberg. U.S. Bank's counsel testified, and it was unrebutted, that NMI had always sought a global settlement. Mr. Karalis acknowledged that he did not have authority to separately settle his fees.

Certainly, both parties could have made further efforts, starting in 2017, after the dismissal-related appeals were resolved, to settle the MK fees then existing. Whether such efforts could have succeeded is unknown. But, none of this translates into "intransigence" by either side.

One additional factor is that the Bank pursued an appeal to the Eleventh Circuit in *Rosenberg* in which the Bank challenged several of the *Rosenberg* Bankruptcy Court's fee rulings. The Bank argued that Section 303(i)(1) does not authorize appellate fees, fees for pursuing damages claims or fees for litigating fees and does not permit courts to award any fees before the final result of a particular proceeding is known. The Bank prevailed on the latter issue only. *See In re Rosenberg*, 779 F.3d 1254 (11th Cir. 2015). The Bank's certiorari petition to the Supreme Court was denied in January 2016. *U.S. Bank, N.A. v. Rosenberg*, 577 U.S. 1063 (2016). Many of the fees sought by MK fell in categories that were the subject of the *Rosenberg* appeal which was not finally resolved

until January 2016. After that, the issues in this case of entitlement and reasonableness remained, and the Bank was not required to waive its right to contest those important issues.

It should also be noted that the Bank, at the end of 2010, asked Judge Fehling to vacate the stay so that NMI's damages and fee claims could be determined in 2010. NMI consented, but Judge Fehling refused. D-350 (Dkt. Nos. 203 & 216). At that time, U.S. Bank sought to adjudicate the matter, not to concede it.

NMI made much noise at trial about alleged intransigence, but failed to provide any evidence that would support the use of that term to characterize the Bank's conduct in this litigation. Pursuing valid arguments or appeals is not a form of intransigence or vexatious litigation. In the current proceedings—the pending Chapter 11, the declaratory judgment action (now on appeal) and the instant fee case, the Bank has been asserting well-researched and good faith positions on various issues. Indeed, at times, the Court has commended both parties for excellent presentations.

This intransigence argument, which may be a wild stab at trying to get prejudgment interest, is a red herring that should be given short shrift by this Court.[23]

---

[23] NMI first disclosed that it was seeking pre-judgment interest in the Adversary Complaint it filed on May 27, 2014. D-236 (pdf 27) (compare D-215, pdf 10). KCR did not disclose its fees until on or about May 31, 2021. P-113 & P-114. NMI is not entitled to prejudgment interest, as demonstrated in U.S. Bank's separate bench memorandum addressing the issue. U.S. Bank has not found a single 303(i) case in which a court awarded prejudgment interest on fees. Nevertheless, Judge Fehling concluded that he had "equitable discretion" to award prejudgment interest and would resolve the issue based on the trial evidence. *Nat'l Med. Imaging*, 570 B.R. at 161. Respectfully, Judge Fehling erred, but, in any event, NMI failed to present any trial evidence to support the exercise of "equitable discretion" to award prejudgment interest, even if such discretion could be exercised in a Section 303(i) case to award pre-judgment interest for the period of time prior to an entitlement ruling. Judge Fehling cited *In re John Richards Homes Bldg. Co.*,

## V.    THE CHAPTER 11 WORK AND THE DECLARATORY ACTION

U.S. Bank's position is that the Chapter 11 proceeding is still pending and the result is unknown.  For this reason, any award of fees should be deferred as discussed further in Point VI below.  The declaratory action was resolved, subject to a pending appeal.  The Court can award trial court fees for a resolved case even though an appeal is pending, but, in this instance, the Court should exercise its discretion and defer ruling until the Third Circuit appeal is resolved.

The status of the Third Circuit appeal (Docket #: 22-1727) is as follows.  The appeal was fully briefed as of August 5, 2022.  The appeal was calendared for oral argument on November 17, 2022.  However, on October 27, 2022, the Clerk notified the parties that oral argument was cancelled and that the case "will be held C.A.V."  That is a Latin phrase meaning "the Court will deliberate."  The appeal impacts whether fees may be awarded for the Chapter 11 proceeding, the declaratory action and the Florida state court case.  That is so because the Third Circuit will decide whether U.S. Bank was acting within its rights when it attempted, in the Florida court, to execute on NMI's Section 303(i)(2) claim, and, relatedly, the Court will decide whether the Florida court's decision on this issue should have been given effect.

---

523 B.R. 83, 88 (Bankr. E.D. Mich. 2014), a poorly reasoned case in which the court *denied* prejudgment interest.  He also cited *In re Groggel*, 333 B.R. 261 (Bankr. W.D. Pa. 2005), a case involving a state law breach of contract claim.  In *Groggel*, the court applied Pennsylvania state law governing prejudgment interest which apparently vests courts with some discretion in this area.  The instant case involves a federal statutory claim, not a state law claim.  Further, NMI is wrongly seeking a rate of interest substantially higher than the federal judgment interest rate set forth in 28 U.S.C. § 1961.  Information about rates can be found at: http://www.federalreserve.gov/releases/H15.  Finally, to the extent NMI is urging that prejudgment interest should be awarded because U.S. Bank was "intransigent," that argument fails miserably for the reasons discussed above.

Having said this, if the Court proceeds to award fees for the Chapter 11 proceeding and the declaratory action, the guidelines set forth in the Court's September 2, 2022 decision are relevant.  In respect of the Chapter 11 proceeding, the Court stated:

> The relatedness is not open-ended, however. The attorney's fees incurred in general chapter 11 case administration are mostly too attenuated to the § 303(i) proceeding to be compensable. An award of attorney's fees for all of these services is not warranted. The relatedness to the § 303(i) proceeding is limited to those legal fees incurred in determining the propriety of the chapter 11 filing in the first place, effecting the filing and defending the case filing in order to maintain the automatic stay. Any additional legal work involved in advising the Debtors on case administration and seeking chapter 11 plan confirmation lack a sufficient nexus to the § 303(i) claims to warrant shifting the entire cost of the proceedings to U.S. Bank. Therefore, I conclude that it would be inappropriate to require the Defendants to pay the entirety of the Debtors' chapter 11 fees in these circumstances. The scope of the compensable attorney's fees must be decided at trial.

644 B.R. at 128.  U.S. Bank has identified the time entries in the Dilworth billing narrative (P-162, D.E. 181) that reflect the time necessary to evaluate the Chapter 11 case, prepare the initial filings, file the petition and required first-day filings and thereby obtain the benefit of the automatic stay so as to stay the impending Florida sale.  The time is indicated on D-436.  It consists of Category 6 time of 5.5 ($3,162.50 in fees) and Category 7 time of 49.55 hours ($22,383.75 in fees).  The total is 55.05 hours for $25,546.25.

At trial, counsel for NMI argued that all of the Chapter 11 work is really necessary to keep the automatic stay in place, including all Chapter 11 administrative work.  Indeed, NMI, during the trial, amended its submission to add back in Chapter 11 time it had previously omitted as administrative time.   NMI added $62,986.77 as Chapter 11 administrative time. See P-162A.  This time was placed in Category 12.  This approach by NMI conflicts with the Court's September 2, 2022 decision and is incorrect.

43

The Court appreciated that awarding fees for a voluntary Chapter 11—filed over a decade after the dismissal of an involuntary petition—is unusual. But, the Court, after concluding that any effort to enforce a petitioning creditor's judgment against a Section 303(i) claim offends bankruptcy policy, determined that some fees for stopping the execution sale were related and appropriate.

The problem here is that the line must be drawn somewhere. A Chapter 11 proceeding can continue for years and involve a tremendous amount of legal work on various matters. This particular Chapter 11 case was not complex. But, the line has to be drawn somewhere in order to make the case that it is reasonable to award such fees.

At trial, counsel for NMI was asked why NMI did not seek a stay of the Florida execution sale in the instant case—this Section 303(i)(1) fee case. After all, the Court had jurisdiction over the parties, and it was NMI's position that the execution sale threatened the very fee claim at stake here. NMI sought stays in Florida courts and in the Third Circuit but not in this Court. Seeking a stay in this Court would have involved a simple motion, not a long-running Chapter 11 proceeding.

NMI might argue that this Court lacked jurisdiction to stay a sale of the Section 303(i)(2) claim, the damages claim. But, the damages claim, by that time, did not exist except for NMI's ability to seek reconsideration by the Third Circuit of its decision affirming the District Court's summary judgment in favor of the Bank. A final judgment had been entered by the District Court in favor of U.S. Bank in August 2019. NMI appealed. NMI did not obtain a stay of the judgment in the District Court. NMI did seek a stay in the Third Circuit, and NMI argued that bankruptcy policy warranted a stay. The Third Circuit denied that motion as moot because, on June 11, 2020, it affirmed the

44

District Court's summary judgment decision.  *See* Case: 19-3255, D.E. 74.  In refusing

NMI's request for a stay, the Third Circuit impliedly determined that NMI's Section

303(i)(2) claim was not entitled to protection.

