## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| **NATIONAL MEDICAL IMAGING, LLC** | : Bky. No. 08-17351 (ELF) |
| | : |
| | : |
| **NATIONAL MEDICAL IMAGING** | : Bky. No. 08-17348 (ELF) |
| **HOLDING COMPANY, LLC,** | : |

| | |
|---|---|
| **NATIONAL MEDICAL IMAGING, LLC** | : |
| **NATIONAL MEDICAL IMAGING** | : |
| **HOLDING COMPANY, LLC,** | : |
| Plaintiffs, | : Adv. No. 14-250 |
| | : Adv. No. 14-251 |
| v. | : |
| **U.S. BANK, NATIONAL ASSOCIATION, et al.** | : |
| Defendants. | : |

# O P I N I O N

## TABLE OF CONTENTS

### I.  INTRODUCTION

A. Overview

B.  The Collateral Litigation

C. The Trial and Post-Trial Submissions

D. NMI's Claim

E. U.S. Bank's Main Arguments

1

**F.  Ashland's Position**

**G. The Ruling**


**II.  HISTORY OF THE LITIGATION**

    **A. The Involuntary Petitions and their Dismissal (Category 1)**

    **B. The Appeal of the Dismissal Order (Category 2)**

    **C. The §303(i)(1) and (2) Adversary Proceedings (Categories 3 and 4)**

        **1.  the initial proceedings**

        **2.  §303(i)(1) adversary proceeding--  initial phase after withdrawal of the reference**

        **3.  §303(i)(2) adversary proceeding – after withdrawal of the reference**

        **4.  §303(i)(1) adversary proceeding– after the district court ruling dismissing NMI's §303(i)(2) claim**

    **D. The Florida State Court Matters (Category 5)**

    **E. The 2020 Voluntary Chapter 11 Filings (Categories 6, 7, 8, 9 and 12)**

    **F.  The 2020 AP and Appeal (Categories 10 and 11)**


**III. APPLICABLE LEGAL PRINCIPLES AND CONCLUSIONS ON CERTAIN DISPUTED LEGAL ISSUES**

    **A. NMI Is Entitled to Relief Under 11 U.S.C. §303(i)(1)**

    **B. Timing Issues Arising from the Pendency of the Chapter 11 Bankruptcy Case and the Appeal in the 2020 AP**

    **C. The Form of Relief**

**D. Attorney's Fees for Services Provided in the Category 4: the §303(i)(2) Collateral Proceeding**

    **1. the applicable legal principles derived from <u>Hensley v. Eckerhart</u>**

    **2. the nexus between the §303(i)(1) and §303(i)(2) actions**

    **3. the methodology for determining the compensability of the attorney's fees incurred in the §303(i)(2) action**

**E. Attorney's Fees for Services Provided in the Three (3) Other Collateral Proceedings**

**F. Scope of the Court's Review of the Time Records**

**IV. DETERMINATION OF THE AMOUNT OF COMPENSABLE FEES AND COSTS**

    **A. Categories 1 and 2: Dismissal of the Involuntary Petitions and Appeal of the Dismissal Order**

        **1. Category 1 fees**

        **2. Category 2 fees**

    **B. Category 3: the §303(i)(1) Proceeding**

        **1. fees for work performed prior to October 2022 by MK and KPC**

        **2. fees for work performed prior to October 2022 by KCR**

        **3. fees for work performed prior to October 2022 by Dilworth**

        **4. the supplemental fee submissions (pre-trial, trial and post-trial)**

**C. Category 4: the Unsuccessful §303(i)(2) Claim – KCR Fees**

**D. Category 5: Fees Incurred in Florida State Court Matters**

    **1. KCR fees**

    **2. Dilworth fees and costs**

    **3. GJB Fees**

**E. Category 6: Fees Incurred Regarding the Propriety of Chapter 11 Filings**

**F. Category 7: Fees Incurred to Effectuate Chapter 11 Filings**

**G. Category 8 and Category 9: Fees Incurred to Oppose U.S. Bank's Motion to Dismiss and Motions for Relief from the Automatic Stay**

    **1. the motion to dismiss**

    **2. the motion for relief from the automatic stay**

**H. Categories 10 and 11: Fees Incurred in the 2020 AP and the Appeal**

**I. Category 12: Fees Incurred for Administration of Chapter 11 Cases – Dilworth Fees**

**J. Costs**

**K. NMI Is Entitled To Pre-Judgment Interest**

    **1. applicable legal principles**

**2. factors influencing the exercise of the court's discretion**

**3. the allowance of pre-judgment interest**

**4. the interest rate**

**5. the calculation**

**L. Summary Table**

**M. Allocation of Liability Between U.S. Bank and Ashland**

**1. Ashland**

**2. U.S. Bank**

**V. CONCLUSION**

## I. INTRODUCTION

### A. Overview

On November 7, 2008, more than fourteen (14) years ago, six (6) related entities, all of which have the initials "DVI" as part of their names ("the DVI Defendants") filed involuntary bankruptcy petitions against National Medical Imaging, LLC and National Medical Imaging Holding Company, LLC (collectively, "NMI").[1]  This court, acting through a predecessor judge, dismissed the involuntary petitions filed on December 28, 2009.  The dismissal precipitated the

---

[1]    The original petitioning creditors were, DVI Receivables XIV, LLC, DVI Receivables XVI, LLC, DVI Receivables XVII, LLC, DVI Receivables XVIII, DVI Receivables XIX, LLC and DVI Funding, LLC.

years-long proceedings that lead to today's ruling.

NMI filed this adversary proceeding under 11 U.S.C. §303(i) in 2014.[2]

11 U.S.C. §303(i) has two (2) subsections and provides:

[i]f the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment —

(1) against the petitioners and in favor of the debtor for —

(A) costs; or

(B) a reasonable attorney's fee or

(2) against any petitioner that filed the petition in bad faith, for —

(A) any damages proximately caused by such filing; or

(B) punitive damages.

Presently, this adversary proceeding involves §303(i)(1) only, not §303(i)(2).

NMI seeks to hold the DVI Defendants and two (2) other parties --  U.S. Bank, National

---

[2]    For ease of reference, I will refer to the two (2) adversary proceedings filed in each of the separate bankruptcy cases in the singular.

For more on why this adversary proceeding arising from a 2008 bankruptcy was first filed in 2014 and why it has lingered into 2023, see Part II.C., infra.

Association ("U.S. Bank")[3] and Ashland Funding, LLC ("Ashland")[4] liable for an award of attorney's fees and costs under 11 U.S.C. §303(i)(1).

There is no dispute that the involuntary petitions were dismissed and that NMI did not waive its rights under §303(i).  So, one might expect a claim for attorney's fees and costs under §303(i)(1) to be resolved through a relatively straightforward process, occurring after the dismissal of the petitions, involving a calculation based on the hours expended, the appropriate hourly rates and the costs incurred by the putative debtors' attorneys.

But this is no straightforward case.

Since 2008, the parties have engaged in an all-out litigation war on multiple fronts.  As a result, in this action under §303(i)(1), to recover attorney's fees and costs incurred in obtaining dismissal of the 2008 involuntary cases, NMI seeks to recover attorney's fees totaling

---

[3]      U.S. Bank is the successor-in-interest of Lyon Financial Services, Inc.  ("Lyon").  This is undisputed.  Neither U.S. Bank nor Lyon was a petitioning creditor. NMI asserts that U.S. Bank, as Lyon's successor, is liable under 11 U.S.C. §303(i)(1) based on the "de facto petitioner" theory.  See In re Rosenberg, 779 F.3d 1254, 1268–69 (11th Cir. 2015).  U.S. Bank disputes the validity of this legal theory. However, this court previously ruled in favor of NMI on this legal issue and the ruling is law of the case. See In re Nat'l Med. Imaging, LLC, 570 B.R. 147, 158 (Bankr. E.D. Pa. 2017) (per Fehling J.).  Of course, U.S. Bank's argument that it cannot be held liable because it was not a petitioning creditor is preserved for appeal.

In the balance of this Opinion, generally, I will refer to U.S. Bank and the DVI Defendants collectively as "U.S. Bank."  U.S. Bank and the DVI Defendants are represented by the same counsel.

[4]      Ashland, while not a petitioning creditor on the original involuntary petitions, joined as a petitioning creditor on a subsequent amended involuntary petition.  (See (Bky. No. 08-17351, Doc. # 55; Bky. No. 08-17351, Doc. # 53).  Ashland is represented by separate counsel.

NMI withdrew its claims against an individual originally named as a defendant, Jane Fox.

$5,122,012.26 and costs in excess of $300.000.00.[5]

As explained below, I have determined that NMI is entitled to recover a substantial

portion of the attorney's fees and costs it seeks, amounting to $2,559,188.15 in attorney's fees,

costs and pre-judgment interest, with the Defendants largely, but not entirely, jointly and

severally liable.

However, I am unable to enter a final, appealable judgment at this time.  There is one (1)

piece of NMI's §303(i)(1) claim, involving approximately $240,000.00 in requested attorney's

fees, that is not ripe for a decision due to a pending appeal before the Third Circuit Court of

Appeals.  Thus, the order accompanying this Opinion will not enter judgment, but instead will set

out my determination regarding the compensable amount of those fees and costs at issue that are

ready to be decided, subject to a potential increase in the award after the conclusion of the Third

Circuit appeal.  After the appeal is decided, NMI's §303(i)(1) entitlement can be finalized and the

court can enter a final money judgment in NMI's favor.

To summarize my ruling, it is necessary to begin with a somewhat lengthier than usual

Introduction.

## B.  The Collateral Litigation

In the past fourteen (14) years, the parties have engaged in a colossal amount of litigation

arising from or related to their pre-bankruptcy relationship and the ill-fated involuntary

bankruptcy filings.  As a result, NMI seeks attorney's fees and costs, incurred not only in

---

[5]      (See NMI Post-Trial Mem. at 43 and NMI Supplemental Fee Submission) (Adv. No. 14-250, Doc.
#'s 218, 219)).  The amount of the request stated above in the text includes pre-judgment interest NMI has
requested.

obtaining dismissal of the involuntary petition filed in 2008 (and successfully defending that

ruling on appeal), but also incurred in the following "collateral proceedings:"

(1) NMI's unsuccessful litigation in the district court pursuing a claim for damages
under 11 U.S.C. §303(i)(2);

(2) NMI's unsuccessful litigation in the Florida state courts in which NMI sought
to prevent U.S. Bank from employing its state court judgment against NMI to
schedule an execution sale of NMI's then pending §303(i)(2) claim;

(3) NMI's subsequent, voluntary chapter 11 bankruptcy cases, filed on June 12,
2020 (Bky. Nos. 20-12618, 20-12619) ("the 2020 Bankruptcy Cases");[6]

(4) the adversary proceeding filed by the Debtors after the commencement of their
2020 bankruptcy (Adv. No. 20-0219) ("the 2020 AP") in which they obtained a
declaratory judgment that U.S. Bank may not:

(a) set off its judgments against the Debtors' recovery under 11 U.S.C.
§303(i)(1) or

(b) employ its judgment to execute against the Debtors' §303(i)(1) claims,
(see Adv. No. 20-219, Doc. # 45).[7]

The parties' dispute regarding the amount of the Defendants' liability under §303(i)(1)

centers largely (but not entirely) on the attorney's fees incurred by NMI in the collateral

proceedings.

By opinion and order dated September 2, 2022, in this adversary proceeding, I denied a

motion for partial summary judgment filed by U.S. Bank and a motion for (total) summary

---

[6]     The two (2) bankruptcy cases filed in 2020 are being jointly administered.  (See Bky. No. 20-12618,
Doc. # 53).  Thus, the claims asserted in this adversary proceeding arising from the dismissal of the 2008
involuntary bankruptcy cases are property of each NMI entity's bankruptcy estate in the 2020 cases.

[7]     This judgment is the subject of an appeal presently pending the U.S. Court of Appeals for the Third
Circuit.

judgment filed by Ashland.  See In re National Medical Imaging, LLC, 644 B.R. 94 (Bankr. E.D. Pa. 2022) ("the 2022 MSJ Opinion").

In the 2022 MSJ Opinion, I held that the attorney's fees incurred in the four (4) collateral proceedings were potentially compensable.  I will further discuss the reasons for this ruling in Part III.B, infra, as the reasons directly impact the standards that I will apply in determining the compensability of the attorney's fees incurred in the various collateral proceedings.

### C.  The Trial and Post-Trial Submissions

Trial of this adversary proceeding was held over three (3) days: November 29, November 30, and December 1, 2022.[8]

Six (6) witnesses, all attorneys, testified at trial.  The attorneys testifying for NMI were the attorneys who litigated on behalf of NMI and against U.S. Bank over the past fourteen (14) years in:

- various federal courts:  the bankruptcy courts and district courts in the Eastern District of Pennsylvania and the Southern District of Florida; the Courts of Appeal for the Third and Eleventh Circuits; and the United States Supreme Court; and

- the state trial court in Pennsylvania and the state trial and appellate courts in Florida.

The attorneys testifying for the Defendants were the attorneys who participated in most of the same matters.

---

[8]    I will refer to the trial transcript for each of the three (3) dates as "N.T. 1," "N.T. 2" and "N.T. 3." (Adv. No. 14-250, Doc. #'s 212, 213, 214).

In addition, two hundred and eighty (280) exhibits were moved into evidence.

The exhibits primarily fell into two (2) categories.  Some were designed to assist the court in evaluating the reasonableness of the fee requests by providing the court with the attorneys' work product (i.e., motions and briefs filed in various courts).  Other exhibits consisted of summaries of the time records of the attorneys' work organized by subject matter, including critiques of the time records prepared by the Defendants.[9]

The parties filed simultaneous post-trial memoranda on December 23, 2022.  By order dated December 8, 2022, I authorized the Plaintiffs to file a supplemental submission to include a request for attorney's fees and costs for the period after the last date in the time records submitted at trial.  The order gave the Defendants until January 10, 2023 to respond to the Plaintiffs' supplemental submission as well as three (3) trial exhibits containing time records introduced at trial that had not been provided to the Defendants prior to the trial.  U.S. Bank and Ashland filed a timely response to NMI's supplemental submission.  All told, the post-trial memoranda totaled almost two hundred (200) pages, accompanied by approximately three hundred (300) pages of various attachments.

### D.  NMI's Claim

NMI's claim for a judgment under 11 U.S.C. §303(i)(1) is based on the attorney's fees and costs incurred for the services provided by four (4) law firms:

---

[9]    I am cognizant that the compilation and organization of the time records by category, as well as U.S. Bank's categorical critique of the time records, required a substantial effort by counsel.  I commend counsel on both sides for their efforts in this regard.

- Karalis P.C. ("KPC")[10]

- Kaufman, Coren & Ress, P.C. ("KCR")

- Dilworth Paxson LLP ("Dilworth")

- Genovese Joblove & Battista, P.A. ("GJB").

Solely with respect to that portion of NMI's §303(i)(1) claim based on the services provided by GJB, the parties have reached an agreement.[11]  The amount of the compensable attorney's fees and costs for the three (3) other law firms is hotly contested.

Without breaking it down by its components or by law firm at this juncture, NMI requests entry of a judgment in its favor for attorney's fees and costs of close to $5.5 million.  In general terms, NMI argues that the magnitude of the fees and its asserted entitlement to pre-judgment interest is justified by U.S. Bank's unrelenting opposition and dogged litigation of the issues between the parties.

### E.  U.S. Bank's Main Arguments

U.S. Bank asserts that it has no liability under §303(i)(1) whatsoever, a position previously raised by pretrial motion and rejected by this court.  See n.3, supra.  U.S. Bank further disputes that

---

[10]    While I referred in the text above to KPC as one (1) of four (4) law firms, in fact, KPC is the successor law to Maschmeyer Karalis P.C. ("MK").  Later in this Opinion, when I get into the weeds of the various parts of NMI's attorney's fees request and the objections thereto, I will distinguish between MK and KPC.

[11]    The parties agreed upon $50,000 as a reasonable attorney's for GJB's services, subject to Defendants' appellate rights to challenge entitlement.  (See N.T. 2, at 8; N.T. 3, at 116).

a §303(i)(1) judgment properly includes the attorney's fees and costs incurred in the collateral proceedings.[12]  And, U.S. Bank disputes NMI's asserted entitlement to pre-judgment interest.

Further, even assuming that it does not prevail on the issues stated just above, U.S. Bank argues that NMI's request should be reduced substantially for a host of reasons.

At the "3,000" foot level, U.S. Bank characterizes NMI's §303(i)(1) fee request as unreasonably inflated by NMI's unfounded, unsuccessful effort to extract millions of dollars from the Defendants in the §303(i)(2) litigation in the district court.

U.S. Bank also argues that the fee request is bloated, raising a host of specific objections to NMI's attorney's fees request including that:

- various time entries in the time records were for services unrelated to the dismissal of the involuntary petitions, the prosecution of the §303(i)(1) claim or even the collateral proceedings described above;

- most of legal work in the §303(i)(2) litigation was not sufficiently related to the §303(i)(1) claim and is not compensable;

- certain costs incurred in the §303(i)(2) litigation were unrelated to the §303(i)(1) claim;

- the amount of time spent and fees incurred on various matters was excessive;

- the time records for the collateral proceedings employ "block billing,"[13] and otherwise are too vague to permit the court to find that the services were sufficiently related to the §303(i)(1) claim so as to be compensable;

---

[12]     Ashland takes the same position.  Again, the reasons for my ruling regarding the collateral matters are stated in the MSJ Opinion and the ruling is law of the case.  The issue is preserved in the event of an appeal.

[13]     Block billing is the term used to describe time entries that include several different activities within a single entry.

- multiple law firms unnecessarily worked on the same matters, resulting in excessive conferencing and, ultimately, excessive fees.

The list above is not comprehensive, but it is sufficient to provide the flavor of U.S. Bank's arguments. These and other NMI arguments will be discussed later in the Opinion.


### F. Ashland's Position

Ashland's arguments overlap U.S. Bank's to a large degree. Ashland disputes liability for attorney's fees incurred in the collateral proceedings. Ashland, too, asserts that the attorney's fees are excessive for largely the same reasons as U.S. Bank, asserting that: the time spent and hourly rates are excessive, the billing records are deficient and there was a duplication of effort by multiple firms.

But Ashland and U.S. Bank also part ways.

Unlike U.S. Bank, Ashland was a petitioning creditor in the involuntary cases. Thus, one (1) of U.S. Bank's legal arguments — i.e., that it is not liable because it was not a petitioning creditor — is not available to Ashland. But Ashland posits that most of the attorney's fees incurred by NMI is the product of a two-party dispute between NMI and U.S. Bank and that, to the extent that attorney's fees are allowed, the bulk of the liability should be imposed on U.S. Bank, not Ashland.

The U.S. Bank/Ashland dispute centers largely on the attorney's fees incurred in the collateral proceedings. Assuming that such fees are potentially compensable (and without waiving its contrary position on the issue), Ashland emphasizes that it did not participate at all in

three (3) of the four (4) collateral proceedings.[14]  It was a defendant in the §303(i)(2) action in the

district court.  But even in that action, Ashland depicts its involvement as "limited."

Consequently, Ashland asserts that if it is liable at all, it should be held liable only for

some portion of the attorney's fees incurred in the proceedings involving dismissal of the

involuntary petitions, the attorney's fees incurred in this §303(i)(1) action and, (over its objection

and grudgingly), only a small portion of the compensable fees incurred in the §303(i)(2) action.

Ashland requests that the court refrain from imposing joint and several liability on U.S. Bank and

Ashland.  Rather, Ashland requests that the court apportion liability between U.S. Bank and

Ashland.

## G.  The Ruling

For the reasons stated below, I conclude that the Defendants are liable to NMI under 11

U.S.C. §303(i)(1).  However, as explained in Part III.B. and C., <u>infra</u>, until the appeal in the 2020

AP reaches its conclusion, I am unable determine the specific amounts of U.S. Bank's and

Ashland's respective liability and enter a comprehensive, final judgment.[15] Therefore, to advance

this litigation as much as possible, and based on my review of the voluminous record and

memoranda, I will enter an order determining that:

- the Defendants are jointly and several liable to NMI under 11 U.S.C. §303(i)(1) for
  attorney's fees and costs in the amount of at least $2,285,882.90, which includes
  pre-judgment interest through February 28, 2023 in the amount of $229,741.73;

---

[14]     Ashland observes that the three (3) collateral proceedings represent more than $1.1 million of the
attorney's fees and costs (exclusive of pre-judgment interest) requested by NMI.  (<u>See</u> Ashland Post-Trial
Memo at 28) (Adv. No. 14-250, Doc. # 220).

[15]     By "final judgment," I mean final for purposes of appeal.

- U.S. Bank is separately liable to NMI in the amount of $237,280.25;

- Ashland is separately liable to NMI the amount of $36,025.00;

- US Bank's separately liability may be augmented after the conclusion of the appeal in the 2020 AP if this court's declaratory judgment order is affirmed on appeal;

- the joint and several liability shall also be increased for additional pre-judgment interest (calculated only on what is described later in this Opinion as Category 1 and 2 attorney's fees) at such time as the court enters judgment.


## II.  HISTORY OF THE LITIGATION

To fully understand the factual and legal issues in dispute, it is necessary to recount the lengthy history of the litigation among the parties.[16]

This history includes not only the NMI involuntary bankruptcy filings, but also a third involuntary bankruptcy petition that the DVI Defendants filed against NMI's principal, Maury Rosenberg ("Rosenberg") in this court at the same time as the NMI involuntary petitions.

The Rosenberg involuntary petition was transferred to the Southern District of Florida and spawned a separate set of litigation between Rosenberg and U.S. Bank — litigation that had a significant impact on the NMI litigation in this district. The relevant litigation history also includes

---

[16]    In this Opinion, I will not review the underlying, pre-bankruptcy business relationship among the parties that broke down and led to the filing of the involuntary petitions. For a concise summary of that relationship, see Nat'l Med. Imaging, LLC v. U.S. Bank, N.A., 2019 WL 4076768, at *1–2 (E.D. Pa. Aug. 28, 2019), aff'd sub nom. In re Nat'l Med. Imaging, LLC, 818 F. App'x 129 (3d Cir. 2020), cert. denied, 141 S.Ct. 1693 (2021).

litigation among the parties in the state courts in both Florida and Pennsylvania.[17]

I have organized the recitation of the litigation history in the same manner in which NMI has organized its fee request.  NMI sorted its fourteen (14) years of time records into twelve (12) subject categories.  Each category pertains to a particular legal proceeding in which the services were rendered.  Within each category, each law firm's billing records are chronological.  All of this has facilitated a critical review of the fee request.[18]

Those categories are:

**Category 1: Fees/Costs Incurred to Dismiss the Involuntary Petitions**

**Category 2: Fees/Costs Incurred to Sustain Dismissal of the Involuntary Petitions on Appeal**

**Category 3: Fees/Costs Incurred this §303(i)(1) Action**

**Category 4: Fees/Costs Incurred Pursuing §303(i)(2) Claims**

**Category 5: Fees/Costs Incurred in the Florida State Court Matter**

**Category 6: Fees Incurred Regarding Propriety of the Chapter 11 Filings**

**Category 7: Fees/Costs Incurred to Effectuate the Chapter 11 Filings**

**Category 8: Fees Incurred to Oppose U.S. Bank's Motion to Dismiss the Chapter 11 Cases and for Related Proceedings**

---

[17]     In 2016, the Third Circuit observed that litigation involving NMI and its principal has produced 27 written opinions at almost every level of the federal judiciary.  Rosenberg v. DVI Receivables XVII, LLC, 835 F.3d 414, 416 (3d Cir. 2016).  By my count, since the Third Circuit made its observation in 2016, at least twenty (20) additional judicial decisions have been reported --  not counting this decision.

[18]     NMI's attorneys advised that this was no easy task since the records had been maintained chronologically.  I commend NMI's attorneys; their efforts are greatly appreciated.

**Category 9: Fees Incurred to Oppose U.S. Bank's Motions for Relief from the Automatic Stay in Chapter 11 Cases and for Related Proceedings**

**Category 10: Fees Incurred in the 2020 Adversary Proceeding for Declaratory Relief**

**Category 11: Fees Incurred in the Appeal of the Declaratory Judgment**

**Category 12: Fees Incurred in the Administration of Chapter 11 Cases**.

### A.  The Involuntary Petitions and their Dismissal (Category 1)

On November 7, 2008, the DVI Defendants filed involuntary bankruptcy petitions against the two (2) NMI entities and Rosenberg. On January 30, 2009, this court transferred the Rosenberg case to the Southern District of Florida.  (Bky. No. 08-17346, Doc. # 22).