The day after this result, on June 12, 2020, NMI filed its Chapter 11 petition and

obtained the automatic stay.  The only claim that was cognizable on June 12 (but for the

extremely remote possibility of the Third Circuit changing its mind or the Supreme Court

reversing) was the Section 303(i)(1) fee claim.  The central argument NMI made in this

Court to justify the Chapter 11 filing was that U.S. Bank could use the decision in Florida

to execute on the fee claim, and it was a valuable asset, and the Chapter 11 petition was

needed to stop that from happening.  This Court agreed.  But, NMI missed an opportunity

to achieve a much less expensive stay by simply asking this Court to issue a stay in this

adversary proceeding.  After all, this is the case in which the fee claim—the very claim

NMI sought to preserve—was pending.  All of this is relevant to how much NMI should

be paid for the Chapter 11 case and where to draw the line.  The line should be drawn

early, on the date that NMI secured the automatic stay, stopped the sale and preserved its

other avenues for relief.

NMI then proceeded to file a declaratory action seeking various relief.  The Court

determined, in its September 2, 2022 decision, that NMI could obtain some relief by way

of fees for the work in the declaratory action.  NMI is seeking $153,828.36 for the work

of three law firm in the declaratory action.  That is Category 10.  *See* P-162 &  162A.

This is far beyond what the Court appeared to contemplate.  The Court stated:

> The Debtors filed an adversary proceeding in their 2020 chapter 11
> cases, seeking to subordinate U.S. Bank's claim, invalidate U.S. Bank's lien
> and obtain certain declaratory relief. *See Nat'l Med. Imaging, LLC*, 627 B.R.

at 82. In that adversary proceeding, I denied most of the relief requested (sometimes without prejudice), but granted the Debtors' request for declaratory relief. I entered an order that provided, in pertinent part:

> 3. It is DECLARED that U.S. Bank may not set off its existing judgments, or credit its claim in these bankruptcy cases, against any liability to the Plaintiffs that it may be determined to have under 11 U.S.C. § 303(i) in Adv. No. 14-250.
> 4. It is DECLARED that U.S. Bank may not employ its existing judgments to execute against the Plaintiffs' claims against U.S. Bank under 11 U.S.C. § 303(i).
> (Order entered Oct. 8, 2021) (Adv. No. 20-219, Doc. # 45).

> This category of fees stands on similar footing to the analysis of chapter 11 fees generally, which is the reason, in large part, that the Defendants assert theses fees are not compensable under § 303(i)(1). I agree that the two (2) categories should be treated similarly and therefore, *129 I again agree, in part, with the Defendants. To the extent that the relief sought in the adversary proceeding related to the general administration of the chapter 11 cases — e.g., the rights of the debtors and creditors in those cases — the adversary proceeding is not sufficiently related to the § 303(i) proceeding to warrant the award of counsel fees under § 303(i)(1).

> However, the Debtors did obtain some relief by virtue of the adversary proceeding that is related to the preservation of their § 303(i) claims. Presently, I have no record that would permit me to distinguish between the compensable and non-compensable attorney's fees incurred to that end. Therefore, I will deny this request for summary judgment and determine the issue after trial.

644 B.R. at 128-29. The Court granted some of the relief requested by NMI and denied other relief, such as NMI's request for equitable subordination of U.S. Bank's unsecured claim and certain relief NMI requested concerning the treatment of U.S. Bank's claim in the Chapter 11 case. Of the original seven claims pled by NMI, NMI, subject to the pending Third Circuit appeal, ultimately prevailed on two. *See In re Nat'l Med. Imaging, LLC*, 627 B.R. 73, 111 (Bankr. E.D. Pa. 2021). NMI argues that the two were the most important claims—declarations of no setoff and no state court interference. However, the state court was not an issue at that point because the automatic stay was in effect, and

these two declarations really turn on a single issue—a public policy issue about whether Section 303(i) claims are immune from judgment creditor process (if the judgment creditor is one of the petitioners).  There is no way to parse the time spent on each of the seven original claims.  The time records do not allow that process.

Some additional factors need to be considered.  First, the fees in the declaratory action are excessive because three firms were actively engaged for NMI and only one of the firms truly was needed to litigate that case.  KCR did the lion's share of the work, and it was fully capable of doing all of it.  Second, the declaratory action was resolved by the Court on summary judgment.  The decision turned on legal issues.  There was no extensive discovery, no depositions, no trial preparation, no evidentiary hearings.

Considering these factors—that NMI only received partial relief, that three law firms were used and that the case was resolved on summary judgment based on legal issues and was not extensively litigated (because the facts were never in dispute)—the Court should reduce the total time for the declaratory action by 50% so that the total attorney time is reduced to $76,733.75 in fees plus full costs of $360.86.

## VI.   TIME CHARGES FOR STILL PENDING LEGAL PROCEEDINGS

NMI has not yet succeeded, and may not succeed, in the pending Third Circuit appeal.  And, it has not yet succeeded, and may not succeed, in its Chapter 11 efforts.  A court cannot award fees for a still pending proceeding because the most important factor under *Hensley* is the degree of success, and that cannot be known until the end of the proceeding.

In *Rosenberg*, Rosenberg sought attorney's fees for the prosecution of his bad-faith claim before the jury trial was concluded.  Surprisingly, the Bankruptcy Court awarded some of those

fees.  The Eleventh Circuit, while affirming the other rulings of the Bankruptcy Court concerning

fees, reversed that one.  It held:

> It was premature for the bankruptcy court in its 2012 Attorney's Fee
> Order to award the fees relating to Rosenberg's bad-faith claims for
> damages before the conclusion of the bad-faith proceedings in the district
> court. We note that none of the cases cited above involved fees relating to
> bad-faith claims for damages that were awarded before the end of the bad-
> faith phase of the proceedings. Further, the strong policy against piecemeal
> appeals involving the bad-faith claims supports our determination that the
> fee award was prematurely entered in 2012.

*In re Rosenberg*, 779 F.3d 1254, 1268 (11th Cir. 2015).  The Eleventh Circuit vacated the

limited portion of the total fee award attributable to Rosenberg's prosecution of his bad-

faith claim for damages and remanded for the Bankruptcy Court to remove this category

of fees.

NMI has not prevailed in the Third Circuit appeal.  It is inconceivable that U.S.

Bank could be ordered at this time to pay NMI's fees for that appeal.  U.S. Bank's position

is that only an appellate court can award appellate fees.  The Ninth Circuit, in a Section

303(i) case, so held.  *See Higgins v. Vortex Fishing Sys., Inc.*, 379 F.3d 701, 708-09 (9th

Cir. 2004).  In *Rosenberg*, the Eleventh Circuit disagreed with the Ninth Circuit's position

on this issue, creating a circuit split.  779 F.3d at 1265-66.  But, even the Eleventh Circuit

did not hold that a bankruptcy court could award fees for a still pending appeal, with the

result being unknown.

Even if the Court awards fees at this time for the Chapter 11 proceeding on the

basis that NMI already obtained relief, it cannot award fees for the separate proceeding

that is an appeal in the Third Circuit.  U.S. Bank may win or partially win that appeal.

## VII.    EXCESSIVE TIME

In determining the lodestar and the hours component, the paramount requirement for the time spent on a given matter is reasonableness. *Interfaith Cmty. Org. v. Honeywell Int'l. Inc.*, 426 F.3d 694 (3d Cir. 2005).  Hours must be excluded which are "excessive, redundant, or otherwise unnecessary." *Public. Int. Research Group of N.J., Inc. v. Windall*, 51 F.3d 1179, 1188 (3d Cir. 1995).  To that end, fee applicants must exercise "billing judgment," *Hensley*, 461 U.S. at 434, and the hours excluded are those that would be unreasonable to bill to a client and therefore to one's adversary irrespective of the skill, reputation or experience of counsel. *Public. Int. Research Group*, 51 F.3d at 1188 (citing *Hensley*, 461 U.S. at 433–34); *Loughner v. Univ. of Pittsburgh*, 260 F.3d 173, 180 (3d Cir .2001); *Maldonado v. Houstoun*, 256 F.3d 181 (3d Cir. 2001).

Courts reduce time for redundancy which may involve repetitive tasks or multiple attorneys performing the same tasks.  A reduction for duplication is warranted if the attorneys are "unreasonably doing the same work." *Rode*,  892 F.2d at 1187 (quoting *Jean v. Nelson*, 863 F.2d 759, 773 (11th Cir. 1988)) (internal quotations omitted).  *See also Duckworth v. Whisenant*, 97 F.3d 1393, 1398 (11th Cir. 1996) (reducing hours based on redundant work, repetitive tasks, multiple attorneys performing the same task and "myriad telephone conferences").