After the Rosenberg case was transferred, the Florida involuntary proceeding moved at faster pace than the Pennsylvania cases.

On August 21, 2009, the Florida Bankruptcy Court dismissed the petition against Rosenberg as improperly filed because it did not meet the statutory requirements of 11 U.S.C. §303(b) — specifically, the "creditor numerosity" requirement.  See In re Rosenberg, 414 B.R. 826 (Bankr. S.D. Fla. 2009).[19]  Following dismissal of the involuntary petition, Rosenberg filed an

---

[19]     In its present iteration, updated since 2008 by cost-of-living increases in the dollar amount, 11 U.S.C. §303(b) provides, in pertinent part, that if a putative debtor has twelve (12) or more creditors holding non-contingent, undisputed, unsecured claims of at least $16,750.00, three (3) creditors may file an involuntary bankruptcy petition.

The precise rationale why the Rosenberg bankruptcy court did not recognize the six (6) DVI entities as qualified creditors is not material in the present matter.

action against U.S. Bank under 11 U.S.C. §303(i).[20]

On December 28, 2009, this court dismissed the NMI involuntary petitions based upon the

application of collateral estoppel.  (Bky. No. 08-17351, Doc. # 183).[21]

U.S. Bank appealed the NMI dismissal order on May 12, 2014, more than four (4) years

after dismissal of the involuntary cases.  (Id., Doc. # 282).  This delay occurred because U.S. Bank

filed a timely motion to reconsider the dismissal order on January 11, 2009, thus stripping the order

of finality for purposes of appeal.  (Id., Doc. # 192).   The dismissal order did not become a final

order until May 2, 2014, when this court denied U.S. Bank's motion for reconsideration.  (Id., Doc.

# 274).

Why did this court take so long to rule on the motion for reconsideration?

The court (per Fehling, J.) chose to defer further litigation until the outcome of a pending

motion for reconsideration of the dismissal order in the Rosenberg case in Florida.  On January 14,

2010, Judge Fehling entered an order staying all proceedings in the Pennsylvania cases.  ("the 2010

Stay Order") (Id., Doc. # 197).

The 2010 Stay Order remained in place after the Florida bankruptcy court denied the

---

[20]      The procedural history of the Rosenberg litigation in Florida was convoluted, but it is not necessary
to go through that history.  Ultimately, Rosenberg succeeded in obtaining relief under both §303(i)(1) and
§303(i)(2) -- including $5 million in punitive damages under §303(i)(2)  -- although U.S. Bank maintains
that his success under §303(i)(2) was due largely to a procedural error.  See Rosenberg v. DVI Receivables,
XIV, LLC, 2014 WL 4810348 (S.D. Fla. Sept. 29, 2014), aff'd in part, vacated in part, rev'd in part, 818
F.3d 1283 (11th Cir. 2016).

[21]      It is worth noting that in November 2009, the month prior to the dismissal of the involuntary
bankruptcy cases, NMI ceased all business operations.  See Nat'l Med. Imaging, LLC v. U.S. Bank N.A.,
2019 WL 4076768, at *3 (E.D. Pa. Aug. 28, 2019), aff'd, 818 Fed. App'x. 129 (3d Cir. 2020).  NMI blames
its demise on U.S. Bank's conduct and, in the litigation that followed, asserted that U.S. Bank caused NMI
to suffer millions of dollars of damages.  As discussed below, NMI was entirely unsuccessful in that claim.

reconsideration motion in Rosenberg case and during U.S. Bank's appeals of that order.[22]   The

Florida district court affirmed the bankruptcy court on September 27, 2011 and, on July 6, 2012,

the Eleventh Circuit also affirmed.  See In re Rosenberg, 472 F. App'x 890 (11th Cir. 2012).

On August 13, 2012, U.S. Bank's counsel filed a status report in the Pennsylvania

bankruptcy case, advising the court of the conclusion of the appellate proceedings with respect to

the dismissal of the Rosenberg involuntary petition.[23]   (Bky. No. 08-17351, Doc. # 242).

For reasons not of record, neither the parties nor the court acted promptly thereafter to

vacate the 2010 Stay Order.

NMI eventually moved to vacate the 2010 Stay Order on December 18, 2013.  (Id. Doc. #

243).[24]  U.S. Bank did not contest that motion.  (Id., Doc. # 251).  Ashland filed an objection, but

its concerns centered on vacating the stay to permit NMI's §303(i) claims to proceed rather than

permitting the court to determine the motion to reconsider the dismissal order.  (See id., Doc. #

250).  (More on the §303(i) procedural history in Part II.C., infra).

On January 23, 2014, the court approved the parties' stipulation establishing procedures for

resolution of the motion to reconsider the dismissal order.  (Id., Doc. #'s 254, 256).  After further

---

[22]     On October 15, 2010, after the Florida bankruptcy court denied the motion for reconsideration in
Rosenberg, U.S. Bank moved to vacate the Stay Order in this court.  (Bky. No. 08-17351, Doc. # 212).
NMI consented to the motion.  However, on January 6, 2011, this court denied the motion due to the
pendency of U.S. Bank's appeal of the bankruptcy court's dismissal order in Rosenberg.  (Id., Doc. # 225).

[23]     The status report also updated the bankruptcy court regarding the status of the §303(i) adversary
proceeding that Rosenberg had commenced in the Florida bankruptcy court.

[24]     It is worth noting that, until December 18, 2013, MK was NMI's sole bankruptcy counsel.  NMI
retained KCR in the fall of 2013.  KCR entered its appearance on NMI's behalf on December 18, 2013.
(Bky. No. 08-17351, Doc. # 245).  After entering its appearance, KCR brought the dismissal reconsideration
motion to its conclusion and became lead counsel in the dismissal appeal as well as in pursuing relief under
§303(i)(1) and §303(i)(2).

briefing and argument, the court denied the motion for reconsideration on May 2, 2014, after which

U.S. Bank filed its notice of appeal.


### B.   The Appeal of the Dismissal Order (Category 2)

Compared to the proceedings in the bankruptcy court, the appellate proceedings in the

district court were conventional and straightforward.

Between July 7, 2014 and October 6, 2014, the parties briefed the appellate issues in the

district court.  (E.D. Pa., C.A. No. 14-3787).  On March 24, 2015, the district court affirmed the

bankruptcy court's order dismissing the involuntary petitions.  DVI Receivables XIV, LLC v. Nat'l

Med. Imaging, LLC, 529 B.R. 607 (E.D. Pa. 2015).

On April 7, 2015, U.S. Bank appealed the district court's order to the Court of Appeals.

Subsequently, U.S. Bank withdrew its notice of appeal, but Ashland continued to pursue the

appeal.  See Nat'l Med. Imaging, LLC v. Ashland Funding LLC, 648 F. App'x 251, 255 n.3 (3d

Cir. 2016).  On May 3, 2016, the Court of Appeals affirmed the district court's order.


### C.   The §303(i)(1) and (2) Adversary Proceedings (Categories 3 and 4)

#### 1.   the initial proceedings

In the December 28, 2009 order dismissing the NMI involuntary petitions, this court set

January 4, 2010 as the deadline for NMI to seek relief under §303(i).  NMI met this short deadline,

filing a timely (and lengthy) motion in which it requested an award of attorney's fees, costs, and

compensatory, consequential, special and punitive damages.  ("the NMI Sanctions Motion") (Bky.

No. 08-17351, Doc. # 185).  Ten (10) days after the NMI Sanctions Motion was filed, the court

entered the 2010 Stay Order.  No further proceedings occurred with respect to NMI's §303(i)

claims for more than four (4) years, until the court vacated the 2010 Stay Order on May 6, 2014.

(Id., Doc. # 280).

On May 27, 2014, NMI filed two (2) adversary complaints (one (1) in each of the two (2)

involuntary cases) asserting claims under §303(i)(1).  (Adv. No. 14-250, Doc. # 1; Adv. No. 14-

251, Doc. # 1).[25]   Nearly one (1) year later, on May 14, 2015, NMI filed amended the complaints,

with leave of court, and added claims for both compensatory and punitive damages under 11

U.S.C. §303(i)(2).[26]

U.S. Bank and Ashland filed motions to dismiss the amended complaints.  (Adv. No. 14-

250, Doc. #'s 58, 59).

On June 5, 2015, NMI moved for withdrawal of the reference of its §303(i)(2) claims to the

district court, whereupon, on June 24, 2015, the bankruptcy court stayed the adversary proceedings

pending resolution of that motion.  (Id., Doc. #'s 62, 69).

The district court granted the motion for withdrawal of the reference of NMI's §303(i)(2)

claim on August 31, 2016.  (Id., Doc. # 73).  NMI's §303(i)(1) claim remained in the bankruptcy

court.


**2.   §303(i)(1) adversary proceeding  —   initial phase after withdrawal of the reference**

In December 2016, several months after the district court withdrew the reference of NMI's

§303(i)(2) claim, the bankruptcy court established procedures for resolution of the then-pending

---

[25]      The parties filed the pleadings, motions and memoranda in both of the adversary proceedings.  For
ease of reference, I will cite only to Adv. No. 14-250.

[26]      Initially, NMI brought their §303(i)(1) claim in this court and a §303(i)(2) claim in the district court.
However, the district court dismissed the §303(i)(2) claim without prejudice, holding that §303(i)(2) does
not create an independent cause of action that may be brought directly in the district court. See Nat'l Med.
Imaging,, 2019 WL 4076768, at *3 n.16 (referencing the order dismissing the complaint).

motions to dismiss the §303(i)(1) claims.  (See id., Doc. # 78).  On June 30, 2017, after further

briefing, the court entered a memorandum and order denying the Defendants' motions to dismiss.

(Id., Doc. #'s 95, 96).

U.S. Bank and Ashland filed answers to the complaints after the denial of the motions to

dismiss,.  (Id., Doc. #'s 103, 104).

U.S. Bank and Ashland also requested that the court stay the §303(i)(1) adversary

proceeding pending the outcome of the §303(i)(2) litigation in the district court.  (Id., Doc. #'s 99,

102).  On August 9, 2017, the court granted the stay request.  (Id., Doc. # 110).

Thus, NMI's §303(i)(1) claim again sat dormant for some time.


### 3.  §303(i)(2) adversary proceeding  —  after withdrawal of the reference

After withdrawal of the reference in 2016, NMI pursued its §303(i)(2) claim in the district

court.

In the §303(i)(2) action in the district court, NMI sought $50 million in compensatory

damages as well as punitive damages.  (NMI District Court Am. Compl. ¶ ¶ 5, 73, 85) (NMI Ex.

69).[27]

Considering the stakes, it comes as no surprise that the §303(i)(2) action in the district

court was heavily litigated, with the parties expending substantial time in conducting discovery

and engaging in motion practice (which will be described in somewhat more detail in Part IV.C.,

infra).  This included a motion for partial summary judgment in which NMI asserted  —

unsuccessfully  —  that the Rosenberg litigation in Florida had already determined U.S. Bank had

---

[27]    The $50 million figure comes from NMI's pleading.  The testimony at trial was that NMI sought
$31 million in damages.  (N.T. 1, at 25).  I infer that NMI lowered its claim after development of the
evidentiary record through discovery.

acted in bad faith, thus, collaterally estopping U.S. Bank from further litigating the issue in Pennsylvania.  See n.20, supra.

On December 14, 2018, after the district court denied NMI's motion for partial summary judgment, (see C.A. No. 16-cv-05044, Doc. # 50) (E.D. Pa.), U.S. Bank and Ashland filed motions for summary judgment.  The district court granted those motions and dismissed NMI's §303(i)(2) claim on August 28, 2019.  Nat'l Med. Imaging, LLC v. U.S. Bank, N.A., 2019 WL 4076768 (E.D. Pa. Aug. 28, 2019).  The district court's order was affirmed by the Court of Appeals.  See In re Nat'l Med. Imaging, LLC, 818 F. App'x 129 (3d Cir. 2020), cert. denied, 141 S. Ct. 1693 (2021).

Thus, NMI was entirely unsuccessful in its §303(i)(2) claim.  The district court's reasoning in rejecting the claim has some relevance in determining the scope of relief NMI is entitled to receive under §303(i)(1) and is discussed in Part III.D.2, infra.

### 4.   §303(i)(1) adversary proceeding  —  after the district court ruling dismissing NMI's §303(i)(2) claim

On June 17, 2020, this adversary proceeding was reassigned to the undersigned judge.  On March 26, 2021, I entered an order vacating all stays and inviting proposed pretrial orders from the parties.  (Adv. No. 14-250, Doc. # 120).

Based on the parties' representations that they needed to conduct some discovery (in light of the prior stays of this adversary proceeding), I entered pretrial orders that were designed to culminate in the filing of a joint pretrial statement by December 6, 2021.  (Id., Doc. # 140).  However, on December 6, 2021, NMI filed its motion for partial summary judgment and Ashland field its motion for summary judgment.  (Id., Doc. #'s 148, 149).  After extensive briefing, on September 2, 2022, I entered an order denying the motions, accompanied by the 2022 MSJ Opinion.

Trial of this adversary proceeding was conducted over three (3) days between November 29 and December 1, 2022.

### D.  The Florida State Court Matters (Category 5)

I now turn to the first of the collateral proceedings that NMI asserts caused it to incur compensable attorney's fees.

On May 27, 2015, long after the dismissal of the involuntary bankruptcy cases, the Court of Common Pleas, Buck County, Pennsylvania entered a final judgment by agreement in favor of U.S. Bank and against NMI in the amount of $12 million.  Later that year, U.S. Bank transferred the Pennsylvania money judgment to Florida's 11th Circuit Court, Dade County ("the Fla. Trial Court").

On December 4, 2019, U.S. Bank initiated a supplementary proceeding in the Fla. Trial Court in the form of a motion ("the Sale Motion"), seeking authority to collect its transferred judgment by executing against what it termed a "chose in action," specifically, NMI's pending §303(i)(2) claim.[28]  NMI opposed the Sale Motion in the Fla. Trial Court.

On April 28, 2020, the Fla. Trial Court entered an order granting the Sale Motion ("the Fla. Order").  NMI appealed the Fla. Order, but its efforts to obtain a stay pending appeal was denied by the Fla. Trial Court and the Florida District Court of Appeals.  NMI also sought a stay in the Third Circuit, but that request, too, was denied.

---

[28]     When U.S. Bank commenced the supplementary proceeding in Florida, the district court in the Eastern District of Pennsylvania had already decided the §303(i)(2) claim in U.S. Bank's favor and NMI's appeal was pending in the Third Circuit.

The Florida sheriff's sale of NMI's §303(i)(1) claim, scheduled for June 15, 2020, was

stayed on June 12, 2020, when each of the NMI filed the 2020 Bankruptcy Cases in this court.

(Bky. No. 20-12618 and Bky. No. 20-12619).


### E.  The 2020 Voluntary Chapter 11 Filings (Categories 6, 7, 8, 9 and 12)

On June 19, 2020, one (1) week after the filing of the 2020 Bankruptcy Cases, U.S. Bank

filed a motion to dismiss the cases.  (Bky. No. 20-12618, Doc. # 25).[29]  Ashland later joined the

motion.  (Id., Doc. # 80).  After extensive briefing and a hearing, I denied the motion on October

14, 2020, by order accompanied by a lengthy bench opinion.  (Id., Doc. #'s 135, 140).[30]

U.S. Bank also filed a motion for relief from the automatic stay on July 9, 2020.  (Id., Doc.

# 65).  In that motion, U.S. Bank sought relief to proceed with the appeals pending in the Florida

appellate court that had been stayed by the NMI chapter 11 bankruptcy filings.  NMI opposed the

requested relief.  On August 10, 2020, after a hearing, I denied the motion without prejudice to

U.S. Bank's right to relist the motion "after further developments in [the bankruptcy case]."  (Id.,

Doc. # 94).

Other than the two (2) U.S. Bank motions described above, the 2020 Bankruptcy Cases

have proceeded in a relatively conventional matter.  The activities in the case include:

---

[29]    The two (2) NMI chapter 11 cases are being jointly administered.  I will cite only to the docket
entries in Bky. No. 20-12618.

[30]    One factual finding in the bench opinion was modified by order dated November 13, 2020 on U.S.
Bank's request.  (Bky. No. 20-12618, Doc. # 155).

- NMI's attendance at the meeting of creditors, 11 U.S.C. §341;

- the filing of monthly operating reports [31]

- three (3) motions to extend the exclusivity period for the filing of a plan

- a motion to approve a "carve-out" agreement with the Douglas Rosenberg 2004 Trust

- the filing of a proposed plan and disclosure statement.

For present purposes, it is not necessary to discuss in detail NMI's proposed chapter 11 plan. Suffice it to say that it is a liquidating plan and the sole asset available for making a plan distribution is the proceeds of this adversary proceeding.[32] After NMI filed its proposed plan and disclosure statement on December 26, 2021, all parties agreed to defer the plan confirmation process pending the outcome of this adversary proceeding. (See id., Doc. #'s 204, 215).

---

[31]    Since NMI has no business operations, the monthly operating reports are about as simple as simple can be.

[32]    When the 2020 Bankruptcy Cases were filed, the adverse district court ruling in the §303(i)(2) action was still on appeal. So, there was still some potential that NMI's §303(i)(2) claim could provide additional funding for the plan. Of course, that is no longer possible.

The "carve-out" agreement referenced in the text was filed because the Douglas Rosenberg 2004 Trust ("the Trust") asserts that is a creditor secured by the proceeds of National Medical Imaging, LLC's §303(i)(1) claim (but not the §303(i)(1) claim of National Medical Imaging Holding Company, LLC). The agreement, which was approved by the court on October 19, 2020, (Bky. No. 20-12618, Doc. # 145), was designed to ensure that the Trust's claim would not unduly interfere with the funding of the plan.

In the agreement the Trust agreed to subordinate its liens to allowed administrative expenses, allowed professional fees for special counsel, and allowed priority claims. The Trust has also agreed to provide a carve-out for holders of allowed general unsecured creditors in an amount equal to the lesser of (a) 50% of the remaining proceeds from NMI's §303(i) Claims after payment of the other senior claims in full, or (b) $500,000.

### F.  The 2020 AP and Appeal
### (Categories 10 and 11)

On July 20, 2020, a little more than one (1) month after the filing of the 2020 Bankruptcy Cases, NMI commenced an adversary proceeding against U.S. Bank, the 2020 AP.

In the 2020 AP, NMI sought a declaratory judgment that, inter alia, U.S. Bank may not set off its judgments against NMI's recovery under 11 U.S.C. §303(i) or take any other action to interfere with the NMI's prosecution of the §303(i) claims.  In the Complaint, NMI also requested a determination regarding the extent, priority and validity of U.S. Bank's liens on property of the bankruptcy estates, equitable subordination of U.S. Bank's claims and attorney's fees under 11 U.S.C. §303(i)(1).

On February 21, 2021, I entered an order, accompanied by an explanatory Memorandum, dismissing most of NMI's claims, some with prejudice, some without prejudice.  See In re Nat'l Med. Imaging, LLC, 627 B.R. 73 (Bankr. E.D. Pa. 2021).  After the entry of the February 21, 2021 dismissal order, NMI's request for declaratory relief was the primary remaining claim in the adversary proceeding.

On October 8, 2021, I entered an order, accompanied by an oral bench opinion, granting NMI's motion for summary judgment with respect to its request for declaratory relief.  The order declared that U.S. Bank may not set off its judgments against NMI's recovery under 11 U.S.C. §303(i)(1) or employ its judgment to execute against NMI's §303(i)(1) claims.  (Adv. No. 20-219, Doc. #'s 45, 46).

NMI appealed the October 8, 2021 order to the district court.  (Id., Doc. # 49).  By order dated March 15, 2022, the district court granted U.S. Bank's request that the appeal be certified

28

for a direct appeal to the Court of Appeals.  (<u>Id.</u>, Doc. # 64).[33]

On April 12, 2022, the Court of Appeals granted the petition for direct appeal.  (No. 22-8014, Doc. # 13) (3d Cir.).  On October 27, 2022, the Court of Appeals took the appeal under advisement without oral argument.  Currently, the appeal remains under advisement.


### III. APPLICABLE LEGAL PRINCIPLES AND CONCLUSIONS ON CERTAIN DISPUTED LEGAL ISSUES

#### A.  NMI Is Entitled to Relief Under 11 U.S.C. §303(i)(1)

In the 2022 MSJ Opinion I recited a number of legal principles governing a claim under §303(i).  Without repeating that entire discussion, those principles can be distilled down to the following:

- To obtain judgment against a petitioning creditor under §303(i), a putative debtor must satisfy three (3) requirements:

   (1) the court must have dismissed the involuntary petition;

   (2) the dismissal must be other than on consent of all petitioners and the debtor; and

   (3) the debtor must not have waived the right to a §303(i) claim;[34]

- while the statutory text states that the court "may" grant judgment, most courts have held that there is a rebuttable presumption in favor of awarding costs and reasonable attorney's fees under §303(i)(1);

---

[33]     The district court's order, entered in 21-cv-04594-MMB (E.D. Pa.), also was entered on the bankruptcy court's adversary docket.  For ease of reference, I cite to the bankruptcy court docket.

[34]     A corollary to this principle is that a party seeking award costs and attorney's fees under §303(i)(1) does not have to establish the existence of bad faith on the part of the petitioning creditors.

- based on "the totality of the circumstances," the bankruptcy court has the discretion
to hold petitioning creditors jointly and severally liable, apportion liability in relation
to each creditor's conduct, or entirely deny an award against some or all creditors —
in other words, the presumption in favor of awarding relief may be rebutted by the
petitioning creditors.

Nat'l Med. Imaging, 644 B.R. at 107–08.

There is no dispute that NMI has satisfied the three (3) essential elements of a claim under
§303(i): the involuntary petitions were dismissed, the dismissal was not on consent of the
petitioners and NMI did not waive its §303(i)(1) claims.  Therefore, there is a presumption of an
entitlement to an award under §303(i)(1).

In their respective answers to the Amended Complaint, filed on July 28, 2017, the
Defendants pled a "totality of circumstances" defense to NMI's §303(i)(1) claim. (See U.S. Bank's
Affirmative Defenses Nos. 4, 11, 12; Ashland's Seventh, Eleventh and Fourteenth Affirmative
Defenses) (Adv. No. 14-250, Doc. #'s 103, 104).  However, in November 2022, a few days before
trial, the Defendants advised the court that they did not intend to offer any evidence in support of
this defense and, in fact, they did not put on any such evidence at trial.[35]

The presumption of entitlement to relief has not been rebutted.  Therefore, I find that NMI is
entitled to the entry of a judgment in their favor under §303(i)(1).[36]

---

[35]    U.S. Bank advised the court of its intention via motion filed on November 9, 2022, (Adv. No. 14-
250, Doc. # 192).  The motion stated that U.S. Bank "will stipulate that the Court may give effect to the
presumption in favor of awarding reasonable attorney's fees and costs under 11 U.S.C. §303(i)(1) . . . ."
U.S. Bank confirmed that intention at the hearing held on the Motion on November 22, 2022, one (1) week
before the trial commenced.  Ashland advised the court of its intentions on the subject on November 22,
2022.

[36]    In its post-trial memorandum, Ashland appears to attempt to resurrect the "totality of
circumstances" defense, arguing that the "fees and costs incurred to defend the involuntary petitions are
unreasonable in light of the fact that NMI had announced its imminent planned closure prior to the filing of

### B.  Timing Issues Arising from the Pendency of 2020 Chapter 11 Cases
### and the Appeal in the 2020 AP

U.S. Bank makes a broad argument that it is premature to award any attorney's fees under

11 U.S.C. §303(i)(1) based on the services rendered by NMI's attorneys in the 2020 Bankruptcy

Cases and the 2020 AP (and subsequent appeal), because both matters are still pending. Succinctly

stated, the argument is:

> NMI has not yet succeeded, and may not succeed, in the pending Third Circuit
> appeal.  And, it has not yet succeeded, and may not succeed, in its Chapter 11
> efforts. A court cannot award fees for a still pending proceeding because the most
> important factor under Hensley is the degree of success, and that cannot be known
> until the end of the proceeding.

(U.S. Bank Post-Trial Mem. at 42) (Adv. No. 14-250, Doc. # 221).