Four areas are often examined when courts seek to determine if time spent by attorneys—and charged to the opposing party under a fee-shifting statute—is excessive: block billing, vague entries, the use of multiple attorneys and duplication.

### A.    Block Billing

Block billing involves including a number of different tasks in a single time record rather than specifying what individual tasks were performed and how long each task took. Block billing makes it difficult or even impossible to determine the reasonableness of time spent on particular tasks. *In re Johnson & Johnson Derivative Litig.*, 2013 WL 11228425, at *19 (D.N.J. June 13, 2013), *adopted*, 2013 WL 6163858 (D.N.J. Nov. 25, 2013). Block billing makes it impossible to arrive at the specificity required "to determine if the hours claimed are unreasonable for the work performed." *Rode*, *supra*, 892 F.2d at 1190. "Block billing is not a good practice when fees will be sought and some of the attorney's work will not be awardable because block billing does not clearly separate out the awardable portions." *Metal Partners*, *supra*, at *2 (citing cases). *See also Crown Bay Marina, L.P. v. Subbase Drydock, Inc.*, 2021 WL 2930070, at *3-4 (D.V.I. July 12, 2021) ("Where, for example, the use of block billing renders it nearly impossible for the Court to determine whether unreasonable time was allocated to specific tasks, the Court will exclude such entries from the requested fee award.")

Some courts will take an automatic across the board reduction for block billing. *See Role Models Am., Inc. v. Brownlee*, 353 F.3d 962, 970-71 (D.C. Cir. 2004). In the Third Circuit, the test is whether the block billing creates confusion that hinders the court's function in determining if the amount of time spent on particular tasks was reasonable. *United States v. NCH Corp.*, 2010 WL 3703756, at *5 (D.N.J. Sept. 10, 2010). When time records reflect block billing, making it difficult to identify the compensable tasks or to determine the reasonableness of the time spent, courts may make

a percentage reduction for those entries. *See Hatchett v. Cnty. of Phila.*, 2010 WL 4054285, at *4 (E.D. Pa. Oct. 15, 2010) (reducing block billing entries by 50%).

In many instances KCR attorneys engaged in block billing, not just for Category 4 time but for Category 3 as well. *See* Exhibits B and C hereto.

## B.    Vague Entries

The problem of determining how much time is spent on particular tasks is compounded when the fee records contain time entries that do not contain sufficiently detailed descriptions of the work performed. Thus, vague descriptions that do not provide any indication of the subject matter of the work cannot be relied on when some of the work is compensable and other work is not. "Such vague descriptions deny the court an opportunity to review meaningfully the fee petition to determine whether claims are inextricably intertwined." *Gray*, *supra*, at *6-7 (citing *H.J. Inc. v. Flygt Corp.*, 925 F.2d 257, 260 (8th Cir. 1991)); *see also Hensley*, *supra*, 461 U.S. at 437 (the applicant should "maintain billing time records in a manner that will enable a reviewing court to identify distinct claims").

An entry for hours claimed should indicate the nature of the activity, the subject matter of the activity, the date the activity took place, and the amount of time spent on the activity. *Rode*, *supra*, 892 F.2d at 1191. "Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *Hensley*, *supra*, 461 U.S. at 433; *Washington*, *supra*, 89 F.3d at 1037. *See also Souryavong v. Lackawanna Cnty.*, 159 F. Supp. 3d 514, 534 (M.D. Pa. 2016) (discussing case law and noting that "[c]ourts within this district have disregarded time entries based on lack of specificity").

KCR's time is replete with vague entries. *See* Exhibits B and C hereto.

51

At trial, NMI's counsel suggested that time records detailing hours expended for separate tasks are not required and that block billing and vague entries are not a problem. As support, counsel cited the *Lindy* decisions. *See Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973) (*Lindy* I), and 540 F.2d 102 (3d Cir. 1976) (*en banc*) (*Lindy* II ).

To the extent, the *Lindy* cases contain statements relaxing the need for clear and task-specific time records, those statements are not applicable here.  In *Lindy* I, the Third Circuit stated that it is not necessary to know "the exact number of minutes spent on each precise activity," 487 F.2d at 167, and in *Lindy* II, the court stated that, in evaluating the quality of the work, a court need not "conduct a minute evaluation of each phase or category of counsel's work."  487 F.2d at 168-69.  But, *Lindy* was a "common fund" case in which contingency fee counsel, in a national class action, produced a settlement fund. The Third Circuit explained that the award of fees in this context—*i.e.*, pursuant to the common fund or equitable fund doctrine—is based on the concept of quantum meruit. 487 F.2d at 165; 540 F.2d at 110.  In this context, the Third Circuit made comments indicating that a detailed line-by-line, hour-by-hour review of time records may not be necessary.

*Lindy* did not involve an award of fees for prevailing on a claim under a fee-shifting statute.[24]  Also, in *Lindy*, the plaintiffs' class action counsel achieved success on a

---

[24] The Third Circuit assumed that Section 4 of the Clayton Act, 15 U.S.C. § 15 (1970), does not authorize award of attorney's fees to a plaintiff who has settled his antitrust action, rather than pursue it to successful judgment.  It based the authority to award fees on the general equitable powers of the court.  487 F.2d at 164-65.

contingent fee basis through settlement, and no allocation issues were presented (*e.g.*, prevailing on certain claims but not others).

None of the Section 303(i) cases say that the attorney time records need not be detailed or that the court need not ascertain the time spent by attorneys on particular tasks or that the court can mete out "rough justice." Thus, *Lindy*, while providing some general guidance on the fee award process, is not especially germane to the case at bar.[25]

### C.      Multiple Lawyers/Law Firms

The presence of multiple lawyers or firms raises a serious concern that the time spent was not reasonable. *Maldonado*, 256 F.3d at 185. The Third Circuit expressed this concern in *Maldonado*: "Ordinarily, this appeal could have been briefed and argued by a single lawyer or two. Lawyers should understand that although the likelihood of success in a fee shifting case may be promising, the prospects of payment by a defendant with a deep pocket or a defendant with tax collecting powers should not encourage the utilization of an excess number of lawyers on the preparation of the appeal." *Id*.

The Third Circuit and many other courts have cautioned parties not to expect that they can charge opposing counsel for the use of multiple lawyers or multiple law firms under a fee-shifting statute. *Daggett v. Kimmelman*, 811 F.2d 793, 797 (3d Cir. 1987)

---

[25] *Lindy* disapproved compensation for time spent in the attorney engagement process. 540 F.2d at 109 (negotiating fee arrangements). NMI improperly seeks that time here. *Lindy* also provides some guidance on the effect of a contingency fee. The Third Circuit noted that, if the risk is slight, any increase in the allowance for the contingent nature of the fee should be minimal. 487 F.2d at 168. Here, the Karalis firms were not on contingency. The KCR firm was hired on contingency. The problem for KCR is that it lost the contingency fee case. Further, as discussed elsewhere herein, Karalis did not need an additional firm, hired on a contingency fee basis, to help him recover his fees for the dismissal work.

(when several attorneys bill a large number of hours for strategy and conferencing, a reduction in the fee request is appropriate); *Citibank, N.A. v. Hicks*, 2004 WL 1895189, at *6 (E.D. Pa. Aug. 24, 2004) (same); *Bloomgarden v. U.S. Dep't of Justice*, 253 F. Supp. 3d 166, 179 (D.D.C. 2017) ("one attorney well versed in FOIA litigation could have adequately represented plaintiff in this matter").

It is not unreasonable for a private client to retain two, three or four law firms, but that does not mean the opposing party must pay for it. *See Halderman by Halderman v. Pennhurst State Sch. & Hosp.*, 49 F.3d 939, 943 (3d Cir. 1995) (explaining that, even though a private client may accede to the use of multiple attorneys, that does not mean the other party must pay for it). *See also Poff v. Prime Care Med., Inc.*, 2016 WL 3254108, at *9 (M.D. Pa. June 14, 2016) ("courts in this Circuit often disallow or reduce the rates or hours of attorneys when multiple attorneys appear at trial or other proceedings") (citing cases).

In many instances, NMI sent multiple attorneys to court hearings. During the dismissal phase, Aris Karalis and Frank Marinas both attended Bankruptcy Court hearings. When the motion for reconsideration was argued on April 23, 2014, three partners traveled to Reading, billed for their travel time and attended the hearing—Aris Karalis, Steven Coren and David Devito. During the recent fee trial, four law firm partners from three law firms appeared for NMI each day—Steven Coren, Aris Karalis, Lawrence McMichael and Jennifer Maleski (by video). Mr. Coren was accompanied by an associate and a paralegal. So, six professionals attended for NMI, while two participated for the Bank.