I am unpersuaded by U.S. Bank's argument regarding the compensability of some of the

attorney's fees incurred in connection with the 2020 Bankruptcy Cases.  U.S. Bank misapprehends

the legal rationale for the compensability of those fees.

---

the petitions." (Ashland Post-Trial Mem. at 2) (Adv. No. 14-250, Doc. # 220).  I read this argument as a
restatement of the argument that, in the totality of circumstances, NMI should be denied relief under
§303(i)(1) because it suffered no damages as a result of the involuntary bankruptcy filings.

Exercising the discretion accorded to the bankruptcy court under §303(i)(1), I reject this argument.

Initially, after indicating that it would present no evidence on the issue, it is too late to raise this
argument.  Had it been clear that Ashland was pressing this argument, I would have permitted NMI to
present a plethora of evidence on the issue, something that all parties agreed would have unduly expanded
the trial and unduly burdened the parties and the court.

Even on the merits, the mere fact that NMI was unable to prove, in the §303(i)(2) action, that it
suffered compensatory damages, (as discussed further in Part III.B.1.b, infra), is insufficient to persuade me
that the equities are such that U.S. Bank and Ashland should be relieved of their liability under §303(i)(1)
for filing defective involuntary bankruptcy petitions.  Any doubts on the issue are resolved by the
conclusion of the same district court that, even if the evidence was insufficient to warrant an award of
punitive damages, there was some evidence of bad faith on the part of the petitioning creditors.

Hensley is not the basis for the award and the chapter 11 case need not "succeed" in the

form of a confirmed chapter 11 plan to warrant the allowance of fees in this §303(i)(1) action for

some of the attorney services provided in the main bankruptcy case.  Rather, allowing attorney's

fees for at least some services in the bankruptcy cases is appropriate because the bankruptcy filing

contributed materially to NMI's ability to prosecute its §303(i)(1) claim to a successful conclusion.

As I pointed out in the 2022 MSJ Opinion, the chapter 11 filing was necessary to prevent

U.S. Bank from extinguishing NMI's §303(i)(2) by executing on the chose in action in the Florida

state courts, see Nat'l Med. Imaging, 644 at 128  —  a tactic which, if successful, easily could have

led U.S. Bank "to dip[ ] into the same playbook and attack[ ] [NMI's] § 303(i)(1) claim." Id. at

127.

Thus, in Part IV, infra. I will award some attorney's fees incurred during the 2020 chapter

11 cases based on the standard articulated in Part III.E., infra.

U.S. Bank's Hensley rationale also is inapposite with respect to the attorney's fees incurred

in obtaining the declaratory judgment in this court and in the subsequent appeal.  However, I agree

with U.S. Bank's ultimate position regarding Category 10 and 11 fees and I will defer a

determination of the compensable amount of those attorney's fees  —  but for different reasons than

those stated by U.S. Bank.

The rationale for allowing compensation for the attorney's fees incurred in the 2020 AP is

that the fees were necessarily incurred to "protect" NMI's §303(i)(1) claim and are recoverable to

prevent dilution of the §303(i)(1) award.  E.g.,  In re John Richards Homes Bldg. Co., LLC, 475

B.R. 585, 597–98 (E.D. Mich. 2012), aff'd, 552 F. App'x 401 (6th Cir. 2013); see also In re S.

California Sunbelt Devs., Inc., 608 F.3d 456, 463 (9th Cir. 2010).

32

Here, the declaratory judgment determined that certain U.S. Bank debt collection tactics were improper because they sought to nullify NMI's §303(i)(1) claim before it was even determined. But if the Court of Appeals reverses the declaratory judgment order, NMI will have failed to protect its §303(i)(1) claim. If that occurs, it is not reasonable to enhance the §303(i)(1) award for services that did not provide any benefit to NMI.[37]

Therefore, I decline, at this time, to make any determination regarding the attorney's fees incurred in the 2020 AP and the subsequent appeal. That determination must await the outcome of the Third Circuit appeal.[38]

---

[37]    As a "fall back" position, U.S. Bank suggests that I might determine the amount of allowable compensation (still over U.S. Bank's objection that none of it is compensable) for the services provided before me in the bankruptcy court, but not for the appellate work in the matter. This suggested approach still leaves today's determination incomplete (with the entry of only an interlocutory order) because no judgment will be final until the court determines the total amount of the attorney's fees to which NMI is entitled under 11 U.S.C. §303(i)(1).

The primary benefit of a partial determination of the potentially allowable fees (i.e., incurred in the bankruptcy court phase) is that it would be made by the judge who presided over the case when the services were rendered. My ruling today makes that impossible since I am retiring from the court, my last day being February 28, 2023. However, this particular part of the NMI's §303(i)(1) claim is sufficiently circumscribed so that it should not be especially difficult or burdensome for the successor judge to determine the allowable attorney's fees, if any, to which NMI may be entitled after the Court of Appeals decides the pending appeal.

[38]    I rule differently with respect to the 2020 AP (compared to the chapter 11 filing) because the chapter 11 filing has already accomplished its goal of permitting NMI the opportunity to complete the §303(i)(1) litigation. By comparison, the declaratory judgment action, especially with respect to the setoff issue, focuses more on protecting NMI's ability to collect on its §303(i)(1) judgment. NMI is unlikely to achieve any practical success if the Court of Appeals reverses the declaratory judgment order. Thus, unlike the chapter 11 filing which has accomplished its purpose vis à vis the §303(i)(1) action, it is not definitive at this time whether the 2020 AP will provide any §303(i)(1) benefit to NMI.

33

### C. The Form of Relief

The decision not to address the Category 10 and Category 11 fees significantly affects the form of relief that may be afforded at this time.

To begin, it helps to take a step back and describe the nature of the §303(i)(1) cause of action.

For understandable reasons, NMI has organized its fee request in category by service and law firm. However, the right to attorney's fees under a fee-shifting status belongs to the plaintiff, not to the plaintiff's attorney. See Evans v. Jeff D., 475 U.S. 717, at 730 n.19 (1986) (it is the prevailing party rather than the lawyer who is entitled to fee award, collecting cases). Thus, at bottom, NMI's entitlement is to the entry of a money judgment in its favor for the fees incurred.[39] This court's review of the bills of the different law firms is essential in that analysis, but there is but a single form of relief, i.e., an entitlement to the payment of money running in favor of NMI. What happens to the money after a plaintiff collects the attorney's fees awarded in a fee-shifting action is determined by separate legal principles derived primarily from the plaintiff's contractual arrangement with the attorneys, (which may be more complicated when multiple law firms are involved).[40]

---

[39]      One consequence that flows from this principle is that it is not necessary for the court to allocate comprehensively how much each of NMI's law firms fees contributed to the overall entitlement. In some categories, I will make that allocation. But in other categories, particularly where multiple law firms worked jointly on a matter, I have not done so.

[40]      In this case, the 2020 Bankruptcy Cases add another dimension. Any fees collected by NMI are property of the bankruptcy estates, perhaps subject to one or more attorney's liens, perhaps not. To the extent that the collected funds are unencumbered, administrative expenses will be paid first (which will

At this time, I find it unnecessary for the court to provide a comprehensive determination

of the extent each firm's billing contributed to the fees NMI may recover from U.S. Bank.  In

certain categories, it may be obvious.  But there are several categories of service in which

multiple firms provided services and, in applying the appropriate standards of review, I have

determined it appropriate to make a single determination of the recoverable fee without a precise

allocation among the law firms.[41]

The other significant relief issue is the form of the court's order.

Taking into account the principle that a successful §303(i)(1) action should result in a

single judgment in favor of the putative debtor and against the petitioning creditors (and, in this

case, the de facto petitioning creditor, see n.3, supra), the need to defer a ruling with respect to the

Category 10 and Category 11 fees prevents the entry of a comprehensive judgment.

Fed. R. Civ. P. 54(b) (incorporated by Fed. R. Bankr. P. 7054) authorizes the entry of a final

judgment on a claim when it is one (1) of a number of claims in the action.  Although the parties

and the court have analyzed NMI's attorney's fee claim by reference to a number of different

"categories," there is only one (1) "claim" in this case and it is under §303(i)(1).  Therefore, the

---

benefit Dilworth, which may be able to paid for services which have been requested but which are not being
fee-shifted in this §303(i)(1) action), after which MK and KCR may have to share in the distribution with
other creditors. Also, under the sharing agreement, some money may be collected by the Rosenberg Trust.
Whether the Rosenberg Trust has any contractual obligation to pay MK and KCR is not in the record.
Presumably, no such arrangement exists with Dilworth because none has been disclosed.  See generally Fed.
R. Bankr. P. 2014(a), 2016(b).

[41]      I hope that I am not being overly optimistic in my view that, after the law firms have reviewed and
digested this Opinion, they will be able to reach an agreement regarding each firm's proportionate share of
the total award.

authorization to enter a judgment on some but not all claims in a case, as provided in Rule 54(b), does not apply.

But all is not lost.

I will enter an order that makes a determination regarding those aspects of NMI's claim that are capable of being decided now and leave the Category 10 and Category 11 determinations (and a final determination of pre-judgment interest) for a later date, after the Court of Appeals has ruled on the pending appeal of the 2020 AP.[42]

This resolution of the problem is based on the last sentence of Rule 54(b), which suggests that an order, "however designated," may "**adjudicate fewer than all** the claims or **rights or liabilities**" of the parties "**and may be revised at any time before the entry of a judgment** adjudicating all the claims and all the parties' rights and liabilities."  (emphasis added).

### D.  Attorney's Fees for Services Provided in the Category 4: the §303(i)(2) Collateral Proceeding

#### 1.  the applicable legal principles derived from <u>Hensley v. Eckerhart</u>

NMI's §303(i)(1) and §303(i)(2) claims have a common origin.  They derive from the same statutory provision.  They were initially asserted in the initial §303(i) complaint filed in this court, although, ultimately, the two (2) claims were litigated in different courts.  The point here is that they are easily conceptualized as two (2) fee-shifting claims, raised in a single lawsuit, one (1)

---

[42]    I note that if the court had been capable of entering a complete order, the pre-judgment interest that is being awarded on the Category 1 and 2 attorney's fees, <u>see</u> Part IV.L., <u>infra</u>, would have stopped running and would have been replaced by the (lower rate) post-judgment interest provided by 28 U.S.C. §1961. Pre-judgment interest is discussed further in Part IV.K., <u>infra</u>.  Altering the amount of pre-judgment interest is another adjustment that will have to be made after the Court of Appeals rules in the 2020 AP appeal.

being the successful §303(i)(1) claim, the other being the unsuccessful §303(i)(2) claim.

In these circumstances, in the 2022 MSJ Opinion, I held that the legal principles enunciated

in Hensley v. Eckerhart, 461 U.S. 424 (1983) govern the determination whether the attorney's fees

incurred in NMI's unsuccessful §303(i)(2) claim are compensable under §303(i)(1).  See Nat'l

Medical Imaging, 644 B.R. at 108-09.

Those applicable Hensley principles may be concisely summarized as follows:

- The core procedure for determining a "reasonable fee" under a federal fee-shifting statute is the lodestar formula: the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.

- The lodestar may be adjusted up or down based on a host of factors, the most critical factor being the degree of success obtained in the litigation.

- The degree of litigation success is especially important when a plaintiff has succeeded on only some of his claims for relief.

- If a plaintiff has succeeded on only some of the asserted claims, the court must then determine whether the plaintiff's unsuccessful claims are related to the successful claims.

- In this context, relatedness means that the claims involve a common core of facts or will be based on related legal theories while unrelated claims generally are based on different facts and legal theories compared to the successful claims.

- When a claims is related, the attorney's work will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis.

- When a claim is unrelated, work on the claim generally will not have contributed to the success of the outcome of the successful claim.

- No fees may therefore be awarded for work on such unrelated and unsuccessful claims.

- Even when unsuccessful claims are related, the court should focus on the degree of overall success the plaintiff achieved in the litigation.

- Lawsuits resulting in only partial or limited success may justify a reduction of the lodestar amount.

- Ultimately, there is no precise rule or formula to be applied; rather the court must exercise its discretion and make an equitable judgment.

Id.

In applying Hensley in the 2022 MSJ Opinion, I concluded that at least some of the fees incurred in the §303(i)(2) case may be compensable under §303(i)(1). To understand why, it is necessary to compare the issues litigated in the respective §303(i)(1) and §303(i)(2) cases.

### 2. the nexus between the §303(i)(1) and §303(i)(2) actions

At first blush, there would appear to little overlap between facts and legal theories involved in each of the two (2) proceedings. But on closer examination of the issues involved in §303(i)(1) claim  -- specifically, the defenses raised by U.S. Bank and Ashland  —  the nexus becomes apparent.

Ordinarily, litigation of a §303(i)(1) claim will be relatively straightforward. It generally requires three (3) elements  —  dismissal of the involuntary petition, other than on consent and no waiver of the putative debtor's claim  —accompanied by evidence supporting the attorney's fees and costs incurred in obtaining dismissal of the involuntary bankruptcy case.

By comparison, a claim under §303(i)(2) requires proof of bad faith conduct by the petitioning creditors, after which the court may award compensatory damages caused by the filing and punitive damages, all of which normally requires a far more substantial evidentiary record than

38

the record necessary under §303(i)(1).[43]

Turning back to the §303(i)(1) action, in its answer to the complaint in the §303(i)(1)

action, U.S. Bank asserted, based on the totality of the circumstances, that the court should deny

relief to NMI even though the elements of the §303(i)(1) claim were established.  This is a

cognizable defense to a §303(i)(1) claim.[44]

In support of this defense, U.S. Bank described a host of examples of what it considered to

be NMI's prepetition misconduct.[45]  According to U.S. Bank, this alleged NMI misconduct served

---

[43]      Although the statute is written in the disjunctive, the judicial consensus is that all of the remedies
provided in §303(i) are available to a putative debtor.  See, e.g., In re Landmark Distribs.,Inc., 189 B.R. 290,
316 (Bankr. D.N.J. 1995); In re Camelot, Inc., 25 B.R. 861, 868 (Bankr. E.D. Tenn. 1982); Matter of
Ramsden, 17 B.R. 59 (Bankr. N.D. Ga. 1981) (per Norton, J.).

[44]      See In re Maple-Whitworth, 556 F.3d 742, 746 (9th Cir.), opinion corrected sub nom. In re Maple-
Whitworth, Inc., 559 F.3d 917 (9th Cir. 2009); In re Diloreto, 388 B.R. 637, 647 (Bankr. E.D. Pa. 2008),
aff'd, 442 B.R. 373 (E.D. Pa. 2010) (citing Higgins v. Vortex Fishing Sys., Inc., 379 F.3d 701, 706 (9th Cir.
2004)).

[45]       In its Answer to the Amended Complaint, U.S. Bank stated:

> Courts consider the conduct of the putative debtor in determining whether to award fees and
> costs based on the "totality of the circumstances." The Court should deny attorney's fees
> and costs because NMI and NMIH engaged in conduct that contributed to the decision that
> was made to file the involuntary bankruptcy petitions. This conduct includes but is not
> limited to the following: (a) intentionally stopping payments under a court-approved
> settlement agreement as a "strategic default" to pressure Lyon into accepting a further debt
> reduction, (b) raising frivolous defenses and objections in a state court confession of
> judgment action and thereby attempting to deprive Lyon of its bargained for rights under a
> court-approved settlement agreement, (c) refusing to provide adequate financial disclosure
> to Lyon regarding NMI's business operations, (d) misleading Lyon concerning NMI's
> financial condition and business plans, (e) operating NMI in such a manner that NMI
> preferred insider creditors over unrelated creditors such as Lyon, (f) engaging in deceptive
> accounting practices designed to conceal compensation and benefits received by Maury
> Rosenberg at a time when NMI was insolvent, (g) engaging in bad faith negotiations
> concerning repayment of the DVI debt, (h) threatening to abandon the DVI leased
> equipment if its unreasonable debt reduction demands were not met, (i) failing to disclose
> material facts to Lyon including the fact that NMI's major lender, Sterling Bank, had
> declared NMI in default, (j) preferring a related party creditor, the Douglas Rosenberg 2004
> Trust (99% owner of NMI), to Lyon and NMI's other creditors, (k) failing to disclose
> significant related party business transactions that worsened NMI's insolvency, (l) failing to

to excuse it from §303(i)(1) liability for filing the involuntary petitions that were dismissed by the

bankruptcy court.

In the §303(i)(2) case, NMI sought compensatory and punitive damages, asserting that the

involuntary petitions were filed in bad faith, based on conduct it characterized as follows:

- the filing of involuntary petitions by entities which were not creditors;

- the sham creation of six alleged creditors for the improper purpose of satisfying the numerosity requirement of 11 U.S.C. § 303(b);

- the adoption of inconsistent positions in the bankruptcy court and in proceedings in another court;

- the failure to conduct due diligence as to the facts or law or to conduct an appropriate pre-filing investigation regarding the number of creditors holding claims against NMI;

- the filing of the involuntary cases as a collection tactic to harass and embarrass NMI in an effort to extract more than what was owed in connection with a disputed debt.

(District Court Am. Compl. ¶ 6) (NMI Ex. 69).

As a result of the alleged bad faith conduct, NMI further asserted that:

- NMI lost preferred provider status with major insurers;

- physicians to lose confidence in NMI's stability and to divert their patients to other providers;

---

advise Lyon that NMI did not own any of its business assets, and (m) allowing NMI's financial condition to deteriorate without taking reasonable and adequate steps to protect NMI's creditors including Lyon. All of this misconduct contributed to the circumstances that led Lyon to rely on the advice of its attorneys and business advisors that the filing of involuntary bankruptcy petitions against NMI and NMIH was prudent, reasonable and appropriate.

(U.S. Bank Ans. And Affirm. Defenses to Am. Compl. ¶ 12) (Adv. No. 14-250, Doc. # 103).

Ashland joined in this defense.  (Ashland Ans. And Affirm. Defenses to Am. Compl., Fourteenth Defense) (Adv. No. 14-250, Doc. # 104).

- lenders cut off the Plaintiffs' access to receivables, thereby creating a liquidity crisis;

- vendors put the companies on a COD basis, thereby further eroding cash and liquidity;

- NMI's reputation in the credit community was damaged, torpedoing planned acquisitions and expansion.

(Id. ¶ 72).

The net effect, according to NMI, was that U.S. Bank's misconduct caused NMI to suffer damages exceeding $50 million.  (Id. ¶ 85).

In the end, while the district court acknowledged the existence of some evidence of bad faith conduct by U.S. Bank, it granted U.S. Bank and Ashland summary judgment on NMI's §303(i)(2) claim, determining that, as a matter of law, NMI was not entitled to either punitive or compensatory damages.[46]

Essentially, in the two (2) pieces of litigation, each side accused the other of misconduct.  In the §303(i)(2) action, NMI accused U.S. Bank of bad faith in filing the involuntary petitions and, in the §303(i)(1) action, U.S. Bank and Ashland accused NMI of misconduct in precipitating the

---

[46]      The district court concluded that the summary judgment record demonstrated that NMI suffered no damages proximately caused by the involuntary bankruptcy filings; rather, NMI's financial difficulties were caused by independent factors.

As for the potential for granting NMI relief in the form of punitive damages, the court held that while the evidence relating to bad faith created a material issue of fact, it did not rise to a level that would merit punitive damages, even viewed in the light most favorable to NMI.  See 2019 WL 4076768, at *4.

The dichotomy between bad faith that is sufficient and bad faith that is insufficient to warrant a grant of punitive damages was one (1) the major grounds NMI raised in its unsuccessful appeal in the Third Circuit and petition for a writ of certiorari in the U.S. Supreme Court.

filing of the involuntary bankruptcy petitions.   Consequently, in the 2022 MSJ Opinion, I

concluded that:

> there is an inevitable factual and legal overlap between § 303(i)(1) and § 302(i)(2).
> At least in this case, the Defendants' "totality of the circumstances" defense to the
> award of attorney's fees and costs under § 303(i)(1)) and the Debtors' "bad faith"
> contentions under § 303(i)(2) are essentially opposite sides of the same coin. The
> evidentiary record developed by the Debtor in prosecuting their bad faith claim
> under § 303(i)(2) could serve to rebut the "totality of the circumstances" defense
> . . .  available to petitioning creditors under § 303(i)(1). To this extent, the two (2)
> claims are related and some of the attorney time developing the bad faith record in
> the unsuccessful § 303(i)(2) claim may be compensable as part of the Debtors'
> meritorious § 303(i)(1) claim (assuming that the Debtors' defeat the "totality of
> circumstances" defense).

Nat'l Med. Imaging, 644 B.R. at 119.

For these reasons, I concluded in the 2022 MSJ Opinion and I reaffirm that the §303(i)(1)

and §303(i)(2) actions are "related" within the meaning of Hensley.


### 3.  the methodology for determining the compensability of the attorney's fees incurred in the §303(i)(2) action

NMI has overcome the "totality of the circumstances defense" in this §303(i)(1) action.

That makes it necessary to determine the extent to which the attorney's fees incurred in the

unsuccessful §303(i)(2) action are compensable.

Having had the benefit of the parties' trial presentations and their post-trial submission, and

further time to reflect on the issue since issuing the 2022 MSJ Opinion, I conclude that the Hensley

determination regarding the compensability of the §303(i)(2) attorney's fees requires consideration

of three (3) questions in this case:

1. **Were the services performed related to an issue that also advanced NMI's §303(i) claim, <u>i.e.</u>, did the issue tend to defeat the Defendants' "totality of the circumstances defense?**

2. **Was the time expended and fees incurred reasonable in the circumstances?**

3. **To what extent, if any, should the attorney's fees be reduced due to the lack of success in the §303(i)(2) action?**

With respect to the first question, if the services relate to issues that bear no connection to advancing NMI's §303(i)(1) claim, then the attorney's fees incurred are not compensable.

In the 2022 MSJ Opinion, I may have suggested that the only attorney services provided in §303(i)(2) case that had a sufficient relationship to the §303(i)(1) case to warrant compensation, were those involving discovery and the development of an evidentiary record regarding U.S. Bank's alleged bad faith or NMI's alleged prepetition misconduct.  <u>See</u> 644 B.R. at 119.  On further reflection, however, I do not see the compensable universe as so circumscribed.

For example, most prominently (because much attorney time was spent on the issue in the district court), the parties disagree whether the attorney's fees incurred in developing the record in the §303(i)(2) case regarding the existence or non-existence of damages caused by the involuntary bankruptcy petitions are compensable.

Putting aside for the moment the effect, if any, of NMI's lack of success on the issue, I am satisfied that the issue of damages has a nexus to the §303(i)(1) case.  Given the broad scope of the "totality of the circumstances" concept, I have no difficulty discerning that the absence of any damage to a putative debtor could affect a court's equitable determination regarding the allowance or amount of attorney's fees awarded under §303(i)(1).  Indeed, Ashland made that very argument

in its post-trial memorandum.  See n.36, supra.

Once the existence or absence of damages is determined to be related, most of the time spent in the §303(i)(2) litigation was related to NMI's §303(i)(1) claim because much time (on both sides) was expended on the allegations of U.S. Bank bad faith, NMI misconduct and the existence or non-existence of NMI damages.  There was some time spent on certain other issues, mostly procedural wrangling, such as choice of forum for litigating the §303(i)(2) claim or NMI's asserted right to a jury trial.  Those procedural issues are not related to the §303(i)(1) claim and the attorney's fees incurred in addressing them are not compensable in the §303(i)(1) action.

Turning to the second question  —  the reasonableness of the time expended  —  little need be said.  The process for calculating a lodestar as part of the determination of the reasonableness of attorney's fees is well-understood.

Once the first two (2) questions are resolved and a "lodestar" number has been calculated, the real crux of the matter is in answering the third question: should the lodestar be adjusted?

To answer the question, and properly apply the Hensley legal principles, I again find it useful to re-conceptualize the case as if both the §303(i)(1) and §303(i)(2) claims were litigated simultaneously in one (1) court, with NMI succeeding in defeating the "totality of the circumstances" defense under §303(i)(1), but being denied all relief on its §303(i)(2) claim.

Viewing the matter through that prism, Hensley becomes easier to apply.  In this inquiry, it is not necessary to dwell on technical shortfalls in time record reporting, (an issue which I will discuss further in Part III.D., infra).  Nor does it matter whether a particular motion filed in the §303(i)(2) action which, if successful, would have supported the §303(i)(1) claim was granted or denied.  Rather, the overall degree of success achieved in the litigation is the polestar.