One typical problem that prompts courts to reduce attorney hours for excessive time arises when several attorneys within a firm or attorneys at different firms engage in excessive conferences.   Although a reasonable number of attorney conferences are necessary to the progress of the litigation, courts will deduct for excessive conferral time between members of the legal team, and with co-counsel at other firms.  *Duckworth*, *supra*, at 1398.  *See also Daggett*, *supra*, 811 F.2d at 797 (when several attorneys bill a large number of hours for conferencing, a reduction in the fee request may be appropriate).[26]

Below are some samples.  These are just conferences between KCR attorneys and Aris Karalis.  There are many other entries for internal office conferences, conferences with the client and conferences with other outside counsel.  These are drawn solely from KCR's time records.  MK and the other firms have plenty of conferences too.

| 3 | 10/14/2013 | BMM | 2.60 | 325.00 | $845.00 | Reviewed background materials on matter; Teleconference with Mr. Karalis; |
| 3 | 10/14/2013 | AJB | 2.40 | 300.00 | $720.00 | Review of background information; conference call w/ A. Karalis. |
| 3 | 10/21/2013 | SMC | 6.90 | 600.00 | $4,140.00 | File review, 3 conferences with clients and Aris Karalis, multiple conferences with staff, etc. -- various dates and times over the last several weeks |
| 3 | 11/08/2013 | SMC | 2.20 | 600.00 | $1,320.00 | File review; Interoffice conference with staff; Legal research; Telephone conference with Aris Karalis; Correspondence to Aris K. |

---

[26] When issues are particularly complex, conferral among attorneys at more than one firm may be chargeable to the losing party under a fee-shifting statute.  But, multiple attorneys at different firms should not ask the opposing party to pay for inter-office conferrals and correspondence in cases that are not extremely complex and that do not present novel issues.  *Armur Realty, LLC v. Banco do Brasil*, 2011 WL 7052112, at *4 (D.N.J. Dec. 12, 2011), *adopted*, 2012 WL 123919 (D.N.J. Jan. 13, 2012).   When a plaintiff uses multiple attorneys when only one is necessary, "compensation should be denied for the excess time."  *Copeland v. Marshall*, 641 F.2d 880, 891 (D.C. Cir. 1980).

| 3 | 11/11/2013 | SMC | 1.80 | 600.00 | $1,080.00 | Interoffice conference with staff; cw Aris Karalis et al.; File review |
| 3 | 11/14/2013 | SMC | 2.60 | 600.00 | $1,560.00 | File review; Correspondence to client; Correspondence to Aris Karalis; Interoffice conference with staff |
| 3 | 10/14/2013 | BMM | 2.60 | 325.00 | $845.00 | Reviewed background materials on matter; Teleconference with Mr. Karalis; |
| 3 | 10/14/2013 | AJB | 2.40 | 300.00 | $720.00 | Review of background information; conference call w/ A. Karalis. |
| 3 | 10/21/2013 | SMC | 6.90 | 600.00 | $4,140.00 | File review, 3 conferences with clients and Aris Karalis, multiple conferences with staff, etc. -- various dates and  times over the last several weeks |
| 3 | 11/08/2013 | SMC | 2.20 | 600.00 | $1,320.00 | File review; Interoffice conference with staff; Legal research; Telephone conference with Aris Karalis; Correspondence to Aris K. |
| 3 | 11/11/2013 | SMC | 1.80 | 600.00 | $1,080.00 | Interoffice conference with staff; cw Aris Karalis et al.; File review |
| 3 | 11/14/2013 | SMC | 2.60 | 600.00 | $1,560.00 | File review; Correspondence to client; Correspondence to Aris Karalis; Interoffice conference with staff |
| 3 | 11/26/2013 | SMC | 0.40 | 600.00 | $240.00 | Interoffice conference with staff; Telephone conference with Aris Karalis |
| 3 | 12/06/2013 | SMC | 0.70 | 600.00 | $420.00 | Review of motion; Interoffice conference with staff; Correspondence to Aris and Frank |
| 3 | 12/17/2013 | SMC | 1.20 | 600.00 | $720.00 | File review; Revision of order; Correspondence to client; Telephone conference with Aris and Frank; |
| 3 | 12/18/2013 | SMC | 1.80 | 600.00 | $1,080.00 | Review of motion; Correspondence to Aris and Frank; Telephone conference with Aris Karalis; Preparation of entry of appearance; File review |
| 3 | 12/24/2013 | SMC | 0.40 | 600.00 | $240.00 | Telephone conference with client; Telephone conference with Aris Karalis (left message) |
| 3 | 12/26/2013 | SMC | 0.60 | 600.00 | $360.00 | Telephone conference with Aris K.; Telephone conference with client |
| 3 | 12/30/2013 | SMC | 0.30 | 600.00 | $180.00 | Telephone conference with Aris K.; Review of Correspondence |
| 3 | 11/26/2013 | SMC | 0.40 | 600.00 | $240.00 | Interoffice conference with staff; Telephone conference with Aris Karalis |
| 3 | 12/06/2013 | SMC | 0.70 | 600.00 | $420.00 | Review of motion; Interoffice conference with staff; Correspondence to Aris and Frank |
| 3 | 12/17/2013 | SMC | 1.20 | 600.00 | $720.00 | File review; Revision of order; Correspondence to client; Telephone conference with Aris and Frank; |
| 3 | 12/18/2013 | SMC | 1.80 | 600.00 | $1,080.00 | Review of motion; Correspondence to Aris and Frank; Telephone conference with Aris Karalis; Preparation of entry of appearance; File review |

| 3 | 12/24/2013 | SMC | 0.40 | 600.00 | $240.00 | Telephone conference with client; Telephone conference with Aris Karalis (left message) |
|---|---|---|---|---|---|---|
| 3 | 12/26/2013 | SMC | 0.60 | 600.00 | $360.00 | Telephone conference with Aris K.; Telephone conference with client |
| 3 | 12/30/2013 | SMC | 0.30 | 600.00 | $180.00 | Telephone conference with Aris K.; Review of correspondence |
| 3 | 02/10/2014 | DMD | 0.90 | 325.00 | $292.50 | Telephone conference w/ A. Karalis, F. Marinas, & S. Coren re opposition to supplemental memos re motion for Reconsideration |
| 3 | 02/10/2014 | SMC | 1.50 | 650.00 | $975.00 | Conference with Team; File review; Telephone conference with Aris and Frank, et al. |
| 3 | 03/05/2014 | DMD | 0.30 | 325.00 | $97.50 | Telephone conference w/ A. Karalis, F. Marinas, S. Coren & B. Mather re opposition to motion for reconsideration |
| 3 | 03/05/2014 | BMM | 1.10 | 375.00 | $412.50 | Reviewed email from Mr. Marinas and attached documents; Teleconference with Mr. Karalis; |
| 3 | 03/11/2014 | SMC | 0.20 | 650.00 | $130.00 | Telephone conference with Aris K. |
| 3 | 05/01/2014 | SMC | 0.30 | 650.00 | $195.00 | Interoffice conference with staff; Correspondence to Aris K.; Review of revised scheduling order |
| 3 | 05/16/2014 | DMD | 0.20 | 325.00 | $65.00 | Telephone conference w/ A. Karalis & F. Marinas re scheduling issues, preparation of response to stay motion and adversary complaint |
| 3 | 05/30/2014 | SMC | 1.10 | 650.00 | $715.00 | Review of brief; Telephone conference with Aris |
| 3 | 06/22/2014 | SMC | 0.40 | 650.00 | $260.00 | Telephone conference with Aris Karalis; Review of correspondence; Correspondence to Aris Karalis |
| 3 | 07/16/2014 | DMD | 0.30 | 325.00 | $97.50 | Telephone conference w/ A. Karalis & S. Coren re status of cases and open issues |
| 3 | 07/16/2014 | SMC | 0.40 | 650.00 | $260.00 | File review; Interoffice conference with staff; Telephone conference with Aris Karalis |
| 3 | 08/01/2014 | SMC | 0.60 | 650.00 | $390.00 | Review of order; Interoffice conference with staff; Correspondence to Aris K. |
| 3 | 08/05/2014 | SMC | 1.30 | 650.00 | $845.00 | Interoffice conference with staff; Telephone conference with Aris Karalis et al.; Telephone conference with Court and other side (on the record); Telephone conference with other side |
| 3 | 09/30/2014 | DMD | 0.30 | 325.00 | $97.50 | Review redlines of bankruptcy court opposition briefs; email A. Karalis re same |
| 3 | 09/30/2014 | DMD | 0.80 | 325.00 | $260.00 | Telephone conferences w/ M. Rosenberg, A. Karalis re FL District Court opinion granting in part Rule 50 motion |
| 3 | 09/30/2014 | SMC | 1.60 | 650.00 | $1,040.00 | Interoffice conference with staff; Telephone conference with Aris Karalis; Telephone conference with client and Karalis; Review of opinion |
| 3 | 11/05/2014 | DMD | 0.20 | 325.00 | $65.00 | Telephone conference w/ A. Karalis & F. Marinas re outcome of telephonic hearing |