44

Here, as a whole, NMI's §303(i) litigation was mostly unsuccessful because the §303(i)(2) claim failed.

I agree with U.S. Bank that the driving force in the litigation between the parties, and NMI's primary objective, the existence of actual damages allegedly caused by the filing of the involuntary bankruptcy petitions and U.S. Bank bad faith conduct sufficient to justify the award of punitive damages. The goal was to obtain a multi-million dollar money judgment against U.S. Bank and Ashland. So, while NMI has prevailed on its §303(i)(1) claim, it lost the much larger §303(i)(2) claim. The litigation was largely a failure.

Further, while many of the issues litigated in the §303(i)(2) case overlapped the "totality of the circumstances" defense asserted in the inactive §303(i)(1) proceeding, it is hard to imagine that the §303(i)(1) litigation would have taken on the scope it did had there been no accompanying §303(i)(2) action — even considering the Defendants' assertion of the "totality of the circumstances" defense. U.S. Bank is largely correct when it suggests that the attorney's fees mushroomed exponentially because NMI sought a "grand slam" result on the §303(i)(2) claim that ultimately was rejected in its entirety by the courts.

For these reasons, I conclude that a substantial reduction in the lodestar is appropriate.

At the same time, U.S. Bank bears some responsibility for the expansive scope of the §303(i) litigation.

The parties debated the issue, at trial with NMI characterizing U.S. Bank as "intransigent" for failing to make a prompt payment of the "Category 1" and "Category 2" fees incurred, especially once the dismissal order was affirmed by the Court of Appeals. (N.T. 2, at 179-180). U.S. Bank disputes this, asserting that it was reasonable for it to pursue its appellate rights and

45

thereafter, it was not possible to settle the §303(i)(1) claim separately due to NMI's insistence on a global settlement.

While there is some merit to U.S. Bank's rebuttal, it only goes so far. There were other means by which U.S. Bank (and Ashland) could have attempted to resolve the §303(i)(1) claim. For example, in the §303(i)(1) action, they could have made an offer of judgment under Fed. R. Bankr. P. 7068. Given the enmity between the parties, I infer that the Defendants and NMI were equally content to keep the litigation going, to keep all the balls in the air for as long as possible, perhaps for no other reason than a concern that settling the §303(i)(1) case would help fund the §303(i)(2) litigation.

In other words, I perceive a kind of litigation co-dependency existed among the parties — or, perhaps, a tacit acceptance by the Defendants that they had little reason to resolve the §303(i)(1) claim independently of the §303(i)(2) litigation. Certainly, there was no urgency to resolve the §303(i)(1) claim. Therefore, I do not find it appropriate for NMI to bear the entire cost of the attorney's fees in the §303(i)(2) case incurred on issues related to the §303(i) claim, even though NMI's litigation, as a whole, was not materially successful.

All of that said, there is no objective, mechanical, mathematical formula to be applied in determining the reduction of the lodestar. It is a discretionary determination. In the exercise of my discretion, I conclude that the lodestar for NMI's attorney's fees incurred in the §303(i)(2) litigation (Category 4) should be reduced by seventy-five percent (75%). I will make the precise calculation of NMI's lodestar and apply the seventy-five (75%) downward adjustment in Part IV.C., infra.

**E.  Attorney's Fees for Services Provided in the Three (3) Other Collateral Proceedings**

There is a different legal rationale for compensating NMI for the attorney's fees incurred in the other three (3) collateral proceedings.

In the 2022 MSJ Opinion, I cited a body of case law in which courts have held that §303(i)(1) permits a putative debtor to recover the attorney's fees incurred in defending the dismissal of the involuntary petition on appeal and enforcing its §303(i)(1) judgment.  Based on those authorities, I concluded that all three (3) of the other collateral proceedings were reasonable and necessary to prevent U.S. Bank from nullifying NMI's ability to prosecute and collect its §303(i)(1) claim.  Accordingly, I ruled that the reasonable attorney's fees incurred in those matters are compensable under §303(i)(1) to the extent that they involved services with a nexus to the advancement or protection of the §303(i)(1) claim.  See Nat'l Medical Imaging, 644 B.R. at 125-29.

The methodology for determining the compensability of the attorney's fees incurred in the three (3) other collateral proceedings differs slightly and is one (1) step simpler than the §303(i)(2) methodology.  The two (2) questions are:

  **1.  Did the services advance or otherwise protect the integrity of NMI's §303(i) claim?[47]**

---

[47]   It is important to note that this inquiry focuses on the services in the litigation as a whole, not on each particular pleading or motion filed.  It does not matter whether a particular motion, which if successful would have helped establish the §303(i)(1) claim, was granted or denied so long as it was reasonable to spend the time on the matter in pursuit of the outcome.

### 2. Was the time expended and fees incurred reasonable in the circumstances?

### F. Scope of the Court's Review of the Time Records

The parties have differing views on the proper scope of this court's review of the time records in evidence in evaluating the reasonableness of the fee requests in the various categories of service.

U.S. Bank places great emphasis on a court's authority to reduce a fee request when time entries are vague or employ "block billing." (U.S. Bank Post-Trial Mem. at 50-53).[48]  U.S. Bank assiduously reviewed the time records and identified numerous entries that it considered deficient on those grounds, grounds that in bankruptcy reorganization and liquidation cases, courts uniformly agree warrant a reduction of a requested fee.[49]  U.S. Bank would have the court scrutinize the time records in a manner comparable to a bankruptcy court's review of a fee application of a bankruptcy estate professional.  Of course, even in bankruptcy cases, the Third Circuit does not expect the bankruptcy court to become so "enmeshed in a meticulous analysis of every detailed facet of the professional representation" resulting in a review of "massive proportions" potentially "dwarfing the case in chief."  In re Busy Beaver Bldg. Cntrs,, Inc., 19 F.3d 833, 845 (3d Cir. 1994) (quoting

---

[48]    In bankruptcy cases, the term "block billing" is commonly referred to as "lumping."  See, e.g., In re Iannini, 460 B.R. 676, 678 (Bankr. W.D. Pa. 2011), vacated on other grounds sub nom. Iannini v. Winnecour, 487 B.R. 434 (W.D. Pa. 2012); In re S. Canaan Cellular Invs., Inc., 2010 WL 3294177, at *21 (Bankr. E.D. Pa. Aug. 19, 2010).

[49]    See, e.g., In re Jefsaba, Inc., 172 B.R. 786, 801 (Bankr. E.D. Pa. 1994); In re Worldwide Direct, Inc., 334 B.R. 112, 119 n.3 (Bankr. D. Del. 2005).  Sometimes courts deny all compensation for "lumped" time entries; other times, courts impose a percentage reduction.  See In re Green Valley Beer, 281 B.R. 253, 259 (Bankr. W.D. Pa. 2002).

Lindy Bros. Builders, Inc. v. American Radiator & Std. Sanitary Corp., 540 F.2d 102, 116 (3d Cir. 1976) (en banc)).

In contrast, NMI suggests that the court's review of the time records in a statutory fee-shifting case does not require the same degree of scrutiny as a bankruptcy court review of a professional's fee application in a bankruptcy case.  NMI asserts that the attorney time records are adequate so long as they provide "definitive information as to the hours devoted to various general activities."  (N.T. 2, at 26).

I agree with NMI.

The Third Circuit has consistently held that fee applications in fee shifting cases must be specific enough to allow the court to determine the reasonableness of the time expended and include definite information as to the hours devoted to various general activities such as pretrial discovery, settlement negotiations, but it is not necessary to know the exact number of minutes spent, the precise activity to which each hour was devoted or the specific attainments of each attorney.  Gelis v. BMW of N. Am., LLC, 49 F.4th 371, 379–80 (3d Cir. 2022) (citing Rode v. Dellarciprete, 892 F.2d 1177, 1190 (3d Cir. 1990)).

In the end, the question is whether the time records are sufficiently specific to permit the court to make a meaningful review of the reasonableness of the amount of time spent on compensable legal tasks, see Hensley, 461 U.S. at 437.

In general, based on my review of the time records, I am satisfied that NMI attorneys' submissions meet the standard set by the Third Circuit.

## IV.  DETERMINATION OF THE AMOUNT OF COMPENSABLE FEES AND COSTS

### A.  Categories 1 and 2: Dismissal of the Involuntary Petitions and Appeal of the Dismissal Order

#### 1.  Category 1 attorney's fees

In Category 1, NMI seeks $701,093.75 in attorney's fees incurred in connection with the dismissal of the involuntary petitions by the bankruptcy court. (See NMI Ex. 162A).  These fees attributable to the services provided by MK only.

Based on time records submitted by MK, $600,099.00 of the fee request represents fees incurred from the filing of the involuntary petition on November 7, 2008 through the entry of the bankruptcy court dismissal order on December 28, 2009.  (NMI Ex. 162, at 7).  The balance requested ($100,994.75) was incurred in the time period after the dismissal order through the entry of the May 2, 2014 bankruptcy court order denying the petitioning creditors' motion for reconsideration of the dismissal order.

U.S. Bank does not dispute that MK successfully achieved dismissal of the involuntary petitions.  Nor does it object to the hourly rates charged by MK's attorney, Aris Karalis.  (See N.T. 1, at 56-57).[50]  Rather, U.S. Bank initially suggests a reduction because it characterizes certain time entries as involving services unrelated to the dismissal litigation.  After that reduction, U.S. Bank suggests a further reduction of twenty percent (20%) of the remaining balance, asking that I find the requested fees excessive.

In support of its suggested twenty percent (20%) reduction for excessiveness, U.S. Bank's main arguments are:

---

[50]  Over the entire time period covered NMI's fee request in this case, Mr. Karalis' hourly ranged between $415.00/hour to $550.00/hour.

- the issues in the dismissal litigation were not novel or particularly difficult because the focus of the litigation was on the application of collateral estoppel, not the various elements under 11 U.S.C. §303(h);

- collateral estoppel was largely a legal issue which, in the end resolved the dispute without a full-blown evidentiary hearing;

- for the period between the entry of the dismissal order and the entry of the order denying reconsideration, the proceedings were stayed by the 2010 Stay Order.

U.S. Bank identifies 190.65 hours of time ($178,982.00 in fees) for services from November 2008 through December 2013 that it asserts are excessive. (U.S. Bank Ex. 427). Most of these challenged time entries are for the period after the entry of the December 28, 2009 dismissal order.

U.S. Bank's analysis ends with a suggested allowance of $511,444.00 for Category 1 attorney's fees.


**the asserted "unrelated" attorney services**

Starting with the threshold "unrelatedness" argument, U.S. Bank identifies approximately 146 hours of attorney time it deemed unrelated to the dismissal or "not sufficiently related to justify a fee award." (See U.S. Bank Ex. 430). The 146 hours amounted to $61,788.75 and spanned the time from November 2008 through May 2016.[51]

These "unrelated" services involved phone calls, correspondence and work connected to the principal of NMI, as well as other business and litigation matters of NMI such as:

- U.S. Bank's guaranty enforcement action in Bucks County;

- NMI landlords;

- other NMI creditors, including General Electric, First Keystone and Sterling Bank;

---

[51]     The last two entries from May 2016 were for reviewing the Third Circuit's decision on the appeal and Ashland's briefing on rehearing. This amounted to 2 hours and $1,600.00.

- NMI/ Zurich insurance matters;

- the Rosenberg litigation in Florida.

U.S. Bank suggests that the court deduct $61,788.75 from Category 1 before applying the requested across-the-board 20% reduction of MK's fees in Category 1.

I disagree. My review of the docket and the services MK provided does not raise any major red flags.

Particularly in the first thirteen (13) months after the DVI Defendants (later joined by Ashland) filed the involuntary petitions, the time records generally reflect work MK needed to do in representing the putative debtors in the involuntary case. Certainly, some tasks involved basic case administration and some general business matters. But once the NMI involuntary bankruptcy cases were filed, MK was acting as NMI's general counsel and could not ignore the many issues NMI faced at that time.

In other words, the compensable time under §303(i) is not limited to work directly aimed at dismissal of the involuntary petitions; it includes all of the necessary work MK had to perform in its role as bankruptcy counsel in representing the putative debtors prior to dismissal of the case.

I acknowledge that there is a modicum of logic behind the argument that the §303(i)(1) liability should be limited to the specific services designed to obtain dismissal of the case and perhaps necessary case administration, but not more general business operation representation occurring during the pendency of the bankruptcy case. However, U.S. Bank asks the court to draw subtle distinctions that I do not believe are consistent with the underlying policy behind §303(i)(1). More bluntly, and perhaps a bit overstated, "if you shoot at the king, you'd better not miss." If you shoot and miss, you are responsible for all of the debtor's bankruptcy counsel's reasonable attorney's fees incurred in representing the debtor in the involuntary case prior to dismissal. See In

re Darby, 536 B.R. 700, 702 (Bankr. E.D. Va. 2015) (fees incurred in general case administration are compensable under §303(i)(1)).

The services provided in the period after the entry of the December 28, 2009 dismissal may present a bit of a closer call on the question of relatedness. The bankruptcy court entered an order dismissing the case and there was no stay of the order. But it was U.S. Bank that filed the motion for reconsideration that stripped the order of finality for appeal purposes and, in fact, later appealed the order. Thus, U.S. Bank was responsible for prolonging the time frame in which NMI faced the entry of an order for relief under 11 U.S.C. §303.

Moreover, most of the post-December 28, 2009 time entries were for monitoring the Rosenberg case and interacting with the Florida attorneys with respect to the issues relating to the dismissal of the involuntary petitions. Considering how significant the collateral estoppel issue was in the Pennsylvania bankruptcy cases, I find these MK activities as sufficiently related as to be compensable.[52]

Considering all of the circumstances, I find it equitable to allow all of the compensation in Category 1 that U.S. Bank challenges as "unrelated."

**the asserted excessiveness of the MK Category 1 attorney's fees**

For the period November 2008 through December 2013, U.S. Bank identifies 190.65 hours of time ($178,982.00 in fees) that it asserts are excessive. (U.S. Bank Ex. D-427). U.S. Bank contends that MK spent excessive time and overbilled for the following work, both before and after

---

[52]     The only issue as to compensability of the time spent monitoring the Rosenberg case in Florida is potential excessiveness. While U.S. Bank did not expressly challenge the "unrelated" fees as "excessive," the concept of unrelatedness strikes me as a subset of excessiveness. However, in stark contrast to its herculean efforts to cull the time records and to identify entries it considers vague or block billing, and despite its burden, U.S. Bank has not separately identified the time spent specifically on monitoring the Florida litigation to demonstrate any asserted excessiveness.

53

the entry of the December 28, 2009 dismissal order:

- NMI motions to dismiss and supporting initial and reply memoranda (November 2008 to and January 2009);

- the parties competing motions for protective orders (February and March 2009);

- a memorandum on §303(i) issues (prepared in October 2009);

- NMI's response to the Defendants' motions for reconsideration of the dismissal order (February to March 2010);

- NMI motion to vacate stay (April to December 2013).

To evaluate this objection, it is helpful to look at the time periods before and after the entry of the December 28, 2009 dismissal order.

The litigation over the dismissal in the slightly more than one (1) year period between the involuntary filings and the December 28, 2009 dismissal was robust.

MK filed motions to dismiss on December 4, 2008, slightly less than one (1) month after the involuntary petitions were filed.[53]  Following a pre-trial conference in March 2009, Judge Fehling issued discovery deadlines and scheduled an evidentiary hearing for May 1, 2009, which was put off until August 12, 2009.  Meanwhile, there was a flurry of pretrial motions and filings, including the petitioning creditors' motion for a protective order and motions to file second and third amended involuntary petitions, all of which required responses by MK on behalf of NMI. NMI also filed its own motion for protective order and an appropriate motion pertaining to the issue of collateral estoppel, which led to oral argument in September 2009 and later, the dismissal

---

[53]    I also am influenced by the fact that there were two (2) involuntary cases. As a result, MK was obliged to file documents and advocate in two (2) separate cases. While undoubtedly there was a large overlap creating an economy of scale, the existence of two (2) cases increased the fees incurred by the NMI entities.

order on December 28, 2009.

U.S. Bank argues that reductions for the fees incurred in this time frame are warranted nevertheless because MK spent an excessive amount of time on drafting the motion to dismiss, related discovery and research.

I disagree.

I have compared the matters itemized in U.S. Bank's Exhibit D-427 to the MK's work product available on the docket. The work product was lengthy, detailed and thoroughly researched. I do not find that the time expended was excessive.[54]

I next consider the fees incurred between the entry of the December 28, 2009 dismissal order and the May 2, 2014 order denying the petitioning creditors' motion for reconsideration of the dismissal order.

When Judge Fehling entered the December 28, 2009 dismissal order, he mandated the prompt filing of a motion for sanctions. MK filed the motion accompanied by a lengthy, detailed supporting memorandum. MK filed also filed an expedited motion seeking clarification from the court as to whether it determined, among other things, whether the involuntary petitions were filed in bad faith. The creditors also filed their motion for reconsideration of the dismissal order.

On January 14, 2010, after this flurry of activity immediately following the entry of the December 28, 2009 dismissal order, Judge Fehling entered the 2010 Stay Order. As a result, little happened in the bankruptcy case from January 2010 for almost four (4) years, until NMI moved to

---

[54]     I note that, in its Exhibit D-427, U.S. Bank points to time spent in October 2009 drafting a memo on §303(i) issues that it considers excessive. MK included these time entries in Category 1 whereas they seem more appropriately placed in Category 3. In any event, I do not find the time spent excessive. To avoid complicating matters further, I will allow the fees as Category 1 fees.

vacate the stay on December 2013.[55]  By this time, NMI had engaged KCR to pursue NMI's

§303(i) claims.  MK and KCR resultingly both billed for the work on the motion to vacate the stay:

MK started the work earlier that year and KCR entered the picture during the later months of 2013.

The allocation of time/fees are as follows:

- MK – 45 hours (April 2013 - May 6, 2014) and $17,188.00 in fees; and

- KCR – 37.4 hours (December 2013- May 2014) and $19,722.00 in fees;

(U.S. Bank Ex. 429).   Together, the two firms spent 82.6 hours ($36,910.00 in fees) on the motion

to vacate the stay.  Id.

MK seeks these fees in Category 1 while KCR seeks the fees in Category 3.  This is less

anomalous than it might first appear.  The bankruptcy court's stay precluded activity on both the

motion for reconsideration of the dismissal order and the motion for sanctions (later morphing into

the §303(i) adversary complaint). Thus, it is understandable that the work on the motion to vacate

the stay might be allocated to either category.

Turning back to the reasonableness of the fee request for this work, considering the limited

nature of the issue, I find that there appears to be some unnecessary duplication of effort rendering

the time spent excessive.  I will reduce the allowed compensation by $18,000.00, roughly fifty

percent (50%) of the requested allowance, half of which will be deducted in Category 1 and half in

Category 3.

MK and KCR also worked jointly in opposing the motion for reconsideration of the

dismissal order.  After MK filed the motion to vacate the stay on December 18, 2013, Both MK

and KCR worked on the opposition. (See U.S. Bank Ex. 428).  MK started the work in 2010

---

[55]      By way of rough example, there were 196 docket entries in the case in the fourteen (14) months
between the filing prior to the entry of the January 14, 2010 stay order.  From January 14, 2010 to December
18, 2013, there were only forty-six (46) docket entries, many pertaining to administrative matters such as
notices of entry and withdrawal of appearances and status reports regarding the Rosenberg case in Florida.

immediately after the dismissal, but KCR began participating in the matter after being retained in

October 2013.  The allocation of time/fees based on U.S. Bank's exhibit are as follows:

- MK – 33.4 hours (January 2010 – March 2014) and $10,252.75 in fees; and

- KCR – 81.6 hours (February 2014 – May 2014) and  $31,239.50 in fees.

(U.S. Bank Ex. D-428). Thus, the two (2) firms expended a combined total of 82.6 hours

($41,492.00 in combined fees) for opposing the motion for reconsideration.

After reviewing the sequence of events and the work product, I again find that there was

some duplication of effort and some degree of excess, but to a lesser extent compared to the

motion to vacate the stay.  I will reduce the fees for this activity by $6,000.00 (approximately

fifteen percent (15%), again allocated $3,000.00 in Category 1 and $3,000.00 in Category 3).

After the above reductions are applied, NMI is entitled to $689,093.75 in Category 1.

### 2. Category 2: fees incurred to sustain dismissal of the involuntary petitions on appeal

Category 2 fees are for the appellate work following the denial of the creditors motion for

reconsideration.  The total request is $88,462.00.  MK seeks $11,948.00 in fees.  KCR seeks

$76,514.00 in fees. (See NMI Ex. 162A).

KCR was NMI's lead counsel for the appellate work.  Presumably, MK felt an obligation to

monitor the course of the appeal.  The time records also suggest that there was some collaboration

between KCR and MK while the dismissal order was on appeal, but most of MK's time was in

monitoring the appeal and corresponding with KCR.

U.S. Bank's urges that only one (1) firm was necessary and that MK should not be awarded

any fees in this category.

I largely agree with U.S. Bank.

By the time U.S. Bank took its appeal, after the denial of its motion for reconsideration in May 2014, KCR had been functioning as NMI's counsel for more than six (6) months, ample time to familiarize itself with the factual background and ongoing legal issues.  While fees of almost $12,000.00 over the roughly two (2) year period are hardly substantial, I have difficulty seeing much value added by MK's limited participation in the appeal. Still, as NMI's counsel MK properly spent some time keeping track of the appeal.

Based on the foregoing, I will reduce the allowed compensation in Category 2 derived from MK's billings by $10,000.00.

This brings me to the Category 2 fees incurred by NMI for KCR's services in connection with the appeals.  Perhaps remarkably, with only one (1) exception, U.S. Bank takes no issue with these fees.

The one (1) exception is the time KCR spent on filing a motion to reassign the appeal in the district court from one (1) district court judge to another.  KCR's time records state that it expended 10.3 hours on this motion, resulting in fees of $3,542.50.  I have reviewed KCR's filing and I agree that the requested fees on this matter are excessive.  I will reduce the Category 2 allowance by $1,750.00, representing approximately fifty percent (50%) for that particular service.

The end result is that I will allow $76,712.00 for Category 2 fees.

Finally, U.S. Bank requests that $36,937.500 of these fees be allocated to Ashland alone because those fees were incurred in the Third Circuit appeal in which U.S. Bank did not participate. This issue is addressed in Part IV.M., infra.

### B.  Category 3: the §303(i)(1) Proceeding

At trial, NMI presented an exhibit in which it requested a total of $886,926.25 in attorney's

fees incurred based on the services of MK/KPC, KCR and Dilworth through September 2022 in

prosecuting this §303(i)(1).

In its supplemental exhibits, NMI has requested additional attorney's fees for:

- the pretrial work between October 1, 2022 up to the commencement of trial on
  November 30, 2022 ($333,441.50);

- the trial work ($110,890.50); and

- post-trial work preparing NMI's post-trial memorandum ($72,545.00).

Thus, NMI seeks a total of $1,403,803.25 for attorney's fees incurred in pursuing its

§303(i)(1) claim.[56]

### 1.  fees for work performed prior to October 2022 by KPC and MK

NMI seeks the allowance of $493,363.25 in attorney's fees attributable to the services

provided by MK and KPC in the §303(i)(1) fee recovery litigation in the time period prior to

October 2022.[57]  For ease of reference, in this Part IV.C., I will refer to both firms collectively as

"KPC."

---

[56]

|       | $ 886,926.25  |
|-------|---------------|
|       | $ 333,441.50  |
|       | $ 110,890.50  |
|       | $   72,545.00 |
| Total | $1,403,803.25 |

[57]    Both KPC and MK billed for work in Category 3.  MK has claimed $452,114.75 in fees and KPC
has claimed $41,248.50 in fees.  (See NMI Ex. P-162A).  In this Part IV.C.1-3, I rely heavily on NMI Ex. P-
162A and Ex. A to U.S. Bank's Post-Trial Memorandum which annotates Exhibit P-162A with U.S. Bank's
proposed reductions in claimed fees.