| 3 | 01/08/2015 | SMC | 0.40 | 700.00 | $280.00 | Telephone conference with client; Telephone conference with Aris K. |
| 3 | 12/21/2016 | DMD | 0.30 | 395.00 | $118.50 | Telephone conference w/ A. Karalis re case status (.2); confer w/ S. Coren re same (.1) |
| 3 | 12/21/2016 | SMC | 0.30 | 750.00 | $225.00 | Review of order; Interoffice conference with staff; Telephone conference with Aris Karalis |
| 3 | 03/07/2017 | SMC | 1.20 | 800.00 | $960.00 | Review of billing records for fee discussion; Telephone conference with Aris Karalis re same |
| 3 | 07/13/2017 | SMC | 0.90 | 800.00 | $720.00 | Review of motion to stay proceedings; Interoffice conference with staff; Telephone conference with Aris Karalis |
| 3 | 08/11/2017 | DMD | 0.40 | 415.00 | $166.00 | Telephone conference w/ A. Karalis and S. Coren re BK Court stay order and strategy |
| 3 | 10/25/2019 | SMC | 1.30 | 850.00 | $1,105.00 | Attend to matters re fee application; Telephone conference with other side; Interoffice conference with staff; Telephone conference with AJK |
| 3 | 11/11/2019 | SMC | 0.30 | 850.00 | $255.00 | Telephone conference with AJK; File review |
| 3 | 06/11/2021 | SMC | 0.50 | 850.00 | $425.00 | Telephone conference with Sara Rosenberg and AJK; File review |
| 3 | 09/02/2022 | SMC | 0.80 | 1100.00 | $880.00 | Review of Opinion re Defs. Motions for Summary/Partial Summary Judgment; Telephone conference with AJK |

P-162 (D.E. 181) reveals that three law firms participated in the work in Category 3, 5 and 7 and in Categories 8-11. Only one firm was needed for the Florida state court action. Time spent by others should just be to receive a report on status at appropriate intervals. Only one firm was needed to file and maintain the Chapter 11 proceeding—the Dilworth firm. The declaratory judgment action could have been handled by a single firm, KCR.

As to fee recovery (Category 3), the work in the fee case could have been handled by MK and its successor firm. The fee work was in the Bankruptcy Court. Mr. Karalis was extremely familiar with the entire history of the matter and was fully capable of litigating the issues. Indeed, looking at the docket for the fee case, there were three significant events/phases: (1) responding to the motions to dismiss, (2) responding to the

motions for summary judgment, and (3) preparing for and conducting the fee hearing. Incredibly, three firms collectively billed $900,000 (approximately) for fee recovery and that was only through September 2022.

Alternatively, in late 2013, when Mr. Coren came on board, the pursuit of a fee recovery could have been "handed off" solely to KCR. Instead, both the Karalis firms and KCR billed time on fee recovery—significant time—from 2014 through 2022, and Dilworth joined them later in logging nearly $30,000 in time (through September) for fee recovery. The fee recovery issues were not cut and dried, but they also were not extraordinarily complex. One firm with some occasional and limited conferral with others would have been reasonable.

That is not to say that NMI was precluded from hiring counsel of its choice or that no benefit was obtained through the joint efforts of three firms. NMI could have added Skadden Arps and Kirkland & Ellis to the roster, thus using five firms for fee recovery. And, it is quite possible that those other firms would have made contributions. But, the case law does not permit a client (in this case, one who was not paying any of the firms) to shift the expenses of multiple firms to the opposing party.

Courts have severely reduced fees when clients have utilized multiple law firms absent a showing that the issues and demands of the case warranted the simultaneous involvement in multiple firms. Thus, in a case involving fees sought under a contractual indemnification clause, the District Court for this District stated:

> Defendants assert that the claimed fees are excessive because of overstaffing and duplication of services. I agree. Plaintiffs saw fit to employ two large law firms, Schnader, Harrison, Segal & Lewis in Philadelphia, and Dewey, Ballantine in New York. Twenty-one different attorneys and twenty-one different paralegals from the Schnader firm, and thirty attorneys

and eleven legal assistants from Dewey, Ballantine, performed services for which reimbursement is now sought. The trial of the case lasted less than one day. Depositions were taken on nine different days. Plaintiffs' brief asserts that most of the legal work was performed by two attorneys, but their services account for only about $230,000 of the amount now claimed. It seems passing strange that the efforts of these two principal attorneys required over $700,000 worth of support and backup.

It is quite apparent that every pleading or other significant document was reviewed by several attorneys at Schnader, and was again reviewed extensively by attorneys at Dewey, Ballantine. Indeed, it appears that at least $20,000 of plaintiffs' claim is attributable to telephone calls between the two law firms relaying messages.

*Res. Cap. Mgmt. Corp. v. Rouse*, 1992 WL 368525, at *2 (E.D. Pa. Dec. 2, 1992). The court reduced the approximately $922,000 in fees sought by approximately 40%. *Id*. at *3. Because NMI, at trial, did not establish the need for three law firms to be substantially involved in several of the categories of work, the Court should either allow only the fees of the principal counsel, adjusted to reflect any excessive hours or rates, or apply an overall, across-the-board reduction of 50% for all three law firms.

### D.    Excessive Time Generally - Examples

The billing records of MK and its successor firm, KPC, reflect excessive time in a number of respects.  A good example is the work performed on NMI's motion to vacate Judge Fehling's stay order.  The preparation of that simple motion spanned from April 2013 through December 2013 when it was filed.  Most of the work was performed by MK over that eight month period, but KCR made some revisions in December 2013.  The drafting work was the bulk of it.  The motion itself was only five pages in length.  The combined frees of MK and KCR are approximately $37,000.  *See* D-429.

Another example is the time spent in opposing U.S. Bank's motion for reconsideration of the dismissal order.  That was an important motion.  But, the issues

turned on the application of collateral estoppel, and, although U.S. Bank made important arguments, the number of arguments and issues was limited.  And, this was a motion for reconsideration, not an evidentiary matter.  The standard for granting reconsideration is high.  Nevertheless, as shown in D-428, the time charges for the two firms, MK and KCR, came to approximately $41,500.  They spent 115 hours opposing the Bank's motion for reconsideration as to the collateral estoppel ruling.

Another example is excessive research performed by MK and the successor firm KPC as shown in D-426.  Most of this time was booked from late 2008 to mid-2014.  Most of it was research on Section 303 issues.  A total of 554.25 hours was spent, all by one attorney except for 7 of the time entries.  The time includes 112 separate entries for research on Section 303 issues.  Bear in mind that this is just research time, not drafting time.  The drafting time is also excessive.  The drafting of the initial dismissal motion (seeking dismissal of the petitions), the reply, a subsequent "303(i) memorandum," the response to U.S. Bank's motion for reconsideration, an "answer" to the involuntary petition (that was never filed) and one or two other papers totals approximately $180,000.  And, this was just the MK firm.  *See* D-427.

Another example is the time KCR spent in Category 3 responding to U.S. Bank's request for billing records and retainer agreements.  KCR spent 52.6 hours ($15,782.00) from April 20 to September 20, 2021 on this task, a task that should not have taken more than five or six hours.  D-434 (pdf 16-17).  There are many other examples.

## VIII.  THE HOURLY RATES

"Generally, a reasonable hourly rate is to be calculated according to the prevailing market rates in the relevant community.  Thus, the court should assess the experience and

skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Rode*, 892 F.2d at 1183 (internal citations omitted). The relevant community is the forum in which the suit was filed. *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 703-05. The two possible exceptions are: when a demonstrated need exists for special expertise requiring the employment of counsel from another community or when local counsel are unwilling to handle the case. *Id*. 705-06.

The prevailing party carries the burden of establishing the reasonable rates. *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984). The prevailing party can offer affidavits from other practitioners in the community concerning rates or other satisfactory evidence. *Washington*, 89 F.3d at 1036.

In Section 303(i) cases, the bankruptcy judge's experience comes into play and "will be the starting point for any analysis" of reasonable rates. *In re Landmark Distributors, Inc.*, 195 B.R. 837, 850 (Bankr. D.N.J. 1996) (citing *Zolfo, Cooper & Co. v. Sunbeam-Oster Co.*, 50 F.3d 253, 258 (3d Cir. 1995)); *In re Delaware Valley Lift Truck Inc.*, 640 B.R. 342, 374 (Bankr. E.D. Pa. 2022) (bankruptcy court relied on its own "expert judgment" where the only evidence the movant introduced consisted of its attorneys standard billing rates). If evidence concerning market rates "directly contradicts the court's judgment, the market rate must take precedence. *Zolfo*, 50 F.3d at 258 (citing *In re Busy Beaver Building Centers, Inc.*, 19 F.3d 833, 854 (3d Cir. 1994)).