After a review of the KPC time records, U.S. Bank asserts that KPC billed $275,489.75 in work that was unrelated to §303(i)(1) fee recovery.  Without waiving its argument that none of the fees should be allowed, U.S. Bank requests the Category 3 award be reduced to $141,300.00 based upon the exclusion of asserted unrelated $275,489.75, plus a further 20% reduction based on excessiveness.[58]

In Exhibit D-431, U.S. Bank details every billing entry from January 2010 through September 2016 to which it objects.  Specifically, U.S. Bank objects to work related to the §303(i)(2) damages case, the Florida Rosenberg bankruptcy case, the Bucks County litigation, and corporate work in relation to NMI's real estate leases and its relationship with Sterling Bank.  U.S. Bank also objects to numerous time entries as vague, excessive, or unnecessary due to the fact this litigation was stayed pending the outcome of the Florida Rosenberg litigation.

I have evaluated U.S. Bank's position, as articulated in U.S. Bank Ex. 431 and its post-trial memorandum, against the backdrop of the two (2) questions to frame my analysis of the compensability of the attorney's fees KPC incurred in the §303(i)(1) fee recovery litigation:

1. **Were the services performed related to an issue that advanced NMI's recovery of §303(i) fees?**

2. **Was the time expended and fees incurred reasonable under the circumstances?**

After studying U.S. Bank Ex. 434 and making my own determinations regarding whether an activity advanced the fee recovery litigation, I agree with U.S. Bank that it would be problematic to allow full compensation for the work related to the §303(i)(2) damages case, the Florida Rosenberg bankruptcy case, the Bucks County litigation, and work related to NMI's real

---

[58]   Ashland objects on the same grounds.  Although most of the discussion in the text references U.S. Bank only, I have considered Ashland's arguments and factored them into my analysis.

estate leases and its relationship with Sterling Bank.

While I have found that there is a nexus between the damages issue in the §303(i)(2) case and this §303(i)(1) action, it is a limited connection (and, of course, involving an issue on which NMI did not prevail). The damages issue was central in the §303(i)(2) litigation but only relevant as one (1) part of the totality of circumstances in the §303(i)(1) litigation.

As for the other issues mentioned above, I agree with U.S. Bank that, with the possible exception of the Rosenberg case in Florida, where some legal issues overlapped with NMI's §303(i)(1) claim, thus making it reasonable for MK to expend some time monitoring those proceedings, the services identified by U.S. Bank were not sufficiently related to §303(i)(1) fee recovery to merit an award of fees.

U.S. Bank also would have the court deny attorney's fees for work related to the services such as, inter alia, drafting the adversary complaint, drafting the motion to vacate, research regarding attorney's fees and §303(i), drafting the motion for clarification, and reviewing past filings in the Pennsylvania bankruptcy court litigation.

On that point, I disagree. Those services were necessary to get the stayed litigation moving again or to prepare for the day the stay was lifted, and KPC would be able to pursue its fee recovery.

Based upon my review of the records, and the considerations described above, I find it appropriate to make a 75% deduction with respect to the fees for services that U.S. Bank identifies as unrelated to 303(i) fee recovery. This is a deduction of $370,022.44.

I do not find a basis and decline to make any further reductions due to alleged excessiveness.

## 2. fees for work performed prior to October 2022 by KCR

NMI seeks the allowance of $366,010.00 in attorney's fees attributable to the services

provided by KCR in the §303(i)(1) fee recovery litigation.

In its post-trial memorandum, U.S. Bank suggests that KCR's fees for Category 3 should be

reduced by 50% based on the use of multiple law firms for fee recovery when only one was needed

and in view of excessive time.  (U.S. Bank Post-Trial Mem. at 74).

In U.S. Bank Exhibit 434, U.S. Bank identifies $72,002.50 in fees U.S. Bank considers non-

compensable.  The exhibit sets out six (6) categories of objections to KCR's Category 3 fees:

1. Possibly Compensable: Work on Various Matters (740.1 hours and $291,705.50 in fees);

2. Not Compensable: NMI Lost (16.8 hours and $6,292.00 in fees);

3. Not Compensable: unnecessary/never Filed (27.3 hours and $11,265.00 in fees);

4. Not Compensable: vague, block billing, file review, calls, meetings (41.8 hours and $25,294.00 in fees);

5. Not Compensable: work on pre-hiring matters (27.3 hours and $11,092.50 in fees)

6. Not Compensable: unrelated to fee case (47.6 hours and $18,059.00 in fees.[59]

I have evaluated U.S. Bank's position based on the two (2) factors articulated in previous

section i.e., relatedness and reasonableness.  Below, I address the numbered objections.

## Objection Number 5 and 6

First, I will address the work that I find clearly non-compensable which is contained, for the

most part in U.S. Bank Objection numbers 5 and 6.  I conclude that 77.1 hours and $30,0551.50 in

---

[59]      U.S. Bank's Post-Trial Memorandum does not explain how the itemized non-compensable items
harmonizes with the suggested 50% reduction.

fees are non-compensable.

KCR failed to provide a description for 2.2 hours billed totaling $2,420.00.  Consequently, I am unable to determine whether this work was related to Category 3 and KCR's portion of NMI's fee allowance will be reduced correspondingly.

KCR performed 27.3 hours of work conducting due diligence and drafting its fee agreement with NMI in October 2013.  While billing for such pre-engagement work may be the norm in most commercial litigation cases, this litigation involves fee shifting.  In a commercial litigation case, the attorney and client can voluntarily negotiate a contract provision providing for payment of pre-engagement due diligence and the drafting on a fee agreement.  After all, a client is hiring an attorney to aid the client and a fully vetted and informed attorney is in a client's best interest.  In a fee shifting case, the opposing party has no opportunity to negotiate such an arrangement and I do not find it appropriate to involuntarily impose such a burden on an opposing party.

KCR performed 47.6 hours of work related to the Rosenberg Trust and Rosenberg litigation in Florida.  I do not find this work sufficiently related to efforts to recover §303(i)(1) fees to allow an award.

Below is a table summarizing the deduction described above:

| DESCRIPTION | HOURS | FEES |
|---|---|---|
| **NOT COMPENSABLE: NO DESCRIPTION OF WORK** | | |
| **SUB-TOTAL** | **2.2** | **$2,420.00** |
| | | |
| **NOT COMPENSABLE: WORK ON PRE-HIRING MATTERS** | | |

| | | |
|---|---|---|
| **due diligence work re NMI prior to Oct. 2013 fee agreement** | **25.5** | **$10,012.50** |
| **Oct. 2013 drafting fee agreement** | **1.8** | **$1,080.00** |
| **SUB-TOTAL** | **27.3** | **$11,092.50** |
| | | |
| **NOT COMPENSABLE - Unrelated to Fee Recovery Case** | | |
| 2013-2015 work related to Florida case against Rosenberg | 9.5 | $4,526.50 |
| Feb. 2014 work on assignment of judgment / claim to trust | 33.4 | $11,515.00 |
| Oct. 2021 work on Florida Rosenberg case | 3.5 | $997.50 |
| **SUB-TOTAL** | **47.6** | **$ 17,039.00** |
| **TOTAL** | **75.9** | **$30,551.50** |

### Objection Numbers 2-4

In Objections numbers 2-4, U.S. Bank argues that 83.7 hours of time are non-compensable.[60]  I will not address every instance of alleged non-compensability cited by U.S. Bank.  Instead, I will paint my reasoning in broad strokes.

According to U.S. Bank, NMI should not receive any Category 3 fees for motions that it "lost" such as the July 2017 Opposition to USB's Motion to Stay or the May 2021 Opposition to USB's Motion to Amend Answer (Objection number 2).  However, NMI's opposition to a further stay of proceedings was directly related to its efforts to collect fees submitted to this court more than a half-decade earlier.  Further the allowable compensation in a fee-shifting case is not

---

[60]     In Objection number 4, U.S. Bank included 2.2 hours of work that lacked any description.  I have already agreed *supra* that these fees are non-compensable.  The figure 83.7 does not include those 2.2 hours..

dependent on succeeding on every motion filed during the case. Deduction for "lost" motions might be made on the ground that the motion was unrelated to the successful claim or the time spent was excessive or as part of an overall deduction for limited success. None of those considerations are present here.

In objection number 3, U.S. Bank requests denial of compensation for work performed in October and November of 2019 relating to research and preparation of a fee application and a status conference on the grounds that the fee application was never filed, and the other work was unnecessary. I am not convinced by this argument. On its face, this type of work is related to NMI's pursuit of fees related to its successful §303(i)(1) litigation.

In objection number 4, U.S. Bank challenges the compensability of work billed as telephone conferences in 2013-2015, 2019, meetings in 2013-2015, 2019, file review in 2013-2014, and miscellaneous matters in 2020. U.S. Bank argues these services should not be compensated due to vague descriptions and the services not being necessary. I do not see the need to drill down to such a granular level regarding billing practices and case management. In Part III.F., _supra_, I explained why I am not making reduction based on U.S. Bank's vagueness and block billing objections. I will not repeat that discussion. Further, although the case was stayed for portions of this time period, KCR was diligent in remaining prepared to proceed.

### **Objection Number 1**

Finally, I consider Objection number 1, which U.S. Bank characterizes as "Possibly Compensable-Work on Various Matters" involving 740.1 hours and $291,705.50 in fees. This objection includes work performed as far back as November 2013 through work performed in September 2022 on variety of matters such as:

- motion to vacate stay;

- motion for reconsideration of the dismissal order;

- the adversary complaint;

- adversary case motion practice;

- discovery related to §303(i)(1);

- appeals; and

- trial preparation.

U.S. Bank's objections include block billing, multiple attorneys, vagueness, excessiveness, and travel time.

As discussed in Part IV.A.1, KPC and KCR both worked on the motion to vacate stay and the motion for reconsideration of the dismissal order during the time the case was stayed.  With respect to the motion to vacate the stay, I have found that a deduction of $18,000.00 is appropriate, with $9,000.00 allocated to Category 1 and $9,000.00 allocated to this Category 3.  Similarly, with respect to the motion for reconsideration, I am reducing the fee request by $6,000.00, $3,000.00 allocated to Category 1 and $3,000.00 allocated to this Category 3.  Otherwise, I see no basis to reduce the attorney's fees award.

Finally, to the extent U.S. Bank urges me to make the value judgment that KCR over-litigated the §303(i)(1) claim and that a percentage reduction should be imposed for excessiveness, I decline the invitation.   This litigation was the product of a poisonous symbiotic relationship among the parties and was hotly contested.  Each move by U.S. Bank resulted in a counter move by NMI and vice versa.  Based on this history and my review of the billing records, I conclude no further reduction in fees is appropriate.

Accordingly, NMI's compensable attorney's fees attributable to KCR for the period prior

to October 2022 total $323.458.50.[61]

### 3.   fees for work performed prior to October 2022 by Dilworth

Dilworth seeks allowance of $27,553.00 in fees for 44.3 hours of work performed relating

to Category 3.

U.S. Bank argues that the Dilworth fees are not compensable at all under §303(i)(1) based

on the 2022 MSJ Opinion, remarking that the fees might be compensable as an administrative

expense in the chapter 11 cases.  (U.S. Bank Ex. 436, at 20).  Alternatively, U.S. Bank suggests

that I reduce Dilworth's fees by fifty percent (50%) ($13.776.50). (U.S. Bank Post-Trial Mem. at

74).

I reject as irrelevant U.S. Bank's argument that Dilworth's fees are compensable from the

estate.  The estate will be funded by the monies that are recovered in this action. See n.40, supra.

Dilworth's rights as an administrative claimant have nothing to do with NMI's right to receive

complete compensation under 11 U.S.C. §303(i)(1).

After reviewing the time records, I find the work performed by Dilworth is related to

§303(i)(1) fee recovery.  Nevertheless, fee recovery for the §303(i)(1) litigation has been the

primary responsibility of KCR and KPC.  The addition of Dilworth as a third firm has resulted in a

duplication of efforts and time warranting a 50% reduction in claimed fees.

Accordingly, NMI's fee allowance attributable to Dilworth for Category 3 will be reduced

---

[61]                        $366,010.00
                   (minus  $ 30,551.50)
                   (minus  $   9,000.00)
                   (minus  $   3,000.00)
       **Total**           **$323.458.50**

to $13.776.50.

### 4.  the supplemental fee submissions (pre-trial, trial and post-trial)

At trial, NMI submitted Exhibits 229, 230, and 231 which contain KCR, Dilworth, and

KPC invoices respectively for Category 3 work for the period October 1, 2022 through November

25, 2022.  These invoices total $333,441.50:

- KCR - $223,495.00 in fees for 209.70 hours;

- KPC - $75,331.00 in fees for 190.50 hours;

- Dilworth - $34,615.50 in fees for 53.80 hours.[62]

As authorized by the court, KCR, KPC, and Dilworth filed a supplemental fee submission

on December 23, 2022 requesting attorneys' fees and costs under §303(i)(1) for the period from

November 26, 2022 through December 21, 2022.  (Adv. No. 14-250, Doc. # 219).  Accompanying

the submission were three (3) additional exhibits, NMI Ex.'s 238, 239 and 240.  (See Adv. No. 14-

250, Doc. # 219).  For that roughly one (1) month period reflected in the December 13, 2022

supplemental filing, NMI seeks allowance of an additional $183,435.50:

- $113,010.10 in fees for 223.6 hours based on KCR's services;

- $40,433.50 in fees for 89.70 hours based on KPC's services;

- $29,992.00 in fees for 38.00 hours based on Dilworth's services;

In total, KCR, KPC, and Dilworth seek $516,877.00 in fees based on 1,104.80 hours billed

for the Category 3 work in the last quarter of 2022.

On January 10, 2023, U.S. Bank and Ashland each filed a Memorandum in Opposition to

---

[62]    Dilworth's billing period started on September 19, 2022 and ended on November 25, 2022.

Plaintiffs' Supplemental Fees and Costs.  (Adv. No. 14-250, Doc. #'s 223, 224).

U.S. Bank objects on the grounds that:

- multiple firms and multiple attorneys worked on the same matters;

- unsuccessful work (fees for opposing narrowing the trial scope and fees to seek an award of prejudgment interest);

- vague and block billing; and

- excessive time (trial preparation, opposition to motions to stay in bankruptcy and district courts, opposition to motion to apply collateral estoppel, responses to pre-trial settlement offers, and Third Circuit appeal).[63]

Ashland also raises objection based on vagueness and block billing, to fees relating to pre-judgment interest, and joins U.S. Bank's opposition.[64]

---

[63]     U.S. Bank also questions the hourly rates of NMI I's lead counsel in the §303(i)(1) action, Steven M. Coren, and Dilworth's attorneys, Lawrence G. McMichael and Jennifer L. Maleski.

Mr. Coren's hourly rate was $850.00 per hour for most of the time covered by the litigation and was raised to $1,100.00 per hour in 2022.  Given his extensive experience as a successful commercial litigator and market rates in this region, I have no difficulty accepting his proffered hourly rate.  See, e.g., In re Mushroom Transp. Co., Inc., 486 B.R. 148, 164 (Bankr. E.D. Pa. 2013) (per Fox, J.) ("[A] bankruptcy judge may use his own knowledge of the market and of the professional's experience to determine the appropriate hourly rate") (citing Busy Beaver, 19 F.3d at 854).

My rejection of the Defendants' attack on hourly rates is also informed by the overall blended rate charged by Mr. Coren's firm for the work performed in the §303(i)(2) case.  Mr. Coren down-streamed much of the work to firm attorneys with lower hourly rates.  Based on my calculation, the average hourly rate charged by firm in the various categories that I have found to be compensable ranged from $316.00/hour to $389.00 per hour.

As for the two (2) Dilworth attorneys, Mr. McMichael's hourly rate ranged from $975.00 to $1,000.00 and Ms. Maleski's hourly rate ranged from $575.00 to $600.00 during the course of the case.

Based on my experience in reviewing fee applications in bankruptcy cases and in matters in which Mr. McMichael and Ms. Maleski have appeared in my court, I find that their rates are appropriate in this case.

[64]     Ashland also reiterates its arguments from its post-trial memorandum that it had limited involvement in much of the Category 3 litigation and that it should not be liable — much less jointly and severally liable  —  for any of the fees incurred by NMI in responding to litigation matters initiated by U.S. Bank Defendants.

U.S. Bank has once again provided an exhaustive analysis of the three (3) firms' billing records in its opposition memorandum.

U.S. Bank divides the fees claimed by all (3) three firms into three (3) categories by time period:

- Pretrial:  October 1, 2022, through November 25, 2022 - 754 hours for $333,441.50 in fees;

- Trial:  November 26, 2022, through December 1, 2022 - 194.8 hours for $110,890.50 in fees;

- Post-trial:  December 2, 2022, through December 21, 2022 - 156 hours for $72,545.00 in fees.

U.S. Bank argues that the $516,877.10 in fees should be reduced by a minimum of fifty percent (50%).


## pre-trial:  October 1, 2022, through November 25, 2022

U.S. Bank separates NMI's pre-trial work into fourteen (14) categories including: trial preparation, trial exhibits, motions practice in both this court and the district court, research, motion drafting, settlement offers, and preparation for a canceled argument before the Third Circuit Court of Appeals.  U.S. Banks asserts NMI's fee allowance should be reduced due to the use of multiple firms and attorneys, vague billing, block billing, unsuccessful work, and excessive billing.

After review of the time records, I will reduce NMI's fee request in five (5) areas based upon a duplication of effort and excessive billing.

The first area relates to the appeal filed by U.S. Bank of the September 2, 2022 order denying its motion for summary judgment and its motion for a stay pending.  U.S. Bank filed a motion for a stay pending appeal and a separate motion for leave to take an interlocutory appeal in

70

the district court.  U.S. Bank posits that NMI attorneys expended 120.4 hours of work on these

matters and billing fees totaling $56,641.00, of which $26,540.00 was incurred in the district.  (See

U.S. Bank Mem. in Opposition to Supp. Fees at 31).

I reviewed NMI's filings made in this court and the district court.  NMI's attorneys

submitted excellent work product, as they have throughout the course of the litigation.  There is no

doubt that the different filings had to be "fine-tuned" to address the particular issue and to take into

account the differences between advocacy in the bankruptcy court and the district court.  At the

same time, however, there was a meaningful overlap in the work product provided to the two (2)

courts (bankruptcy court and district court).  This leads me to conclude that the time spent was a

bit excessive, at least in the district court.  Consequently, I will impose a twenty-five percent

(25%) reduction, $6,635.00, to the $26,540.00 fees requested for NMI's opposition work in the

district court.

I address the second and third requested deductions together.

Shortly before trial, U.S. offered a proposed stipulation to narrow the scope of the trial and,

thereafter filed a Motion to Limit Scope of Fee Trial and a Motion to Expedite Hearing.  In the

motion to limit the scope of the trial, U.S. Bank proposed to concede that presumption that NMI

was entitled attorney's fees and costs under 11 U.S.C. § 303(i)(1) following the dismissal of an

involuntary bankruptcy petition.  NMI billed $17,274.00 in fees for 26.5 hours related to its

response to the proposed stipulation.  In addition, NMI expended 97 hours and billed $46,089.50

drafting its opposition to the motions and attending a hearing.

U.S. Bank attacks NMI's billing regarding its response to the proposed stipulation on the

grounds multiple attorneys worked on the matter.  U.S. Bank argues that NMI's fees for work

related to its opposition to the motion to narrow the scope should be reduced due to vague and

block billing, and multiple attorneys (three (3) firms, four (4) partners, and two (2) associates).

71

While I was not privy to the proposed stipulation or negotiations among the parties, expending 26.5 hours of attorney time by four (4) partners form three (3) firms seems excessive. Further, although NMI's opposition to the motion to narrow the scope of the trial was thoughtful, well-written and raised valid points, the opposition memo was a mere eleven (11) pages. Expending 97 hours on such a short document seems excessive.

Accordingly, NMI's fee allocation relating to its response to the proposed stipulation and its opposition to the motion to narrow the scope will be reduced by fifty percent (50%). NMI is awarded $8,637.00 and $23,044.75 respectively.

Finally, I also address the fourth and fifth deductions together.

Both U.S. Bank and Ashland made settlement offers to NMI during the pre-trial time period. NMI expended 13.90 hours and billed $12,065.00 in responding to U.S. Bank's settlement offer. NMI expended 9.30 hours and billed $5,892.00 in responding to Ashland's settlement offer. U.S. Bank objects on the grounds of vagueness, block billing, multiple attorneys, and excessiveness.

I agree with U.S. Bank that amount of time expended and the amount billed is excessive. Accordingly, NMI's fee allocation will be reduced by 50% relating to it responses to the U.S. Bank and Ashland settlement offers. NMI is awarded $6,032.50 and $2,946.00 respectively.

Thus, the total allowance for NMI for its attorneys' pretrial services from October 1, 2022 through November 25, 2022 is $286,146.25.[65]

---

[65]

|  |  |  |
|---|---|---|
|  |  | $333,441.50 |
|  | (minus $ | 6,635.00) |
|  | (minus $ | 8,637.00) |
|  | (minus $ | 23,044.75) |
|  | (minus $ | 6,032.50) |
|  | (minus $ | 2,946.00) |
| **Total** |  | **$286,146.25** |

## Trial:  November 26, 2022, through December 1, 2022

KCR, KPC, and Dilworth expended 194.8 hours and billed a total of $110,890.50 in fees during the trial week.  U.S. Bank primarily objects to Dilworth's billing for attending the trial.  At trial, Mr. McMichael was a witness and Ms. Maleski attended the whole trial but participated only once when Mr. Michael was testifying.  U.S. Bank posits that at only three (3) partners should have represented NMI at trial as U.S. Bank and Ashland were represented by three (3) attorneys.

Dilworth expended 41.40 hours and billed $30,973.00 during the trial week.  I agree that attendance by two (2) Dilworth partners was not entirely reasonable, especially considering that Mr. Karalis is an experienced bankruptcy practitioner who would have been cognizant to any issues affecting the 2020 bankruptcy case such that he and Mr. Coren could have addressed any "bankruptcy-centric" issues that might have arisen.

Accordingly, I will reduce Dilworth's fees by one third (1/3) resulting in an award of $20,751.91.  NMI is awarded $90,138.59 in fees for the trial work.

## Post-trial:  December 2, 2022 through December 21, 2022

In the post-trial period, KCR, KPC, and Dilworth filed NMI's post-trial memorandum, NMI's supplemental fee application, and NMI's limited objection to (1) U.S. Bank's opposition to the supplemental fees and (2) the Declaration of Peter H. Leavitt.  Three (3) firms, seven (7) attorneys, and two (2) paralegals expended 156.0 hours accumulating $72,545.00 in fees with a blended hourly rate of $465.00.

NMI's post-trial work product was excellent, and I commend the firms on providing a clear, concise, and substantially persuasive work product to support their fee claims.

Nevertheless, I find the amount of time expended was somewhat excessive and I conclude that a 20% reduction in fees is appropriate.  NMI's fee allowance for the post-trial period shall be

reduced from $72,545.00 to $58,036.00.

## Summary

NMI requested $1,403,803.25 in fees for its Category 3 work relating to the recovery of the

§303(i)(1) fees.  NMI's total award for Category 3 fees is $870,166.56 as summarized below:

| TIME PERIOD | FEES AWARDED |
| --- | --- |
| KPC (fees prior to Oct. 2022) | $123,340.81 |
| KCR (fees prior to Oct. 2022) | $323.458.50 |
| Dilworth fees (prior to Oct. 2022) | 13,776.50 |
| Pretrial Work Oct.1 to Nov. 25, 2022 (all 3 firms) | $261,416.16 |
| Trial | $90,138.59 |
| Post-Trial | $58,036.00 |
| TOTAL | $870,166.56 |

## C.  Category 4: the Unsuccessful §303(i)(2) Action – KCR Fees

Initially, NMI sought $1,326,555.00 for the KCR services through the entry of the adverse

district court summary judgment order.  During the trial, as an exercise of "billing judgment," NMI

suggested another reduction of $331,638.75, representing twenty-five (25%) of the lodestar

request. (See 2 N.T. at 5;  see also NMI Post-Trial Mem. at 25).  This brought NMI's request down

to $994,916.25 in attorney's fees attributable to the services KCR provided in the §303(i)(2)

litigation.

As explained below, I am putting aside the voluntary deductions suggested by NMI and I will use the original amount, $1,326,555.00, as the starting point in my analysis.

U.S. Bank maintains that NMI is not entitled to any fees incurred in the §303(i)(2) litigation, but if fees are awarded, the services provided by KCR in the §303(i)(2) case should be limited to, at most, $75,205.00.[66]  U.S. Bank came to this figure by giving NMI credit for the four (4) depositions that it recognized concerned liability issues, its document request and interrogatories to U.S. Bank.