Here, NMI's attorneys did not introduce affidavits of other professionals, expert opinions or market information about what other comparable professionals—in this community—have charged over the years at issue for similar work. NMI's attorneys

merely testified as to their own standard rates. That testimony is not particularly enlightening because it does not demonstrate whether the rates these professionals have charged and are now charging are consistent with rates in the relevant legal community for similar work performed by equally capable professionals.

U.S. Bank does not have a problem with the rates charged by Aris Karalis or any of his partners or associates. Karalis was at $415 per hour in 2008 and at $550 this year, with rate increases over the intervening years. His partner, Frank Marinas, billed at lower rates. U.S. Bank *does* have a problem with the rates charged by Steven Coren: $650 in 2014, $850 from 2018 to 2021 and $1,100 in 2022. The 2022 rate reflects an increase in a single year of more than 25%.

Mr. Coren explained that attorneys of his level of skill and experience, in major cases, in the District of Delaware and in the New York federal courts, are commanding these rates. The problem with this position is threefold. First, Mr. Coren's boutique firm is located in Philadelphia, and this case is in the Eastern District of Pennsylvania. Second, a rate increase of more than 10% in one year is difficult to justify. Third, Mr. Coren's rates are not suited to the work involved. Stated differently, skillful Eastern District practitioners who are capable of fee recovery work, like Mr. Karalis, can be retained at lower rates.

The United States Trustee has published fee guidelines for attorneys in larger Chapter 11 cases. This was not such a case. The rates must be based on forum rates if the attorneys have their primary offices in the forum. Further, the U.S. Trustee considers a 10% increase in one year to be significant.

The main problem with Mr. Coren's rate (not his associates' rates) is that he was hired to be the "big case" jury trial lawyer, and, while his client was not paying hourly rates, one can argue that, in appropriate cases involving the potential for recovery of several hundred million dollars, the special expertise of an experienced big case jury trial specialist is appropriate. High stakes litigation sometimes justifies high rates. But, NMI lost the damages case. It lost in 2019 while Mr. Coren was billing a very high rate of $850 per hour. After August 2019 (and excluding unsuccessful appeals), Mr. Coren's role was to assist Mr. Karalis in pursuing fee recovery and to attempt to recover his own fees for the failed damages case.

Unless a specialist is truly needed, a fee applicant under a fee-shifting statute cannot expect to shift the higher cost of a specialist to the opposing party. *Catholic Benefits Association LCA v. Azar*, 2018 WL 3876615, at *11 (W.D. Okla. 2018) (citing *Ramos v. Lamm*, 713 F.2d 546, 555 (10th Cir. 1983)) ("A client may choose the 'Cadillac' of law firm representation," but that client "is not automatically entitled to have an opposing party make the car payments."). *See also Beard v. Teska*, 31 F.3d 942, 956 (10th Cir. 1994), *abrogated on other grounds*, *Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Human Res.*, 532 U.S. 598 (2001) ("[W]hen it comes down to fee shifting ... the higher cost of [a] ... specialist cannot properly be thrust on someone who did not, after all, make the uneconomic choice of counsel."); *Praseuth v. Rubbermaid, Inc.*, 406 F.3d 1245, 1259 (10th Cir. 2005) ("absent a clear showing that the matter could not reasonably have been handled by counsel from the locality, rates above the prevailing local hourly rates should not be applied.").

The Third Circuit applies a "forum rate" rule which looks to prevailing rates in the forum for attorneys who provide similar services to the kind of work required by the case. *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 706 (3d Cir. 2005), as amended (Nov. 10, 2005). The fact that an attorney has substantial successful trial experience or many years in practice does not necessarily justify a higher rate. It depends on whether that level of experience and expertise is necessary in the matter at hand. *Souryavong*, 159 F. Supp. at 528-29 (denying higher rate for attorney who had not demonstrated that, in the particular litigation, she provided special expertise that other attorneys at lower rates could not provide and that she uniquely helped the plaintiff in the case at hand). *See also Maldonado*, 256 F.3d at 184-85 (explaining that the prevailing party's attorney's rates should be compared to rates of attorneys in the community who provide similar kinds of services).

Steven Coren's rate started out at $650 in 2014 and climbed to $1,100 in 2022. He was not billing a client. His client never agreed to pay those rates. His fees were not subject to client approval. Indeed, his client agreed only to pay a contingency fee. After Mr. Coren lost the damages case—the case he was mainly retained to handle—he jacked up his rate very substantially. His time post-August 2019 was spent largely on an unsuccessful Third Circuit appeal and in pursuing fee recovery, largely for the fees spent in the failed damages case.

To be clear, U.S. Bank is not questioning Mr. Coren's expertise or his experience, but the Court must consider the nature of the services and whether a particular attorney's expertise is needed for the given case. NMI could have retained an experienced attorney who frequently argues cases in the Supreme Court at a rate of $2,400 an hour. That

attorney might have done a superb job helping Mr. Karalis recover his Section 303(i)(1) fees, but it would not be appropriate to pay $2,400 an hour for the work involved.

The recent case of *Delaware Valley Lift Truck* is instructive in this regard. It did not involve Section 303(i). It involved a request for fees under Bankruptcy Rule 9011, 11 U.S.C. § 105(a), and 28 U.S.C. § 1927 for alleged abuse of the bankruptcy process by orchestrating the filing of a voluntary Chapter 11 petition for an improper purpose. 640 B.R. at 359. Mr. Karalis' firm, KPC, was one of the firms that represented the 50% equity holder that was seeking fees and costs in connection with the bankruptcy litigation and the dismissal of the petition.

The court engaged in fee-shifting, and it applied the lodestar approach. As to rates, the court considered the appropriate rate in the community (the Eastern District of Pennsylvania) among bankruptcy practitioners with the requisite skills and ability to perform the work. *Id*. at 372-74. It found that KPC's rates were reasonable, but that the involvement of another firm, Sidkoff, Pincus & Green (SPG), was not necessary and that the rates charged by the SPG attorneys were not reasonable. *Id*. at 374-76.

The court, based on its "experience and knowledge of the common rates that bankruptcy practitioners charge in this district," found that the rates of KPC were "comparable to those of other bankruptcy practitioners in the Eastern District of Pennsylvania with similar levels of experience and, therefore, reasonable for the purpose of the lodestar calculation." *Id*. at 374. KPC charged $530 an hour for the services of Aris Karalis and $395 per hour for the services of his partner Robert Seitzer. The court also found that the hours worked by KPC were reasonable. *Id*. at 374-75.

The other firm, SPG, had been retained to represent the equity holder in related district court litigation.  After the chapter 11 petition was filed, SPG appeared as co-counsel with KPC and collaborated with KPC in the bankruptcy court litigation.  *Id.* at 374-75.  Thus, the situation was similar in many respects to the retention of KCR here, although here KCR's involvement started, albeit briefly, in the bankruptcy court.  KCR came in at the tail end of the dismissal litigation to assist Mr. Karalis in opposing the motion for reconsideration.  After that, and excluding the appeals, KCR's work was in the district court until that litigation ended when KCR once again entered the bankruptcy court arena, this time in pursuit of fees.

Putting these parallels aside, the bankruptcy court, in *Delaware Valley*, found that SPG's rates were not reasonable.  As to SPG's bankruptcy court work, SPG's time records indicated 100.9 total hours spent working closely with KPC to research and formulate the legal reasoning and compile the evidentiary support for prosecuting the dismissal motion and opposing a bid procedures motion.  *Id.* at 375-76.  The court found that some of SPG's time was excessive because multiple attorneys were not always needed.  As to rates, the court found that SPG's rates were above those commonly charged in this district for good bankruptcy counsel.  The two SPG partners, Green and Keller, had comparable levels of experience to the KPC attorneys, but not primarily in bankruptcy court.  Green's rate was $1,150 per hour, and Keller's was $775.  Green's rate was $50 an hour above the rate Mr. Coren seeks here for his work in 2022.  *Id.*

The court found that the issues in the case were "related to general business litigation" and "because of the close correlation between the district court litigation and the bankruptcy case," it was "reasonable for SPG to work closely with KPC on the issues

67

presented in the bankruptcy case." That said, however, the court concluded that the SPG rates should be brought in line with the rates charged by KPC for the bankruptcy court work. *Id*. The court reduced the rates of Keller and Green to $500 per hour which the court found "consistent with the market rate in this district for seasoned business law practitioners serving in a supportive role in a bankruptcy case of this type." *Id*. at 376.

Here, the focus is on the bankruptcy court work because that was the successful work—*i.e.*, the dismissal and presumably the Section 303(i)(1) fee recovery work (although the parties disagree on what amounts are reasonable). The KCR rates should be brought in line with the KPC rates, and, indeed, the Dilworth rates should be brought in line with the KPC rates too because this case is not *Philadelphia Newspapers*. This was a single asset bankruptcy case for a defunct company that has been, for the most part, a two-party dispute. The rate charge by Mr. Karalis is appropriate for this case.