I acknowledge U.S. Bank's extraordinary effort to support its position.  U.S. Bank took on the massive (mind-numbing) task of combing through the voluminous amount of KCR time records, reorganizing and recharacterizing the subject matter to highlight the work it deemed not compensable.  This was no small feat.  While I appreciate U.S. Bank's effort, after reviewing the material, I find, in the end, that this detail-heavy approach is not necessarily the best way to resolve this issue.

Drilling down into each time entry to evaluate the reasonableness of the time spent and the value of that time defeats one (1) of the purposes of determining the reasonableness of requested attorney's fees in a fee-shifting case, avoiding turning a request for attorney's fees into "a second major litigation."  Hensley, 103 S. Ct. at 1941.  While that "ship may have sailed" at this point, a corollary legal principle can be achieved: "trial courts need not, and indeed should not, become green-eyeshade accountants."  Fox v. Vice, 563 U.S. 826, 838 (2011).

The alternative to compelling a federal court to labor over a massive fee application line-

---

[66]   U.S. Bank arrives at this amount by calculating that KCR devoted 175.2 hours to preparing for and taking four (4) fact witness depositions — resulting in billings totaling $65,445.50. (This amount does not subtract for certain time entries that U.S. Bank flagged and criticized as "blocked billing").  U.S. Bank also calculated that KCR spent 9.7 hours ($4,207.50) to draft NMI's interrogatories, review the responses and prepare a discovery deficiency letter.  In the suggested $75,205.00 allowance, NMI did not deduct 20.2 hours ($5,552) for "block billing" for "discovery/drafting."

by-line is for the court to use estimates and make percentage adjustments.  As one district court

observed:

> While blanket percentage reductions should not be ordered in a perfunctory fashion,
> and sufficient reasons for selecting a particular percentage reduction must be given,
> reductions are permissible so long as the court provides a concise but clear
> explanation of its reasons for the fee award. . . .  A court may take into account
> its overall sense of a suit, and may use estimates in calculating and allocating
> attorneys' time. This approach stays true to the fact that the essential goal in shifting
> fees is to do rough justice, not to achieve auditing perfection.

Christian v. Honeywell Ret. Ben. Plan, 2014 WL 1652222, at *7 (E.D. Pa. Apr. 24, 2014)

(citations omitted); accord Am. Bd. of Internal Med. v. Von Muller, 540 F. App'x 103, 107–08 (3d

Cir. 2013) (nonprecedential); Johnson v. Mold Sols. & Inspections, LLC, 2022 WL 17657671, at

*3 (E.D. Pa. Dec. 13, 2022).

All of that said, U.S. Bank's hard work is not wasted.  U.S. Bank Exhibit 434 was

extremely helpful because it provided a framework for me to see the forest from the trees of the

§303(i)(2) litigation.

In U.S. Bank Exhibit 434, U.S. Bank identified the following (4) four subject areas within

category 4 that it considers non-compensable:

- expert witness reports and discovery unrelated to §303(i)(1) (661.2 hours and
  $257,531.00 in fees);

- work on various discovery matters unrelated to §303(i)(1) (1,196.1 hours and
  $377,711.50 in fees);

- pleadings and motions practice in damages case unrelated to §303(i)(1) (898.5
  hours and, $307,282.00 in fees);

- and work on various matters unrelated to §303(i)(1) (621.9 hours and,
  $208,620.50 in fees).

(U.S. Bank Ex. 434, at 34-35).[67]  These requested reductions total 3,588.3 hours of attorney time

---

[67]     U.S. Bank Exhibit 434 includes a fifth category for time expended for work "specific to Ashland."  I
will address U.S. Bank's concerns on that point in Part IV.M., infra.

and $1,225,041.50 in attorney's fees.[68]

I have evaluated U.S. Bank's position, as articulated in its Exhibit 434 and its post-trial memorandum, against the backdrop of the three (3) questions stated in Part III.B.3., supra, that frame my analysis of the compensability of the attorney's fees NMI incurred in the §303(i)(2) litigation:

1. Were the services performed related to an issue that also advanced NMI's §303(i) claim, i.e., did the issue tend to defeat the Defendants' "totality of the circumstances defense?

2. Was the time expended and fees incurred reasonable under the circumstances?

3. To what extent, if any, should the attorney's fees be reduced due to the lack of success in the §303(i)(2) action?

Having reevaluated the scope of the §303(i)(2) services that are compensable, see Part III.B.3., supra, I conclude that most of the work in the §303(i)(2) case bore a sufficient relationship to the §303(i)(1) issues to warrant consideration for compensation — at least as a threshold matter. Generally, most of the time expended went to the parties' respective alleged misconduct or the existence and extent (if any) of damages caused by the involuntary bankruptcy filings. As discussed earlier, these issues were germane to the §303(i)(1) adversary proceeding.

Certain other matters litigated involved procedural or tactical issues that related only to the §303(i)(2) claim. I am excluding the attorney's fees incurred in those other matters from the allowance of compensation.

---

[68]    Two (2) points need be made regarding the amounts stated above in the text. First, U.S. Bank's calculations were based on NMI's initial request before the twenty-five percent (25%) discount NMI suggested at trial. Second, the amounts in the text do not deduct for the fifth category of fees that U.S. Bank asserts should be attributable only to Ashland.

For this reason, and using Exhibit D-434 as a point of reference, I find that the following

services categorized under Category 4 are not compensable:

| SERVICES | TIME | FEES |
|---|---|---|
| Motion to withdraw the reference | 111.5 | $36,973.00 |
| Opposition to Withdrawal of the Reference | 24.5 | $8,222.50 |
| Motion for Reconsideration (re: jury trial issue) | 45.9 | $18,663.00 |
| Motion to Strike/ Leave to Answer Counterclaim | 37.3 | $13,581.00 |
| Opposition to Motion for Default Judgment on the Counterclaim | 41.5 | $14,787.50 |
| Jury Waiver Research | 9.9 | $5,553.00 |
| **TOTAL** | **260.7** | **$97,780.00** |

Reducing the initial $1,326,555.00 lodestar by $97,780.00 brings it to $1,228,775.00.

Next comes the second step: determining whether any reduction should be made because the

requested fees are not reasonable.

Despite U.S. Bank's strenuous argument that the requested fees are unreasonable due to

vagueness, excessiveness, and block billing, I will make no reduction based on the second step of

the analysis.

Bearing in mind the legal standard, (i.e., it is being unnecessary to know the exact number

of minutes spent, the precise activity to which each hour was devoted or the specific attainments

of each attorney, from my vantage point, I am not able to make an informed judgment that the

time spent by NMI's attorneys was excessive or unreasonable.  Nor, after considering the hourly

rates charged, am I convinced by U.S. Bank's argument that the hourly rate of the lead attorney

should be reduced.  See n.63, supra.

The stakes were high and the §303(i)(2) case was litigated vigorously by both sides. U.S. Bank bears some responsibility for this.  Indeed, much of the discovery conducted, (which generated the lion's share of the attorney's fees), was initiated by U.S. Bank.  (See NMI Ex.'s 86-89, 201).[69]

For these reasons I am unwilling to reduce the lodestar based on the second step, especially since the third inquiry — whether the fees should be reduced because of the lack of success — ameliorates any concerns I have about reasonableness.

The §303(i)(1) and §303(i)(2) litigation, taken together and viewed as a whole, was ambitious but largely a failure.  For this reason, a significant reduction in the lodestar is appropriate, as discussed earlier in Part III.D.3., supra.  Considering NMI's lack of success, but also U.S. Bank's role in the scope of the litigation, I consider it fair and equitable to reduce NMI's lodestar for Category 4 by seventy-five percent (75%).[70]

Accordingly, I will reduce the §303(i)(2) lodestar, calculated after the reductions for work insufficiently related to the §303(i)(1) claim, from $1,228,775.00 to $307,193.75.

---

[69]     My perception of U.S. Bank's attorney as an aggressive advocate in the district court §303(i)(2) action is consistent with my experience in this §303(i)(1) litigation.  The U.S. Bank work product before me has been zealous, detail-oriented, high-quality, sometimes correct and sometimes incorrect, all at the same time.

[70]     While the Third Circuit has observed that the use of percentage reductions authorized in Hensley should not be done in a perfunctory fashion,  Daggett v. Kimmelman, 811 F.2d 793, 797 (3d Cir.1987); Am. Bd. of Internal Med. v. Von Muller, 540 F. App'x 103, 108 (3d Cir. 2013), courts in this district have regularly employed this tool in determining the appropriate amount of an attorney's fee award in cases in which the plaintiff succeeded on some but not all of the claims asserted.  See, e.g., Johnson v. Mold Sols. & Inspections, LLC, 2022 WL 17657671, at *3 (E.D. Pa. Dec. 13, 2022); Jordan v. Se. Pennsylvania Transp. Auth., 2013 WL 1234149, at *5 (E.D. Pa. Mar. 26, 2013); Pelzer v. City of Philadelphia, 771 F. Supp. 2d 465, 473 (E.D. Pa. 2011); Sweetzel, Inc. v. Hawk Hill Cookies, Inc., 1996 WL 434012, at *2 (E.D. Pa. July 30, 1996).

### D.  Category 5: Fees Incurred for Florida State Court Matters

In the 2022 MSJ Opinion, I held that fees incurred by Plaintiffs in opposition to U.S. Bank's sale motion were sufficiently related to and compensable in this §303(i)(1) action.  I reasoned that U.S. Bank's efforts to use its money judgment to execute in Florida on NMI's §303(i)(2) claim was equivalent to a petitioning creditor's efforts to set off the debt owed by the putative debtor against the putative debtor's §303(i) claim.  I then cited and applied case law holding that the attorney's fees incurred by the §303(i)(1) plaintiff in opposing such set off efforts is compensable under §303(i).  <u>Nat'l Med. Imaging</u>, 644 B.R. at 125–26.

Three (3) law firms seek fees and costs under Category 5, pertaining to the services provided in connection with the litigation between NMI and U.S. Bank in the Florida state courts, predominantly relating to U.S. Bank's attempt to execute against NMI's §303(i)(2) claim based on its Pennsylvania money judgment against NMI that U.S. Bank transferred to Florida.  The firms request a combined total of approximately $70,000.00. The respective requests are:

|  |  |
|---|---|
| KCR | $12,503.50 in fees; |
| Dilworth | $8,950.75 in fees; |
| GJB | $139,952.00 in fees |

(<u>See</u> NMI Ex. 162A).

The parties have already agreed the GJB portion of the request shall be allowed in the amount of $50,000.00.[71]

As for the two (2) other firms, U.S. Bank argues that only GJB should charge for the Florida State Court Matters.  The other firms needed only to "receive a report on status at

---

[71]      U.S. Bank agreed to this at trial, but reserved its rights to challenge the allowance of any amount under §303(i)(1) for the fees incurred in the Florida litigation.  (U.S. Bank Post-Trial Mem. at 9; N.T. 2, at 8; N.T. 3, at 116).

appropriate intervals" and no Category 5 fees should be allowed to NMI based on their billings. (U.S. Bank Post-Trial Mem. at 58, 79).

KCR, as lead counsel in the §303(i)(2) case, had ample reason to stay abreast of the litigation in the Florida state courts, litigation which had the potential of extinguishing the §303(i)(2) claim and, subsequently, the §303(i)(1) claim. Dilworth, as bankruptcy counsel in the 2020 Bankruptcy Cases, similarly was obliged to monitor the events in Florida after the bankruptcy was filed regarding NMI's only valuable assets.[72] Therefore, I reject U.S. Bank's suggestion that none of the fees incurred by those firms are non-compensable.

In evaluating the KCR fees, I am influenced by KCR's billing prudence.

KCR billed a total of 35.1 hours in Category 5, over the roughly eighteen (18) months from July 2019 through January 2021, a relatively modest amount of time when viewed on a monthly basis. Also, most of the time (25.2 hours) was billed at an associate rate of $250.00 per hour (as opposed to KCR senior partner's rate of $850.00 per hour).

On the other hand, it is hard to understand what services KCR needed to provide other than monitoring the developments in Florida. GJB was well-versed in the history of the dispute among NMI, Rosenberg and U.S. Bank, having represented Rosenberg extensively in the Eleventh Circuit courts.[73]

Based on these circumstances, I find it appropriate to reduce the requested KCR fees to by

---

[72]   Almost all of the Dilworth time records are post-petition.

[73]   See, e.g., In re Rosenberg, 724 F. App'x 882 (11th Cir. 2018); In re Rosenberg, 779 F.3d 1254, 1257 (11th Cir. 2015); In re Rosenberg, 2012 WL 3990725 (Bankr. S.D. Fla. Sept. 11, 2012), aff'd sub nom. DVI Receivables XIV, LLC v. Rosenberg, 500 B.R. 174 (S.D. Fla. 2013), aff'd in part, vacated in part, remanded sub nom. In re Rosenberg, 779 F.3d 1254 (11th Cir. 2015).

twenty percent (20%), $2,500.70, resulting in allowance of $10,002.80.

I view the Dilworth fees, virtually all of which were incurred after the 2020 bankruptcy filings stayed the Florida litigation, differently.

There was some continuing activity in the Florida courts after the bankruptcy filing.  In fact, this resulted in an entry of an order by this court on October 20, 2022 enjoining U.S. Bank from proceeding further in the Florida litigation.[74]  To be sure, given the importance of the §303(i) assets to the chapter 11 cases, Dilworth, too, was obliged to remain well-informed regarding the Florida litigation.  But, like KCR, I have difficulty perceiving much value that Dilworth added to GJB's representation of NMI's interests in the Florida litigation.

Further, Dilworth staffed the case in a "partner-heavy fashion," its two (2) attorneys billing at $950.00-$1,000.00 and $575.00-$600.00 per hour.

For these reasons, I find it appropriate to reduce the Category 5 fees requested by NMI on account of Dilworth's services by sixty-seven percent (67%), a reduction of $5,996.50, resulting in an allowance of $2,954.50.

In the aggregate, NMI is awarded $62,957.05 on account of attorney's fees incurred in Category 5.

### E.  Category 6: Fees Incurred Regarding the Propriety of the Chapter 11 Filings

In Category 6, NMI seeks a modest $3,162.50 for attorney's fees incurred for services provided by Dilworth from May 7, 2020 through May 18, 2020, prior to the filing of the 2020

---

[74]     This is less ominous than it might first appear.  U.S. Bank made no effort to violate the automatic stay, 11 U.S.C. §362(a).  However, based on what it considered to be a difference between Eleventh Circuit and Third Circuit law regarding the scope of the automatic stay, the Florida appellate court did not stay NMI's appeal of the trial court decision that permitted U.S. Bank to execute against NMI's §303(i)(2) "chose in action."  This required action by Dilworth, but its services on this issue are captured in Category 9.

chapter 11 bankruptcy petition in June 2020.  There is no request for reimbursement of costs.

U.S. Bank did not object to this request.  Therefore, I will allow it in its entirety.


**F. Category 7: Fees Incurred to Effectuate Chapter 11 Filings**

In Category 7, NMI seeks a total of $79,847.25 for attorney's fees incurred by Dilworth

and KCR for effectuating the chapter 11 filing on June 12, 2020.

U.S. Bank's contends that NMI only needed one (1) firm, Dilworth, to effectuate the

chapter 11 filing.  Therefore in addition to reducing Dilworth's request, U.S. Bank suggests that all

of KCR's fees be denied.

<u>**Dilworth**</u>

Dilworth seeks $44,467.75 for 95.15 hours of time.  This request includes additional

services for days in May 2020 (26 & 27), the time frame otherwise captured in Category 6.  It also

includes services Dilworth provided from June 1, 2020 through July 14, 2020 (one month past the

date it filed the petition).

U.S. Bank recommended June 12, 2020 as an appropriate cut-off date for Category 7

because it's the date of the petition filing.  (<u>See</u> U.S. Bank Ex. 436 at 1-2).  Based on this

approach, U.S. Bank recommends the request should be reduced to $22,383.75 of compensable

time for 49.55 hours of work, but oddly did not include all time entries from June 12, 2020 in its

calculation.

I understand why U.S. Bank quarrels with the time frame included in Category 7.

Theoretically, the petition filing date of June 12, 2020 would seem to be an appropriate cut-off

because by that date, Dilworth "effectuated" the bankruptcy case.   However, as bankruptcy

professionals understand, there are often many tasks that must necessarily happen to accomplish a

successful filing beyond the act of the petition filing itself; those tasks occur that on the date of

filing, but also within the first few days or weeks post-petition.

In this case, I consider the following types of services were provided by Dilworth prior to the filing date and in the weeks following the filing as part of the effectuation process:  filing the bankruptcy schedules and statements, the disclosure of attorney compensation, moving for and scheduling a hearing for joint administration, retention applications, and all respective correspondence relating to same.

Accordingly, I will consider the time entries following June 12, 2020 in the Category 7 allowance, as well as those entries U.S. Bank excluded from its recommendation without explanation, as potentially compensable.  Having done so and reviewed the time entries, I find that $8,959.75 in fees represents general case administration services that are outside the compensable tasks described above.  I will deduct that sum, resulting in an allowance of $35,508.00 in attorney's fees attributable to Dilworth's services in Category 7.


**KCR**

NMI's request Category 7 request based on KCR's fees is another story.

NMI seeks $35,379.50 in fees, based on 72.80 hours of KCR services spanning from June 11, 2020 through December 2, 2021. (NMI Ex. 162, at 570-571).

Of this request, $2,000.00 (approximately) is for work provided on June 11, 2020, the day before the 2020 chapter 11 bankruptcy filings.  The balance of the work thereafter principally involved correspondence, phone calls, and hearing preparation.

I interpret these time entries as general bankruptcy support and strategy work, despite KCR not being lead bankruptcy counsel. Considering that NMI retained an elite bankruptcy firm, known for its bankruptcy expertise and for the limited, immediate purpose of effectuating the filing to obtain the benefit of the automatic stay, I do not see the need for such a substantial expenditure of

time by KCR.  It appears largely duplicative, excessive or both.

Nevertheless, in the early phase of the chapter 11 cases, KCR undoubtedly assisted Dilworth by imparting its institutional knowledge of the long history of litigation among the NMI entities, U.S. Bank, Ashland, Rosenberg and the Rosenberg Trust.  This had some value.

Thus, while I agree that KCR's request is excessive, I will not disallow it entirely.  I will disallow eighty percent (80%), $28,303.60, resulting in an allowance to KCR of $7,075.90..

The total allowance for Category 7 is $42,583.90.

### G. Category 8 and Category 9 Fees Incurred to Oppose U.S. Bank's Motion to Dismiss and Motions for Relief from the Automatic Stay

In Category 8 and Category 9, NMI seeks attorney's fees for the two (2) issues litigated on the main case docket in the 2020 chapter 11 cases that are most closely related to NMI's §303(i)(1) claim: U.S. Bank's motion to dismiss the chapter 11 cases and U.S. Bank's motions for relief from the automatic stay.  So, I will consider them together in this Part IV.G.

### 1. the motion to dismiss (Category 8)

In Category 8, three (3) NMI law firms request fees totaling $159,201.50 for their combined work opposing U.S. Bank's motion to dismiss as follows:

- Dilworth - $61,433.50  in fees for 108.10 hours;

- KCR – $53,982 in fees for 112.00 hours;

- KPC -- $43,786.00 in fees for 88.50 hours.

U.S. Bank argues that three (3) firms were just too many, even for this motion.  However, given the case dynamics, I can see why each firm played a role in NMI's response to the motion.

At first blush, one might assume Dilworth, as NMI's bankruptcy counsel, should shoulder the heaviest load in responding to the motion.  But that is not necessarily true.  I recognize that it

85

was reasonable for Dilworth to lean on the knowledge of KCR and KPC in fashioning the strongest defense possible.

Further, it is understandable that NMI's attorneys put much effort into opposing the motion to dismiss. In order to protect NMI's §303(i) claims, success in defeating the motion was essential. The issues were significant — even U.S. Bank acknowledges that its motion raised "serious issues." (U.S. Bank Post-Trial Mem. at 76).

Thus, I understand why the three (3) firms responded to the motion to dismiss with an "all hands on deck" approach. They collaborated as if they were one big firm, which was an effective strategy. They "saved the day" in convincing the court not to dismiss a bankruptcy case that had several characteristics that could easily have caused the court to dismiss the case as a bad faith filing under existing case law.

A final consideration is the quality of the work product. As the judge presiding over the matter, I found NMI's attorneys' written submissions and advocacy at the hearing held on the motion to be top-notch.

Nevertheless, I have some difficulty understanding why the billing for this matter amount to approximately $160,000.00. While all three (3) firms had a role to play in the defense against the motion to dismiss, the size of the fees billed leads me to conclude that there necessarily was some duplication of services and that the total amount billed excessive, requiring some reduction in the allowed compensation.

In exercising my discretion on the issue, I find that $100,000.00 is a reasonable sum for the services provided and I will allow that amount for the Category 8 attorney's fees.

**2.  motions for relief from the automatic stay (Category 9)**

Similarly, in Category 9, all three (3) firms request fees totaling $57,659.50 for their

combined work opposing U.S. Bank's motions for relief from stay.  Unlike the motion to dismiss,

however, this opposition was more straightforward.  U.S. Bank did not seek complete stay relief or

relief to proceed with the sale.  It sought limited relief to proceed in Florida with NMI's appeal of

the state court sale order.

U.S. Bank argues that the combined fee request is excessive because only one firm,

presumably Dilworth, could have handled the matter and even Dilworth's request of $39,357.50 in

fees for 66.00 hours of time is excessive.

I agree with U.S. Bank that the stay relief issues were far less complex than the motion to

dismiss, making it less necessary for an extensive collaboration among the law firms.  The total fee

request is excessive.  I will reduce NMI's fee request, based on the total billings of all three (3)

firms by fifty percent (50%).[75]

NMI's request for attorney's fees in Category 9 will be allowed in the amount of

$28,829.75.


**H.  Categories 10 and 11: Fees Incurred in 2020 AP and the Appeal**

For the reasons stated in Part III.D., <u>supra</u>, a ruling regarding allowance of the attorney's

incurred by NMI in connection with the 2020 AP and the appeal from the bankruptcy court's order

is deferred pending the outcome of the appeal presently before the Court of Appeals.

---

[75]     With respect to both Category 8 and Category 9, I will not allocate the fee allowance among
multiple firms.

I.  **Category 12: Fees Incurred for Administration of Chapter 11 Cases – Dilworth Fees**

In Category 12, NMI seeks $62,986.77 in attorney's fees for the services provided by Dilworth for general case administration of the chapter 11 case.  (NMI Ex. 162, at 716).  The work involved various activities that are generally necessary in representing a debtor in a chapter 11 case, such as preparing the bankruptcy schedules and statements, attending the initial debtor interview conducted by the U.S. Trustee, appearing at the meeting of creditors as required by 11 U.S.C. §341 and filing monthly operating reports.

General case administration in a chapter 11 case filed in 2020, more than ten (10) years after dismissal of a prior involuntary appears far removed from the dismissal of the prior case and the reimbursement of related attorney's fees provided by 11 U.S.C. §303(i)(1).

I addressed the issue in the 2022 MSJ Opinion and held that NMI's attorney's fees for general case administration are not compensable in this §303(i)(1) action:

> [T]here is a limited "but for" causal nexus between U.S. Bank's improper attempt to execute on the (i)(2) chose in action and the Debtors' 2020 bankruptcies. To be more specific, the bankruptcy filings became the remedy of last resort once the Debtors' efforts to prevent, or at least stay, the Florida execution proceedings failed. This suffices to support the award of at least some attorney's fees incurred in connection with the bankruptcy case.
>
> The relatedness is not open-ended, however. The attorney's fees incurred in general chapter 11 case administration are mostly too attenuated to the §303(i) proceeding to be compensable. An award of attorney's fees for all of these services is not warranted. The relatedness to the § 303(i) proceeding is limited to those legal fees incurred in determining the propriety of the chapter 11 filing in the first place, effecting the filing and defending the case filing in order to maintain the automatic stay. Any additional legal work involved in advising the Debtors on case administration and seeking chapter 11 plan confirmation lack a sufficient nexus to the § 303(i) claims to warrant shifting the entire cost of the proceedings to U.S. Bank.

Nat'l Med. Imaging, 644 B.R. at 128.

I adhere to the views expressed in the 2022 MSJ Opinion.  No attorney's fees will be

allowed in Category 12.[76]

### J.  Costs

Across all the categories, NMI seeks a total of $437,972.08 in costs.