Mr. Coren's rate should be reduced to match that of Mr. Karalis or close thereto because Mr. Karalis was fully capable of handling the fee recovery work, and his rate, which is not at all insubstantial, is reflective of the community rate for work of this nature. But, in any event, the Court should not permit Mr. Coren to obtain a rate above the $850 rate he was charging while the damages case was still alive and while his particular expertise, arguably, was needed.

That leaves the rates of the Dilworth lawyers. The only evidence of reasonableness was Mr. McMichael's testimony that he typically gets the rates he charged here, $975 to $1,000 per hour, and that those rate have been approved by this Court and other bankruptcy courts for Chapter 11 work. U.S. Bank is not questioning Mr. McMichael's skill or experience. But, he was not hired, in this instance, to take the helm of a complex

and large Chapter 11 case.  He was hired to stop a state court execution sale in a case in which the debtor ceased to exist over a decade earlier, had no office, no employees, no contracts, and no assets other than a litigation claim against one adversary.  The main task was avoiding dismissal, and three law firms worked on that task, combining to bill in the area of $160,000 to oppose U.S. Bank's motion to dismiss the Chapter 11 case.

Mr. Karalis could have handled the Chapter 11 case easily.  A number of other highly skilled bankruptcy attorneys who often represent small and mid-size corporate debtors in small business cases could have handled the case at rates ranging from $500 to $600.  (That is not to say that Mr. Karalis could not have handled an enormous Chapter 11 case as lead counsel.  He could have.)

The other problem with Dilworth is that Mr. McMichael relied primarily on a skilled partner, Jennifer Maleski, whose rates ranged from $575 to $615 from 2020 through 2022.  While the firm did use a paralegal, Christine Tomlin, for certain routine tasks, a very substantial portion of the legal work was done at the partner rate of $575, $600 or $615 per hour rather than at an associate rate of $300 to $400 or a rate near that range.

The final problem is that the Dilworth firm did not act as sole counsel in the Chapter 11 case, using the other firms only to supply occasional fact information.  All three firms billed for much of the Chapter 11 work and for the declaratory action as well.  So, we have a combination of high rates by the primary firm, coupled with the use of multiple law firms.

The work in the Chapter 11 case, and the fee litigation, was challenging and many issues were raised, and the parties engaged in zealous advocacy.  But, NMI is attempting

69

to shift enormous fees to U.S. Bank at very significant rates for work that could have been streamlined, consolidated in a single law firm and performed at lower rates. The Court should make appropriate adjustments in the rates based on its expertise, assuming the Court determines that it was not necessary for NMI's attorneys to supply comparable rate information (other than attestations as to their own standard rates). Once the Court determines the reasonable number of hours in each category, the Court should adjust the rates of Messrs. Coren and McMichael significantly downward, and it should adjust the rate of Ms. Maleski downward as well.

Having said this, if the Court adopts U.S. Bank's overall assessment, which involves large percentage time reductions for some categories, it may not be necessary to adjust the rates because the percentage reductions will mitigate the excessive rates. If the Court makes less aggressive downward time adjustments, it should adjust the rates downward significantly. In that event, once the Court determines the reasonable number of hours for each firm per category, either U.S. Bank or NMI can recalculate the hours based on the reduced rates.

## IX.   NMI'S COSTS

The Karalis costs are set forth on D-432 and KCR's on D-433. The Dilworth firm's costs are not significant, and U.S. Bank does not challenge them. The figure that jumps out in the Karalis costs is approximately $30,000 in copying charges. The invoices do not explain what documents are being copied. In an age of electronic documents, and given the fact that MK and KPC were not involved heavily in the damages case, it is difficult to understand how $30,000 in copying costs were incurred. Some monthly invoices refer to copying "financial documents." Others to "miscellaneous." Other vague

descriptions appear in the invoices.  It is not known whether and to what extent outside vendors were used for copies.

The main function of the MK firm, in respect of documents, was gathering and preparing documents for an evidentiary hearing on the motion to dismiss the involuntary petitions that never took place.  NMI had 122 exhibits on its Exhibit List attached to the Joint Pretrial Statement that was filed in advance of the expected evidentiary hearing on the motion to dismiss the involuntary petition.  *See* Case 08-17351-elf, D.E. 78-4 (filed 06/01/09).  Of course, there was a need to copy exhibits, transcripts, pleadings and documents subsequently produced in other proceedings.  But, still, $30,000 is a large figure, and, without any explanation at all of what was being copied, it is not possible to conclude that $30,000 (approximately) is a reasonable figure.  The other Karalis costs appear to be reasonable.

The much more problematic costs are those of KCR.  They are enormous— $232,513.92 (and this is after deduction of $132,637.50 for expert witness fees paid in the failed damages case).  These costs are for the failed effort to recover damages pursuant to Section 303(i)(2).

Just as KCR was required to prove relatedness of its attorney time in the damages case with compensable work in the fee case, KCR was required to show the relatedness of its costs.  It failed to do so at trial, and it is too late now.

The major KCR costs are "E-Discovery"—a whopping $119,675.92—and computer research—$33,336.78.  There are inappropriate smaller miscellaneous costs for travel and some other items.  It is not likely that the computer research was undertaken to

garner additional legal support for the (i)(1) claim, and it certainly was not done to build a factual record for the (i)(1) claim.

Even more problematic, KCR spent significant costs, nearly $120,000, on maintaining a computerized database. NMI apparently paid an outside ESI vendor to host the documents and make it possible for NMI's counsel to search and retrieve documents. There is no evidence that NMI's counsel made these significant ongoing costs known to U.S. Bank's counsel during the litigation.

NMI chose to bring the damages case. It foisted that case on U.S. Bank and then lost the case. NMI needed to maintain its own documents to be able to pursue the case it voluntarily elected to bring and to respond to U.S. Bank's appropriate document requests—all of which concerned damages, the issue NMI lost on.

The ESI support was not to gather and maintain the few emails and letters that shed light on the motivations and reasons underlying the filing of the involuntary petitions. Both parties already had most of those documents, and they are not numerous.

Further, KCR did not show the relatedness of the documents maintained in the database or the relatedness of the ESI support to building a record to help in the recovery of Section 303(i)(1) fees. And, U.S. Bank's counsel testified that one of the KCR partners advised him that NMI did not maintain hard copy files and, for this reason, it was necessary to search various computer servers to retrieve responsive documents. That problem was caused in part by NMI's decision not to maintain its hard copy records.

The bottom line is that it is unconscionable for NMI to demand that U.S. Bank pay the costs of NMI's ESI vendor for a case that NMI lost, especially since the focus of the

U.S. Bank discovery was on the very matter NMI failed to prove—actual damages.[27]
Requiring the *prevailing party* to pay the costs of an opponent's ESI services is
unprecedented. For all of these reasons, the ESI costs are not compensable. NMI did not
prove the relatedness of the other KCR costs either, including the computer research.

### U.S. BANK'S OVERALL ASSESSMENT

U.S. Bank has annotated P-162A to show the adjusted amounts that are arguably
reasonable, working within the framework of this Court's prior rulings and applying the
principles discussed herein. This is, of course, subject to the pending Third Circuit appeal
and any future appeal that may be taken with respect to prior rulings. The annotated P-
162A is attached as Exhibit A hereto. The explanations follow.

## REASONABLE FEES

### Category 1

The dismissal fees are solely those of MK. The unrelated time of $61,788.75 has
been deducted. A 20% reduction has been applied to the balance based on excessive time
as demonstrated by the examples provided herein.

### Category 2

MK and KCR billed time to the dismissal appeals. KCR performed the briefing
work, and only one firm was needed. The MK time has been deducted. KCR has received
full credit for its time; however, time spent by KCR on Ashland's Third Circuit appeal in

---

[27] The documents NMI thought relevant to proving fee entitlement under the
"totality" test are Exhibits 1-67 on NMI's Exhibit List in its Pretrial Disclosures filed
herein. D-438. NMI did not need an outside ESI firm to manage these exhibits.

which U.S. Bank did not participate has been deducted—98.6 KCR hours/$36,937.50
fees. D-434 (pdf 1 & 8-10).

**Category 3**

For the MK and KPC time in Category 3, the unrelated time of $ $275,489.75 has
been deducted. (This deduction was applied to the MK time). The balance of the time
for the two Karalis firms has been reduced by 20% for excessiveness. The KCR and
Dilworth attorney time has been reduced by 50%. This reduction is made based on the
use of three law firms for fee recovery when only one was needed and in view of excessive
time.

**Category 4**

The Category 4 time is solely that of KCR. KCR lost the damages case. At most,
KCR should receive credit for the four depositions it took that concerned liability issues
and its document request and interrogatories to U.S. Bank.