By law firm, the request breaks down as follows:

- MK and KPC - $65,696.43;

- KCR - $365,151.42;[77]

- Dilworth – $4,654.99;

- GJB - $2,469.24.

---

[76]    At trial, NMI argued that the Category 12 attorney's fees are compensable based on a "proximate cause" analysis in which  a defendant is responsible for all of the damages that are reasonably foreseeable as a result of its wrongful conduct.  NMI contends that all of the fees incurred in connection with the chapter 11 filing, including fees incurred in general case administration, are a reasonably foreseeable result of U.S. Bank's efforts to extinguish NMI's §303(i) claims through the execution effort in Florida.  (N.T. 2, at 60-61).

I appreciate the logic of NMI's argument, but I am unpersuaded.

In my view, for legal work in a collateral proceeding to be compensable under §303(i)(1), the services must relate directly to the protection or advancement of the §303(i)(1) claim.  Perhaps another way of putting it is that NMI's argument turns the proximate cause analysis into a "but for" analysis.  It eliminates the limitations placed by the word "proximate."

Also, I recognize that I allowed more general bankruptcy services in connection with MK Category 1 request.  However, those services were provided in the very involuntary bankruptcy case that was dismissed and which gave rise to the §303(i)(1) claim.  The nexus to §303(i)(1) is much greater than the general services provided in the 2020 chapter 11 case more than ten (10) years later.

[77]    (See NMI Ex. 162, at 707-13).  The KCR amount in the text above differs from the numbers on NMI Exhibit162A because I have added back, for now, the voluntary billing judgment deduction of $132,637.50 for expert witness fees in Category 4 that NMI made at trial, which, at the time, brought the request down to $232,513.92.  (N.T. 2, at 46; see also NMI Post-Trial Mem. at 11)

I made the same initial adjustment, i.e., restoring a voluntary deduction before analyzing the request, when I determined the allowable amount of the KCR Category 4 attorney's fees request. (See Part IV.C., supra).

(NMI Ex. 162A).

To start, I will subtract, at least for the time being, $360.86 in costs incurred by Dilworth in connection with the 2020 AP and the appeal.  This can be revisited after the appeal is decided.

NMI does not question the other Dilworth expenses or the GJB expenses.  They will be allowed.

NMI challenges the allowance of the following costs submitted by NMI:

- $30,000.00 in MK copying costs incurred in connection with Category 1 services in seeking dismissal of the involuntary petitions; and

- $132,637.50 in witness fees and e-discovery expenses of $119,675.92, both incurred by KCR in connection with the Category 4 §303(i)(2) litigation.

With respect to the MK copying expenses, U.S. Bank points out that the invoices with these expenses are vague, referring to the copying of "financial documents" or "miscellaneous." U.S. Bank recognizes that MK had to collect documents in preparation of the evidentiary hearing on dismissal (that never took place because of the "collateral estoppel" disposition) and that "there was a need to copy exhibits, transcripts, pleadings and documents subsequently produced in other proceedings," but finds $30,000.00 to be too large an amount to justify without more explanation.

I agree with U.S. Bank on this point and will reduce the compensable costs by fifty percent (50%), a reduction of $15,000.00.

U.S. Bank's primary complaints about the KCR request for cost reimbursement (aside from U.S. Bank's core view that nothing related to the §303(i)(2) litigation is compensable) are that none of the deposition expenses for "damages" witnesses should be allowed and that the just under $120,000.00 expended was unnecessary and, in any event, involved issues that were unrelated to the §303(i)(1) claim.

I disagree with U.S. Bank's methodology.  But I will make a substantial reduction in the allowed expenses.

Starting with U.S. Bank's "relatedness" objection, for the reasons explained in Part IV.C.1. above, I have found that the issues explored by the parties in discovery in the §303(i)(2) action were related to the issues in the §303(i)(1) action.

I also find no reason to second guess KCR's judgment in employing professional IT assistance as a reasonable means of case management tool in a case involving document heavy electronic discovery.

As a threshold matter, I will not disallow theses expense as requested by U.S. Bank.

Yet, I find it appropriate to adjust the allowable expenses downward to reflect NMI's overall lack of success under §303(i) and I will do so by the same percentage, seventy-five percent (75%) as I employed in Category 4. See Cummings v. Connell, 316 F.3d 886, 899 (9th Cir. 2003) (district court may reduce costs to reflect limited success on the merits, but costs sufficiently related to successful claims may be allowed); Field v. Haddonfield Bd. of Educ., 769 F. Supp. 1313, 1323–24 (D.N.J. 1991) (reducing expenses by identical percentage as attorney's fees because it would be "anomalous" to reduce the fee award under Hensley due to plaintiffs' limited success, yet require defendant to reimburse plaintiffs 100% of their not insignificant expenses).[78]

In making this downward adjustment (in the same manner as the attorney's fees adjustment), I begin with all the expenses incurred. I will not take into account the voluntary deductions offered by NMI. This makes sense because my cuts are deeper than those offered by

---

[78]     Other courts have made percentage reductions to costs after finding it appropriate to make a percentage reduction to the attorney's fees lodestar. See T.B. v. San Diego Unified Sch. Dist., 293 F. Supp. 3d 1177, 1205 n.11 (S.D. Cal. 2018); Rodriguez v. Barrita, Inc., 53 F. Supp. 3d 1268, 1296 (N.D. Cal. 2014); Deadwood Canyon Ranch, LLP v. Fid. Expl. & Prod. Co., 2014 WL 11531553, at *10 (D.N.D. June 26, 2014); Bates v. Dura Auto. Sys., Inc., 2011 WL 3664444, at *4 (M.D. Tenn. Aug. 19, 2011); Estes v. Meridian One Corp., 2001 WL 34134965, at *1 (E.D. Va. Aug. 10, 2001); Rural Water Sys. No. 1 v. City of Sioux Ctr., Iowa, 38 F. Supp. 2d 1057, 1067 (N.D. Iowa 1999), aff'd sub nom. Rural Water Sys. No. 1 v. City of Sioux Ctr., 202 F.3d 1035 (8th Cir. 2000).

NMI.

Accordingly, I will reduce NMI's $365,151.42 cost reimbursement request in Category 4 by seventy-five percent (75%), a reduction of $273,863.57.[79]

After all of the adjustments above are made, NMI is entitled to reimbursement of litigation costs totaling $148,747.65.[80]

### K.  NMI Is Entitled To Pre-Judgment Interest

NMI requests that the court augment the judgment by adding pre-judgment interest to its §303(i)(1) judgment calculated at the prime interest rate.  Starting with the amounts it requested in its post-trial memorandum, then employing the prime rate in existence when the involuntary petitions were dismissed (3.25%) and finally, using different start dates for running interest for different fee categories, NMI calculates that it is entitled to an additional $495,520.49.  (NMI Post-Trial Mem., Ex. C) (Adv. No. 14-250, Doc. # 218).

U.S. Bank disputes that NMI is entitled to *any* pre-judgment interest, both as a matter of

---

[79]    I acknowledge that U.S. Bank questioned the $33,336.78 in computerized research charges on the ground that it "was not likely" that the research was conducted on issues relating to the §303(i)(1) claim. (U.S. Bank Post-Trial Mem. at 71-72) (Adv. No. 14-250, Doc. # 221).

I agree that it is probable that some of that research was related to non-compensable attorney time. In a perfect world, the expenses related to non-compensable attorney time would be liquidated and I would reduce the expense request on that basis before applying the seventy-five (75%) reduction.  But it is not a perfect world and I have no way to estimate the amount of the reduction. Considering the relatively modest amount involved and the substantial reduction that I am imposing, I believe that the approach I have employed may not constitute "auditing perfection," but is sufficient to achieve "rough justice." Fox, 563 U.S. at 838 (2011).

[80]            $437,972.08
       (minus  $      360.86)
       (minus  $  15,000.00)
       (minus  $273,863.57)
       **Total   $148,747.65**

law and equity.  As a fallback, U.S. Bank argues that if any pre-judgment interest is assessed, the

court should use the federal judgment rate of interest as of the date of the dismissal of the

involuntary petitions (December 28, 2009) as provided in 28 U.S.C. § 1961, which was 0.41%.

For the reasons stated below, I will allow pre-judgment interest, but in an amount less than

that requested by NMI.


### 1.   applicable legal principles

U.S. Bank asserts that, as a matter of law, no pre-judgment interest should be assessed,

because pre-judgment interest should be assessed only for amounts that have been "wrongfully

withheld."  (U.S. Bank Pre-Trial Mem. at 2) (Adv. No. 14-250, Doc. # 201).  According to U.S.

Bank:

> [U]ntil this Court determines that an award of fees under 303(i)(1) is warranted
> and quantifies the amount, no fees are owed to NMI. Simply put, until entitlement
> and amount are determined, the U.S. Bank Defendants cannot be found to have
> wrongfully withheld fees and cannot be held liable for pre-judgment interest.

(Id.).

NMI responds by pointing out, correctly, that the primary precedent relied upon by U.S.

Bank, Eaves v. Cnty. of Cape May, 239 F.3d 527 (3d Cir. 2001), is inapposite because it involved

the assessment of post-judgment, not pre-judgment, interest.[81]

---

[81]      The issue in Eaves, which bears a superficial similarity to the factual posture here, was whether
post-judgment interest under 28 U.S.C. §1961 should be assessed on the date on which the district court: (a)
ruled for the plaintiff (incidentally, granting pre-judgment interest on the plaintiff's damage claim) and (b)
declared the plaintiff entitled to attorney's fees, with the amount to be determined later; or should post-
judgment interest begin to run only upon the court's quantification of the attorney's fee award, which
occurred approximately eighteen (18) months later.

In Eaves, the Court of Appeals held that because the statute authorizes interest only upon entry of a
"money judgment," post-judgment interest under 28 U.S.C. §1961 on an attorney's fee award runs from the
date that the district court actually quantifies the award.  239 F.3d at 532.

NMI contends that different legal principles than those posited by U.S. Bank apply to the court's determination whether to grant pre-judgment interest.  I agree.

The applicable legal principles, which override U.S. Bank's "wrongfully withheld" argument, can be bullet-pointed as follows:

- most fundamentally, the decision whether to award pre-judgment interest is discretionary and ultimately is based on "considerations of fairness;"[82]

- the court's discretion is guided by the principle that awarding pre-judgment interest is favored as a means to make the plaintiff whole;[83] and

- a statute's silence on the subject of pre-judgment interest does not preclude the award of pre-judgment interest.[84]

Section 303(i) is silent on the subject of pre-judgment interest.  But the Third Circuit has observed that "prejudgment interest is available with respect to judgments obtained pursuant to several statutes that are silent as to its exaction."  Skretvedt v. E.I. DuPont De Nemours, 372 F.3d 193, 206 (3d Cir. 2004).  With respect to the Bankruptcy Code, the Third Circuit has already

---

The result in Eaves was driven by a plain language reading of 28 U.S.C. §1961 and in no way addressed the propriety of pre-judgment interest on any attorney's fee award.  If anything, in dictum, the court acknowledged the possibility of enhancing an attorney's fee award by granting pre-judgment interest. Id. at 541 (suggesting that the lodestar can be adjusted to account for payment delay).

[82]    Pignataro v. Port Auth. of N.Y & N.J., 593 F.3d 265, 274 (3d Cir. 2010); see also  Anthuis v. Colt Indus. Operating Corp., 971 F.2d 999, 1009 (3d Cir. 1992).  As far back as 1939, the Supreme Court stated that "interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness."  Board of Comm'rs of Jackson Cnty. Kansas v. United States, 308 U.S. 343, 353 (1939).

[83]    Booker v. Taylor Milk Co., 64 F.3d 860, 868 (3d Cir. 1995); accord In re Hechinger Inv. Co. of Delaware, Inc., 489 F.3d 568, 580 (3d Cir. 2007).

[84]    Skretvedt v. E.I. DuPont De Nemours, 372 F.3d 193, 205-07 (3d Cir. 2004).

authorized the award of pre-judgment interest in the context of transfer avoidance.  See In re

Hechinger Inv. Co. of Delaware, Inc., 489 F.3d 568, 580 (3d Cir. 2007) (remanding case where

the bankruptcy court denied pre-judgment interest without explanation).

Given the policy underlying §303(i)(1) — "to allow an alleged debtor to recover its

reasonable costs and attorney's fees, regardless of whether there was bad faith or improper

purpose," In re McMillan, 543 B.R. 808, 817 (Bankr. N.D. Tex. 2016) — I perceive no threshold

reason why, in the exercise of the court's discretion, pre-judgment interest cannot be added to an

attorney's fee award under §303(i)(1).[85]


### 2.  factors influencing the exercise of the court's discretion

Having concluded that pre-judgment interest is potentially available to NMI in this action,

I must still determine if it is appropriate to make such an award.

There is little case law providing concrete standards for the court to apply in exercising its

discretion.  About the best that can be said was stated by the court in Securities & Exch. Comm'n

---

[85]      To the extent U.S. Bank argues that pre-judgment interest cannot be awarded because NMI's
attorney's fees claim under §303(i)(1) is unliquidated, I am unpersuaded.

The premise of the argument is questionable.  As of the dismissal of the involuntary bankruptcy
cases, the attorney's fees and costs incurred by NMI may not have been judicially determined, but that does
not mean that they were unliquidated.  Generally, a claim is liquidated if it is "readily and precisely
determinable by reference to an agreement or by a simple computation."  Richard Levin & Henry J.
Sommer, 2 Collier on Bankruptcy ¶109.06 (16th ed. 2022) ("Collier").  The attorney's fee allowance
process arguably meets this definition.

Even if one characterizes the attorney's fees claim as unliquidated, that does not preclude the
allowance of pre-judgment interest.  Putting aside case law applying the differing treatment given to
unliquidated claims under various state laws,, in the federal system, there is no blanket prohibition against
pre-judgment interest on an unliquidated claim.  Eazor Express, Inc. v. Int'l Bhd. of Teamsters, Chauffeurs,
Warehousemen & Helpers of Am., 520 F.2d 951, 973 (3d Cir. 1975); accord Wickham Contracting Co. v.
Loc. Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO, 955 F.2d 831, 835–37 (2d Cir. 1992); see
generally Poleto v. Consol. Rail Corp., 826 F.2d 1270, 1276 (3d Cir. 1987) (discussing the judicial
"movement toward the award of prejudgment interest for economic harm in all cases"), abrogated on other
grounds, Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827 (1990).

v. McDermott, 2022 WL 16533556, at *10 (E.D. Pa. Oct. 28, 2022) (citation omitted):

> In determining the propriety of prejudgment interest, courts must consider: "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) ... fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.[86]

In support of its request for pre-judgment interest, NMI emphasizes, not surprisingly, the amount of time that has passed since the dismissal of the involuntary petitions.

> The statutory prerequisites for an award of fees and costs to NMI under § 303(i)(1) have been met since December 2009 when the involuntary petitions were dismissed. NMI filed its Sanctions Motion in January 2010, seeking, *inter alia*, such costs. Yet, Defendants continually asserted that it did not owe any fees or costs, based on a belatedly abandoned totality of circumstances defense. . . . It was only on the eve of trial—nearly thirteen years after NMI first sought fees and costs under § 303(i)(1), and eight years since this adversary was filed—that Defendants withdrew their "totality of circumstances" defense and conceded liability under § 303(i)(1).

(NMI Post-Trial Mem. at 34) (footnote omitted) (Adv. No. 14-250, Doc. # 218).

NMI contends pre-judgment interest is appropriate because U.S. Bank engaged in dilatory litigation tactics and dragged out the litigation. (Id. at 35).

U.S. Bank sees it differently.

As stated earlier in Part I.E., U.S. Bank attributes the amount of litigation, the large amount of requested attorney's fees and the delay in bringing the §303(i)(1) case to a conclusion to NMI's §303(i)(2) action, perceived as ill-fated effort to manufacture an exorbitant damages claim when NMI's damages were non-existent.

U.S. Bank also burrows down further into the weeds and raises a number of other arguments why, in its view, the equities do not favor the allowance of pre-judgment interest. In its

---

[86]     Other than consideration of the policy goal of fully compensating the putative debtor, these considerations for determining whether to grant pre-judgment interest are essentially a "totality of the circumstances" test.

memorandum, it bullet-pointed fifteen (15) arguments regarding the equities of allowing pre-judgment interest.

I find it unnecessary to address all of these arguments, but a number of them warrant some comment.[87]

### *The involuntary bankruptcy case was dismissed based on novel and debatable issues concerning the standing and status of the securitization entities.*

I give no weight at all to this factor, in which U.S. Bank suggests that pre-judgment interest is inappropriate because it litigated in good faith legitimate issues regarding dismissal of the involuntary petitions.

U.S. Bank's argument runs contrary to the purpose of §303(i)(1) which provides for fee-shifting "regardless of whether there was bad faith or improper purpose," McMillan, 543 B.R. at 817.  Rather, the propriety of pre-judgment interest is grounded in the goal of making the putative debtor whole and has little, if anything, to do with the merits of the creditors' decision to file the involuntary case and press for the entry of an order for relief.[88]

---

[87]     The italicized text of U.S. Bank's arguments that follow in the text are taken from its post-trial memorandum and the characterizations therein are U.S. Bank's, not mine.

Also, I point out that my decision not to discuss every potential argument is consistent with the principle that:

> Application of any multi-factor totality of the circumstances standard is not a mechanical or mathematical exercise. Not all of the factors may be relevant in a particular case. The factors that are relevant may not be entitled to equal weight.

In re Ames, 2022 WL 2195469, at *10 (Bankr. E.D. Pa. June 17, 2022).

[88]     Similarly, U.S. Bank's separate bullet-pointed argument that the district court's finding it did not engage in conduct that would justify the award of punitive damages is irrelevant to the pre-judgment interest issue.

\*\*\*\*\*\*\*\*\*\*\*\*\*

**_U.S. Bank holds judgments (with post-judgment interest) against NMI (over $16 million and Rosenberg (over $7 million) that have not been paid._**

This is another factor that I do not find significant in evaluating the pre-judgment interest issue.

Along with other courts, I have held that petitioning creditors may not set off their underlying claim against a putative debtor's §303(i) claim.[89]  While I recognize that this issue is presently before the Court of Appeals, for present purposes, I must assume that the my ruling the 2020 AP is based on an accurate statement of the law.  As such, the applicable legal principle suggests that the competing §303(i) and creditor claims are wholly unrelated.  The putative debtor's entitlement to pre-judgment interest under §303(i)(1) should be determined without any consideration of the amount of the creditor's underlying claim.

\*\*\*\*\*\*\*\*\*\*\*\*\*

**_It was Rosenberg's election to have his involuntary case transferred to Florida, that increased the litigation expenses due to having to litigate in two jurisdictions_**

**_U.S. Bank has already paid Rosenberg, who was the actual owner and founder of NMI, over $6 million, "more than fully" compensating him and his family_**[90]

---

[89]    See  U.S. Bank v. Rosenberg, 741 F. App'x 887, 890 (3d Cir. 2018) (nonprecedential) (collecting cases); In re Diloreto, 442 B.R. 373, 377 (E.D. Pa. 2010); see also 2 Collier ¶ 303.33[8] (16th ed. 2020) ("setoff would undermine the goals of section 303(i)") (citing In re Macke Int'l Trade, Inc., 370 B.R. 236 (B.A.P. 9th Cir. 2007).

[90]    The "more than fully" phrase stems from U.S. Bank positing that Rosenberg's compensation was a windfall, i.e., that he succeeded in his litigation based on a technicality, even though "the Chief Judge of the district Court for the Southern District of Florida concluded that his case lacked merit."  (U.S. Bank Pretrial Mem. at 10) (Adv. No. 14-250, Doc. # 201) (footnote omitted).

I have grouped the two (2) arguments above together because they both involve matters extrinsic to the NMI litigation that took place in this court, the district court or the Third Circuit. I give very little weight to these factors.

Undoubtedly, the transfer of the Rosenberg involuntary to Florida slowed the litigation in this district. Due to the overlap of the issues between the Rosenberg and NMI cases, Judge Fehling determined that it was appropriate to allow the Florida courts to take the lead and stayed the dismissal and §303(i) litigation in this court for several years, believing that resolution of the Florida litigation would simplify and reduce the litigation here. As a result, the dismissal and §303(i) litigation (in particular, the §303(i)(2) litigation) did not gear up in this district until 2014 and even then, did not progress especially rapidly.

While the Rosenberg §303(i)(2) litigation in Florida may not have simplified the §303(i) litigation in the district court here (the district court having denied NMI's motion to apply collateral estoppel), the same cannot be said regarding the litigation over the dismissal of the involuntary petitions. The bankruptcy court here applied collateral estoppel (affirmed on appeal). Thus, the stay (and accompanying delay) did simplify the dismissal litigation in the bankruptcy court, thereby reducing the potential legal fees incurred by both sides.

The point here is that the delay arguably attributable to the transfer of the Rosenberg case to Florida was not without some benefit to both sides in this matter. As a result, I do not consider it an important equitable consideration.[91]

---

[91]     In a related argument, U.S. Bank states that the §303(i)(1) was stayed for many years by the bankruptcy court and that it should not be compelled to pay interest it could not proceed when it "wanted to proceed." (U.S. Bank Pretrial Mem. at 11) (Adv. No. 14-250, Doc. # 201). Presumably, U.S. Bank is referring to its  motion to lift the 2010 Stay, filed after the Florida bankruptcy court denied the motion for reconsideration in Rosenberg. But NMI consented to this motion. (Bky. No. 08-17351, Doc. #'s 212, 218). Judge Fehling's denial of the motion affected both sides equally.    For this reason, as well as the reasons as stated in the text above, I do not find this to be a significant equitable consideration in U.S. Bank's favor.

As for the compensation Rosenberg received, it is, of course, axiomatic that Rosenberg and NMI are distinct legal entities with distinct legal rights.  NMI's §303(i)(1) claim in this court stands independent of the Florida judgment in Rosenberg's favor.  Whatever §303(i) compensation Rosenberg may have received (and whatever its rationale may have been), NMI has a separate entitlement to §303(i)(1) relief that has been long delayed.  Rosenberg's success is not a meaningful factor in evaluating the propriety of pre-judgment interest on NMI's §303(i)(1) claim.

✱✱✱✱✱✱✱✱✱✱✱✱✱

**NMI did not pay all of the fees and costs that is now seeks to recover.  Here, NMI seeks interest on fees it never paid.[92]**

This is a provocative argument.  It exposes the legal fiction that statutorily authorized fee-shifting claims belong to the plaintiff, not to the plaintiff's attorney.  See Evans v. Jeff D., 475 U.S. at 730 n.19.  Even so, the economic reality may be that a law firm that takes on a fee-shifting case has the more concrete, economic interest in the attorney's fee award.[93]

Here, that tension between legal doctrine and economic reality exists.  Subtly, U.S. Bank is suggesting that this common economic relationship between attorneys and plaintiff-clients equitably cuts against allowing pre-judgment interest.

While this argument has some bare, superficial appeal, I give this very little weight in my

---

[92]     NMI or the Rosenberg Trust paid approximately $800,000.00.

[93]     The situation brings to mind the famous scene in film, "The Wizard of Oz," in which the wizard cries out, "Pay no attention to that man behind the curtain."  U.S. Bank is asking me not to look behind the curtain.

equitable determination.

While NMI itself has not actually expended most of the requested attorney's fees, the law firms it hired expended the resources and have experienced considerable delays in being paid the attorney's fees (pursuant to their agreements with NMI) that NMI and the firms rightfully expected to receive pursuant to §303(i)(1) once the involuntary petitions were dismissed.  This is a legitimate equitable consideration for the court to take into account.

Regardless whether the economic impact falls directly on NMI or on its attorneys, the fact remains that there has been a considerable delay since the dismissal of the involuntary cases in 2009, and even since the affirmance of the dismissal on appeal by the Court of Appeals in 2016. As a general principle, (but subject to other considerations discussed below), it is presumptively more equitable that the loss of the time value of the attorney's fees entitlement caused by a substantial delay be borne by the §303(i)(1) defendant, not the plaintiff.

Further, allowing for pre-judgment interest in situations such as this makes it more likely to give putative debtors access to legal representation after the filing of an involuntary petition, a favorable policy outcome.