As best as U.S. Bank can determine, KCR devoted 175.2 hours to preparing for
and taking these fact witnesses for total fees of $65,445.50 (including substantial hours
of block billing). D-434 (pdf 37-38).

As best as U.S. Bank can determine KCR spent 9.7 hours and $4,207.50 in fees to
draft NMI's interrogatories, review the responses and prepare a discovery deficiency
letter. KCR has another 20.2 hours and $5,552.00 for block-billed time for various tasks
that include, among other things, "Discovery/Drafting." So, the total time/fees for
preparing written requests to U.S. Bank appears to be, at most, 29.9/$9,759.50. *See*
Exhibit D.

Giving full credit for the enormous amount of hours devoted to preparing for and taking these four witnesses (all of whom were deposed before), and ignoring the block billing and giving full credit for the hours booked as working on written discovery requests to U.S. Bank, the total amount is 175.2 hours/$75,205.00.

KCR also shows 53 hours for reviewing documents produced by U.S. Bank, but there is no way of telling what documents were reviewed (*e.g.*, documents U.S. Bank obtained through subpoenas to third parties and produced to KCR, documents relating to damages, documents KCR already had from related litigation, etc.). Because KCR did not meet its burden of providing specifics and showing relatedness, these hours are not compensable.

Therefore, the total allowable KCR Category 4 time is 175.2 hours/$75,205.00.

## Category 5

Only one firm should charge (if any) for the Florida state court case that NMI lost. That firm is Florida counsel, GJB. During trial, NMI (with the consent of GJB) stipulated to accepting $50,000.

## Category 6

Category 6 is for fees regarding the propriety of filing Chapter 11. U.S. Bank does not object to the small amount charged by Dilworth.

## Category 7

Category 7 consists of fees to effectuate the Chapter 11 case. Only one law firm was needed to effectuate the filing and obtain the automatic stay. Dilworth was fully capable of that task. Only Dilworth should be compensated.

For the reasons discussed above, U.S. Bank drew the line on June 12, 2020 right after NMI's counsel notified U.S. Bank's counsel that NMI had effectuated a Chapter 11 filing and a stay was in place. D-436. That resulted in the cancelling of the imminent state court sale. The total hours/fees through the relevant entry (as marked on D-436) are 49.55 hours/$22,383.75. That is approximately half of the dollars Dilworth has in this category.

**Category 8**

Three firms collectively logged a whopping approximately $160,000 to oppose a motion to dismiss that was based on undisputed facts and procedural history. It was an important motion. U.S. Bank raised serious issues. However, it was not necessary to utilize three law firms, and approximately $80,000 is more than adequate to oppose such a motion by any measure. Therefore, the hours of each firm (and dollars) have been halved.

**Category 9**

This category consists of fees to oppose the Bank's stay relief motion. The Bank did not seek complete stay relief or relief to proceed with a sale. It sought only limited relief to proceed in the Florida Third District Court of Appeal with an appeal NMI filed of the state court sale order. NMI had already filed its appeal brief. U.S. Bank had prepared its own brief (before the Chapter 11) and wanted to file it and proceed to see whether the sale order would be affirmed. It would have meant NMI having to file a reply brief and attend oral argument (if scheduled). The Court determined that it would not be productive to proceed and would involve an unnecessary expense for the estate. NMI seeks nearly $58,000 for opposing the stay relief motion. That is probably more than

NMI would have spent filing a reply brief in the appeal.  In any event, three firms were not needed to oppose the limited stay relief motion.  One Dilworth attorney could have handled it.  Thus, the fees for each of the three firms are halved.

**Category 10**

Three firms recorded a whopping approximately $154,000 for the declaratory action.  Only one firm was needed.  KCR appears to have handled the bulk of it.  NMI succeeded on some but not all of the claims.  The matter was resolved on summary judgment, based on legal issues.  The facts were not disputed.  The case involved minimal discovery.  There were no evidentiary hearings.  $154,000 is excessive.  The time for each firm has been cut in half.

**Category 11**

For the reasons discussed above, the Court should defer with respect to fees for the pending Third Circuit appeal.  The result is not known.  U.S. Bank may win.  There is no legal authority to award fees for a pending appeal simply because the appellee won below.

**Category 12**

Dilworth initially did not include time for this because the Court ruled that administrative time for the Chapter 11 case is not compensable.  Dilworth reconsidered and added back in $62,986.77.  For the reasons already discussed, this time should be disallowed.  Further, it should be noted that Dilworth may be able to recover additional fees in the Chapter 11 process pursuant to 11 U.S.C. § 330.  The question here is whether U.S. Bank should pay based on Section 303(i)(1) of the Code.

**Multiple Codes**

A 50% across the board discount has been applied to the KCR multi-code time.
The problem is that the multi-code entries, almost by definition, consist of block billing.
Further, in many instances, the multi-code entries include time in other categories in
which KCR was billing simultaneously with the two other firms, such as in various
aspects of the Chapter 11 and Chapter 11-related work.  Because it is not possible to
ascertain with certainty whether this mixed grab bag of time is compensable, and because
a lot of it reflects multi-firm work when only one firm was needed, a reduction of 50%
has been applied.

## REASONABLE COSTS

From the total Karalis costs of $63,304.23, and for the reasons discussed above,
$29,565.11 in "copy costs" has been deducted.  As to KCR, the issues concerning the ESI
vendor (for the damages case) are discussed above.  Those costs have been deducted.
KCR did not show at trial that its other cost items, including computer research, are
related to the (i)(1) claim as opposed to other work, but, in an abundance of caution, the
other KCR costs have not been deducted.

U.S. Bank does not object to the Dilworth firm's cost items.

## CONCLUSION

The fees sought for dismissal and fee recovery include substantial unrelated time
and substantial excessive time.  NMI failed to carry its burden of demonstrating the
relatedness of the Category 4 work, and the record reveals that most of it is unrelated to
NMI's (i)(1) fee claim.  The work on the Florida case should be resolved by NMI's

agreement to accept $50,000 for GJB's work.  The other firms should not be collecting for work in the Florida state court case or consulting with GJB.

The Chapter 11 work, including the declaratory judgment action, must be heavily discounted in line with the guidance provided by the Court in its September 2, 2022 decision, in consideration of the work performed and in light of the active participation of three law firms in the Chapter 11 and Chapter 11-related work.  NMI is not entitled, at this time, to any fees for the still pending Third Circuit appeal.  Costs should be reduced as well for the reasons explained above.

During the trial, NMI offered several voluntary fee reductions, perhaps in recognition of the validity of the Bank's objections.  Tr. (11-30-22), pp. 4-9.  Those concessions, though not immaterial, are woefully inadequate.  U.S. Bank has offered what it believes are reasonable fees and costs, within the guidelines this Court has provided.  *See* Exhibit A.  If the Court agrees with the Bank's assessment, or substantially agrees, it need not labor to reduce the objectionable billing rates.  The discounts U.S. Bank is proposing on hours will mitigate the impact of the overly high rates.

However, should the Court find that attorney hour reductions in the ranges urged by U.S. Bank are not supported, then it should adjust the billing rates downward substantially in consideration of prevailing rates in this legal community for the kind of work involved here—fee recovery and the filing of a single asset Chapter 11 case to avoid an execution sale.

U.S. Bank appreciates the time and attention this Court has devoted to this matter throughout the Court's involvement.

Dated:  December 23, 2022

Respectfully submitted,

STEVENS & LEE

By: */s/ Steven J. Adams*
    Steven J. Adams, Esquire
    111 N. 6th Street, P.O. Box 679
    Reading, PA 19603
    Telephone:(610) 478-2133
    Email: steven.adams@stevenslee.com

SHUTTS & BOWEN LLP

    /s/ *Peter H. Levitt*
    Peter H. Levitt, *pro hac vice*
    John W. Bustard, *pro hac vice*
    Shutts & Bowen LLP
    200 South Biscayne Boulevard
    Miami, FL 33131
    Telephone: (305) 415-9447
    Email: plevitt@shutts.com
    Email: jbustard@shutts.com

Attorneys for the U.S. Bank Defendants

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that the foregoing memorandum was served by electronic mail this 23rd day of December 2022 upon Aris J. Karalis, Esq. Karalis PC, 1900 Spruce Street, Philadelphia, PA 19103 (akaralis@karalislaw.com); Steven M. Coren, Esq. and Janice D. Felix, Esq., Kaufman, Coren & Ress, P.C., 2001 Market Street, Suite 3900 Philadelphia, PA 19103 (scoren@kcr-law.com & jfelix@kcr-law.com); and Amy E. Vulpio, Esq., White and Williams LLP, 1650 Market Street, 18th Floor, Philadelphia, PA 19103 (vulpioa@whiteandwilliams.com).

By: _/s/ Peter H. Levitt_
        Peter H. Levitt