✻✻✻✻✻✻✻✻✻✻✻✻✻

*NMI unduly complicated this matter and created tremendous additional fees by voluntarily deciding to pursue two (2) separate adversary proceedings in two (2) separate courts.*

*Much of the legal work at issue here was caused by NMI's filing of a damages claim (that it lost) seeking $31 million in compensatory damages and punitive damages; yet it wants fees for all this work and pre-judgment interest on such fees.*

*In NMI's unsuccessful §303(i)(2) case, U.S. Bank itself incurred very substantial defense fees and costs that have not been recouped.*

I have grouped these three (3) related arguments together because they are grounded in U.S. Bank's core argument — that NMI's §303(i)(1) fee request, not only was delayed a resolution, but also was increased exponentially by its unfounded and losing effort to extract millions of dollars from the Defendants in the §303(i)(2) litigation in the district court.  It is U.S. Bank's strongest argument.[94]  The strength of the argument, though, is tempered somewhat by my prior observation that some of the delay is attributable to the Defendants' possibly tacit acceptance of the slow pace of the litigation and a tactical decision that they had little reason to resolve the §303(i)(1) claim independently of the §303(i)(2) litigation.

In the end, though, I agree with U.S. Bank that the unsuccessful §303(i)(2) litigation should not result in an undue increase in its overall §303(i)(1) liability.  To some degree, the unsuccessful §303(i)(2) litigation affects my analysis of the equities regarding the allowance of pre-judgment interest.

### 3.   the allowance of pre-judgment interest

In resolving this issue, I have considered the two (2) main competing equitable considerations: the long delay in resolving NMI's §303(i) claim and its contributory role for that delay in pressing its unsuccessful §303(i)(2) claim.

My conclusion is that pre-judgment interest is appropriate, but, in the interest of fairness, it should be circumscribed.

As a result, I will allow pre-judgment interest, but only on the amounts allowed in Categories 1 and 2. The interest will run from December 28, 2009, the date that this court

---

[94]    Ashland joins in this argument.  (See Ashland Post-Trial Mem. at 30-31) (Adv. No. 14-250, Doc. # 220).

dismissed the involuntary petitions, i.e., the date that NMI became entitled to attorney's fees

under §303(i)(1) and its entitlement ripened.  See  McDermott, 2022 WL 16533556, at *10 (court

has equitable discretion to determine the period of time on which the interest will be calculated).[95]


### 4.  the interest rate

The last pre-judgment interest issue debated by the parties is the proper rate of interest to

be applied.

As stated earlier, NMI requests that the court employ the prime rate in existence when the

involuntary petitions were dismissed (3.25%) while U.S. Bank asks the court to use the federal

judgment rate of interest as of the date of the dismissal of the involuntary petitions, as provided in

28 U.S.C. § 1961, which was 0.41%.

The rate of  interest in assessing pre-judgment interest committed to the court's discretion.

Sun Ship, Inc. v. Matson Navigation Co., 785 F.2d 59, 63 (3d Cir. 1986); see also McDermott,

2022 WL 16533556, at *10; see also S.E.C. v. Teo, 746 F.3d 90, 110 (3d Cir. 2014) (affirming

district court's "choice" in setting the pre-judgment interest rate).

Considering the "make-whole" purpose of pre-judgment interest, I find that NMI has the

better argument here.  Thus, I will follow a number of courts that have assessed pre-judgment

interest using the prime rate of interest.[96]

---

[95]     There are numerous cases stating that pre-judgment interest may run from the date that the claim
accrued.  See  West Virginia v. United States, 479 U.S. 305, 310 n.2 (1987); Martin v. Cooper Elec. Supply
Co., 940 F.2d 896, 910-11 & n.13 (3d Cir. 1991); Corning Inc. v. Missouri Nebraska Express, Inc., 1996
WL 224673, at *4 n.7 (E.D. Pa. Apr. 29, 1996); In re Glatstian, 215 B.R. 495, 498 (Bankr. D.N.J. 1997).
Here, that would be on the date of the dismissal of the involuntary petitions.

[96]     See Dwyer v. Unum Life Ins. Co. of Am., 548 F. Supp. 3d 468, 497-98 (E.D. Pa. 2021); Frommert
v. Becker, 216 F. Supp. 3d 309, 316 (W.D.N.Y. 2016), aff'd sub nom. Frommert v. Conkright, 913 F.3d 101
(2d Cir. 2019); In re 1031 Tax Group, 439 B.R. 84, 89-90 (Bankr. S.D.N.Y 2010); In re Patriot Seeds Inc.,

For another reason, NMI's suggested rate is quite reasonable.

The 3.25% prime rate in December 2009 was its low point.  Since then, there have been considerable periods in which the prime rate was higher.  For example, between December 2015 and December 2018, the prime rate ranged between 3.50% and 5.25% and since March 2022 to the December 2022 the prime rate increased from 3.50% to 7.50%.  See https://fred.stlouisfed.org/series/PRIME (accessed February 10, 2023).

Calculating pre-judgment interest at a flat 3.25% for the entire time period (rather than the occasionally higher rates) is another mechanism that accounts for NMI's partial role in the delay in the §303(i)(1) litigation and helps achieve a fair result.

### 5.   the calculation

In Part IV.A. and B., I determined that NMI was entitled to $765,805.75 in attorney's fees for the services provided by its attorneys in Categories 1 and 2.

On a monthly basis, the 3.25% interest is 0.83%.  Since December 28, 2009 through February 28, 2023, 158 months have passed.[97]  The net result is an adjustment upward of the Category 1 and 2 entitlement by 30%.[98]  This increases NMI's entitlement by $229,741.73.

---

2010 WL 381620, at *26 (Bankr. C.D. Ill. Jan. 20, 2010), aff'd sub nom. Rothert v. Barber, 2011 WL 1303506 (C.D. Ill. Apr. 1, 2011); In re NETtel Corp., Inc., 327 B.R. 8, 13 (Bankr. D.D.C. 2005).

[97]   Even though this decision is being entered prior to February 28, 2023, I am using that date to simplify the calculation.  In any event, it is virtually certain that the above calculation will have to be adjusted because no final judgment can be entered due to the pendency of the appeal affecting the Category 11 fees.  Nonetheless, the above calculation should be easy to adjust when the time is right.

[98]   0.0083 x 158 = 1.299.

## L.  Summary Table

Below is a table that summarizes my conclusions regarding the allowance of fees in all of

the twelve categories:

| Category | Allowed Amount |
|---|---|
| 1 | 689,093.75 |
| 2 | 76,712.00 |
| 3 | 870,166.56 |
| 4 | 307,193.75 |
| 5 | 62,957.05 |
| 6 | 3,162.00 |
| 7 | 42,288.50 |
| 8 | 100,000.00 |
| 9 | 28,829.75 |
| 10 | Deferred |
| 11 | Deferred |
| 12 | 0.00 |
| Pre-judgment interest | 229,741.73 |
| **ATTORNEY'S FEES TOTAL** | **2,410,440.49** |
| | |
| **Costs** | **148,747.65** |
| | |
| **TOTAL AMOUNT** | **2,559,188.14** |

Attached as an Appendix is a spreadsheet that provides a more detailed breakdown of the

interim calculation of NMI's entitlement described in this Opinion.

## M. Allocation of Liability Between U.S. Bank and Ashland

The bankruptcy court's discretion under 11 U.S.C. §303(i) includes the ability to allocate

liability among the petitioning creditors based on the totality of the circumstances.  In re Maple-

Whitworth, 556 F.3d 742, 746 (9th Cir.), opinion corrected sub nom, In re Maple-Whitworth, Inc.,

559 F.3d 917 (9th Cir. 2009).  The court may hold petitioning creditors jointly and severally liable,

apportion liability in relation to each creditor's conduct, or deny an award against some or all

creditors.  Id.; In re Navient Sols., LLC, 627 B.R. 581, 593-94 (Bankr. S.D.N.Y. 2021), aff'd 2022

WL 863409 (S.D.N.Y. Mar. 23, 2022); In re Anmuth Holdings LLC, 600 B.R. 168, 205 (Bankr.

E.D.N.Y. 2019); In re Forever Green Athletic Fields, Inc., 2017 WL 1753104, at *9 (Bankr. E.D.

Pa. May 3, 2017).[99]


### 1.  Ashland

As stated earlier, Ashland urges the court to allocate most the §303(i)(1) liability to U.S.

Bank.

Ashland's primary argument is that it was not involved in three (3) of the four (4) matters in

which NMI incurred attorney's fees for which it seeks payments, i.e.,  Categories 5-12, relating to

the Florida state court litigation, the filing and defense of the 2020 chapter 11 bankruptcy filings

and the 2020 AP.

I agree with Ashland that it is fair to assess the attorney's fees allowed in Categories 5-12

against U.S. Bank only.  Thus, I will reduce the calculation of the amount of joint and several

---

[99]     Ashland correctly observes that in the 2022 MSJ Opinion, I suggested, based on the wording of
§303(i)(1) as a whole, that the court's authority to apportion liability possibly applies only to awards under
§303(i)(2). Nat'l Med. Imaging, 644 B.R. at 129.  That observation was dictum and I expressly stated that it
was unnecessary to decide the issue.  Id.  Now it is time to reach the issue.

I now conclude, unqualifiedly, that the bankruptcy court has the authority to allocate liability among
§303(i)(1) defendants.

This holding is consistent with my prior rulings in which I have read treated subsections (1) and (2)
together, finding the remedies in both subsections cumulative, see Nat'l Med. Imaging, 644 B.R.at 112-15.
The holding also is consonant, by and large, with the general, broad discretion accorded bankruptcy courts
in determining the propriety and scope of relief available under §303(i).

liability by $237,280.25,[100] representing the amounts I have allowed for attorney's fees incurred in

Categories 5-12, subject to a possible further reduction after the ruling in the Third Circuit appeal

affecting Categories 10 and 11.[101]

To ensure that NMI receives its complete compensation, my order will include a separate

determination of liability against U.S. Bank of $237,280.25.

Ashland also argues that it should not be held jointly and severally liable with U.S. Bank,

for the amounts allowed for Category 4 (the §303(i)(2) litigation).  Its basic argument is that the

volume of its litigation activity in the district court case paled in comparison to U.S. Bank and

NMI.[102]  Thus, Ashland asks that its liability for Category 4 attorney's fees be reduced (by some

unstated amount)

I am unpersuaded by this argument.

Ashland, a co-defendant  acknowledges that it "rode the coattails" of U.S. Bank in the

§303(i)(2) action.  Ashland does not suggest that U.S. Bank over-litigated the matter or that

Ashland had any objection to the level of U.S. Bank litigation activity in the matter.

---

[100]
|       |            |
|-------|------------|
|       | 63,000.00  |
|       | 3,162.00   |
|       | 42,288.50  |
|       | 100,000.00 |
|       | 28,829.75  |
| Total | 237,280.25 |

[101]     The costs in these categories are relative de minimus.  I will not allocate the costs.

[102]     Ashland points to the relative volume of discovery requests as "emblematic of the bigger picture."
(Ashland Post-Trial Mem. at 23) (Adv. No. 14-250, Doc. # 220).  Ashland served only one (1) set of the
sixteen (16)written discovery, noticed no depositions, and engaged a single expert on the issue of damages.
By comparison, U.S. Bank: (a) served 107 interrogatories, 212 requests for production and fifty (50)
requests for admission; (b) noticed 22 depositions; and (c) engaged 4 experts.  (Id.)

The decisive principle here is quite simple.  Ashland accepted the benefits of allowing U.S. Bank to take the laboring oar in the §303(i)(2) action.  U.S. Bank's efforts undoubtedly contributed to the district court's entry of a judgment in Ashland's favor.  With the benefits, come the burdens.  To the extent that attorney's fees incurred by NMI in the §303(i)(2) litigation are compensable in this §303(i)(1) action, Ashland is equally responsible and should be held jointly and severally liable with U.S. Bank.[103]

Finally, Ashland argues that it should not be held jointly and severally liable for the attorney's fees attributable to Category 1.  However, Ashland was a petitioning creditor and carried its opposition to the dismissal of the involuntary petitions all the way to the Court of Appeals, even after U.S. Bank withdrew its notice of appeal.  In these circumstances, I see no basis to impose a greater liability on U.S. Bank for NMI's attorney's fees incurred in obtaining the dismissal of the involuntary petitions and the defense of the dismissal order on appeal.[104]

---

[103]    Ashland also requests that the lion's share of the fee request for trial preparation contained in NMI's supplemental filing on December 23, 2022 be allocated to U.S. Bank.  For the same reasons stated above in the text, I reject this request.

[104]    In requesting a reduction in its liability as compared to U.S. Bank, Ashland points out that it made a settlement offer of $50,000.00 in September 2017 and $150,000.00 "[p]rior to trial.  (Ashland Post-Trial Mem. at 25) (Adv. No. 14-250, Doc. # 220).  These offers were rejected without a counter-offer.  With respect to the second settlement offer, NMI rejected the offer because it was concerned about "joint tortfeasor" consequences that could affect its claim against U.S. Bank.  (N.T. 3, at 10).

At trial, I allowed the presentation of evidence regarding settlement discussions because NMI opened the door to this evidence.  As one (1) of the justifications for the scope of the litigation, NMI suggested that its litigation tactics were a response to the Defendants' aggressive litigation tactics and intransigence, at least  in refusing to promptly pay the Category 1 and 2 fees.  Consequently, I permitted the Defendants to present evidence to rebut NMI's assertions.  All parties consented.  (N.T. 3, at 6-8).

I am unpersuaded by Ashland's argument based on the rejected settlement offers.  The first offer was nominal, when compared to the scope of the Category 1 and 2 attorney's fees.  The second offer came late in the day, long after the damage had been done.

## 2. U.S. Bank

The last point made in the previous section segues into U.S. Bank's position on the respective allocation of liability in Categories 2 and 4.

U.S. Bank asserts that Ashland should be solely responsible for the Category 2 attorney's fees insofar as they were incurred in the Court of Appeals.  (N.T. 1, at 45; N.T. 3, at 149).

While the amount at stake ($36,025.00) is relatively small,[105] I agree that U.S. Bank should not be held liable for these attorney's fees.  Therefore, I will reduce the calculation of the amount of joint and several liability by $36,025.00 and, to ensure that NMI receives its complete compensation, my order will reflect that a separate judgment against Ashland should be entered for $36,025.00.  This further reduces the joint and several liability to $2,285,882.90.[106]

U.S. Bank also seeks to allocate $40,591.00 of requested attorney's fees incurred in Category 4 (§303(i)(2) case) to Ashland because those fees were incurred in response to motions filed by Ashland in that case. (See U.S. Bank Ex. 434, at 36).

I find it inappropriate, and I am unwilling, to parse the §303(i)(2) litigation filing-by-filing to ascertain whether specific matters within that case related exclusively to U.S. Bank or Ashland. The suggested approach is one (1) level too deep.  U.S. Bank and Ashland were both defendants with a common interest and achieved a common result in that case.  I have already rejected Ashland's request for an allocation in its favor in Category 4.  The same holds for U.S. Bank. To the extent that NMI is entitled to recover attorney's fees incurred in Category 4, the Defendants' liability is joint and several.

---

[105]      (See U.S. Bank Ex. 434, at 1).

[106]                   2,559,188.15
          minus  (   237,280.25)
          minus  (     36,025.00)
          **total    2,285,882.90**

## V.  CONCLUSION

This was a challenging case for the parties, their counsel and the court.  The relationship between the parties (but not their attorneys) is toxic and the record is voluminous -- as is the number of relevant legal issues raised by the parties and the number of issues committed to the discretion of the court.

In ruling in this matter, I have attempted to consider all of the arguments presented, to correctly decide the issues of law and to exercise my discretion fairly and equitably.  In doing so, I have concluded that NMI is entitled to a substantial portion, but not all, of the relief it has requested under 11 U.S.C. §303(i)(1).

Considering the long history of this litigation, I have no reason to expect that my ruling will comprehensively end the parties' dispute.  Hopefully, however, this decision will assist in materially advancing this case to its final conclusion.

**Date:  February 27, 2023**

**ERIC L. FRANK
U.S. BANKRUPTCY JUDGE**

# APPENDIX

## SUMMARY OF ALLOWANCES

| | |
|---|---|
| Category 1 | $ 689,093.75 |
| Category 2 | $ 76,712.00 |
| Category 3 | $ 870,166.56 |
| Category 4 | $ 307,193.75 |
| Category 5 | $ 62,957.05 |
| Category 6 | $ 3,162.00 |
| Category 7 | $ 42,583.90 |
| Category 8 | $ 100,000.00 |
| Category 9 | $ 28,829.75 |
| Category 10 | $ - |
| Category 11 | $ - |
| Category 12 | $ - |
| | |
| **Total Fees Allowed** | **$ 2,180,698.76** |
| **Total Costs Allowed** | **$ 148,747.66** |
| **Prejudgment Interest** | **$ 229,741.73** |
| **TOTAL ALLOWANCE** | **$ 2,559,188.15** |

Page 1 of 6

# APPENDIX

## BY CATEGORY

### Category 1

| | | |
|---|---|---:|
| **Category 1 Request** | $ | **701,093.75** |
| *reduction for motion to vacate* | $ | (9,000.00) |
| *reduction for opp to motion for recon* | $ | (3,000.00) |
| **net reductions category 1** | $ | **(12,000.00)** |
| total allowance category 1 | $ | 689,093.75 |

### Category 2

| | | |
|---|---|---:|
| **Category 2 Request** | $ | 88,462.00 |
| *reduction to MK Billing* | $ | (10,000.00) |
| *KCR motion to reassign* | $ | (1,750.00) |
| **net reductions** | $ | **(11,750.00)** |
| total allowance category 2 | $ | 76,712.00 |

### Category 3

| | | |
|---|---|---:|
| **Category 3 Request** | $ | **1,403,803.25** |
| **total request up through 9/2022** | $ | 886,926.25 |
| MK Fee Request | $ | 452,114.75 |
| KPC Fee Request | $ | 41,248.50 |
| KCR Fee Request | $ | 366,010.00 |
| Dilworth Request | $ | 27,553.00 |
| ***reductions of fees requested prior to 10/22*** | | |
| Reduction of 75% for combined MK and KPC ($ 493,363.25) | $ | (370,022.44) |
| Reductions to KCR for work up through 9/2022 | $ | (30,551.50) |
| Reductions of $9k and 3K for Cat 1/3 overlap | $ | (12,000.00) |
| Reductions of 50% Dilworth for work up through 9/2022 | $ | (13,776.50) |
| **net reductions of fees for time prior to 10/22** | $ | **(426,350.44)** |
| supplemental request - pretrial 10/2022-11/30/2022 | $ | 333,441.50 |

# APPENDIX

| | | |
|---|---|---|
| KCR Suppl Fee Request | $ | 223,495.00 |
| KPC Supp Fee Request | $ | 75,331.00 |
| Dilworth Supp Fee Request | $ | 34,615.50 |
| *reductions to pretrial 10/2022-11/30/2022* | | |
| *25% reduction for opposition to stay in DC from $26,540* | $ | (6,635.00) |
| *50% reduction in response to the proposed stipulation from $17,274.00* | $ | (8,637.00) |
| *50% reduction in response to narrow the scope of $46,089.50* | $ | (23,044.75) |
| *50% reduction for responding to USB settlement offer $12,065.00* | $ | (6,032.50) |
| *50% reductionfrom $5,892.00for responding to Ashland settlement offer* | $ | (2,946.00) |
| **supplemental request - trial work** | $ | 110,890.50 |
| *reduction of Dilworth request of $30,973 by 33%* | $ | (10,221.09) |
| **supplemental request - post trialwork** | **$** | **72,545.00** |
| *20% reduction for all three firms* | $ | (14,509.00) |
| **net all supplemental reductions** | **$** | **(72,025.34)** |
| **total allowance prior to 10/22** | **$** | **460,575.81** |
| MK and KPC (fees prior to 10/22) | $ | 123,340.81 |
| KCR (fees prior to 10/22) | $ | 323,458.50 |
| Dilworth fees prior to 10/22) | $ | 13,776.50 |
| **total combined supplemental fees** | **$** | **409,590.75** |
| pretrial allowance | $ | 261,416.16 |
| trial allowance | $ | 90,138.59 |
| *Dilworth allowance* | $ | 20,751.91 |
| post-trial allowance | $ | 58,036.00 |
| **total allowance category 3** | **$** | **870,166.56** |

| Category 4 | | |
|---|---|---|
| **Category 4 Request (KCR)** | **$** | **1,326,555.00** |
| *motion to w/d ref* | $ | (36,973.00) |
| *opp to w/d ref* | $ | (8,222.50) |
| *motion for record* | $ | (18,663.00) |
| *motion to strike* | $ | (13,581.00) |
| *opp to otion for default* | $ | (14,787.50) |

# APPENDIX

| | | |
|---|---:|---:|
| *jury waiver* | $ | (5,553.00) |
| *net KCR reductions* | $ | (97,780.00) |
| **net allowance** | **$** | **1,228,775.00** |
| *Additional 75% reduction as not reasonable* | $ | (921,581.25) |
| **total category 4 reductions** | **$** | **(1,019,361.25)** |
| **total allowance category 4 allowance** | **$** | **307,193.75** |

## Category 5

| | | |
|---|---:|---:|
| **Category 5 Request** | **$** | **161,406.25** |
| KCR Request | $ | 12,503.50 |
| Dilworth Request | $ | 8,950.75 |
| GJB Request | $ | 139,952.00 |
| 20% reduction to KCR | $ | (2,500.70) |
| 67% reduction to Dilworth | $ | (5,996.50) |
| GJB settlement reduction | $ | (89,952.00) |
| **total category 5 reductions** | **$** | **(98,449.20)** |
| **total allowance category 5** | **$** | **62,957.05** |
| *Dilworth allowance* | $ | 2,954.50 |
| *KCR allowance* | $ | 10,002.80 |
| *GJB settlement* | $ | 50,000.00 |

## Category 6

| | | |
|---|---:|---:|
| **Category 6 Request** | **$** | **3,162.00** |
| **total allowance category 6** | **$** | **3,162.00** |

## Category 7

| | | |
|---|---:|---:|
| **Category 7 Request** | **$** | **79,847.25** |
| Dilworth request | $ | 44,467.75 |
| KCR request | $ | 35,379.50 |
| *Dilworth Reduction 50% of fees for 6/13-7/2* | $ | (8,959.75) |
| *KCR R80%  Reduction* | $ | (28,303.60) |
| **total category 7 reductions** | **$** | **(37,263.35)** |

# APPENDIX

| | | |
|---|---|---|
| **total allowance category 7** | **$** | **42,583.90** |
| *Dilworth allowance* | *$* | *35,508.00* |
| *KCR allowance* | *$* | *7,075.90* |

## Catergory 8

| | | |
|---|---|---|
| **Category 8 Request** | **$** | **159,202.00** |
| Dilworth Request | $ | 61,433.50 |
| KCR Request | $ | 53,982.00 |
| KPC Request | $ | 43,786.50 |
| **total category reduction (reduce to 100k)** | **$** | **(59,202.00)** |
| **total allowance category 8** | **$** | **100,000.00** |

## Category 9

| | | |
|---|---|---|
| **Category 9 Request** | **$** | **57,659.50** |
| Dilworth Request | $ | 39,357.50 |
| KCR Request | $ | 1,870.00 |
| KPC Request | $ | 16,432.00 |
| **total category 9 reduction (50%)** | **$** | **(28,829.75)** |
| **total allowance category 9** | **$** | **28,829.75** |

## Category 12

| | | |
|---|---|---|
| **Category 12 Request** | **$** | **62,986.77** |
| **total reductions** | **$** | **(62,986.77)** |
| **total allowance category 12** | **$** | **-** |

# APPENDIX

## PREJUDGMENT INTEREST

| | |
|---|---|
| **fee allowance (cat 1 & 2)** | **$ 765,805.75** |
| **30% prejudgment interest** | **$ 229,741.73** |

## COSTS

| | |
|---|---|
| **Costs Requested** | **$ 437,972.08** |
| MK and KPC | $ 65,696.43 |
| KCR | $ 365,151.42 |
| Dilworth | $ 4,654.99 |
| GJB | $ 2,469.24 |
| *reductions* | |
| *reduction for the 2020 AP appeal* | $ (360.86) |
| *50% reduction of $30,000.00 for MK* | $ (15,000.00) |
| *75% reduction of $365,151.42 for KCR* | $ (273,863.57) |
| **total costs reductions** | **$ (289,224.43)** |
| **total costs allowance** | **$ 148,747.66** |